Page 1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                   CHARLESTON DIVISION
 3   NATHANIEL DAVID FRUSHTICK,
 4              Plaintiff,
 5        vs.              C/A NO. 1:18:CV-02891
 6   FEROEXPRESS INC. and FRANTISEK SEPESI,
 7              Defendants.
 8
 9   DEPOSITION OF:  DAVID L. DORRITY, MHRD, CDS, CDT
10   DATE:          August 29, 2019
11   TIME:          10:32 a.m.
12   LOCATION:      Offices of A. WILLIAM ROBERTS,
                    JR., AND ASSOCIATES
13                  33 Market Point Drive
                    Greenville, SC
14
15   TAKEN BY:      Counsel for BANKERS STANDARD
                                 INSURANCE COMPANY
16
     REPORTED BY:   ERIC GLAZIER, Court Reporter
17   _____
18
19
20
21
22
23
24
25      Job No. CS3502722
```

Page 2

```
 1    APPEARANCES OF COUNSEL:
 2          ATTORNEYS FOR NATHANIEL DAVID FRUSHTICK:
 3                GOLDSTEIN & HAYES
                  BY:   JONATHAN P. HAYES
 4                3060 Peachtree Road, NW
                  Suite 1000
 5                Atlanta, GA  30305
                  (888) 425-6070
 6                jph@goldsteinhayes.com
 7          ATTORNEYS FOR BANKERS STANDARD INSURANCE
            COMPANY:
 8
                  LEWIS BRISBOIS BISGAARD & SMITH
 9                BY:   SCOTT D. HURAY
                  1180 Peachtree Street, NE
10                Suite 2900
                  Atlanta, GA  30309
11                (404) 348-8585
                  scott.huray@lewisbrisbois.com
12
13          ALSO PRESENT:
14                ALAN METTS, Legal Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                      I N D E X

2

3                                      Page      Line

4

5     DAVID L. DORRITY              6          2

6     EXAMINATION                   6          21

7     BY MR. HURAY

8     SIGNATURE OF DEPONENT        204         1

9     CERTIFICATE OF REPORTER      206         1

10

11

12

13              REQUESTED INFORMATION INDEX

14

15                                     Page      Line

16    White paper regarding the     86         16

17    distracted brain

18    Study referenced in report   199         19

19

20

21

22

23

24

25

Page 4

1

2

3                      E X H I B I T S

4

5                                    Page      Line

6   DFT. EXHIBIT 1, INITIAL SAFETY    14        10

7   REPORT

8   DFT. EXHIBIT 2, SUPPLEMENTAL      15        9

9   REPORT

10  DFT. EXHIBIT 3, DRIVER LOGS       16        13

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                         - - - - -

 3              VIDEOGRAPHER:  Good morning.  We're

 4      going on the record at 10:32 on August 29th, 2019.

 5      This is Media Unit 1 of the video-recorded

 6      deposition of David L. Dorrity, taken by counsel

 7      for the defendants in the matter of Nathaniel David

 8      Frushtick, plaintiff, versus FeroExpress,

 9      Incorporated, and Frantisek Sepsei, defendants,

10      filed in the United States District Court, Northern

11      District of Georgia, Civil Action File Number

12      1:18:CV-02891.  The deposition is being held at A.

13      William Roberts, Junior, and Associates, located at

14      33 Market Point Drive, Greenville, South Carolina.

15              My name is Alan Metts from the firm

16      Veritext Legal Solutions, and I am the

17      videographer.  The court reporter is Eric Glazier

18      from the firm Veritext Legal Solutions.

19              Will counsel now please introduce

20      yourselves for the record?

21              MR. HAYES:  Jonathan Hayes for the

22      plaintiff.

23              MR. HURAY:  Scott Huray for Bankers

24      Standard.

25              VIDEOGRAPHER:  And will the court
```

1  reporter now please swear in the witness?

2                    DAVID L. DORRITY,

3  being first duly sworn, testified as follows:

4            MR. HURAY:  Okay.  This will be the

5  deposition of David Dorrity.  It's taken pursuant

6  to agreement and pursuant to notice for the use in

7  the above-styled civil action.  It's being taken

8  for cross-examination, discovery, and any other

9  purpose permitted under the Federal Rules of Civil

10 Procedure.

11           MR. HURAY:  Jonathan, if it's agreeable

12 with you, we'll reserve all objections except for

13 those going to the form of the question or the

14 responsiveness of the answer until first use is

15 sought for the deposition.

16           MR. HAYES:  That's agreeable.  We'll

17 reserve the right to read and sign.

18           MR. HURAY:  Okay.  We'll stipulate and

19 agree that Mr. Dorrity can read and sign before any

20 notary.  He's been sworn.

21                   EXAMINATION

22 BY MR. HURAY:

23      Q.   Okay.  Mr. Dorrity, name is Scott

24 Huray.  I represent Bankers Standard in this case.

25 We just met for the first time a couple minutes

1 ago.  I'm here to ask you some questions about

2 yourself and your involvement in this case as an

3 expert the plaintiffs have identified.  I am

4 gathering you've given a deposition before.

5          A.   Yes, sir.

6          Q.   Okay.  Let me just briefly review with

7 you the ground rules, although this, I'm sure, will

8 sound familiar to you, so we're on same page.

9               There's a court reporter here, taking

10 down everything we say, and even though you're on

11 video and I can see you, if you can give me an

12 out-loud answer, that will be very much

13 appreciated.  That'll allow for a clean record.

14 Let's try to avoid nodding of the head or things

15 like uh-huh or huh-huh.  I'll probably understand

16 that, particularly if it's a nod of the head, but

17 it doesn't translate very well when we get the

18 transcript.

19               If you could wait for me to finish

20 asking my question, I'd appreciate that.  I will

21 likewise give you a full and complete opportunity

22 to answer any question I ask.  Let's just try and

23 get out of each other's way and not talk over one

24 another.  I'm sure this court reporter is very

25 capable and can take down both of us talking at the

1    same time, but he'd probably prefer not to.

2          A.   I'm sure.

3          Q.   Any time you don't understand a

4    question I ask, let me know.  I'm happy to repeat

5    it or rephrase it or go about it some other way

6    until we are on the same page, okay?

7          A.   Okay.

8          Q.   I'm going to assume if you've answered

9    a question that you did in fact understand the

10   question unless you indicate otherwise.  Is that

11   fair?

12         A.   Yes.

13         Q.   All right.  We've got a fair amount of

14   material to go through today.  I don't know how

15   long it's going to take.  It's not my intention to

16   be here any longer than we have to be here.  But

17   with that in mind, if you need a break at any time

18   for any reason -- and I don't need to know the

19   reason -- just put your hand up, ask me, say

20   something, and we'll accommodate you.  Okay?

21         A.   Okay.

22         Q.   I'm going to leave that up to you for

23   the most part, although I generally try to take at

24   least a five-minute break every hour just so we're

25   not sitting here indefinitely.  The videographer

Page 9

1    indicated that there's a two-hour limit on the

2    videotape.  I don't expect we're going to be going

3    two hours straight without a break, but you tell me

4    what you need and we'll make sure we get it to you

5    with one caveat:  If we're in the middle of a

6    question or line of questioning, I'd like to finish

7    that question or line of questioning before you

8    take a break.  Okay?

9           A.    Sure.

10          Q.    You have a laptop in front of you?

11          A.    I do.

12          Q.    I assume that's allowing you access to

13   your work product and your file?

14          A.    I've put it locally here and I can put

15   it on a thumb drive if need be.  I don't have

16   access to everything I have necessarily at my

17   office, but I do have that on this resident right

18   here.

19          Q.    Okay.

20          A.    And I work primarily electronically.  I

21   did print just a couple things today, both of my

22   reports and a fresh CV.  I think you have that

23   already, but I printed it just in case the computer

24   malfunctions.

25          Q.    Understood.  Did you bring anything

1  else with you?

2         A.   I only brought some regulatory

3  resources, industry texts, just the Federal Motor

4  Carrier Safety Regulations, a copy of the

5  commercial driver's license manual, and one other

6  resource that just stays in my satchel all the

7  time.

8         Q.   What is it?

9         A.   It is the motor fleet safety

10  supervision principles and practices produced by

11  the North American Transportation Management

12  Institute.

13         Q.   Was that referenced in any of your

14  reports?

15         A.   I don't know that I referenced that as

16  one of the industry guides or not.

17              No.

18         Q.   Okay.  So can I assume it was not used

19  at all in your evaluation of this case, or was it?

20         A.   Well, it's a source that I use all the

21  time.  It's in my brain.  It's something that I

22  teach from.  I'm certified through that

23  organization and helped develop a lot of the

24  curriculums for that, and we base a lot of our

25  curriculums off of that document.  So I can't say

1   that I didn't incorporate that in some of my

2   opinions, but I didn't reference it directly.

3          Q.   Can I see it?

4          A.   Sure.

5          Q.   Can you also pull out the CDL reference

6   material?

7          A.   Yes.  Now, I have the specific state on

8   my computer, but I've just brought the South

9   Carolina addition, which is a hard copy that I

10  could have in my hand.  They would read the same.

11  This is the commercial driver's license manual.

12  But again, I have the electronic version on my

13  computer.

14         Q.   Is -- South Carolina commercial driver

15  license manual, which the version you gave me was

16  revised as of December 2010?

17         A.   Correct.

18         Q.   Does it translate across state lines or

19  is it peculiar to South Carolina?

20         A.    It translates across state lines.  If

21  you go to 383. -- I think it's 131, the Federal

22  Motor Carrier Safety Administration requires CDL

23  manuals produced no earlier than 2005 to be those

24  which the state uses for the basis for all of their

25  examination and testing.

1        Q.   Do you know which state or version Mr.

2   Sepesi had applicable to him?

3        A.   I relied upon both the Illinois and the

4   Georgia.  Illinois in that he was licensed in the

5   state of Illinois.  I don't recall right off and

6   know where he took his first examination for his

7   CDL license.  It really wouldn't matter as far as

8   the manual.  And then I looked at Georgia since

9   that's the state of the crash.

10       Q.   I guess you've answered the question I

11  was going to ask.  It wouldn't matter in terms of

12  the content of the manual?

13       A.   It would not.

14       Q.   Okay.  You do you know if this has been

15  updated at all since December of 2010?

16       A.   Yes.  I have subsequent additions, but

17  all electronically.  I just don't go to the Highway

18  Department anymore, for obvious reasons, to get a

19  hard copy.

20       Q.   Okay.  Was -- and the manual is

21  referenced in your opinions, correct?

22       A.   It is.

23       Q.   Okay.

24            All right.  You said the motor carrier

25  regulation.  You're talking about this?

1         A.    Yes.

2         Q.    Okay.  And I held up the CFR, right?

3         A.    That's correct.

4         Q.    Okay.

5         A.    49 CFR -- the sections in 49 CFR we

6    call the Federal Motor Carrier Safety Regulations.

7         Q.    Okay.  Your full name, please?

8         A.    David L. Dorrity.

9         Q.    Do you have a business address?

10        A.    2 Meeting Place, Greenville, South

11   Carolina.  I do have an address here where we're

12   at, actually, 33 Market Point, Greenville, South

13   Carolina.

14        Q.    What do you mean?

15        A.    Well, I rent here.  I rent conference

16   space, meeting space, office space, receptionists,

17   copy machine, everything that comes with a rental

18   package here.

19        Q.    So to the extent you have a business

20   address, this is it?

21        A.    The mailing address that I publish is

22   2 Meeting Place, Greenville, which happens to also

23   be my home.

24        Q.    Okay.  So it's just a nice coincidence

25   that the court reporting service that you had

Page 14

```
 1    indicated you'd prefer to use if you could when I
 2    got your fee schedule is the court reporting
 3    service that we ended up using?
 4            A.   Well, they're in the same building.
 5    That's correct.  That just makes it really
 6    convenient.
 7            Q.   Your -- just for purposes of the
 8    record, hand you what we'll attach to the
 9    deposition.
10                 (DFT. EXHIBIT 1, INITIAL SAFETY REPORT,
11    was marked for identification.)
12    BY MR. HURAY:
13            Q.   Exhibit 1 is a safety report that was
14    produced to us, dated June 24, 2019.  I believe
15    it's complete, but if you could, look through that
16    and tell me if you agree that it's a fully complete
17    copy of the initial report that you generated in
18    this case.
19            A.   Yes, sir.  The report looks to be the
20    one that I produced.
21            Q.   Okay.
22            A.   In addition to two attached exhibits
23    which included my CV and Federal Rule 26 case list.
24    I'm not sure if I see that in here.
25            Q.   You don't.
```

Page 15

1          A.   Okay.  So that would have to be part --

2     that is actually incorporated as part of the

3     report.

4          Q.   All right.  I saw that it was

5     referenced.  Candidly, I don't know if it was

6     actually included, but I'm going to address that

7     right now, and there are no issues, from my

8     standpoint anyway.

9               (DFT. EXHIBIT 2, SUPPLEMENTAL REPORT,

10    was marked for identification.)

11    BY MR. HURAY:

12         Q.   Exhibit 2 is your supplemental report,

13    which I got two days ago.  It's dated August 27th,

14    2019, correct?

15         A.   Yes, sir.

16         Q.   You'll see attached to that report

17    there's an Exhibit A, which is your resume, and

18    Exhibit B, which is your deposition and trial

19    testimony list?

20         A.   Correct.

21         Q.   So even though it's referenced in both,

22    just from what I got, I don't know that A and B

23    were in the original report as it was presented to

24    me.  I don't care as long as I've got a copy of it.

25    All right?

Page 16

1        A.    Okay.

2        Q.    So you agree that's a full and complete

3   copy of your supplemental report?

4        A.    Yes, sir.

5        Q.    Have you generated any other reports in

6   conjunction with your work on this case?

7        A.    No.

8        Q.    Okay.  Let me just hand you, just so we

9   can complete the identification of the exhibits --

10  I'm going to use Exhibit 3, which is a copy of

11  driver logs that were produced by Mr. Sepesi's

12  counsel.

13            (DFT. EXHIBIT 3, DRIVER LOGS, was

14  marked for identification.)

15  BY MR. HURAY:

16        Q.    And I believe those were part of the

17  materials that you reviewed in coming up with some

18  of your opinions.  Is that correct?

19        A.    That is correct.

20        Q.    Do you recall seeing any other driver

21  logs beyond what we've marked as Exhibit 3, this

22  one page?

23        A.    No.

24        Q.    Okay.

25            All right.  Do you have any handwritten

Page 17

```
 1    notes or typewritten notes that did not make it
 2    into your original or supplemental report?
 3          A.    Bear with me one second.  Let me just
 4    see what -- I'm looking at the Exhibit 1 here to
 5    see what -- I do not see an Exhibit 1.  And
 6    obviously I have no way of knowing what has been
 7    provided to you.
 8               Oh, I see.  They're out of order.  I
 9    was looking for Mr. Sepesi's notes that I took from
10    his deposition.  I don't see any other notes that I
11    have in my file currently that are not part of
12    Exhibit 1, but let me do one more review here.
13          Q.    Just for clarity, when you were
14    referencing Mr. Sepesi's notes, you're talking
15    about the personal deposition digest that you did
16    and typed up, identifying what you felt were
17    pertinent aspects of his deposition testimony?
18          A.    Correct.
19          Q.    Okay.
20          A.    No, there are no other notes other
21    than I do have several things in my file that
22    involve things like maps and when I was doing my
23    analysis of his hours-of-service issues.  And I do
24    have some slides that incorporate some of those
25    maps and distances and timelines, so to speak.
```

1      Q.   Are they not part of your supplemental

2  report?

3      A.   They are, but I also have them

4  separately.

5      Q.   Okay.  I'm just interested in making

6  sure that I have an understanding as to a full

7  accounting of what is reflected in your file.  If

8  it's in the report and you've got it separately,

9  that's fine, but if you have other materials that

10  you would consider to be part of your file that are

11  not in the report or not referenced in the report,

12  that's what I'm interested in knowing about.

13      A.   Okay.  And I see some research that I

14  did, the motor carrier from the FMCSA, and it is in

15  here as well.  So I don't see anything else.

16      Q.   Okay.  The Exhibit A to Exhibit 2,

17  which is the supplemental report?

18      A.   Yes, sir.

19      Q.   There's a copy of your resume and

20  there's a date of July 2019 in the top left corner?

21      A.   Yes, sir.

22      Q.   We're not that far removed from

23  July 2019.  To your knowledge, is what's attached

24  as Exhibit A a true, accurate, and up-to-speed copy

25  of your resume?

Page 19

1          A.   It is.  I think I've had one continuing

2    education course in August.  I know I have.  Other

3    than that -- and I don't try to update this but

4    about every year, maybe every year and a half, or

5    if I have new certifications or something like

6    that, I update it.

7          Q.   Okay.  How about communication with Mr.

8    Hayes or his office?  Is there any written

9    communication that was generated that had you have

10   in your file?  Letters, emails regarding your

11   involvement in this case?

12         A.   I do have some emails in my file.

13   There may be some that I've had that have not been

14   copied my file.

15         Q.   Do you know if those emails were

16   produced as part of your identification?

17         A.   I don't know.

18              MR. HURAY:  Do you know?

19              MR. HAYES:  Any emails or scheduling

20   and the information provided, nothing related to

21   his opinions.

22              MR. HURAY:  Okay.  Then I don't need to

23   see those.

24   BY MR. HURAY:

25         Q.   Just here's the information-type stuff

Page 20

1   or, hey, they want to take your deposition, that

2   type of thing?

3           A.    That's correct.

4           Q.    Okay.

5           A.    Nothing that I relied upon to formulate

6   my opinions.

7           Q.    Okay.  And did anyone assist you in

8   generating either your original report or your

9   supplemental report?

10          A.    No.  I mean, I rely upon a small staff

11  of two folks, one full time and one part time, that

12  help me in organizing files and things like that,

13  but I and I alone produce the report.  And the

14  first time that it was ever seen by Mr. Hayes was

15  when I sent it to him.

16          Q.    Okay.  I'm glad you've said that.  So

17  no advanced copy was drafted by anybody for you to

18  edit; instead, the reports are your work product

19  and your work product only?

20          A.    That's correct.

21          Q.    Okay.  In terms of reference materials

22  or articles or materials that you believe are

23  authoritative or part of industry standards, to the

24  extent you rely upon them, they're referenced in

25  your reports?

1          A.    I think so.  There was -- I thought

2     about that this morning, actually.  Let me look and

3     see if there is one that I reference here that is a

4     standard in our industry.

5          Q.    Let me just clarify the question.  I'm

6     not suggesting by asking the question that what

7     you've referenced in your report is in fact

8     authoritative.

9          A.    Okay.

10         Q.    But to the extent you've relied on any

11    materials in a footnote or in the body of the

12    report, they're referenced in the reports?  What

13    I'm trying to avoid is finding out that you're

14    relying on other materials that I don't know about

15    and haven't had a chance to review.

16         A.    Correct.  There is nothing else that I

17    think is essential to aid the jury or to support my

18    opinions that I haven't already referenced.

19    There's probably one additional document, and the

20    reason I mention it is because it has so many good

21    graphics that can aid the jury, is a white paper

22    that has been produced by the National Safety

23    Council some years ago that has a title something

24    similar to this:  The Distracted Brain.

25                And it is a compilation of a lot of

Page 22

1   research material that sort of draws the knot for

2   the trucking industry on how a driver's brain

3   functions when they are making a cell phone call.

4   I mean, I have that, that I could produce to you,

5   but I didn't put it down here as something I was

6   relying upon.

7        Q.   Okay.

8        A.   The research that is listed here in my

9   footnotes and so forth would be the research that

10  the National Safety Council is relying upon.

11       Q.   Okay.  And I understand you've got your

12  billing records electronically and you can send

13  those to Mr. Hayes and he can in the turn send

14  those to me?

15       A.   Yes, sir.

16       Q.   Do you have access to them right now?

17       A.   I have got a summary page right here.

18       Q.   Okay.

19       A.   I haven't generated any invoices yet.

20  I typically do that after the deposition.

21       Q.   Okay.

22       A.   But I can tell you what the hours are

23  if you --

24       Q.   Okay.  That was going to be my next

25  question.

Page 23

```
 1        A.    Sure.  If you don't mind me adding them
 2   up here.  They're not totaled on this spreadsheet.
 3             32.5 hours.  And that was before today.
 4        Q.    What did you do, if anything, in
 5   preparation for today's deposition?
 6        A.    I always go back and look at my
 7   reports.  I review the materials that I need to
 8   collect and bring to the deposition, like some of
 9   the things we've already talked about.  I read back
10   over some of the depositions to make sure that my
11   notes are on point.  Just things like that, just
12   try to get it back in my brain.  I don't --
13   obviously, this is not the only file and piece of
14   business I do.  So I have to refresh myself so I
15   can, you know, be sharp and right to the point.
16        Q.    How much time did you spend preparing
17   for today's deposition?
18        A.    Five hours in total.
19        Q.    Did you have a chance to consult with
20   Mr. Hayes or anybody from his office in preparation
21   for today's deposition?
22        A.    We chatted, I think it was either
23   yesterday or the day before, might have been the
24   day before, could have been yesterday as well, just
25   briefly about scheduling.  And he and I talked just
```

1    briefly this morning, as you know, about

2    ten-minutes.

3         Q.   Okay.  I know you talked.  What did you

4    all talk about?

5         A.   We talked about my file.  I had, you

6    know -- had I brought my file, and where I had it.

7    Of course, he learned that I had it all

8    electronically.  I did print out my reports, but I

9    see you already have them.

10        Q.   Okay.

11             All right.  Let me talk a little bit

12   about your education, employment, and training,

13   okay?

14        A.   Okay.

15        Q.   I promise you I'm not going through

16   everything that's listed on your CV, but I just

17   have a few questions.

18             The MHRD that's referenced after your

19   name I assume refers to your master's degree in

20   human resource development that you secured from

21   Clemson University in 2005?

22        A.   That's correct.

23        Q.   The CDS, which are also letters after

24   your name, I'm assuming is the certified director

25   of safety that you secured in November of 1999?

Page 25

1          A.    That is correct.

2          Q.    Okay.

3          A.    That is a certification that also is

4    connected with the university.  The university has

5    changed since the time that I first obtained mine

6    20 years ago.  It is now the University of Central

7    Florida.

8          Q.    Indiana University of Pennsylvania is

9    now at UCF?

10          A.    No, sir.  We -- NATMI, the

11    organization, is connected -- has been connected

12    all along with universities since the '40s for

13    certification.  It started out as Penn State and

14    IUP is a part of the Penn State system.  I don't

15    know where they -- it's in Indiana, Pennsylvania.

16    But over time they've migrated to Central Florida

17    University.  For an a brief time we used

18    Embry-Riddle University, which has a transportation

19    department.

20          Q.    What is NATMI?

21          A.    NATMI stands for the North American

22    Transportation Management Institute.  At one time,

23    it was known as the National Council.  It changed

24    its name.  Actually, I was part of the committee

25    making that change, but it used to be part of the

Page 26

1   American Trucking Association.  It now stands alone

2   and is loosely affiliated with the Truckload

3   Carriers Association.

4        Q.   Tell me what goes into securing

5   certification as a director of safety.  Is that a

6   classroom situation?  Is it on-the-job training?

7   Is it a two-year program, a six-month program?

8   What do you have to do to get a CDS?

9        A.   Okay.  Well, the first thing that you

10  have to do is you have to qualify by way of

11  experience and position within an organization to

12  be able to get certification.  Unfortunately, you

13  wouldn't be able to get certification because you

14  don't have the experience.  You can't prove that

15  you have the experience of managing and directing a

16  safety program for a transportation company.  This

17  could be a non-DOT or a DOT transportation company.

18       Q.   There's nothing unfortunate about that.

19       A.   Okay.

20       Q.   I have no interest in securing that

21  certification.

22       A.   Okay.  But I mean, I'm just using that

23  as an example.  So not just anybody can dive in and

24  get the certification.

25            The second thing is you have to -- or

Page 27

```
 1    when I did it, you had to present a portfolio
 2    including references and examples of your
 3    productivity regarding directing the safety
 4    function.  And this went in a notebook to NATMI
 5    proctors.  I used to proctor for NATMI, so I know
 6    the system pretty well, and also went to the
 7    university.  And it was analyzed, and then if you
 8    did qualify by way of experience, then you had to
 9    obtain the requisite education or training.
10            The training courses that were
11    required, at least two training courses, could be
12    more, were three-day courses during the time that I
13    took them.  So that would be actually six days of
14    training.  At the time I took it, you couldn't get
15    those all in one week, so you would have to go
16    around the country and find a place that you could
17    find the course that fit your schedule.
18            And then once you did that, you would
19    make application to take the examination, and then
20    you go and sit for the examination.  Examinations,
21    I think they allot four hours.  Probably takes
22    about two and a half, three hours.
23        Q.   And once you take and pass the
24    examination, you secure your certification?
25        A.   You are certified.  And do have to
```

Page 28

1   recertify.

2          Q.   How often?

3          A.   Every three years.

4          Q.   And that's indefinitely, to maintain

5   that certification?

6          A.   Unfortunately, yes, sir.  Well, I say

7   unfortunately.  I mean, it's good discipline.  Most

8   certifications do require, you know, some type of

9   treatment on an ongoing basis just to make sure

10  that you're up to date.  So I attend seminars and,

11  you know, continue to read, continue to be

12  participatory in associations that drive the safety

13  initiatives, state membered with a lot of these

14  associations, all of that is part of the

15  certification process.

16         Q.   As we sit here today, you've maintained

17  your certification since you secured it in 1999?

18         A.   Yes, sir.  I'm current.

19         Q.   Without interruption?

20         A.   As far as I know, yes, sir.

21         Q.   Has your certification ever been

22  suspended for any period of time?

23         A.   No.  There can be ethical challenges to

24  it.  I've never had any, no.

25         Q.   Did you pass the examination the first

1  time you took it?

2          A.   I did.

3          Q.   Tell me about what goes into securing

4  the certification as a certified driver trainer, a

5  CDT.

6          A.   It's a similar process to what I

7  described a second ago, except it's different

8  courses that must be taken.

9          Q.   Okay.  But similar insofar as not

10  everybody qualifies or is eligible to do it, you

11  have to have certain requisite background training

12  experience before you're allowed to sit for the

13  test?

14          A.   That is correct.  In that particular

15  certification and distinction, you would need to be

16  able to provide evidence that you have been

17  involved in the actual commercial driver training

18  business or process and give some examples of that

19  and how it's been effective and so forth.

20              A different course than the CDS, the

21  director of safety.  And -- but the examination,

22  you know, you still sit for it.  I don't remember

23  exactly the number of questions, but my memory is

24  it was probably about the same amount of questions,

25  same amount of time to complete.  And it still also

Page 30

1    requires the recertification at least every three

2    years.

3           Q.   Are you likewise current on that

4    certification?

5           A.   Yes, sir.

6           Q.   Ever been subject to suspension or

7    ethical challenge?

8           A.   No, sir.

9           Q.   Passed the examination the first time

10   you took it?

11          A.   Yes, sir.

12          Q.   Where would I find the criteria that

13   NATMI uses to determine who can sit for the

14   examination to be either a certified director of

15   safety or certified driver trainer?

16          A.   Visit our website at natmi.org.

17          Q.   Are you a member of any professional

18   affiliations that are not referenced in your CV?

19          A.   No, sir.

20          Q.   You have a section on your CV which

21   talks about public courses taught, including the

22   NATMI two-to-three-day professional development

23   course, correct?

24          A.   Yes, sir.

25          Q.   When was the last time you taught that

1   course?

2          A.    I don't think I have taught anything

3   for them since the time that I began teaching at

4   Clemson University, so it would have been right

5   about 2005.

6          Q.    Okay.  And when you were teaching that

7   course for them, do you have any recollection or

8   understanding as to how many times you taught the

9   course?

10         A.    Each of those courses I have taught

11  several times.  I know the one with the Department

12  of Transportation where I was co-teacher, I know I

13  taught that one several times.  The managing motor

14  fleet and motor fleet basics, I taught that several

15  times, and maybe as many as three or four times.

16         Q.    Okay.

17         A.    The commercial motor vehicle accident

18  investigation course, I think I only taught that

19  one once, and I think I actually co-taught that

20  with a professor up at Michigan State.  The driver

21  training course, I don't recall how many times I

22  taught that.  At least one time.

23         Q.    You had a three-year period, it looks

24  like, that you've taught a course in safety

25  training at Clemson?

Page 32

1        A.   Yes, sir.  It was, I think seven

2    semesters.

3        Q.   Safety training is an awfully broad and

4    racit (phonetic) vague description.  Tell me about

5    the class.  What did you cover?

6        A.   Yes.  Generally on my report, I pick up

7    on that just a little bit.  It involved

8    occupational safety and commercial motor vehicle

9    safety.  About 75 percent of the course dealt with

10    occupational safety, and 25 percent dealt with

11    commercial and motor vehicle safety.

12        Q.   Is there a curriculum that you

13    followed?

14        A.   I did have a text that was offered to

15    class.  I don't recall the name of the text right

16    now.  I did have to provide a syllabus.  I don't

17    think I have that anymore.

18        Q.   Okay.  And in terms of publications, I

19    only see two on your CV.  Are there any beyond the

20    two that are listed?

21        A.   No, sir.

22        Q.   So you've not published anything in

23    your field since 1998?

24        A.   Correct.  Not publicly, that's correct.

25    Most of my work as a consultant has been in the

1    development of our clients' policies and procedures

2    that were their proprietary products.

3           Q.   The list of continuing education that's

4    included in your CV, are you required to take

5    certain continuing education to keep certain

6    certifications in your industry?

7           A.   Yes, sir.

8           Q.   And who mandates that continuing

9    education, or are there multiple organizations?

10          A.   NATMI requires that.

11          Q.   And what do they require?

12          A.   I just went through this not too long

13   ago.  I don't recall exactly.  It's a point system.

14   You get so many points for, you know, attending a

15   seminar, you get so many points for webinars, you

16   know, and how many associations you're involved in,

17   whether you're teaching something.  It's a point

18   system.

19          Q.   Do they dictate subject matter?

20          A.   No.

21          Q.   Okay.  I do not want to go back to your

22   first listed course on intermodal transportation in

23   1974.

24          A.   I appreciate that.

25          Q.   But why don't we look, let's say on

Page 34

1    Page 5 of your Exhibit A, which covers a period of

2    calendar year 2012 through July of 2019.  Can you

3    look at that list and tell me whether any of those

4    course topics that you participated in for your

5    continuing education have any particular

6    application to the opinions that you've generated

7    in your original supplemental report?

8         A.   Yes, sir.  I would say, just working my

9    way from the bottom of the page, which would be the

10   last ones that I've entered because of the date of

11   this CV or resume, Managing Motor Fleet Safety

12   Programs, Motor Fleet Safety Basics.  Those all

13   have applications to my reports and opinions.

14             Hang Up on Distractions.  This was a

15   webinar by Dr. Paul Ashley who I happen to -- I

16   consider to be a colleague.  He's a professor at

17   University of South Florida.

18             Following Distance - Resolving the

19   Debate, a Smith System course.  This was an actual

20   online course that I took where I actually had to

21   take an exam, and I received a certificate for

22   that.  That would have applications.

23             Driving Distracted.  I took that course

24   online on the same day as I took the following

25   distance.  I just took a day out of my life to take

Page 35

```
 1   those.
 2              And now we're up to January of this
 3   year.  The defensive driving course regarding
 4   distracted driving, the 90-minute course I took
 5   through the National Safety Council online.  That
 6   would have direct applications to my opinions.
 7        Q.   Would it be easier if you looked to see
 8   which courses do not have applications?
 9        A.   Okay.
10        Q.   Because so far from the bottom of the
11   list we've checked every one through January --
12        A.   Okay.  Okay.  I'm sorry.  Yeah.
13        Q.   You don't need to apologize.  I'm just
14   trying to be more efficient.
15        A.   Sure.  You know, most of what I do,
16   I've got a narrow opinion cropping.  Most of what I
17   do revolves around generally the opinions that I
18   give.  So let me see if there's anything here.
19              Maybe Managing Risk, the CSA scores
20   might not necessarily have anything to do with my
21   opinions.  ELD Real World Experiences -- ELD is
22   electronic log device -- would not.  The next one
23   would.  The Lytx, or Lytx, however you'd pronounce
24   the DriveCam thing, I don't recall if that has
25   anything to do with any opinions here or not.
```

1              Let me see.  The federal workplace drug

2      testing seminar would not.  The next one, the

3      FMSCA, would not.  The 7 Stages of Distraction

4      Denial, this was a heavy-duty trucking online

5      seminar.  That would have direct application.

6              I don't have enough information to know

7      whether or not the sleep apnea training that I

8      received live by Dr. Kales from Harvard would have

9      any application.

10             The, next one would, the NSC truck

11     driver training.  The next one would, Cell Phone

12     Liability through the NSC.  The CVSA workshop would

13     not.  Trucking Litigation Trends, I don't remember

14     if that would or not.  The next one would not.

15             FMSCA compliance workshop, that would.

16     That would have some applications here,

17     particularly when we get to the log reconstruction

18     and application of the rules.

19             Now we're up to 2012.  How far do you

20     want to go?

21         Q.   Just to the top of the page.

22         A.   Okay.  CVSA would not.  NSC truck

23     driver training, the defensive driver training,

24     that would.  The next one in Charlotte, the FMCSR,

25     driver safety seminar, that would.  The next one

Page 37

1    regarding corporate liability cell phone policy,

2    that would have a bearing through the NSC.  And the

3    one on the very top would not.

4           Q.   Okay.  Generally speaking, when you

5    participate in your continuing education, whether

6    it be in person, through a webinar, or online, are

7    there course materials that are prepared and

8    provided to you?

9           A.   If I'm in person, generally there's

10   going to be some kind of outline, and from time to

11   time I may take notes that get scattered all over

12   my files.  As far as the online, most of the time

13   my experience has been you can't -- there might

14   be -- sometimes there are opportunities to download

15   the slides and sometimes there aren't.

16          Q.   Okay.

17          A.   So it really is a yes-and-no answer.

18          Q.   Okay.  But am I correct in stating that

19   to the extent any of these courses have application

20   to your opinions, none of the course reference

21   materials, to the extent that they even exist, are

22   referenced in either your original or supplemental

23   report?

24          A.   Well, I would disagree to this extent:

25   I do mention that materials that I have relied

Page 38

1   upon -- and I mentioned this on both reports in

2   addition to the federal regulations, which some of

3   these involve the federal regulations, some of

4   those seminars -- a defensive driving course for

5   professional truck drivers, if you recall on this

6   list that we went over, that I've probably taken

7   this maybe three times in the last -- since 2012,

8   anyway.  So that course is referenced.

9        Q.   Generally, but not specifically in

10  terms of specific reference materials?

11       A.   The principles that I identified, yes,

12  but specifically referencing them as a footnote,

13  no.

14       Q.   Okay.  The case list that you've

15  identified as Exhibit B in the supplemental report,

16  unless I misread your coding, you have never

17  testified at trial in federal court, is that

18  correct, in the past -- since 2015?

19       A.   Let me see.

20            There are a few cases that may not be

21  on here.  Let me just double check.

22            If -- the way I have coded this, I've

23  tried to give as much helpful information as I can.

24  If you look at that last column, it says state and

25  then fed.  That means either state court or federal

1   court.  If you'll look on Page 6 of my report, the

2   last one that you'll see that has an F -- the most

3   recent, I should say -- would be October of 2018.

4   That was in federal court.  I believe that was in

5   Florence Division in South Carolina.  And then

6   there is also -- excuse me.  That was in

7   Charleston.  That was federal court in Charleston.

8           The one in 2016, November of 2016

9   federal court, was in the Florence Division, South

10  Carolina.  The one right above it in 2016 was in

11  Shreveport, Louisiana.

12       How far back do you want to go?  I think

13  that gets me back to four years.  I mean, there

14  have been numerous other federal courts that I've

15  testified in, but just since I only keep the last

16  four years, those are the ones.

17       Q.   Right.  And I guess the reason I'm

18  asking the question is, unlike Pages 1, 2, 3, 4,

19  and 5 of Exhibit B, where you've got a final column

20  which clearly indicates whether your testimony was

21  deposition testimony, trial testimony, or in some

22  cases both, unless I'm missing it, I don't see such

23  a designation on Page 6, which is why I asked the

24  question about testifying in court, in federal

25  court.

Page 40

1        And if I wasn't clear from my original

2   question, that's want I wanted to know.  Have you

3   ever personally testified in a courtroom in a case

4   that's pending in federal court?

5        A.   That's what I just covered with you.

6   Look at Page 6, top of the page.  It says, personal

7   trial appearances.

8        Q.   Okay.  I'm sorry.  I didn't see that.

9        A.   Does that help?

10        Q.   It does.  So this is inclusive of the

11   prior list?

12        A.   Yes.

13        Q.   Okay.  I wasn't following that.  Okay.

14   Thank you.

15        A.   Yeah, I think you'll find that I've

16   probably as an expert given you more information

17   than most experts do.  I've given you the case

18   number.  You can do all the homework you want to

19   track it down and see if what I'm telling you is

20   so.

21        Q.   Okay.  We will.

22        A.   Okay.

23        Q.   But I got this two days ago, so that's

24   why I'm asking you more questions than I normally

25   would.

Page 41

1          A.    Okay.

2          Q.    Tell me, if you can answer this

3     question -- and I know that in -- your personal

4     trial appearance, Page 6 of Exhibit B, you were

5     kind enough to include -- and I agree with you --

6     more information than we normally get.

7          A.    More than you probably want.

8          Q.    The area in which you were qualified as

9     an expert.

10         A.    Yes, sir.

11         Q.    How many of those cases, in terms of

12    the areas that you were qualified as an expert in

13    those cases, overlap or mirror the areas where

14    you're offering expert testimony in this case?

15         A.    Well, let's see.  I've tried to give a

16    little bit of a narrative in sort of the last

17    little line or two lines of each of these cases

18    about what my best memory was about what

19    essentially the nucleus of my testimony was that

20    the judge allowed me to talk about.  So let's just

21    see.

22              I'll work backwards from the one --

23    I'll just call it number 42, Allen.  And that was

24    not too long ago.  This involved some lookout

25    issues with a CMV tractor-trailer similar to the

Page 42

1    one involved in this crash and safe driving

2    procedure, so there's some overlap there.

3              The one before that, I'll call it

4    number 41 and Sloan in 2019, this had no bearing

5    whatsoever.

6              The one right above it, number 40,

7    Schaeffer, in 2019 as well, this did involve cell

8    phone distraction.  So there's definitely overlap

9    there.

10             Number 39, there is no overlap.  That

11   was a load securement case.

12             And number 38, we'll call this one

13   Glover.  This does have specific overlap regarding

14   lookout, speed-and-space, following distances,

15   things like that.  A little bit of an overlap in

16   that.  In that particular case I had the benefit of

17   ECM downloads of a hard-braking event that allowed

18   me to educate the jury on more specifically

19   following distances in speed and space.  It also

20   involved hours-of-service reconstruction.

21        Q.   The ECM data was not available in this

22   case?

23        A.   It was not helpful because it was not

24   timely, and it didn't make any sense --

25        Q.   What do you mean -- sorry.  I didn't

1    mean to interrupt you.  Go ahead and finish your
2    answer.
3         A.    I'm finished.
4         Q.    What do you mean, it wasn't timely?
5         A.    If data is not downloaded immediately
6    following the crash, typically the vehicle needs to
7    be towed from the scene.  And there's right ways
8    and wrong ways to download the data, so it can get
9    corrupted as well, but if it's not downloaded
10   immediately following the crash and the vehicle is
11   towed away, typically my experience has taught me
12   that the data can be written over.  So hard-braking
13   events and things like that are likely accurate,
14   but they're not historically appropriate.
15        Q.    Okay.
16        A.    In other words, they're not helpful by
17   way of the time and date of our crash to tell us
18   anything.
19        Q.    Was any ECM data provided to you in
20   this case?
21        A.    There was something called Datamax that
22   was provided to me in this case.  I think I
23   actually saw it in one of these exhibits.  But I
24   don't really call that hard-braking evidence.  It's
25   more of an engine control giving us data about the

Page 44

1  cooling systems and other data regarding the

2  engine.

3       Q.   So that's not anything you relied upon

4  in reaching your conclusions?

5       A.   No, sir.

6       Q.   All right.  What training do you have

7  in evaluating and analyzing ECM data?

8       A.   Well, I've attended accident

9  reconstruction courses, and I have also studied the

10  various iterations of DDEC, for example, just using

11  that one as an example.  DDEC is a proprietary ECM

12  for Detroit Diesel Allison Engines, and they have

13  manuals regarding that and cohort with accident

14  reconstructionists that also look at that.  That's

15  my experience.  I've studied it and I've attended

16  courses that talk about it.

17       Q.   Are you an accident reconstructionist

18  or do you consider yourself to be an accident

19  reconstructionist?

20       A.   I don't.  I consider myself to be an

21  accident investigator, but an accident

22  reconstructionist in my view differs in several

23  ways.  And I don't have expertise to hold myself

24  out as an accident reconstructionist.

25       Q.   And you haven't reconstructed this

Page 45

1   accident?

2         A.   No, sir.

3         Q.   And you've got no certification in

4   accident reconstruction?

5         A.   No.

6         Q.   And to the extent we call -- to the

7   extent you have training in accident

8   reconstruction, that would be the courses you've

9   attended?

10        A.   Correct.

11        Q.   Are you an engineer?

12        A.   No.

13        Q.   Do you have any training in

14   biomechanical?

15        A.   No.

16        Q.   I interrupted your review of Pages 6

17   and 7.

18        A.   Okay.  So let's go to Page 6.  I don't

19   think number 37 will have any relevance to my

20   opinions in this case.

21             36, we'll call it the Zahirovic case, a

22   South Carolina case.  That will definitely have

23   some overlap specifically regarding hours of

24   service and falsification of records.

25             35, I don't think will have relevance

Page 46

1   to my opinions in this case.

2            34 will have some relevance in that

3   that particular case did deal with some driver

4   performance issues and speed-and-space issues.

5            33, a federal court case, 2016, we'll

6   call it the O'Tuel.  Number 33, O'Tuel.  That's

7   O-'-T-U-E-L.  It has relevance in that it did deal

8   with lookout, speed-and-space, following distance,

9   and also, very importantly, cell phone issue.

10           Number 32, I don't think has relevance

11  to this.  That was also a load securement case.

12           31 does have overlap.  We'll call that

13  Copeland, C-O-P-E-L-A-N-D, a Florida case.  This

14  dealt with hours of service, reconstruction,

15  various hours-of-service issues, driver fatigue,

16  and defensive driving.

17           Number 30 probably has some overlap.

18  Number 30 is Gillard, G-I-L-L-A-R-D.

19           THE WITNESS:  I'm sorry, Eric, for not

20  spelling some of these other names sooner.

21       A.   Number 29, I don't think has any

22  relevance to this case.

23       Q.   Okay.  Thank you for doing that.

24       A.   Okay.

25       Q.   We talked about your certifications.

Page 47

1    Are you licensed in any particular field or just --
2    do you just have certifications?
3         A.   No.  I mean, there is one additional
4    registration I have, but it's not a license.  I am
5    registered as a defensive driver instructor by the
6    National Safety Council, and that's a distinction
7    I've had for several decades.  It's not a
8    licensure, though, by state.
9         Q.   And that was going to be my next
10   question.  In your field of expertise is there any
11   state regulatory agency that oversees you and
12   licenses you where you have to get approved and
13   then recertified by that state agency?
14        A.   No.
15        Q.   Is that also true from a federal
16   standpoint?
17        A.   Correct.
18        Q.   Okay.  If I'm reading your CV
19   correctly, it looks like 1989 is the first time you
20   transitioned from working in or being an executive
21   for a trucking or transportation company and
22   transitioned to consulting.  Is that fair?
23        A.   Correct.  1989 was a shift in my career
24   from working directly in the trucking industry and
25   management to becoming a professional consultant

Page 48

1   and starting a consulting firm.

2        Q.   Can I assume that your work as an

3   adjunct professor at Clemson was in addition to

4   your consulting business?

5        A.   That's right.  That work ran concurrent

6   with my consulting business, and I did draw a

7   salary, albeit, it seemed like a donation, to --

8   that I probably spent sometimes two trips to

9   Clemson each week, but often it was one trip to

10  Clemson and I did the other day online with our

11  students.

12       Q.   But otherwise you've been involved with

13  three consulting companies since 1989?

14       A.   Correct.

15       Q.   All of them yours?

16       A.   All of which I had either full

17  ownership or partial ownership, yes.

18       Q.   What's the reason for changing the

19  names or changing the description of the companies?

20       A.   That's a good question.  With Carolina

21  Trucking Consultants, after three years with a

22  couple of partners who had other interests -- they

23  actually owned an insurance company, and part of

24  the reason we partnered together was to provide

25  safety consulting for their insureds, which were a

1    lot of commercial DOT-type trucking companies and

2    then other smaller fleets.  It just wasn't working

3    out.  It limited me on my ability to work with some

4    larger carriers for consulting.  So I started -- I

5    left and started Transportation Resources, Inc.

6             With Transportation Resources, Inc., we

7    started and I worked my way up to probably about

8    seven employees.  We did a number of services that

9    we couldn't do with the other company, for example,

10   doing driver log audit services, drug and alcohol

11   testing selection, hiring -- screening for a lot of

12   our clients, as well as doing policy and procedure

13   development.  And it was through that, that I

14   actually began being called by insurance companies

15   and lawyers to do forensic analysis doing the same

16   thing I did, just simply taking that skill and

17   knowledge and applying it in your world.  And

18   that's why we're here today.

19            After really just sort of reaching a

20   point in my life, I wanted to simplify things a

21   little bit.  We began to sunset all of the service

22   business with Transportation Resources, Inc., and

23   in 2016 we said goodbye to our last full time

24   trucking client, and I just simply decided to open

25   up a new company name, LLC, take a little bit of

Page 50

```
 1   advantage of a few tax advantages, and so I'm
 2   continuing to operate doing forensic analysis like
 3   I'm doing today under the banner of Dorrity Safety
 4   Consulting.
 5            Sorry for the long answer, but...
 6       Q.   That's okay.  Is what you do today and
 7   what you've done since you started Dorrity Safety
 8   Consulting all litigation consulting, or is there
 9   part of it that's not litigation?
10       A.   It is all litigation now, litigation
11   support consulting.  I am doing more.  I have a
12   little bit more time now to do some research and
13   some things that I'm working on.  Some of the
14   research is not like original research.  I do hope
15   to do some original research, but it's actually
16   being a student of the research that is out there,
17   and I'm involved in a couple of safety initiative.
18       Q.   Have you ever worked with Mr. Hayes or
19   his firm before this case?
20       A.   I think I have maybe once before.
21       Q.   Okay.
22       A.   It could be more than one time, but it
23   hasn't been a lot.  But it's been so long ago, I
24   wouldn't be able to tell you what it was that we
25   did together.
```

1          Q.   That's fine.  Do you have an

2    understanding or an appreciation in terms of how

3    your cases fall in the plaintiff category or the

4    defense category?  Does that question make sense to

5    you?

6          A.   Sure.

7          Q.   How much work you do for lawyers that

8    are representing plaintiffs versus how much work

9    you do for lawyers representing defendants maybe is

10   a better question.

11         A.   Sure.  I mean, I hear that in like

12   every deposition.

13         Q.   Right.  It's in everybody's outline.

14         A.   It probably is.  It's predominantly

15   plaintiff.  And as far as the percentage, which

16   probably your followup would be, it's going to be

17   90 percent, and maybe north of 90 percent now for

18   plaintiff, as far as all the work that I do.  As

19   far as depositions, it's even more north of 90.

20         Q.   Do you have an understanding as to why

21   that is?

22         A.   I have, I think, an understanding of

23   why I think it is.

24         Q.   All right.  You very carefully answered

25   that question, so tell me what your understanding

Page 52

1    is.

2           A.   I led you right into that one, didn't

3    I, or led myself into it.  You know, I've been

4    doing the same thing that I've been doing now for

5    50 years.  I consult in the same way that I ran

6    companies.  I don't make any apologies for being a

7    safety advocate in that.  I want to try to do

8    everything I reasonably can to make the companies

9    that I ran and all also the companies I consult for

10   as safe as they can be.

11          My experience has taught me -- and I've

12   got a lot of friends.  I'll make a lot of referrals

13   to other experts.  That's -- I'm not -- I won't

14   ever get into the naming of names.  Some experts

15   have become safety excusers in that they're looking

16   for a minimalist-type safety outlook.  I'm not that

17   person.  So you're going to know that after the

18   deposition today.  Interestingly, I get a lot of

19   business from defense lawyers like you after the

20   deposition, albeit a couple years later, that know

21   they have some problems with their client.  They

22   may not want to put me on as a testifying expert,

23   but they want me as an honest consultant.

24          And so I guess the short answer is, I

25   suppose I've set myself up as being a safety guy.

Page 53

1   But if you want to try to find somebody on the

2   opposite side to excuse safety, then you're going

3   to hire somebody different.

4          Q.   Okay.  You've got a Bachelor of Science

5   degree from the University of South Carolina,

6   Spartanburg in interdisciplinary studies, which

7   references business and psychology, correct?

8          A.   Yes, sir.

9          Q.   You're not a psychologist, correct?

10         A.   No, sir.

11         Q.   Upon securing your degree, any training

12  in psychology once you graduated from college?

13         A.   No.

14         Q.   Do you hold any degrees from any

15  university beyond your Bachelor of Science and your

16  master's in human resource development?

17         A.   No.

18         Q.   Do you advertise your services as a

19  consultant?

20         A.   No.

21         Q.   Have you ever?

22         A.   No.  I don't even Facebook.  I barely

23  text.

24         Q.   This may be an unfair question, but I'm

25  going to ask it anyway, particularly in light of a

Page 54

1    comment you made earlier about your focus.  Is

2    there a particular area or subject matter or

3    subject matters that you feel you are an expert --

4    I mean, I know it's a broad question, but I mean,

5    safety consultant can mean a lot of different

6    things.  Is there any particular area that you

7    consider yourself to be or to have particular

8    expertise?

9              MR. HAYES:  Let me object just to the

10   extent it's overly broad, but...

11        A.   Well, this will be a simple answer to

12   that, and we can drill down as much as you want,

13   but I feel like I am an expert in everything that

14   I've expressed an opinion in paper in this case.

15        Q.   Well, we can agree to disagree on that,

16   but go ahead and just --

17        A.   Well, I'm just answering your question.

18   You don't have to agree with anything I say.  There

19   are additional areas that I believe I have

20   expertise in by way of knowledge and skill and

21   training and education, but in this particular case

22   there is two particular highlights.  One is cell

23   phone distraction, and the other is

24   hours-of-service-compliant fatigue management.

25              Those are areas that I can't tell you

Page 55

1    the number of times that I've been asked to weigh

2    in on that and to analyze that.  I enjoy both of

3    those areas.  I suppose hours-of-service issue, I

4    mean, we had several decades of doing this for

5    companies and so we developed a skill set of being

6    able to do that very systemically.  The cell phone

7    issue is something really that's just -- it's

8    really just been a focal point over the last

9    decade.  So that's been one of the newest areas.

10             But driver training, management issues

11   involving motor carrier management, driver hiring,

12   all of that issue, I'm certified as a driver

13   trainer, so obviously that would be one, certified

14   director of safety, so hiring and all of the

15   supervision aspects would be another, just to give

16   a few.

17         Q.   Okay.

18         A.   I do occasionally weigh in on vehicle

19   maintenance issues, but more on the management side

20   of vehicle issues.

21         Q.   In terms of this case, you would boil

22   down -- I'm not limiting it to this, but you would

23   boil down the two main areas of expertise as cell

24   phone distraction and hours-of-service fatigue

25   management?

1          A.    And speed-and-space issues.

2          Q.    Okay.

3          A.    You know, the -- how a commercial

4    driver should approach the lookout.  We don't need

5    an expert to help the jury, tell them that

6    everybody should look out.

7          Q.    I agree with you.

8          A.    I agree with you 100 percent on that.

9    But what the jury will not know, and I need help

10   them and his Honor or her Honor know is how a

11   commercial truck brakes and the distance it takes

12   to brake differently than an ordinary automobile

13   that the jurors will drive to the court that day,

14   and how much greater distance it takes, all things

15   being equal, and how with a commercial air brake

16   system, the brakes do not apply the moment you

17   press on the pedal.

18              Those are unique features about

19   commercial air brakes, the size of the vehicle, the

20   weights of the vehicle, and so forth, that I think

21   will be instructional.  And maybe even more to that

22   would be how this is taught through a required

23   training through the CDL manual that they would

24   never have seen before.

25              So the speed-and-space management part

Page 57

1   of it is more of an education about what commercial

2   drivers are taught and the uniqueness of their

3   vehicle as compared to the ordinary automobile of

4   any juror.

5           Q.   Have you ever calculated total stopping

6   distance with a commercial motor vehicle?

7           A.   I actually have, in actually a test

8   with a truck, but they're not all the same, and

9   there are variables.

10          Q.   What are the variables that go into the

11  calculation?

12          A.   Well, the drag factors, the different

13  types of suspensions, the number of axles, weights.

14  All of those things are variables.  And I'm not

15  going to be addressing that.  That is actually

16  accident reconstruction material.

17          Q.   Have you ever testified as to

18  perception or reaction time?

19          A.   I have.

20          Q.   Do you feel you're an expert in that

21  field?

22          A.   Well, to the extent that it is

23  mentioned in the CDL manual.  I simply recite what

24  the in the CDL manual.  I don't -- I'm not going to

25  testify as a human factors expert regarding that,

1    just simply that CDL manual, the National Safety

2    Council, the Smith system, JJ Keller all mention

3    the same numbers regarding perception and reaction

4    times, in general.

5         Q.   Do you know what the formula is to

6    calculate total stopping distance of a vehicle?

7         A.   Yes, sir.

8         Q.   What is it?

9         A.   It involves several ingredients:

10   Perception, I recognize something is wrong here.

11   Reaction, how long it takes me to take -- if you've

12   got to stop -- take my foot off the accelerator and

13   put it on the brake.  The next is air brake lag.

14   That is the amount of time that it takes once a

15   signal is sent underneath the foot pedal through

16   the air system to begin braking from the rear all

17   the way to the front.  That can be up to a half

18   second.

19             The next would be the actual drag

20   factor, that is, how long the friction of the tires

21   on the pavement -- and there's a number of

22   variables there, you know, to take into

23   consideration -- takes the vehicle to come to a

24   complete stop.

25             That's the formula.  Perception,

Page 59

1    reaction, air brake lag, and then friction.

2           Q.    What about speed?

3           A.    Well, speed goes into all of that.

4           Q.    Do you know how to calculate from miles

5    per hour to feet per second?

6           A.    Velocity?  Yes, sir.  If we have a

7    known speed, we multiply it times 1.4667 to

8    determine velocity, which would be feet per second.

9           Q.    Did you do any total stopping distance

10   calculation in this case?

11          A.    No, sir.

12          Q.    It's not pertinent to your opinions?

13          A.    No, sir.

14          Q.    Okay.  Has your involvement in any of

15   the cases that you've identified in Exhibit B been

16   subject to any challenge, in federal court a

17   Daubert challenge, and in state court whatever the

18   state equivalent is, to your knowledge?

19          A.    Is your question qualified just for

20   challenges?

21          Q.    I want to know, to your knowledge,

22   whether you've ever had your involvement in a case

23   as an expert witness challenged in terms of your

24   qualifications in whole or in part to offer expert

25   testimony in a case that you've listed in Exhibit

1    B.

2         A.    Okay.   Just using what my understanding

3    of the definition of a challenge is, in that

4    somebody has filed a motion or something like that,

5    there's probably been numerous occasions that there

6    have been motions.   That seems to be the order of

7    the day this day and time.   No doubt you'll

8    probably do that.   I thought you were going to ask,

9    have they ever been successful in any exclusions.

10        Q.    Well, let's start with the first

11   question, and you've said you're sure that they

12   have had -- you have had challenges?

13        A.    Oh, yeah.

14        Q.    Do you keep a list or do you know in

15   which cases on this Exhibit B there have been

16   challenges to your involvement in a case as an

17   expert witness?

18        A.    No, sir.   I don't keep a list and I

19   wouldn't be able to remember them.

20        Q.    Okay.   Then let's address the second

21   issue that you raised that was going to be my

22   followup question.   To your knowledge, has anybody

23   that has in fact challenged either your

24   qualifications or your role in whole or in part in

25   a case as an expert witness ever been successful in

```
 1    either excluding you or limiting your opinions?
 2         A.   I'm going to take the second part of
 3    that first, if I can.  There's likely been some
 4    limitations by the time I show up to court or
 5    something like that, where if I've got eight or
 6    nine opinions, maybe one of them, the judge says
 7    maybe it's prejudicial or something like that, and
 8    they just don't want me to speak to that.  And I
 9    get it and I just go with whatever the other six or
10    seven or eight opinions are.  I don't keep track of
11    that either.
12              There's only been two -- there was an
13    exclusion of a number of -- or limits I would say,
14    not exclusions; I wasn't excluded as an expert --
15    in a case not too terribly long ago, a couple years
16    ago, where there were some limitations.  There's
17    only one exclusion of me as an expert that I know
18    of, and that was in a federal case in South
19    Carolina.  It was Machin, M-A-C-H-I-N, versus
20    Carus, C-A-R-U-S, et al.  And there's a number
21    there, Anderson Brothers and some others.  I don't
22    remember them all, of the defendants.
23         It was not an exclusion for my
24    qualifications except that I was not a judge.  His
25    Honor, in the motion -- and the reason I know this
```

Page 62

1    is because I actually obtained the manuscript of

2    the hearing so I could learn from it -- he

3    believed, like I did, that there was a duty for

4    this shipper to train their trucking company and

5    the truck drivers for the trucking company on how

6    to handle their hazardous materials when they

7    pumped it out at the destination, but yet he felt

8    like it was a matter of law, and so I was excluded

9    because of a matter of law.  And he ended up

10   addressing and I think actually gave the jury

11   instructions regarding this issue.

12         Q.   Okay.

13         A.   That's all that I know of.  That

14   doesn't mean that there's not some that I don't

15   know about.

16         Q.   You don't think you'd know if you were

17   hired in a case and somebody was successful in

18   limiting or excluding you from testifying?

19         A.   It depends how good my client is.  You

20   know how I learned about the Machin case?  In a

21   deposition.

22         Q.   Okay.

23         A.   Would this be a good time to take a

24   quick break?

25         Q.   You're in control.

Page 63

```
 1          A.   All right.  In that case, I'll vote we
 2     all take a comfort break.
 3               VIDEOGRAPHER:  We're going off the
 4     record.  This is the end of Media Unit 1.  The time
 5     is 11:52.
 6               (After a recess, proceedings were
 7     continued as follows:)
 8               VIDEOGRAPHER:  We are back on the
 9     record.  This is the beginning of Media Unit Number
10     2.  The time is 12:06.
11     BY MR. HURAY:
12          Q.   All right.  Mr. Dorrity, you charge
13     $250 for your general consulting services, correct?
14          A.   Yes, sir.
15          Q.   $400 per hour for trial, testimony, and
16     deposition appearances, correct?
17          A.   Yes, sir.
18          Q.   And you have a five-hour minimum for
19     your depositions and trial?
20          A.   Yes, sir.
21          Q.   Okay.  Before I forget -- and I'm sure
22     you won't let me forget -- I do have a check here
23     for you today for $2,000.
24          A.   Thank you.
25          Q.   I'll make sure you get that, but...
```

1        A.    I've got to earn it.

2        Q.    Well, I wasn't going to say that.  What

3   I was going to say was, if we leave and you haven't

4   been paid, I'm going to put that on you because

5   I've brought it to your attention.

6        A.    I might forget.  Just lay it out

7   somewhere.

8        Q.    I'll tell you what.  I'm going to give

9   this to -- I'm going to throw that over there by

10   the videographer.

11        A.    Okay.

12        Q.    I'm not going to make him responsible

13   for it, but when we're cleaning up, let's make sure

14   you get paid.

15        A.    Okay.

16        Q.    All right.  You were hired by Mr. Hayes

17   and his firm, correct?

18        A.    Correct.

19        Q.    Do you remember when they first

20   retained you?

21        A.    Yes, sir.  It was April of 2019, this

22   year.

23        Q.    And was that an initial telephone

24   conversation?  Was that email communication?  Do

25   you recall?

Page 65

1          A.    I don't recall specifically.

2          Q.    Okay.  Do you remember what they asked

3     you to do or what they told you about in this case?

4          A.    Well, I generally start off with just a

5     description of the crash, if it involves a crash.

6     I do a little bit of load securement and logistics

7     accident investigation.  But I ask them to describe

8     the crash, a little about the motor carrier, make

9     sure that I have no conflicts.  And that

10    occasionally happens.  And that's generally what

11    takes place in that first phone conversation.

12              And then the other might be, you know,

13    sort of a timeline.  I'm not the guy that you can

14    call and say, hey, I need a report this weekend.

15    I'm just not that guy.  I just send them the list

16    of people that I know that might could help them.

17    I need a little bit of time.  So those are the

18    things that generally go on in the first

19    conversation.

20         Q.    Have your primary contacts been with

21    Mr. Hayes?

22         A.    I probably had some conversations with

23    his paralegal.

24         Q.    Okay.

25         A.    You know, quite a few of those.

Page 66

1         Q.    Jessica?

2         A.    Yes.  But no other lawyer that I'm

3    aware of in his firm.

4         Q.    So once you cleared conflicts and

5    learned a little bit about the case, I assume at

6    that point they sent five materials for you to

7    review?

8         A.    They did.  Sent me, as I recall,

9    Dropbox links.  I don't think there was anything

10   sent by way of a USB.  That's the only two ways

11   that I'll accept material, is through some type of

12   electronic transfer or a media.

13        Q.    Okay.  And in the report in Section 2,

14   you specifically indicate that you were asked to

15   evaluate the defendant's CMV driver safety training

16   and performance as it relates to CMV regulation or

17   respected industry standards?

18        A.    Yes.

19        Q.    Okay.  And that's in fact what you did?

20        A.    Yes, sir.

21        Q.    Did you do anything beyond that?

22        A.    No.

23        Q.    Okay.  Then your second paragraph, your

24   initial tasks to evaluate the document production

25   and interrogatory responses.  And I see in the list

Page 67

1    of case materials that were provided, you list as

2    Numbers three and four the interrogatory answers in

3    the document production, correct?

4         A.    Correct.

5         Q.    Is there any particular interrogatory

6    answer that's pertinent to your analysis or

7    opinions in this case, or do you just like to get

8    the discovery and see what everybody's said?

9         A.    There's nothing that sticks out here

10   other than I did mention earlier to you about,

11   it's -- the more information I've got, the more

12   likely helpful it will be in me deciding one way or

13   the other what my opinions are going to be.  So to

14   give you an example, I've already mentioned one

15   here.  Getting any type of electronic information

16   that's meaningful to the time of the crash might

17   help me in any accident investigation about the

18   speed-and-space issues.

19             I'll give you another example.  This

20   would be from the answers and the interrogatories

21   or the production answers.  I'm always interested

22   in getting more logs than just the day of the

23   wreck.  You know, I think in this case we only

24   had -- I think it actually may have been in

25   Exhibit 3 -- your client only produced to you three

1   days' worth of --

2          Q.    Let me just be clear.   I don't

3   represent the defendants.

4          A.    Okay.

5          Q.    That's not my client.

6          A.    All right.   So the defendant driver, he

7   only produced three days of logs.   Typically what I

8   expect to see, there are always an exception to

9   every rule, but typically what I find that I

10  receive and am able to review is anywhere between

11  two weeks and a month.   And I would say 50 percent

12  of the cases, they produce six months, which is the

13  statute of limitation for retention.

14             So the reason it would be helpful to

15  receive more than the three days that we have would

16  be to see if the hours-of-service violations that I

17  detected were in fact a practice and pattern of the

18  driver in the past.   And then that would go to

19  whether or not the motor carrier defendant was

20  doing their job from a management audit enforcement

21  supervision standpoint.

22         Q.    But you didn't have the benefit of the

23  logbooks beyond the three days, correct?

24         A.    Three days is all I was provided.   So I

25  didn't have the benefit to look back further.

1          Q.   Did that handcuff you in your ability

2     to investigate and evaluate in this case and offer

3     opinions?

4          A.   No.  My opinions that I have aren't

5     predicated on having more.  Having more, I might

6     have more opinions, but they -- not having those,

7     I've not ventured out and speculated on what the

8     past might've looked like.

9          Q.   Okay.  You indicate --  and again, I'm

10    just kind of following through the report.  If you

11    want to follow along, that's fine.

12         A.   Okay.  Which one are we on now?

13         Q.   Your -- the initial report.

14         A.   Okay.

15         Q.   You were hired initially in April of

16    2019.  You generated your report on June 24th of

17    2019.  So about two months between retention and

18    final work product and the initial report, correct?

19         A.   Yes, sir.

20         Q.   All right.  And in Section 2, last

21    paragraph, you indicate that the methods and basis

22    for my opinions in this report and depositions are

23    the same as those relied upon by any other expert

24    in my field if you have similar training and

25    experience.  Did I read that correctly?

1        A.   Yes, sir.  Close.  It says, who have

2   similar training and experience.

3        Q.   Okay.  Any other expert in my field who

4   have similar training and experience?

5        A.   Yes.

6        Q.   Which is not grammatically accurate.

7   Experts who -- expert -- well, maybe it is.

8             I'm not interested in any other expert

9   in your field.  I'm interested in your methodology

10  and your process.  So explain to me generally what

11  your methodology was as you approach this case to

12  come to your conclusions.  Because you're the only

13  expert that I've been made aware of and you're the

14  only expert I'm deposing in this case on these

15  issues.  So what is your methodology?

16       A.   Okay.  I, after evaluating all of the

17  answers, evaluating the production material, then I

18  begin to look at the things that I routinely

19  would -- and these are the same things I would look

20  at if I were investigating an accident for one of

21  my past clients, which I've done, I don't know how

22  many times, countless times.  I would evaluate the

23  cell phone issue.  I would evaluate the driver's

24  hiring background information, training information

25  if provided, supervision issues, you know, whether

Page 71

```
 1   or not he had been disciplined for various things
 2   and what those things might be.
 3           Q.   Did you get any information with regard
 4   to discipline as to Mr. Sepesi?
 5           A.   No, sir.
 6           Q.   Are you aware of any discipline with
 7   regard to his driving?
 8           A.   No, sir.
 9           Q.   Are you aware of any prior or
10   subsequent accidents that he's been involved in?
11           A.   No, sir.
12           Q.   Are you aware of any citations that
13   he's issued -- that have issued to him as a result
14   of his involvement as a driver?
15           A.   No.
16           Q.   Are you aware of any times that he's
17   been written up by any regulatory agency in
18   conjunction with compliance or lack thereof with
19   the DOT regulations or the Federal Motor Carrier
20   regulations?
21           A.   No, sir.  I haven't mentioned any of
22   those in my report.
23           Q.   Okay.  And you're not aware of anything
24   that is --
25           A.   No, sir.
```

Page 72

1          Q.    -- responsive to those questions?

2          A.    No, sir.

3          Q.    All right.  Go ahead.

4          A.    Now you want me to continue?  Okay.  So

5    after reviewing that material, certain things may

6    develop in that review that appear, based on my

7    knowledge, training, and experience, to be

8    deviations from industry standards.

9               So the cell phone issue, when we were

10   able to get the cell phone record, comparing that

11   with the known time of the crash based on the CAD

12   report, then led me to the conclusion that he had

13   been on his cell phone right at the time of the

14   crash.  So that's an issue.

15              Another example -- and this is

16   incorporated in the supplemental report -- was

17   taking a look at the cell phone record and

18   comparing it with his account of his record of duty

19   status -- oftentimes we refer to it as the driver

20   log, or just log for short -- and seeing if in fact

21   his driver log was accurately represented based on

22   this independent record of his cell phone.

23              So that gives you an idea of the

24   methodology.  Now, as far as conclusions and so

25   forth, I'm basing my conclusions on industry

Page 73

1    standards that I've already listed some of, you

2    know, like the speed-and-space issue would be the

3    National Safety Council's defensive driving course,

4    you know, the cell phone distraction issue.  We

5    have, I mean, just a plethora of research, magazine

6    articles, training courses, policy and procedure

7    recommendations regarding cell phone distraction.

8    And then the hours of service of course is strictly

9    mainlining right to the Federal Motor Carrier

10   Safety Regulations.

11        Q.    Okay.  One of the things you were

12   provided was the motor vehicle accident report,

13   correct?

14        A.    Yes, sir.

15        Q.    What was significant about that

16   document, if anything?

17        A.    Well, I mean, it gives me, you know,

18   dates and times and, you know, the narrative by the

19   police officer of, you know, when he's talking

20   realtime with the actual participants or witnesses,

21   if there are any, for the officer to give his or

22   her narrative of exactly how the crash occurred.

23   That's about the extent of how it helps me.

24        Q.    There were no witnesses to this

25   accident, were there?

Page 74

1          A.   I don't recall any.

2          Q.   Have you ever spoken with Mr. Frushtick

3     to get his account of what transpired?

4          A.   No.

5          Q.   Your only understanding of what he's

6     told anyone with regard to this accident would be

7     the deposition testimony that you reviewed?

8          A.   Correct.

9          Q.   Okay.  Would that also be fair as to

10    Mr. Sepesi?  You've never spoken or interacted with

11    him personally?

12         A.   That is correct also.

13         Q.   The sole understanding of what you

14    understand his description of the accident comes

15    from his deposition testimony?

16         A.   Correct.

17         Q.   Okay.  Have you ever spoken with or

18    interacted with the investigating police officer?

19         A.   No.

20         Q.   Have you seen any dashboard video which

21    memorializes what may have transpired at the

22    accident scene on the date of loss?

23         A.   I'm not aware that exists.

24         Q.   Have you seen any body camera video

25    which may have captured any of the officer's

Page 75

1   interaction with either Mr. Sepesi or Mr. Frushtick
2   at the accident scene?
3           A.   I haven't seen that.  I don't know if
4   that exists or not.
5           Q.   Okay.  You were provided litigation
6   pleadings in this case.  What significance or
7   importance, if anything, has that had for you in
8   coming up with your opinions?
9           A.   They don't have any bearing necessarily
10  on the opinions that I put in my report.  I
11  mentioned earlier that from time to time I am
12  interested -- I'm interested in things that are
13  provided and I'm also interested sometimes on
14  things that are not provided that I know should be
15  available.
16           I haven't specifically stated that in
17  my report, but I mentioned that earlier, you know,
18  like the driver logs, you know, downloads of hard
19  braking events, and things like that, that would be
20  helpful to just understand what was going on.
21           Q.   Is it fair to say that 100 percent of
22  the opinions that you intend to offer in this case
23  at trial, if the Court allows you to do so and if
24  this case proceeds to trial, are contained within
25  your original and supplemental report?

1        A.    I think in supplementing with what I

2   just mentioned, you know, about a few of the things

3   about -- I'm always interested in, you know, we

4   don't know what we don't know, and I have to work

5   right off paper because I'm not allowed to go and

6   interview people and things like that.  You know

7   that.  So --

8        Q.    What do you mean, you're not allowed to

9   go and interview people?

10       A.    Well, it's just not appropriate.  I

11  don't know any expert that goes out -- maybe except

12  defense experts -- that go out and interview the

13  defendants.  We know that wouldn't be appropriate.

14  And oftentimes it's not appropriate for me to go

15  personally and interview a police officer.  Now,

16  maybe an accident reconstructionist would, but it's

17  just not in my area.  I don't want to appear to be

18  biased by going and talking to a police officer and

19  getting a different take than what they put down on

20  paper.  Because it's just not part of my opinion.

21       Q.    How does that -- how does that suggest

22  bias if you're going to investigate as part of the

23  accident investigation, to talk to the

24  investigating officer and ask him or her questions

25  about what they saw and heard, concluded?  What

Page 77

1  bias does that suggest?

2          A.   Well, I don't know because I don't know

3  what they might tell me, but I don't want to run

4  that risk.  And so I don't do those things.

5  Obviously, I don't pry into somebody's background,

6  even if I'm given permission to do so, to do

7  independent investigations into their background.

8  So I deal strictly with the paper documents,

9  deposition transcripts, witness, things like that,

10  documents.

11          So back to your original question on

12  the litigation answers or interrogatory production

13  answers, sometimes it's helpful to me to see about

14  things that are not provided.  That's informative

15  to me.  I haven't specifically targeted that in

16  this particular report.

17          Q.   All right.  Let me try and make this

18  more simple.

19          A.   I'm for simple.

20          Q.   You've done this a long time, right?

21          A.   Yes, sir.

22          Q.   You've been identified as an expert and

23  you've prepared two reports in which you've

24  outlined eight separate opinions that you're

25  prepared to address, should this case proceed to

1  trial?

2          A.   Yes, sir.

3          Q.   And I'm entitled to know all of the

4  opinions that you intend to offer at trial.  I'm

5  simply trying to confirm that the opinions that are

6  contained in your original and supplemental report

7  are the only opinions you intend to offer in this

8  case.  I do not want to be surprised if we try this

9  case and you're offering opinions we don't have an

10 opportunity to explore here today.

11         A.   Sure.  And I agree with you.  I don't

12 want you to be surprised.  In everything that I --

13 all of my opinions are contained in these two

14 reports, but as may be supplemented in this

15 deposition.  So you just go back and read it at the

16 end, and if there's anything that's added -- and

17 I'll be sure and delineate it.  And it won't be an

18 extra opinion.  It just might be a little more meat

19 on the bone.  Does that make sense?

20         Q.   I fully appreciate that you may explain

21 or elaborate on your opinions as we go through the

22 deposition process.

23         A.   Well, good.

24         Q.   What I don't want to find out is that

25 you've got new or different opinions that are not

Page 79

1    otherwise referenced or contained in these reports.

2         A.   No, I don't think you're going to find

3    that.

4         Q.   Okay.  You were provided with the Cobb

5    County 911 records, correct?

6         A.   Yes, sir.

7         Q.   What is the significance of the records

8    that were provided as it pertains to 911?

9         A.   I reference it only because it gives us

10   a starting point for the best information we have

11   about the actual time of the crash.

12        Q.   You're talking about the CAD report?

13        A.   Yes, sir.

14        Q.   And what's the first time that you see

15   on the CAD report that helps you determine as best

16   you can the time of the accident?

17        A.   Well, the CAD -- first of all, the

18   crash report puts the time as 10:30, and I think

19   everybody that's done this for long enough

20   understands that's really just the police officer's

21   estimate.  The Cobb County 911, often we call it

22   CAD report, has a time of 10:29 and one second.  So

23   it's a minute earlier than that.  And the

24   importance of that to me is --

25        Q.   What is a minute earlier than that?

Page 80

1          A.    It's one minute earlier than the crash

2     report time.

3          Q.    Comparing the CAD report 911 call --

4          A.    Yes, sir.

5          Q.    -- to the police officer's estimate is

6     a difference of a minute?

7          A.    Yes, sir.

8          Q.    Okay.  Go ahead.

9          A.    Okay.  And so when I take a look at

10    that and compare it with the cell phone record --

11    I'm just going look at my version of it.  It's a

12    little bit bigger.

13         Q.    Before you do that -- and you can

14    certainly go back to that -- do you have the CAD

15    report in front of you?

16         A.    Let me see if I can pull it up.

17         Q.    It's in the materials that I provided

18    to you as well.

19         A.    Okay.  I have it.

20         Q.    The time of 10:29.01, where are you

21    getting that?

22         A.    This is on Page 3 of the document that

23    I have, the incident detail report created,

24    10:29.01.

25         Q.    And what is your understanding as to

Page 81

1    who inputs that data and when it's inputted?

2         A.   That I don't know.

3         Q.   Do you see a reference in the CAD

4    report to a 911 call?

5         A.   Let's see.

6              Yes.  The -- at the very bottom of

7    the -- yes.  10:26.

8         Q.   And 30 seconds?

9         A.   And 30 seconds.  I do see that.

10        Q.   Did you ever listen to the 911 audio,

11   to the extent it exists?

12        A.   I haven't listened to one.  I don't

13   know that I had been -- I don't think I've been

14   provided that, if it exists.

15        Q.   But as part of your accident

16   investigation, you typically want to review and

17   you're generally familiar with the CAD report?

18        A.   Yes.

19        Q.   Okay.  Based on that familiarity,

20   wouldn't you agree with me that this CAD report

21   indicates that there was a 911 call placed on

22   October 24th, 2017, at 10:26 and 30 seconds?

23        A.   I agree.

24        Q.   So your interpretation of the CAD

25   report as previously articulated of 10:29.01 isn't

Page 82

1    accurate?

2        A.   What I have written down there as --

3    the way I've listed it right there as being the --

4    well, let me see exactly what I wrote here.

5             10:29.01 is still correct as to when

6    they opened the case based on that first few pages,

7    but the statement right before that, the assumed

8    crash time that occurred before 10:29, is still

9    accurate, but now we have more information, it's

10   10:26 and before.  Likely before.

11       Q.   Well, we can agree that a 911 call as

12   you interpret this CAD report, took place at 10:26

13   and 30 seconds, correct?

14       A.   I do agree with you.

15       Q.   What that doesn't tell you is when the

16   actual accident took place?

17       A.   That's correct.

18       Q.   You have no way of knowing when the

19   person who called 911 saw the wreck and how much

20   time passed between when they witnessed the wreck

21   and when they had an opportunity to call 911?

22       A.   That is correct.

23       Q.   And isn't that an important piece of

24   information that you're never going to be able to

25   have to match up all these times and compare to

Page 83

```
 1    them cell phone records?
 2              MR. HAYES:  Object to the form of the
 3    question.
 4              MR. HURAY:  What's wrong with the form?
 5              MR. HAYES:  Important information that
 6    you're never going to have, I think that's...
 7              MR. HURAY:  Okay.
 8              MR. HAYES:  Object to the form of the
 9    question.
10    BY MR. HURAY:
11         Q.   You can answer the question.
12         A.   Trying to have as precise a time as we
13    can to match up with the cell phone record is
14    important.
15         Q.   Let me try it a different way.
16         A.   Okay.
17         Q.   You don't know when the actual accident
18    took place?  You can't timestamp it?
19         A.   No, sir.  If we had an ECM would be our
20    best chance of making that determination.
21         Q.   And you similarly don't know how much
22    time passed between when the accident took place
23    and when the 911 call registered with the emergency
24    authorities?
25         A.   That also is correct.
```

1        Q.   Okay.  And are you aware of any other

2   source of information that would allow us to make a

3   more refined determination of when the accident

4   took place other than to state definitively that it

5   must have taken place at some point prior to 10:26

6   and 30 seconds, when the 911 call was placed?

7        A.   I do not have any better information.

8        Q.   Okay.  So anything else about the CAD

9   report or the 911 records that was significant to

10  you in coming up with your opinions or conclusions?

11       A.   No.  The CAD report gives me no

12  additional information that applies to my opinions.

13       Q.   Okay.  You were provided Mr. Sepesi's

14  cell phone records.  We're going to talk about

15  that.  And I understand that they are important to

16  your evaluation of this case, correct?

17       A.   Yes, sir.

18       Q.   The photographs of the vehicles at the

19  scene, tell me what importance or impact that

20  played in your evaluation of this case and coming

21  up with your expert opinions?

22       A.   The photographs are -- I didn't

23  reference them at all in my report other than it

24  was something I looked at.  They're not really

25  important to me.

Page 85

1      Q.   Okay.  You were provided with Mr.

2  Frushtick's deposition and Mr. Sepesi's deposition,

3  correct?

4      A.   Correct.

5      Q.   And then you took it upon yourself to

6  generate a separate page or pages where you

7  identified what you deem to be important or

8  significant information that you pulled from those

9  deposition transcripts, correct?

10     A.   Yes, sir.  It's really more of an

11 outline of where to go look in the deposition.  But

12 you know, there's probably a little bit of my

13 gleanings there, but it's really more of sort of an

14 outline of where to go look in the deposition.

15     Q.   Okay.

16     A.   Sometimes I get depositions that don't

17 have the benefit of word search and things like

18 that, so later on it just speeds things along for

19 me.

20     Q.   All right.  And then with regard to

21 industry reference materials, Federal Motor Carrier

22 Safety Regulations, which we can agree are

23 applicable to this case?

24     A.   Yes, sir.

25     Q.   The CDL instruction testing manuals

Page 86

1    published by Georgia and Illinois you believe is an

2    applicable industry document?

3         A.   Yes.

4         Q.   The National Safety Council training

5    regarding distracted driving, where would I access

6    that information?

7         A.   That was where I was referring to the

8    white paper.  I just don't spell it out very well

9    here, but it would be the white paper.  And that's

10   something I can certainly send to Mr. Hayes to

11   provide to you, but that was the white paper

12   regarding the distracted brain.

13        Q.   Okay.  I would like you to do that, if

14   you don't mind.

15        A.   Okay.

16             (This page contains information to be

17   supplied by counsel and/or the deponent.)

18        Q.   Is that document specifically

19   referenced in a footnote in either your original or

20   supplemental report or is it just a general

21   reference material that you believe is accepted by

22   folks your industry?

23        A.   It's a general -- it's generally

24   accepted as a reference material for our industry.

25   I do reference things that you will find in that

Page 87

```
 1   paper in here, but I don't specifically give credit
 2   to it.
 3           Q.   Okay.
 4           A.   I mean, any time I would quote
 5   something, obviously I'd give credit to it, but
 6   it's really a -- it's a recapitulation again of --
 7   if you look at Page 8 and you look at the bottom of
 8   those footnotes, all those different, you know,
 9   fatal distraction and some of those other by, you
10   know, Strayer and others, those will be referenced
11   in that distracted brain white paper.
12           Q.   What is the date of the white paper?
13           A.   Let me look and see if I've got it on
14   this computer.
15                The one I have, it's probably been
16   updated at different times, perhaps, but this one
17   is -- and I'll give you the precise title, just for
18   the record.  It's Understanding the Distracted
19   Brain: Why Driving While Using Hands-Free Cell
20   Phones is Risky Behavior, National Safety Council
21   white paper, April 2012.  And you may can access
22   this and the other materials by going to
23   distracteddriving.nsc.org, but I'll go ahead and
24   send it in any event.
25           Q.   Who's the author?
```

Page 88

1          A.    The National Safety Council.

2          Q.    Is there a particular person who wrote

3     the white paper or is it just an organization?

4          A.    I don't see anybody attributed as the

5     compiler or editor of the paper.

6          Q.    Is it specific to commercial vehicles

7     or does it include passenger vehicles?

8          A.    It really is not specific to any type

9     of vehicle.  It's specific to the brain.

10         Q.    Okay.  Number four, the defensive

11    driving course for professional truck drivers by

12    NSC.  Again, is that referenced specifically by

13    footnote in either your original or supplemental

14    report or is that just a source material that

15    you've identified?

16         A.    I don't know if I have referenced it or

17    not.  Let me look and see.

18               I don't know if I referenced it or not.

19    I know that I do have some references here for the

20    Smith system, which is not listed under that

21    industry, but I have it actually footnoted.  But

22    again, the National Safety Council training, which

23    I am registered as a registered defensive driving

24    instructor, will carry the same information that I

25    have most often referenced in this report, which is

Page 89

1    the CDL manual.

2         Q.   How can I access the defensive driving

3    course for professional truck drivers by NSC, or

4    can I?

5         A.   You can purchase it at nsc.org.

6         Q.   The Smith System Driver Improvement

7    Institute is in fact listed in number six of your

8    report.

9         A.   Yes.  Okay.  And you can access any of

10   that material through -- I forget their website.

11   You just may need to Google.  I think it's like

12   drivesafe.org or something like that, but it's not

13   like Smith system or something like --

14        Q.   Okay.  How about number five, safe

15   practices for motor carrier operations, which makes

16   reference to an ANSI standard?

17        A.   Yes, sir.  You could obtain that

18   through one of two ways.  You could obtain that

19   document through ANSI.  I'll tell you this:  You're

20   going to pay more if you go that route.  If you go

21   through our organization or the organization I'm a

22   member of, ASSE, it's now ASSP, American Society of

23   Safety Professionals, you can obtain it, I think

24   maybe -- I don't remember.  The last price of it

25   is -- you know, maybe 100 bucks.

1       Q.  Is that resource number five

2  specifically referenced anywhere in your report

3  when you're going through your analysis and

4  opinions?

5       A.  It is referenced on Page 8, footnoted

6  seven, using as an example of different

7  organizations -- it's referencing really the

8  organization which is a reference back to that

9  particular document.

10      Q.  But not a reference to a specific

11  section, correct?

12      A.  No.  It doesn't reference down to a

13  particular paragraph in that Z15-1.

14      Q.  Do you know whether or not this ANSI

15  standard has been adopted by the state of Georgia?

16      A.  I don't know that.  You're talking

17  about legislatively adopted or something?  No, I

18  doubt it.  I don't think so, but I don't really

19  know.

20      Q.  But you contend it's applicable to this

21  case?

22      A.  Right.  I would consider it to be

23  aspirational, but it is endorsed.  If you look at

24  the document and you look at the organizations, I

25  think Georgia Power and Light.  I can't remember

Page 91

1    all the different companies that were part of the

2    cohort peer review, if you will, to develop these

3    policies and procedures that absolutely recommends

4    a total cell phone ban while driving a commercial

5    truck.  I mean, those -- those are weighty to me,

6    but it is not the law.

7           Q.   All right.  That was going to be my

8    point.  The motor carrier regulations are not

9    aspirational.  They're required.  Correct?

10          A.   That is correct.

11          Q.   The ANSI standards are not required, to

12   your knowledge?

13          A.   Correct.

14          Q.   All right.  Then Section 4 in your

15   original report, you talk about your opinions.  And

16   the second paragraph on Page 4 indicates these are

17   preliminary, since discovery is ongoing, may be

18   supplemented, and should you be asked to review any

19   additional information.  And of course we got your

20   supplemental report a couple days ago, correct?

21          A.   Yes, sir.

22          Q.   But the only two reports you've

23   authored are your original report, Exhibit 1, and

24   your supplemental report, Exhibit 2?

25          A.   Correct.

Page 92

1          Q.   All right.  Do you intend to do any

2     additional evaluation or work on this file once we

3     finish with your deposition today?

4          A.   I have no plans to do that.  I mean,

5     any future work would depend on what Mr. Hayes

6     asked me to do.

7          Q.   Okay.  And can we agree that if you're

8     asked to do any additional work that results in any

9     additional opinion that's not otherwise reflected

10    in Exhibits 1 and 2, you'll provide that

11    information to Mr. Hayes, who will in turn provide

12    it to me?

13         A.   Absolutely.

14         Q.   And we may need to visit again

15    regarding those additional reports.

16         A.   Sure.

17         Q.   Okay.  Let's talk through your actual

18    opinions, all right?

19         A.   Okay.

20         Q.   Some make take longer than others.

21              Opinion one was that FeroExpress -- or

22    is that FeroExpress is a DOT-authorized motor

23    carrier.  It had a DOT number, correct?

24         A.   Correct.

25         Q.   Mr. Sepesi was operating a commercial

Page 93

1    motor vehicle, correct?

2         A.   Correct.

3         Q.   He was involved in a crash, and that

4    trucking company has to comply with all federal,

5    state, and additional industry-recognized safety

6    standards.   That's your opinion?

7         A.   Correct.

8         Q.   Is that really something we need an

9    expert to comment on?   Doesn't the Federal Motor

10   Carrier regulations address who's covered and not

11   covered by those regulations?

12        A.   Well, I'm not sure how you would

13   introduce it in court.   I mean, certainly you can

14   make arguments at the beginning of court, but to

15   the extent that it is helpful for the jury to

16   understand that there are a body of regulations

17   that apply to this company and not ordinary jurors,

18   you may need an expert.

19             But I'm simply just doing what I always

20   do here, setting the stage.   Every case that I look

21   at -- I work a lot of fleet accidents that the

22   regulations don't apply.   So that's generally like

23   the first boilerplate type of opinion that I may

24   have.

25        Q.   Okay.   So your opinion generally in

Page 94

1   number one is that the regulations generally apply

2   to these defendants?

3        A.   That's right.  And that's important to

4   set the stage because I'm going to have some direct

5   applications of those Federal Motor Carrier Safety

6   regulations later on in my reports.

7        Q.   Okay.  In your discussion you indicate

8   that FeroExpress received a pass as a result of a

9   recent safety audit, correct?

10        A.   Correct.

11        Q.   When was the safety audit done?

12        A.   I'd have to go back and look.  I don't

13   know as I sit here.  Do you want me to look?

14        Q.   Please.

15             October 12th, 2017?

16        A.   I'm still getting there.

17        Q.   Actually, that safety audit -- here, I

18   can hand it to you, unless you've got it.  Safety

19   audit conducted on October 3, 2017?

20        A.   Yes, I believe that's correct.

21        Q.   And how often is a safety audit done in

22   your experience?

23        A.   It's a very capricious thing.  For new

24   motor carriers, the Department of Transportation is

25   no longer -- or the FMCSA is part of the Department

1  of Transportation -- they are no longer providing

2  satisfactory conditional and satisfactory ratings.

3  Rather, any motor carriers that have entered the

4  business in the last couple of years just receive a

5  pass or a fail.  And part of that is because

6  they're working on a new measurement system other

7  than the antiquated satisfactory and unsatisfactory

8  and so forth.

9           So once a motor carrier gets their

10  initial inspection, they may never be visited

11  again.  If they're involved in some kind of

12  catastrophic accident, they will likely be visited,

13  or if there is a compelling public complaint, that

14  can be from an employee or something like that,

15  they might be investigated.  The luck of the draw

16  or any of those types of reasons in the past that

17  were used for investigation, they just don't have

18  enough boots on the ground to do it anymore.

19           The only other thing would be if their

20  statistical notations and averages get way out of

21  line with the national averages as far as roadside

22  inspections and out-of-services and things like

23  that, or frequency of crashes, that could prompt a

24  audit.

25           So there's no simple answer to that of

Page 96

1   exactly -- and everything is really predicated on

2   how busy they are in each region this day and time.

3          Q.   What's the significance of a passing

4   grade for a safety audit?

5          A.   It just meant they met the minimum

6   requirements based on the investigator's

7   evaluation.

8          Q.   And what do they evaluate when they're

9   doing that investigation?

10          A.   Driver personnel file, qualification

11   file, making sure they have essentially the correct

12   amount of paper in their file at the moment in time

13   that they investigate, that they've got driver

14   logs, that they're compliant, that they are doing

15   drug and alcohol testing, that they have

16   maintenance files that are requisite with 396.  You

17   know, a few other things like in 390 like having an

18   accident register file and things like that.

19              So it's really just the barebones

20   minimum of paper documentation that helps to guide

21   them.  And I want to minimize it.  I mean, that's

22   important, to minimize them to have the management

23   controls to operate safely.

24          Q.   Let me ask you this:  If they have some

25   but not all of the documents that are required, can

Page 97

1    you get a passing grade, or do you know?

2           A.   Probably, yeah.  Probably, so.  Yeah, I

3    mean, you don't have to be perfect, not this day

4    and time.  In fact, you know, in the old system

5    where they used to -- I don't remember if you

6    remember seeing any of the DOT audits.  I've sat in

7    on quite a few of those for clients in the past.

8    They used to have a numbering scale, sort of like a

9    point system.  And you could have one

10   unsatisfactory in one category, but still get a

11   satisfactory overall rating.  There's about seven

12   little categories that they look at. So you don't

13   have to be perfect.

14           In fact, if they're doing like -- let's

15   just say they're evaluating an hours-of-service

16   falsifications.  If you've got enough drivers and

17   they only find perhaps 20 percent of the drivers

18   that have falsified, they could still get a pass

19   and a satisfactory rating.

20           Q.   Is there any way to look to see the

21   scope of the audit or specifically what was

22   addressed, what passed, what failed, in conjunction

23   with the passing grade?

24           A.   Yes, sir.

25           Q.   Did you investigate the scope of the

1   audit or any of the specifics of the audit as it

2   pertains to the October 3, 2017, audit that

3   resulted in a safety audit pass for FeroExpress?

4         A.   I did not.

5         Q.   Why not?

6         A.   Well, I wasn't asked to.  I typically

7   do not -- I used -- a long time ago, I used to

8   actually sent off for the requests, to answer your

9   question.  The only way I would be able to obtain

10  it, being a nonlawyer, would be sending a freedom

11  of information request out.  And that would be to

12  Washington, to the FMCSA.  I do provide from time

13  to time our clients the information on how they can

14  do it.

15        You can actually do it online now at

16  the FMCSA's website.  The experience that we're

17  having, though, right now is because there are so

18  many requests, that this is likely going to take a

19  year or longer to obtain back the actual

20  documentation for that investigation.

21        Ideally, what I find in most of the

22  cases is, the defendant produces it, you know,

23  because this is pretty important.  If you've got a

24  passing grade from an inspection, I think that's a

25  wall hanger.  I think you would want to -- I think

1    you would want to put that in the file and keep it

2    close.  It wasn't provided in this case though.

3           Q.   The detail wasn't, but the passing

4    grade was?

5           A.   Yes, sir.

6           Q.   Less than 30 days before the accident?

7           A.   Yes, sir.

8           Q.   And then the second sentence in your

9    discussion that FeroExpress had primary

10   responsibility to train and evaluate Mr. Sepesi's

11   driving acumen and performance -- did I read that

12   correctly?

13          A.   Yes, sir.

14          Q.   Are you offering an opinion one way or

15   the other as to whether they did or did not

16   discharge that responsibility properly?

17          A.   No.  The reason for opinion two is --

18          Q.   I'm still on opinion one.

19          A.   On opinion one.  So I missed your

20   question.  I'm sorry.

21          Q.   I'm simply asking, since you put that

22   sentence there, that FeroExpress had primary

23   responsibility to train and evaluate Mr. Sepesi's

24   driving acumen and performance is whether or not

25   you're offering an opinion one way or the other as

1    to whether or not they properly discharged that

2    responsibility?

3           A.    I do have opinions, and I think they're

4    set forth as we follow along in the report.

5           Q.    Okay.  Anything else of significance as

6    to opinion one that we have not discussed?

7           A.    No.

8           Q.    All right.  Let's go to opinion two.

9    Mr. Sepesi, who was driving the commercial motor

10   vehicle, was a regulatory employee of FeroExpress,

11   and that entity had regulatory duty for hiring,

12   training, and supervising Mr. Sepesi while he was

13   operating the commercial motor vehicle under their

14   control and authority.  Correct?

15          A.    Yes.

16          Q.    That's more simply stating that

17   regulations apply to these particular defendants

18   and the trucking company is responsible for the

19   truck drivers that they employee, fair?

20          A.    Yes, sir.  I -- and again, I can help a

21   little bit.  But part of the reason for opinion

22   two -- it's not in every report I do, but in many

23   of the reports -- oftentimes we'll have an occasion

24   where a driver is not an IRS employee of the motor

25   carrier.

1          This opinion here, number two, is to

2     try to help the jury understand that the Federal

3     Motor Carrier Safety Administration doesn't care

4     how the driver receives his compensation, whether

5     it be with a W-2 form or an I-9 form.  They're

6     indifferent to that.  They want to make sure that

7     everybody understands that the regulations apply to

8     the person holding the steering wheel at the

9     direction of the person's name on the door at the

10    time of the crash, they call them an employee.

11          So I get this all the time, you know,

12    the defense is saying, you know, he's not our

13    employee; we done told you he's a contractor.

14    Well, that's really a nonsense argument based on

15    this regulation.

16         Q.   Okay.  You didn't get that contention

17    in this case, did you?

18         A.   No, sir.  Again, I'm just -- I get one

19    shot at getting this reports down.  And so, again,

20    it's an opinion I generally put in there to make

21    sure that if I've missed something, it is covered.

22         Q.   Okay.  Anything else of significance as

23    to opinion number two that we have not discussed,

24    recognizing that it's referenced later in your

25    opinions about -- I'm sorry.  Strike that.  Well,

Page 102

1    no.  That's right.  Hiring, training, supervision

2    we're going to cover as we go through the opinions?

3         A.   Yes, sir.

4         Q.   Anything else?

5         A.   No, sir.

6         Q.   All right.  Opinion three.  Mr. Sepesi

7    failed to use the ordinary care expected of a

8    prudent CDL driver by failing to maintain a proper

9    lookout required for his commercial motor vehicle,

10   which included following at an appropriate

11   distance, reducing speed according change in

12   traffic conditions, and hazard recognition.  Did I

13   read that correctly?

14        A.   Yes, sir.  I grammatically left out

15   according to change.  I should introduce a to, T-O,

16   in there.

17        Q.   The use of ordinary care expected of a

18   prudent CDL driver.  Are you not commenting on a

19   legal standard?

20        A.   No, sir.  That might be the definition

21   of some standards you're familiar with, but I won't

22   use terms like negligence or recklessness or any of

23   those terms.  This is just the way that we talk in

24   our consulting and talking with our clients.  And

25   we compare this ordinary care, that of expected of

1  a CDL driver.  I'm not comparing this to the

2  ordinary care of an ordinary automobile driver,

3  which we don't need an expert for, I don't guess.

4  We understand what this ordinary care is based on

5  the CDL manual and these other training sources

6  that I've already mentioned like the NSC and Smith

7  System and so forth.  They help us to understand

8  what that ordinary care is and the reasons for

9  that.

10       Q.   Would you agree that to the extent this

11  opinion reflects a legal standard, that it is

12  outside your area of expertise to comment on what

13  law and legal standard the jury should be provided

14  by the Court to determine negligence or

15  responsibility for this accident?

16       A.   I don't have an answer for that one.  I

17  don't have an opinion on that.  I mean, this is

18  probably something you'll just have to take up --

19  I'm certainly not trying to instruct on the law.  I

20  would never do that intentionally.

21       Q.   Have you ever offered an opinion that's

22  been allowed by a court that a party is negligent

23  or not negligent?

24       A.   Again, I don't use those terms.  I

25  just -- I mean, I sort of -- I've done this long

Page 104

1   enough, I understand.  I want to let the judge be

2   judge, and I'll just be the expert.  I'm just

3   trying to help the jury understand things they

4   wouldn't ordinarily know that I think will help

5   them.  They're the trier of fact.  I'm just trying

6   to help guide them and educate them.

7          Q.   Okay.  What were the changes in traffic

8   conditions and hazard recognition that you contend

9   were important for your assessment of opinion

10  number three in Mr. Sepesi's conduct?

11         A.   The big idea for me that I've gleaned,

12  if I understand this correctly, is, traffic was not

13  flowing sufficiently in the intersection for Mr.

14  Frushtick to be able to proceed into the

15  intersection, and he had to stop on his side, at

16  the beginning side of the intersection, and the

17  truck driver just failed to appreciate that for

18  some reason.

19         Q.   And where was Mr. Frushtick's vehicle

20  located when Mr. Sepesi first noticed the presence

21  of that vehicle?

22         A.   Are you looking for a specific place in

23  the highway?

24         Q.   Yes.

25         A.   I think that would be reconstruction

Page 105

1  question.

2         Q.   So you can't answer that?

3         A.   No, sir.  All I can go on is based

4  on -- and I think both testimonies are consistent,

5  both Mr. Frushtick and Mr. Sepesi's tractor-trailer

6  is that it was prior to going into the actual flow

7  through the intersection somewhere.  I don't know

8  if it was at the stop bar, slightly before,

9  slightly after, but it was not in the actual

10  intersection.

11        Q.   But in terms of calculating or

12  commenting on an actual distance, you can't do

13  that?

14        A.   No, sir.

15        Q.   How about speed?  Can you comment on

16  speed of either vehicle at any point leading up to

17  and including the accident?

18        A.   For which vehicle?

19        Q.   Either vehicle.

20        A.   Well, Mr. Frushtick, and I think Mr.

21  Sepesi, indicates that his vehicle was stopped.

22  But I don't know if that's accurate or not, but I

23  mean, they seemed to agree with that, and I don't

24  know of any other witnesses or testifiers.  As far

25  as Mr. Sepesi's -- am I pronouncing that correct?

1      Q.   I don't know.  I'm pronouncing it

2   Sepesi.  You may be right and I may be wrong.  I

3   think just keep going with what you're saying.

4      A.   Okay.  Okay.  I've probably got it in

5   my brain now, so I'll try Sepesi.  I mean no

6   disrespect to him.  I just don't know how to

7   pronounce it.

8           So Mr. Sepesi's vehicle, I have no idea

9   how fast he was going.  Again, that would be an

10  accident reconstruction opinion unless we had some

11  type of ECM data that I could look at.

12     Q.   Which we've agreed we don't have,

13  correct?

14     A.   Correct.

15     Q.   All right.  Page 6, continuing with

16  opinion three.  According to the state's commercial

17  driver's license manuals, Mr. Sepesi should have

18  been scanning the roadway ahead by 12 to 15 seconds

19  and appreciating what the traffic conditions were

20  and how to adjust his speed and space.  Did I read

21  that correctly?

22     A.   Yes.

23     Q.   What state commercial driver's license

24  manual are you referring to?  Are you talking about

25  South Carolina?

1        A.   No, sir.  It would be Georgia.  It

2   would be any of them.  They all -- they all -- all

3   that I've looked at, and I've looked at probably

4   75 percent of every state in the nation, has same

5   manual, and all of the manuals, if you go to the

6   Federal Motor Carrier Safety Regulations, in part

7   383 it states specifically that the American

8   Association of Motor Vehicle Administration is the

9   producer of that manual and it's distributed to

10  every DVM in the state or in the nation.  So they

11  all have the same instructional information.

12       Q.   What section of the South Carolina

13  manual that you brought with you has this 12 to 15

14  second information?  It should be in there, right?

15       A.   Yes, sir.

16            This whole discussion begins in -- and

17  just if it will help a little bit here, if you can

18  hold your finger where you're at on that report and

19  go over to Page 10, you will actually see where it

20  is actually cited --

21       Q.   Okay.

22       A.   -- in Section 2.4.  And so what you

23  do -- I mean, I can demonstrate this to you or I

24  can wait until trial.  I mean, it would just slow

25  things up.  But if I go to 2.4 in any manual that I

1    have access to, Georgia, Illinois, Pennsylvania,

2    California, Texas, that information is going to

3    come out of that section.  The only difference

4    sometimes might be -- it will typically be -- the

5    narrative will be identical from one state to the

6    next.

7              It just might be if the governor and

8    some advertisements go in the first two or three

9    pages, it might be on the opposite side of the

10   page, but it's going to typically be the same page

11   number, the same section.  It will be identical.

12        Q.   Great.  What does it mean to scan the

13   road ahead by at least 12 to 15 seconds?

14        A.   It actually says 12 to 15 seconds,

15   but...

16        Q.   Isn't that what I just said?

17        A.   10 to 15, I thought I heard, but -- he

18   said 12?  Okay.  Excuse me.  12 to 15 seconds.

19             It means to not be focused downward,

20   but rather outward, and the way we practically

21   teach drivers in the past is that we can't be

22   fixated on somebody's taillights in the back of

23   their bumper and see what the changing conditions

24   are ahead.

25             So if that's true, and that is true,

1    because it's not going to give us enough time to

2    react to what that person -- we in essence have

3    done a couple of things.  Number one is, we have

4    abdicated our judgement for the judgement of the

5    person in front of us, whether it's right or wrong.

6    The second thing we've done is we've, because we're

7    driving a big tractor-trailer truck that is going

8    to take more space to stop it and control it, we

9    are not looking ahead to see what those conditions

10   are because we are focused downward.  So we're

11   abdicating our judgement to that person and we're

12   not seeing what's ahead so that we can use our own

13   judgement.

14           So those are the two conflicts.  That's

15   the reason that we have to manage the space better

16   to give ourselves enough opportunity -- certainly

17   we're going to glance down at taillights, but we're

18   also going to be looking ahead and we will toggle

19   back and forth to those.

20           But if somebody's, for example,

21   tailgating going down the roadway, I mean, and you

22   see a kid in the back seat of a car and so forth,

23   and nobody wants to intentionally run over

24   somebody, but if they're just dangerous and not,

25   you know, using these principles, they're going to

Page 110

1   be so fixated on those taillights and the back of

2   that car that they don't see what's going off

3   ahead.  And that's attributable to a number of

4   rear-end crashes, particularly in city driving.

5           Q.   Does this analysis apply, whether or

6   not a truck is in -- on the highway, moving at a

7   certain designated speed and stop-and-go traffic,

8   completely stopped at a red light?  I mean, aren't

9   there different scenarios where this would have to

10  be adjusted?

11          A.   Absolutely it does.  If you look back

12  here at Page Number 10 again on this report here,

13  you can see the visual aid here that we'd show the

14  jury.  For city driving, you know, 12 to 15 seconds

15  is maybe a block.  Okay.  For open highway, it's a

16  quarter of a mile.  So speed is relevant and it's

17  relative.

18          So 12 to 15 seconds down the road,

19  quarter of a mile is -- you likely can't see in a

20  city environment a quarter of a mile ahead.  You

21  might can, depending on what you're looking at, but

22  your following distance is going to be predicated

23  on another system, and that is a matter of counting

24  seconds and developing a feel for how far that is

25  under different speeds.

1      Q.   What were the traffic conditions that
2  Mr. Sepesi was presented with leading up to the
3  accident, as you understand it?
4      A.   Let me see if I've got anything that
5  can be a help.
6      Q.   We can agree he wasn't driving on the
7  open highway, right?
8      A.   Correct.
9      Q.   Nor was he engaged in any type of city
10  driving?
11      A.   Correct.
12      Q.   So the two examples in your appendix,
13  neither one of them are illustrative of what was
14  presented to Mr. Sepesi?
15      A.   Well, they would give extremes.  You
16  still need to look ahead 12 to 15 seconds.  Both of
17  them say that.
18      Q.   Okay.
19      A.   It's just illustrative of sort of the
20  contrast, you know, from the smallest to the
21  greatest.
22      Q.   Okay.
23      A.   But you were asking a specific question
24  about the traffic situation.  Now, just looking, I
25  don't know that it's completely elaborated on here

Page 112

1    in -- but he indicated -- you know, this was his

2    statement -- that he didn't feel like there was

3    that much traffic in front of Mr. Frushtick's car.

4    But I don't know that I captured anything that sort

5    of identified how thick or heavy the traffic would

6    be, if it was at all.

7         Q.   Okay.  But your opinion is, he should

8    have been scanning 12 to 15 seconds?

9         A.   Yes, sir.  That's the instruction.

10        Q.   Is it also your opinion he wasn't, or

11   do you know?

12        A.   I don't know how far he was looking.  I

13   don't know where he was looking.  I don't know if

14   he was looking at all.

15        Q.   Okay.

16        A.   But that's going to be a job for the

17   jury to decide.  Only he can tell us what he's

18   looking at.

19        Q.   Okay.  He would be in the best position

20   to explain traffic conditions and his speed and the

21   space as it was presented to him?

22        A.   Well, I think he and Mr. Frushtick.  I

23   think they're going to be able -- it will be up to

24   a jury to decide whose definition of the traffic

25   is -- that they want to believe.  But I think those

Page 113

1   two, since we don't have a witness and obviously

2   the law enforcement was not there at the time,

3   they're all we have.

4          Q.   Do you have any understanding as to

5   whether Mr. Frushtick saw the tractor-trailer

6   before impact?

7          A.   Let me see.  I don't have an opinion on

8   that, but I'm happy to answer, so let me just look

9   at my notes here.

10          Q.   Yeah, my question was whether you had

11   an understanding, not necessarily whether you had

12   an opinion.

13          A.   I understand.  I'm --

14          Q.   I don't think that it necessarily calls

15   for an opinion.  He either did or he didn't.

16          A.   I'm going to try to answer your

17   question.  When I say that I don't have an opinion,

18   it's not something I put in chief in my report.

19          Q.   Okay.

20          A.   So it's not something I'm focused on

21   trying to remember.

22          Q.   Okay.

23          A.   He said he didn't see the truck coming

24   in his rearview mirror.

25          Q.   Okay.  The second paragraph on opinion

1    three talks about stopping distance, correct?

2          A.   Yes, sir.

3          Q.   Commercial vehicles can take one and a

4    half to two times more to stop?

5          A.   Yes, sir.

6          Q.   Can?

7          A.   Can.

8          Q.   Don't always have to take that amount

9    of time?

10         A.   We talked about that a little bit

11   earlier.  There's variables to how long it

12   physically will take a truck to stop.  Again, I'm

13   trying to help the jury with training information

14   to the driver.  In other words, if a truck driver

15   knows that his vehicle takes one and a half to two

16   times -- he's not an engineer -- to stop, he either

17   embraces that and drives according to that

18   knowledge, or he tailgates and he runs into people.

19              So that's hopefully the benefit to

20   educate the jury on what they've been trained --

21   all of this that follows under that opinion is

22   educational material.  I'm just trying to be an

23   educator to the jury regarding what this driver

24   knew or should have known based on the CDL

25   instruction.

Page 115

1        Q.   You don't have any information

2   indicating he was tailgating Mr. Frushtick, do you?

3        A.   I use that just as a figure of speech,

4   that if a driver does not appreciate these

5   principals and in fact follows too closely, or

6   tailgating as we sometimes use in the vernacular,

7   then he would be operating contrary to this

8   education.

9        Q.   But you don't have the information to

10  comment on the distance Mr. Sepesi's vehicle was

11  behind Mr. Frushtick at any point in time other

12  than you know there was an impact and it was a

13  rear-end impact?

14       A.   Correct.

15       Q.   CDL manual teaches a rule that Mr.

16  Sepesi should have been following at least seven

17  seconds behind the plaintiff's vehicle, but that

18  was -- but that was not he did?

19       A.   I'm sorry about that.  That was not --

20       Q.   Not what he did?

21       A.   That's right.

22       Q.   How do you know that?  Simply because

23  there was an accident?

24       A.   Well, if he had been attentive and

25  following seven seconds.  My experience from my own

Page 116

```
 1   driving, from my own training, talking with
 2   drivers, that would have been sufficient for him --
 3   again, see, the seven seconds allows, what I talked
 4   about earlier.  The seven-second following distance
 5   allows him to be able to look out and appreciate
 6   that Mr. Frushtick is stopping.  And the reason
 7   perhaps he's stopping, according to Mr. Frushtick's
 8   testimony is, he couldn't proceed into the
 9   intersection.  Otherwise he's violating some other
10   law of blocking the intersection.  That's a good
11   thing.
12            But if he's following closer than the
13   seven seconds and then he's also maybe inattentive
14   or impaired for some reason -- we'll talk about
15   that later -- then he can't react timely and avoid
16   a collision.  The seven seconds following the
17   scanning outsets everything else up for safety
18   unless the person is impaired.
19            Q.   Are 11 and 12 in your appendix the
20   CDL -- specific CDL references to this principal?
21            A.   They help to further educate on this
22   subject.  That's right.
23            Q.   On Page 11 you indicate, the CDL
24   standard for a CMV like the one the defendant was
25   driving is supposed to follow at a distance no
```

Page 117

1  closer than a six-second interval from the vehicle

2  it is following and at least seven seconds when

3  traveling over 40 miles per hour.  Did I read that

4  right?

5         A.   Yeah.  That --

6         Q.   Was Mr. Frushtick -- was Mr. Sepesi

7  going more than 40 miles an hour at any point in

8  time that you understand?

9         A.   No.  That -- this is making an

10 assumption that his vehicle is 60 feet or less in

11 length, this particular -- and I realize this looks

12 a little bit contradictory to the statement that I

13 use the seven-second rule, and that's typically

14 what we refer to it as.  If in fact his vehicle is

15 longer than -- and I don't have any measurements or

16 anything like that, but if it's a typical

17 tractor-trailer rig, 53-foot trailer, it went over

18 60 feet, in which case it would be seven-second,

19 not six-second interval.  For speeds over 40 miles

20 an hour, then your -- the recommendation is to add

21 a second.

22         So a big tractor-trailer truck, the

23 typical ones that we find today, 53-foot trailers

24 and the tandem-axle tractors with sleepers, they're

25 going to be over 60 feet.  And so once they exceed

Page 118

1    40 miles an hour, it actually increases to eight

2    seconds.  I'm not saying it should be eight

3    seconds, but I am saying it should be seven

4    seconds.  But I'm not going to quibble if you want

5    to say six seconds or seven seconds.

6         Q.   What if you're going five to ten miles

7    an hour in stop-and-go traffic?

8         A.   Well, the second routine is relative,

9    and it's relative to the speed.  That's the reason

10   we use seconds and not car lengths.  Somebody --

11   you know, my dad, he told me, you know, just follow

12   the car in front of you a couple car lengths.

13   Well, that just doesn't work anymore because

14   vehicles now are going faster than when my dad

15   taught me about driving.

16             So that's the reason that AAA, National

17   Safety Council, Smith System, JJ Keller -- I don't

18   know of a training instructional material on this

19   subject that doesn't use that principle, including

20   the CDL manual.

21        Q.   You talk about a fully loaded CMV such

22   as Mr. Sepesi's can weigh up to 80,000 pounds

23   versus 4,000 pounds for an ordinary passenger car.

24   Is that just illustrative?

25        A.   It is.

1        Q.   The difference between the fully loaded

2   tractor-trailer and a car, that the fully loaded

3   tractor-trailer is going to be a lot heavier than

4   the car?

5        A.   Well, yes.  Now see, I don't know

6   anything about the weight of his vehicle either.

7   Sometimes we know that in some of the cases, and it

8   just depends on how much information is provided,

9   you know, the shipping bill of lading and things

10  like that.

11       Q.   You didn't that information?

12       A.   Didn't have it.

13       Q.   You knew he was pulling empty, though,

14  didn't you?

15       A.   And that's the good point, the point

16  that I was working toward, and you're a step ahead

17  of me.  We also know in the CDL manual that empty

18  tractor-trailers stop -- take longer to stop,

19  according to the instruction, than fully loaded

20  tractor-trailers.

21       Q.   Go back to that second paragraph.  I've

22  neglected to ask you about this.  The CDL manual

23  describes CMV drivers who follow too close as

24  aggressive drivers.  Did I read that right?

25       A.   Yes, sir.

1      Q.   Where is that in the CDL manual?  I see

2   your Page 13.

3      A.   Right.

4      Q.   I see Section 2.10.1 and 2.10,

5   aggressive driver/road rage.

6      A.   Yes, sir.

7      Q.   That's what you pulled out as an

8   excerpt to support your opinion from the CDL

9   manual, correct?

10      A.   Right.  Yeah, so --

11      Q.   Where does it say that drivers who

12   follow too close are aggressive drivers in the

13   section that you've pulled out?

14      A.   Okay.  It's -- well, it's my

15   interpretation, if you look at Page 13 and you look

16   at that last paragraph that deals with aggressive

17   driving, is in my opinion, aggressive driving is

18   the act of operating a motor vehicle in a selfish,

19   bold, or pushy manner without regard to the rights

20   or safety of others.

21         In my opinion -- and I think I'm

22   supported by others as well on this subject, and

23   this is what we've taught through our training

24   courses -- that a driver that does not respect

25   these principles of following at a safe distance

Page 121

1  and giving himself or herself an opportunity for

2  various errors that are going to come along the way

3  are putting other people at risk of harm.  That's

4  aggressive driving.

5          Now, you don't have to like that, but

6  you know, think of it as your family in front.  You

7  know, is that the distance you're going to be

8  satisfied with following?  So it's do you want to

9  excuse safety or do you want to accept safety?  The

10  principles that we've been taught for safety are

11  the ones that I've articulated here.

12          So to do anything otherwise is

13  aggressive.  I'm not saying it's road rage.  That's

14  different.  That's using your vehicle as a weapon.

15  I'm not saying he did that, but I am saying that

16  following too close is aggressive driving.

17          Q.  And you don't know how close, at any

18  point in time other than when there was an impact,

19  Mr. Sepesi was following behind Mr. Frushtick's

20  vehicle?

21          A.  No, sir.  You've asked me that a number

22  of times.  The answer is still no.

23          Q.  Okay.  And when you say the CDL manual

24  describes CMV drivers who follow too close as

25  aggressive drivers, it absolutely, sir, does not

Page 122

1    state that anywhere in the CDL manual.  That's your

2    interpretation and spin of that section?

3          A.   I've already answered the question.  I

4    mean, I've already answered the question.  I think

5    it is my interpretation.  I sort of resent the

6    word, spin.  That sounds nefarious.  But it is my

7    interpretation.

8          Q.   I'm not being nefarious.  You know,

9    you're the expert.  I'm not.  I'm just trying to

10   understand your opinions.  You have an affirmative

11   statement that this is what the CDL manual

12   describes, and then I read the section that you've

13   listed and I don't see that language.  That's all

14   I'm trying to explore with you.

15              When you talk about weight difference

16   can have a devastating result when high-speed

17   crashes occur in paragraph 3...

18          A.   Let's see.

19          Q.   On Page 6.

20          A.   Okay.  Where are you at now?

21          Q.   Where we were talking about the fully

22   loaded vehicle and weight.

23          A.   Okay.  All right.

24          Q.   This wasn't a high-speed crash, was it,

25   or do you know?

Page 123

1           A.   No, sir.

2           Q.   All right.  And the comments on crash

3    fatalities, what does that have to do with anything

4    in this case?  Mr. Frushtick thankfully did not die

5    as a result of this accident, correct?

6           A.   Correct.  I am thankful for that.  We

7    all should be thankful for that.  But my experience

8    has taught me that sometimes circumstances, same

9    set of facts, different circumstances, can produce

10   a different result.

11           The importance of this -- it should be

12   important for everybody, and I don't know how the

13   jury and the Court would ever know this, is the

14   dangerous impact of big commercial vehicles and how

15   they must be operated differently and in a

16   different regard to safety than ordinary

17   automobiles, just simply because of the energy

18   associated with them.

19           And so statistically we know they have

20   a greater fatal and injurious impact, if you just

21   want to go with injuries, than do automobile

22   crashes, all things equal.  I can't explain from a

23   bio-mechanical standpoint why that is.  Obviously,

24   I know when I see tractor-trailer trucks ride right

25   up over the top of cars that they've been following

Page 124

1    too closely and the car stops and they run right

2    over the top of them, you can look at the picture

3    and tell what happened there.  The person is

4    crushed by the truck.  But you know, the banging

5    and bumping and so forth without entering the

6    passenger compartment is still injurious.

7              And so the point with that statement

8    is, is that trucking operators and truck drivers

9    must be fully trained.  They cannot afford to get

10   outside of those boundaries, drive within those

11   boundaries, drive safe, don't run the risk of being

12   aggressive, because the consequences are tragic.

13   And the statistics bear themselves out.  These come

14   from the NTSA.  So they don't come from me.

15        Q.   Okay.  Let's look at the next

16   paragraph.  You say it's your professional opinion

17   that Mr. Sepesi was either untrained, willingly

18   driving too fast for conditions, impaired, or

19   distracted in some way so as not to observe traffic

20   slow or stopped, willingly following too close, or

21   a combination of the above.

22              How in the world can you comment on Mr.

23   Sepesi's state of mind to suggest that he's

24   willingly doing anything such as driving too fast

25   or following too closely?

1          A.   Well, I'm stating what I believe to be

2     the world of possibilities.  Now, there could be

3     some others that I don't know about, but based on

4     what I've observed right here, if he's following at

5     the proper distance, it's my opinion -- and he's

6     not impaired in some way -- this crash doesn't

7     occur.

8               I'm going to address some issues

9     regarding impairment and distractions here in just

10    a little bit, but he's at the control of this

11    vehicle.  Nobody's forcing him to drive the speed

12    he does.  Nobody's forcing, that I know of, forcing

13    him to follow at the distance he is.  If he's

14    following at the recommendations, it's my opinion

15    this crash would not have occurred.

16         Q.   Okay.  Do you understand there's a

17    difference between, to use your word, willingly and

18    perhaps negligently or making a mistake?

19         A.   I didn't use the word negligently.

20         Q.   Say again?

21         A.   I said I didn't use the word

22    negligently, I don't think.

23         Q.   No, you didn't.  Do you appreciate that

24    there may be a distinction between your language,

25    willingly driving; he's intentionally driving too

Page 126

1  fast; he's intentionally following too close?

2       A.   Right, well -- but notice right up here

3  at the very beginning I said he may not be trained.

4  So here's the way this synthesizes.  If a driver is

5  trained to do something and he does not do it, what

6  do we call that?  I would call that, he willfully

7  didn't follow his training.  On the other hand, if

8  somebody has not been trained in that and they do

9  it, then maybe it's just ignorance.

10            So what I'm saying here, it's one or

11  the other and maybe some combinations of these

12  things.  Does that help?

13       Q.   What evidence do you have that he was

14  untrained?

15       A.   I'm going to go back again.  I don't

16  know that I want to stay here much longer because I

17  think we've beat this thing to death.  I mentioned

18  to you earlier that it's one or the other or maybe

19  some combinations of it.  I don't know anything

20  about his training.

21            So if he is trained, if you want to

22  ride that, that he is trained and because he's got

23  a CDL license then he's fully trained and that's

24  all he ever needs, then he willingly did this, you

25  know, by following too close.

1      Q.   The fact that he was cited by the

2   investigating officer, what impact or import does

3   that have with regard to your opinions, if any?

4      A.   Well, in the officer's opinion, he

5   cited him for following too close.

6      Q.   Well, let me strike that as

7   nonresponsive.

8           What import or impact does this

9   citation have with regard to your opinions?

10      A.   It's consistent with what I -- you

11   know, my findings are regarding the training and

12   how, if he's doing what he's supposed to be doing

13   and according to the training, that the crash more

14   than likely would not have happened.

15           And I think, you know, the officer is

16   not analytical like we're going to be here today

17   and he doesn't understanding trucking needs and

18   training, but he's come to essentially the same

19   conclusion.  But that stands alone.  It's not -- I

20   don't need that for my opinions.

21      Q.   You didn't talk to the officer, right?

22      A.   I did not.

23      Q.   Okay.  We've covered that.  You don't

24   know how the citation was disposed of, right?

25      A.   No.

Page 128

1          Q.   You don't know how Mr. Sepesi pled?

2          A.   No.

3          Q.   Okay.

4          A.   I mean, I may have seen that or

5     something, but it's not important to me.

6          Q.   Okay.  Opinion four.

7          A.   Okay.

8          Q.   Mr. Sepesi deviated from the standard

9     of care for prudent CMV CDL operators by talking on

10    his cell phone near the time of the crash while

11    driving a large CMV.

12         A.   Yes.

13         Q.   All right.

14         A.   Before we get into that one, this seems

15    like a good place to --

16         Q.   I agree.

17         A.   Okay.  Let's just take a quick comfort

18    break here.

19              VIDEOGRAPHER:  We're going off the

20    record.  This is the end of Media Unit Number 2.

21    The time is 1331.

22              (After a recess, proceedings were

23    continued as follows:)

24              VIDEOGRAPHER:  We're going back on the

25    record.  This is the beginning of Media Unit Number

1   3.   The time is 13:42.

2   BY MR. HURAY:

3        Q.   Mr. Dorrity, I think we've transitioned

4   to opinion number four in your original report.

5   We've completed the discussion of speed and space

6   and lookout, correct?

7        A.   I think we've worked that one pretty

8   good.

9        Q.   All right.  Okay.  So that was one of

10  the three main areas that you had identified as

11  being the subject of your opinions, the other two

12  being the cell phone distraction and hours of

13  service and fatigue management.  And we're going

14  to, I assume, cover those as outlined in the

15  remainder of your original report and supplemental

16  report.

17       A.   Yes, sir.

18       Q.   All right.  When you say, the standard

19  of care for prudent CDL operators, to what are you

20  referring?

21       A.   Taking into consideration the nature of

22  the type of vehicle that this driver is operating,

23  you know, all the things we've talked about, you

24  know, weight, size, more difficult to maneuver if

25  something goes wrong, you know, an articulated

Page 130

1    vehicle is much more difficult to do evasive

2    maneuvers than a single vehicle like an automobile.

3               All those things considered and

4    understanding the body of evidence that has been

5    published to our industry and the regulations that

6    are associated with cell phones that may or may not

7    have been regulated with automobile drivers, and

8    then the trends in policy and management positions

9    regarding cell phone use.  That's what I'm talking

10   about when I talk about the prudence when it comes

11   to a commercial motor vehicle operator.

12               So we can't set the brain aside, no pun

13   intended on that, but we can't set all that aside

14   and just say it's all the same for everybody.  It

15   is different because of the nature of the vehicle

16   that's being operated.  There's a lot more that

17   goes on in the cabin of a commercial truck, things

18   that the driver has to look at.  He's got two air

19   gauges.  He's just got a lot of different things

20   he's got to be looking at that ordinary automobile

21   drivers don't have to contend with.

22        Q.   And you're saying if he's using a

23   phone, regardless of how it's used, that impacts on

24   his driving abilities?

25        A.   Yes.

1      Q.   Okay.  And your area of expertise as it

2  pertains to this comes from what?

3      A.   On this particular point it would be to

4  educate the jury on how our industry has been

5  educated on this topic.  Not on the science of it.

6      Q.   You're not qualified to talk about the

7  science, correct?

8      A.   I think I'm qualified to talk about the

9  scientific conclusions, but I'm not qualified to do

10  the science studies themselves.

11      Q.   You've never done these studies that

12  deal with cell phone use and driver inattention?

13      A.   I have not.

14      Q.   Okay.  You have read materials that

15  others have published?

16      A.   I've attended numerous seminars, read

17  their materials, talked to the actual originators

18  of the material, worked with the originators of the

19  scientific -- scientists and the scientific

20  studies, but I have not been the scientist to

21  conduct that.  Neither have any of the trucking

22  managers of FedEx, UPS, Schneider National, and so

23  forth.  We have accepted their studies, just like I

24  accept my doctor's recommendations on Friday about

25  my body.

Page 132

1          Q.    But the appropriate and qualified

2     person to talk about the science is the scientist

3     who actually has done the analysis, correct?

4          A.    You'll have to decide that.  I've

5     already told you what my role is here today.  So

6     that's argumentative, I think.  You'll have to

7     decide who's more qualified to talk about the

8     results of the scientific studies.

9          Q.    Have you ever participated in any of

10    these studies in any capacity --

11         A.    No.

12         Q.    -- or are you simply getting the work

13    product of others that you've reviewed, evaluated,

14    and applied as you deem appropriate?

15         A.    It's the latter.

16         Q.    Okay.  Have you ever administered or

17    written any protocol for any of these studies that

18    deal with cell phone usage?

19         A.    Ask again.  I'm sorry.

20         Q.    Have you written or administered any of

21    the protocols that deal with these studies as it

22    pertains to cell phone usage?

23         A.    No.  I've written policy and procedures

24    as a result of our understanding of these studies,

25    but I was not involved in the studies to develop

Page 133

1  the methodologies and protocols of those.

2          Q.   Okay.  And the reference materials that

3  are identified in your report, there were two

4  articles -- actually -- yeah, there were two

5  articles.  The New England Journal of Medicine

6  article from February 13 of 1997, correct?

7          A.   Yes, sir.

8          Q.   22 years ago?

9          A.   Yes, sir.  That's how long this has

10 been studied and known.

11          Q.   And Dr. Strayer's 2003 report from

12 July 22?

13          A.   Yes, sir.

14          Q.   Are these peer-reviewed documents?

15          A.   May I see the one, the last one you

16 just referenced regarding Dr. Strayer?

17          Q.   Sure.  It may have some of my notes on

18 it, but you're free to read them.  I don't have any

19 secrets on that document, and probably don't on

20 this either.

21          A.   Yep, this particular document you hold

22 is a little bit different than the one that I

23 referenced, not that he hasn't spoken to this issue

24 a number of times.  Let me see which reference I

25 have here.  And I can send you the precise copy

Page 134

1    that I was relying upon since I've got a little bit

2    of a followup.

3              I referenced a document by Dr. Strayer,

4    and he gave this at the -- I think it was a human

5    factors symposium in 2002.  I think yours had 2003,

6    right?

7         Q.   It references a 2003 driving assessment

8    conference.

9         A.   Right.  And he has spoken all over the

10   world on this subject.  You can Google him and,

11   boy, you'll find some very interesting YouTube

12   videos that are modern and current.  He's a current

13   standing professor at University of Utah now.  The

14   one I was referencing was, Fatal Distraction? A

15   Comparison of the Cell Phone Driver and Drunk

16   Driver, Strayer, 2002.

17        Q.   Which the identical title of this

18   article.

19        A.   So it's the same thing, just

20   regurgitated, you know, with other -- so your

21   original question, and I'm sorry, was, is it peer

22   reviewed?  I never quite understand exactly what

23   peer reviewed means.

24        Q.   Okay.

25        A.   But it is something that the National

1    Safety Council, NTSA, and the National

2    Transportation Safety Board has relied upon in the

3    past.

4            Q.    Have they adopted it as authoritative?

5            A.    I don't know that answer.

6            Q.    Okay.  Do the Federal Motor Carrier

7    regulations preclude the use of cell phones while

8    driving a commercial motor vehicle?

9            A.    No.  They do not preclude the use.

10           Q.    So it's not illegal under the regs to

11   drive a CMV using a cell phone hands-free?

12           A.    Hands-free.  And that is the caveat

13   that a -- to meet the minimum requirements, a

14   driver must -- can only use a cell phone while

15   driving if he uses it hands-free as they have

16   described it.

17           Q.    Okay.  You read Mr. Sepesi's

18   deposition, correct?

19           A.    Yes.

20           Q.    You saw where he testified under oath

21   that to the extent he used a cell phone, it was

22   through a headset or hands-free device?

23           A.    Yes.

24           Q.    Do you have any reason to challenge or

25   dispute the accuracy of what he said?

1        A.    No.

2        Q.    Do you have any evidence to indicate

3   that he was using a cell phone in his hand at any

4   point in time leading up to the accident back in

5   October of 2017?

6        A.    No.

7        Q.    So assuming his testimony as he gave it

8   is taken as true, the use of a hands-free device

9   would have been compliant with the federal

10  regulations?

11       A.    I don't have any evidence whether or

12  not he was noncompliant or not, given his

13  testimony.

14       Q.    Okay.

15       A.    That's not my issue.  That's not my

16  opinion.  I don't even know that I even mentioned

17  about, you know, 392.80 and 392.82 that

18  specifically deals with the cell phone regulation.

19  That is not the issue in my report.

20       Q.    Tell me what the issue is.

21       A.    The issue is, is the science, and our

22  industry understands from numerous sources -- and I

23  won't go back over that.  And as far as I know,

24  every regulator, every federal agency that I'm

25  aware of, the National Transportation Safety Board,

Page 137

```
 1   National Highway Transportation Safety

 2   Administration, Centers For Disease Control,

 3   National Industrial Organization Safety Group,

 4   OSHA, all agree that talking on cell phones while

 5   driving, regardless of whether it's hands-free,

 6   Bluetooth, or whatever you want to call it, is

 7   dangerous and should not be done.  And according to

 8   Dr. Strayer, driving while having a phone

 9   conversation on a cell phone, regardless of how you

10   do it, through the dash in your car or headset, is

11   kindred with drunk driving.

12          So another way to put it is, if you're

13   talking on your cell phone, you're cell phone

14   drunk.  And I'm not aware -- the only regulatory

15   body that hasn't adopted that is the one that

16   really counts when it comes to big trucking

17   companies, and that's the Federal Motor Carrier

18   Safety Administration.  And there are reasons for

19   that, that now have been called into question on

20   their basis for adopting this sort of

21   split-the-baby regulation that they did back in

22   2012, and that was allowing hands-free.  And we can

23   talk about it if you're interested.  I'll probably

24   mention it at trial.

25          Q.   Okay.  Go ahead and tell me what you
```

Page 138

1    think you might think say at trial on that topic.

2         A.   Okay.  So just a little bit of a

3    background on the regulation itself.  When it was

4    proposed to have some types of limitations on

5    commercial drivers talking on cell phones since we

6    knew that at that time that, you know, it was

7    estimated about 25 percent of all crashes were a

8    direct result and contributing factor of cell

9    phone-distracted use, the regulators initially were

10   considering doing a complete ban.  The American

11   Trucking Association and other interested parties

12   objected to that.

13        There was one solo study that runs to

14   different conclusions or comes to different

15   conclusions than all the other scientists and

16   studies, and that was a study out of Virginia Tech.

17   There, Hancock and a few others, and Ron Knipling

18   also being one of the chief architects of that

19   study, found through doing not a driving simulator

20   study or an epidemiological study, but rather an

21   experimental study of observation of, we call it --

22   they call it the 100-driver study, which did not

23   provide simulations of the same conditions for

24   everybody, but just simply observed whether or not

25   they were lane departing or having crashes, and

1  there was only one crash that ever occurred in

2  these 100 trucks that were studied over a year or

3  two.

4          They came to the conclusion that there

5  was no difference between a driver talking on a

6  hands-free or talking on a handheld cell phone.  In

7  fact, they even came to this conclusion, that there

8  might be some benefit of talking on the phone while

9  holding it in your hand.  I don't know how they'd

10  ever come to that conclusion, but that was their

11  conclusion.

12          Now, fast forward about two years ago,

13  and now former professor and Dr. Ron Knipling, who

14  I've spoken on the same venue with him before and

15  have known him, he has now recanted his particular

16  part in the architecture of this particular study

17  that was the sole one document that the FMC relied

18  upon for their promulgating of the regulation

19  392.82.  He has recanted that as being an

20  inappropriate type of research to make such a

21  significant determination.

22          Now, he's embattled right now, but

23  others have addressed this.  You can find this

24  actually online from like Dr. Paul Ashley at the

25  University of South Florida and others have gotten

1    in on this battle.  Dr. Hancock at the University

2    of Virginia Tech is still holding to that

3    particular study for obvious reasons.  They've got

4    a federal grant to do it.

5              So that's sort of the background.  All

6    that being said, it is shaky ground to now rest on

7    what has already been determined as suspicious, if

8    not unreliable -- at a minimum it's suspicious; at

9    a maximum it's unreliable -- study to make such a

10   tremendous and important ruling that motor carriers

11   for years, long before this argument ever came out,

12   all your national motor carriers -- in fact, I did

13   a little study based on my own reason experience as

14   a forensic expert where I've seen actual policy.  I

15   can't ever print them and show them to anybody

16   because I get them confidentially, but just from my

17   memory, when I looked at the top 20 motor carriers

18   in the nation, I was hard pressed to find a motor

19   carrier that didn't have a total ban policy.

20             So if a carrier is willing to -- again,

21   you asked me earlier on about why am I oftentimes,

22   you know, selected as a -- in my expertise on the

23   plaintiff's side.  Maybe it's because I do believe

24   in safety.  But if you want to be a minimalist and

25   just follow the rule and ignore all the other

1  evidence, then you would fall out on saying, we

2  don't really care; we're just going to let a

3  driver -- we're going to do whatever the law forces

4  us to do and no more.  But your major thinking and

5  the trending now is, you have to do more because

6  the rule is not sufficient.  And the rules always

7  lag behind science.  The rules always lag behind

8  trends.  And many times, unfortunately, they're

9  just 20 and 30 years behind.

10       Q.   Isn't the standard of care what the CFR

11  says?

12       A.   Not in my world, it's not.  You know,

13  if I'm advising a client on this very subject, I

14  would say, no, that isn't the standard of care.

15  Here's the science, and my clients look at it and

16  say, our standard of care is going to be this.  I

17  mean, how -- why would you go -- why would you

18  ignore what has been discussed so openly and widely

19  and on TV that cell phone distraction is a drunk

20  brain, equivalent to driving, you know, .008 weight

21  volume alcohol.

22       Q.   Would you agree that the CFR is the

23  minimum standard of care?

24       A.   I do agree to that.  It states that in

25  many places.

1        Q.   But it may not be the gold standard?

2        A.    It is an insufficient standard.   I

3   don't know how to define -- I don't know what you

4   mean by gold.

5        Q.   Okay.

6        A.   And again, I'm not looking for

7   perfection with any of these carriers.  They're not

8   going to be perfect.  There's only one perfect, and

9   we know who that is.  But I am looking for them to

10  use their safety sense, which is different than

11  common sense.  Safety sense is an education --

12  educated perspective about what safety is necessary

13  and works, and that comes through education.

14       Q.   What is the evidence you have that Mr.

15  Sepesi was talking on his cell phone near the time

16  of the crash?

17       A.   Okay.

18       Q.   Before we answer that, I take it you

19  don't have -- you're not of the opinion based on

20  your analysis that he was talking on his cell phone

21  at the time of the crash, are you?

22       A.   I'm going to give an answer, and I'd

23  like to explain my answer, if you don't mind.

24       Q.   I have not stopped you from explaining

25  any answer you've provided.

Page 143

1          A.    And I want to acknowledge, I really

2     appreciate that, because I get a lot of these

3     objection nonresponsive stuff, but it's just

4     helpful to get it out there, so thank you for that.

5               So the answer is, I don't know if he's

6     talking at the time of his crash.  But there's a

7     difference between talking, listening, having an

8     open phone call.  Okay.  So I've answered that

9     question before where they ask me pointedly and I

10    try not to interject too much and try just to be a

11    good boy and answer the question as it's asked.

12    Maybe it was not the right question or maybe it was

13    a trick question, but I don't know if he's talking

14    or listening.  But the issue is -- and if you see

15    this paper on the distracted brain, the brain, it's

16    impossible for the brain to toggle.

17               But to go to specific record, how I

18    have come to this conclusion, if we look at the

19    cell phone record which is attached to my

20    Exhibit 1 -- and let me get to the right page here.

21    I'm just going to look at this Exhibit.  I may have

22    to pull it up on my computer to see it well.

23          Q.    26, or Bates stamp 1885, I think is

24    what you're looking for, if you're looking for the

25    cell phone records that captured the date of loss.

1          A.    Okay.

2                All right.  So did you say Bates stamp

3     1887?

4          Q.    I didn't, but I'll go there.

5          A.    Okay.

6          Q.    If that's what you're looking at.

7          A.    Let me just look at my source.

8                Okay.  I am looking at -- let me get a

9     Bates stamp here -- 1885.  Is that what you had

10    said?

11         Q.    That is.

12         A.    Okay.  All right.  So working on --

13    working from this record and also operating under

14    the initial belief that this record represents the

15    time zone where the bill would have been, where he

16    lived in central time zone.

17         Q.    What do you base that assumption on?

18         A.    Based on my experience with other

19    Verizon records that I've reviewed before where

20    we've made that specific inquiry.  I base it on

21    that.

22         Q.    Did you make an inquiry of Verizon as

23    to the phone records from Mr. Sepesi that you're

24    evaluating?

25         A.    I did not.

1        Q.    Why not?

2        A.    I just didn't.  But if you'll hear me

3    out one second, I don't really think it makes a

4    difference on this point, and I'll tell you why.

5             Understanding the CAD 911 call record

6    at 10:26.  I think we'd established that a little

7    bit earlier, that the crash would have had to have

8    occurred before 10:26 sometime.  We just don't know

9    exactly when.  We agreed on that.  There is a call

10   at 9:19 a.m., which would be 10:19 Eastern Time,

11   the time of the CAD record in Georgia.  So at that

12   particular moment in time, there is a three-minute

13   call to LaGrange, Illinois at 9:19.

14       Q.    Does the call start at 9:19 and end at

15   9:22 or does the call start at 9:16 and end at

16   9:19?

17       A.    It begins at 9:19 and ends at 9:22.

18       Q.    How do you know that?

19       A.    Well, when I say 9:22, this is rounded,

20   so the three minutes could be rounded.  I mean, it

21   could be anywhere, in fairness, two minutes and one

22   second to two minutes and 59 seconds.

23       Q.    How do you know it goes in that

24   direction as opposed to the opposite direction?

25       A.    That's based on my experience, that

1  that is the time of the execution.  They may

2  actually say it up here, but let me see.  It's

3  based on my experience that that particular -- I

4  don't know that they gave us a legend on this, but

5  I could get you one on Verizon.  I have one.

6      Q.   Well, I'm asking about your

7  interpretation of the documents that were provided

8  to you which did not include a legend.  You're not

9  a cell phone record expert, are you?

10      A.   No, sir.  Well, what do you mean by

11  cell phone record expert?

12      Q.   We're talking about how to interpret

13  this document with regard to when the call starts,

14  when the call ends, what time zone we're using.  Is

15  that now in your area of expertise?  Not saying you

16  haven't looked at this stuff, but...

17      A.   Right.  I understand.  Based on my past

18  experience of looking at cell phone legends and so

19  forth, I am operating under the belief and based on

20  my knowledge and training that that time in that

21  left column is the time that the call was engaged.

22  I think they call it -- I don't know if it's like

23  locked or -- but that's the time of the actual

24  initiation of the call.

25      Q.   Okay.  Would you agree with me that the

1     best person to provide unequivocal and accurate

2     information about how these cell phone records

3     should be interpreted is a representative from

4     Verizon?

5          A.   Well I mean, that would certainly --

6     that could answer every single potential question,

7     you know, questions we haven't even thought of.  I

8     don't know how they would testify about that.  I've

9     read some of those depositions from Verizon and

10    others.  We don't have one in this one.

11         Q.   Okay.

12         A.   But I'm operating under the assumption

13    that it's an executed call starting around 9:19.

14         Q.   And you're operating under the

15    assumption that all of the times on this bill are

16    Central Standard Time?

17         A.   Correct.

18         Q.   Not Eastern Standard Time?

19         A.   Correct.

20         Q.   Not Greenwich Time?

21         A.   Correct, or UCT.

22         Q.   Have you ever seen a cell phone record

23    that has the --

24         A.   All the time, yes.

25         Q.   UCT?

Page 148

1        A.    Yeah.

2        Q.    UT --

3        A.    UC, yeah.

4        Q.    Okay.

5        A.    Universal Time Code --

6        Q.    But you don't think that's this?

7        A.    No.  No, I don't.

8        Q.    How do you know it's not?

9        A.    Well, you're going to have -- well, I

10   mean, I guess we could go through an exercise here

11   to see if that would even work.

12        Q.    That would be a five-hour difference,

13   right, from us?

14        A.    Yes.  London time, so it is five hours

15   difference in London, but sometimes the change, you

16   know, from daylight to savings, sometimes that can

17   have a difference, but it's probably a five-hour

18   difference.

19        Q.    Did you look to see whether or not

20   October 24th fell anywhere near what would have

21   been the fallback, daylight savings time?

22        A.    I don't remember exactly when that

23   would be.  Are you talking about in consideration

24   of what Illinois would observe?  I think that

25   Illinois observes the same thing that South --

1   Georgia observes regarding that.  I mean, there's

2   only a few states that don't observe --

3          Q.   That don't observe it at all?

4          A.   Like out in Phoenix and a few other

5   places I've run into -- I've had an embarrassing

6   events like that.

7          Q.   All right.

8          A.   But hear me out on this.  So at

9   9:19 a.m., and a three-minute call which runs it

10  over to approximately 9:22, we're now running up

11  close to the time, potentially, of the time of the

12  crash.

13         Q.   If you accept your assumptions as true.

14         A.   That's correct.  Now, let's assume I'm

15  wrong, okay, for the sake of analyzing this.  And

16  I've considered this.  Let's assume that -- and I

17  don't know why a person that's living in, you know,

18  Illinois and got an Illinois phone bill would be

19  getting an Eastern Time Zone phone bill, but let's

20  assume this is Eastern Time Zone.  Then there is a

21  call at 10:19 a.m.  So 9:19, 10:19, it really

22  covers both of those particular assumptions.  And

23  that particular call happens to be also a

24  three-minute call, running up to about 10:22 -- or,

25  excuse me -- yeah, 10:22.

1          Q.   Do you know whether or not a call that

2     is incoming that goes to voicemail is recorded on a

3     cell phone bill as an incoming call?

4          A.   It could very well be.

5          Q.   Well, do you know?

6          A.   It could very well be.  I have not

7     seen -- where I have gotten different kinds of

8     bills where they've been subpoenaed, and we can

9     actually see voice message information.  That would

10    be the definitive answer of that, to tell us if it

11    went to voicemail and there was a recording taking

12    place.  I don't know that I have ever seen a

13    voicemail that takes longer than a minute.  I'm not

14    saying there couldn't be a longer-than-a-minute

15    message, but my experience has been that it's -- I

16    mean, I don't know that I've ever seen one that

17    would be three minutes.  I'm not sure that it

18    actually will let you give that one that long, but

19    I haven't tested that.

20         Q.   Okay.  And Verizon would be the better

21    resource to definitively answer that question,

22    right?

23         A.   Well, to the extent that they've got

24    more documentation on this.  Now, they might could

25    talk about theoretically how it's supposed to work,

1    but I don't know that they, you know -- again, my

2    experience is, most of the carriers any longer are

3    deleting everything but the phone bill after about

4    a year.  They're purging it.

5         Q.   Okay.  Go ahead with your -- I mean, I

6    think we were in the middle of --

7         A.   That's about it.  I mean, that's

8    about -- that's tying the time of a phone call with

9    what we are seeing as within the range of when the

10   crash occurred, sometime before 10:26.  So we're

11   within -- just on that information alone, we're

12   within somewhere in the neighborhood of about four

13   minutes or so.

14             It certainly sets the stage that he is

15   willingly talking on his phone.  Because, I mean,

16   if we look, let's go back to the assumption of

17   9:19 a.m. as being the time that is close in

18   proximity to the time of the crash, and we've made

19   the adjustment because of time change, or time zone

20   difference.  He's got a call right before that,

21   9:03.  He's got a call right before that at 8:42.

22   I mean, is he on the roadway at that point in time?

23   I just don't know.  At 9:19 --

24        Q.   You don't?

25        A.   I just don't know.  If I look at his

1    log, he indicates on his log -- let's see.  His log

2    has been found to not be reliable, but --

3         Q.   Found by you to not be reliable?

4         A.   I don't think you're going to find any

5    expert that's going to disagree with that if

6    they're using the right side of their brain.

7         Q.   Hang on a second.  You're the one

8    that's evaluated that, and that's your opinion,

9    right?

10        A.   We're going to get to the logs here in

11   just a few minutes.  Back on this --

12        Q.   I thought you had just gotten to

13   referring to them for some reason.  That's the only

14   reason I bring it up.

15        A.   I don't understand the question.

16        Q.   I thought you were cross-referencing

17   some of the cell phone records.

18        A.   I was getting ready to before you --

19   and maybe I should not have said what I did, but to

20   the extent that they're written down here, you

21   know, they just haven't found in my view to have

22   been reliable.  But he shows a drive of 15 minutes

23   after being off duty.

24        Q.   Which date are you referring to?

25        A.   This is 10/24, the date of our crash.

1          Q.   Okay.

2          A.   From 9:30 to 9:45.  Again, his log is

3    going to be Central Time.  He's -- I don't see any

4    reason that it doesn't make sense, at least at that

5    point, that it's Central Time because we know our

6    wreck, you know, was -- he's got it at 9:45.  We

7    know that's not correct, you know, which would be

8    10:45 our time.  But --

9          Q.   Is -- all of his entries for October

10   24th are while he's in Georgia?

11         A.   Yes, sir.

12         Q.   Which is Eastern Standard Time,

13   correct?

14         A.   Yes, sir.

15         Q.   But you believe that the time is

16   Central Standard?

17         A.   Yes, sir.

18         Q.   Okay.

19         A.   Yeah, you'll find other experts to

20   agree with that.  And here's the reason.  There's

21   two reasons.  One is, is he is obligated, according

22   to 395.8, to use as his time base the base of his

23   home terminal.  Okay.  Second thing is, the time of

24   the accident only makes sense that it would be

25   Central Time.  The time of the accident that he

1   shows on his log, it only makes sense that it would

2   be Central.

3         Q.   Do me a favor.  You're looking at the

4   log.  Show me where you're -- where he's indicating

5   the time of the accident on his log.

6         A.   See right here.  You've got accident.

7   See right there?

8         Q.   Okay.  And that line goes up to here?

9         A.   Yes, sir, 9:45.  Is that what it looks

10  like to you?

11        Q.   You know, I tried to get the biggest

12  version of this --

13        A.   I know.

14        Q.   And a magnifying glass, and it's still

15  hard to read.

16        A.   The colored version, it just looks a

17  lot better.

18        Q.   Okay.

19        A.   We'll show the colored version to the

20  jury.

21        Q.   All right.  Great.

22             So you're reading that to say that he

23  identifies the time of the accident at 9:45 a.m.,

24  which if we assume he is using Central Standard

25  Time is 10:45 Eastern Standard Time, correct?

Page 155

1       A.   Yes, sir.

2       Q.   Which is after the 911 call, right?

3       A.   Yes, sir.

4       Q.   Okay.

5       A.   In realty, he's a little bit off here

6   in when he notates the time of the crash.  I mean,

7   I think we'll all have to agree if in fact this is

8   Central Standard Time, and I'm confident it is, he

9   should have shown the time of the crash -- if he's

10  driving 15 minutes, he just backs everything up by

11  15 minutes on this log.

12      Q.   If he's driving 15 minutes when?

13      A.   I'll blow this up right here, and it's

14  a little bit easier for you to see.  Driving line,

15  right here.  See, he's showing driving 15 minutes

16  from somewhere in Smyrna to the point of the crash.

17  Do you see that?

18      Q.   Yes.

19      A.   Okay.  So if we just slide this back --

20      Q.   That's the very small horizontal line?

21      A.   Correct.

22      Q.   Okay.

23      A.   Correct.  So if we just slide all that

24  back by 15 minutes from right here.

25      Q.   To the left?

1        A.   Yes, sir.   It's a little more accurate

2    to the -- again, this is not an electronic log.

3    This is an old paper log, which was applicable

4    during that time.   It's only factored in 15-minute

5    increments.   So you know, it doesn't provide real

6    well for rounding.   So he would only have really

7    the option of showing the crash at 9:15 or 9:30.

8    So if the crash occurs at 9:23, 22, 24, 25, he

9    could show 15, more than likely if it's closer

10   toward the rounding up, he should have shown 9:30.

11   That's a small issue there, but I'm not real

12   critical of that.

13       Q.   Does your analysis account for an

14   honest mistake, as opposed to intentional

15   falsification?

16       A.   Yeah.   Yeah.

17       Q.   And how much time or leeway would you

18   give for that type of mistake?

19       A.   I track with what my experience has

20   taught me that the regulators use regarding

21   falsification.   That's what we're talking about,

22   false records, and the industry term we use often

23   is falsification.   I may at trial just use false

24   record because that's exactly what it says in the

25   book.

1         But for the purpose of this, just to

2    make it easier, falsification is typically

3    identified with two criteria:  One -- and this is

4    the most important -- is where a record does not

5    represent the accurate time based on other

6    independent records that are very reliable, and it

7    gives the driver a distinct regulatory advantage.

8    I put this in my report.  It typically involves the

9    issue of rest breaks.

10         And heres the way it works.  The driver

11   understands, look, he knows the rules, and see,

12   this driver, you can't say the driver doesn't know

13   the rule, because we don't have many logs, but his

14   rest break is exactly ten hours.  Well, that's

15   exactly what he's supposed to have according to

16   395.3.  So -- but what happens is, is if he's

17   getting there late -- so he takes that ten-hour

18   rest break and he just slides it up and down the

19   scale where it needs to be fit.  In other words, he

20   looks right on paper.  Okay.

21         The other dilemma is, though, is

22   sometimes he is not going to be able to get ten

23   hours in, no matter his best effort.  He's arriving

24   late.  He's got to leave early just to have enough

25   time to get the job done, the load done.

1   So then what he has to do is he has to compress

2   that in realty, but on paper he shows it as being

3   stretched out to ten hours.  And that's what we

4   have in my analysis.

5         Q.   What is your understanding of his

6   schedule for the day before and time leading up to

7   the accident, where he was obligated to be, if

8   anywhere, and at what specific time?

9         A.   I don't know.  It don't matter to me.

10        Q.   Well, the only reason I ask is you made

11  a comment about where he had to be or where he

12  needed to go.

13        A.   I don't think you heard that I was

14  using that as an example.  I was using that as an

15  example of how the falsification is determined

16  about what a driver's record shows and it giving

17  him an advantage because regulators have -- they

18  may not have all the stuff that we have in our

19  forensic analysis, but they ask for bill of ladings

20  and phone records and fuel receipts, and all this

21  kind of stuff.  And you've got to give it to them.

22  They've got a badge and a gun.

23              And they analyze that.  And when they

24  see, my goodness; well, I see what happened here;

25  he's supposed to be here at 9:00 a.m., and this

Page 159

```
 1    makes sense.  And they use those sometimes in their
 2    determination.
 3          Q.    They being?
 4          A.    The Department of Transportation.
 5          Q.    Okay.  And that wasn't done by anybody
 6    from the Department of Transportation in this case?
 7          A.    No, sir, but we're losing track here.
 8    But so the falsification determination does answer
 9    this question then:  Does the driver have something
10    to gain by stating his record falsely?  In this
11    case he did, distinctively.  And secondly, is it
12    more than, you know, 15, 45 -- I err on the side of
13    about an hour.  I'm going to give a guy an hour
14    leeway.
15          Q.    And when you say, does it give the
16    driver an advantage, you're referring to him being
17    able to show that he was otherwise compliant with
18    the rest break, when in your opinion he was not?
19          A.    Based on the supporting documentation,
20    that's right.  Not just in the opinion, but based
21    on my -- I guess my opinion of the supporting
22    documentation, that he was not compliant.
23          Q.    The supporting documentation being the
24    logs as compared to the cell phone records?
25          A.    That's the two documents we have to
```

Page 160

1    compare here, yes.

2          Q.   Okay.  In your report on Page 8, you

3    indicate cell phone use while driving a CMV shows a

4    conscious indifference to the scientific evidence

5    and education.

6          A.   So we're back now to my first report.

7          Q.   I'm still on the first to finish it.

8          A.   Okay.

9          Q.   I know we leaped into the second

10   report, but --

11         A.   I didn't leap to it, but yeah -- but so

12   we're back on four.  Which page now?

13         Q.   Eight.

14         A.   Okay.

15         Q.   Conscious indifference.  What do you

16   know, if anything, about what Mr. Sepesi or his

17   trucking company knew about the scientific evidence

18   and education regarding cell phone use?

19         A.   I don't know.

20         Q.   Where did you get the term, conscious

21   indifference?

22         A.   I want to make sure I'm referencing the

23   same line that you're looking at.  Which line

24   again?

25         Q.   Page 8, second paragraph, second line.

1      A.    Okay.

2            Okay.   This statement, the second

3      sentence, is a general statement that, going -- I

4      don't want to regurgitate all this again, but going

5      back, if someone knows, if they've been properly

6      trained and educated, and they know what we've

7      talked about already about the distracted brain and

8      the dangers of driving while talking on a cell

9      phone, and they make an intentional decision to

10     ignore that and run contrary to it, that's what

11     that's speaking to.

12           So cell phone use while the driving a CMV.

13     I didn't say while Mr. Sepesi was that, and I don't

14     even reference Mr. Sepesi in that sentence.   Maybe

15     I should have dropped it in a separate paragraph

16     to, you know, avoid the confusion.   In my opinion,

17     it's an indifference to the scientific evidence and

18     education that's been published in our industry.

19     Q.    Okay.

20     A.    Does that help?

21     Q.    Yeah.   Stay with me on your first

22     report so we can kind of go through it.

23     A.    Okay.

24     Q.    You attached a company snapshot of

25     FeroExpress.   Do you see that?   This.

Page 162

1          A.   I didn't attach it to my report.  That
2     was just part of my file.
3          Q.   Oh.
4          A.   You've mentioned a couple of times.
5     Now I think I'm sort of getting -- that was just
6     something I guess I produced to Mr. Hayes as part
7     of my file.
8          Q.   I just --
9          A.   It wasn't attached as part of the
10    report, but it was part of my file.
11         Q.   All right.  Well you know, I guess I
12    can go back and see what was presented and how it
13    was presented.  Is this company snapshot of any
14    importance to you one way or the other in terms of
15    how it affects your opinions?
16         A.   No, I don't think I had any opinions
17    regarding their -- we've talked a little bit about,
18    you know, their past grade on their recent
19    inspection and -- but since you brought it up, let
20    me just make sure there's nothing glaring here.
21              I suppose the one thing that would be
22    relevant here, since you asked, is, if you look at
23    Page 2 of that particular report, and you look down
24    at the -- near the bottom where it has crash
25    activity, we do in fact see our particular crash

Page 163

1   noted, 10/24/2017, and it gives a little bit more

2   information and data there.  They did show this as

3   an injury crash, as opposed to a tow-away crash.

4            There also from 2017 to 2019, when I

5   pulled this report, June of 2019, there has been no

6   attempt by the carrier to make any attempt to have

7   this determined from their particular attempts as

8   being non-preventable.  There is a provision

9   where -- and I see it all the time; you look on

10  your major motor carriers particularly, but then

11  smaller ones too -- if they feel like, look, this

12  crash is on there; we didn't have anything to do

13  with it; it wasn't our fault; it wasn't

14  preventable, there is a procedure you can go

15  through, and the government won't expunge it, but

16  they will notate that it's been deemed

17  non-preventable.

18       Q.   Or been challenged as non-preventable?

19  Who makes the deeming determination?

20       A.   DOT.  Because I see it all the time

21  that they'll actually reject sometimes.  So we know

22  two pieces of information.  One, there's been a

23  challenge, and then we also understand what the

24  Department of Transportation's determination was.

25       Q.   Okay.  Would you agree that the fact

Page 164

1    that it was not challenged doesn't necessarily

2    preclude taking that position as it being

3    non-preventable?

4         A.   Sure.  You can take any defense you

5    want on it.  But I'm just bringing that out as you

6    were asking me what was important here.

7         Q.   Okay.  How about the safety measurement

8    system documentation?  What significance, if any,

9    does that have in allowing you to reach your

10   opinions?

11        A.   It doesn't.  And part of the reason for

12   that is, is the time lag between the time of our

13   event in 2017 and 2019 when I drew this

14   information.  This information regarding the basic

15   status and some of those statistics and even the

16   out-of-service rates and so forth are contingent

17   on, most of that data drops off after two years.

18             So it tells me, you know, based on

19   their inspections -- I don't see any activity

20   after -- we know that they were inspected in

21   February of 2018.  After that, I don't see any

22   evidence of whether they're operating or not.

23        Q.   Okay.  Anything else you'd care to add

24   as to opinion number four in your original report

25   that we haven't otherwise covered?

Page 165

1          A.   No, sir.

2          Q.   Okay.  Let's transition to your

3    supplemental report --

4          A.   All right.

5          Q.   -- which is attached as Exhibit 2,

6    correct?

7          A.   Yes, sir.

8          Q.   Or identified as Exhibit 2, which we

9    will attach to your deposition.  So summary of your

10   qualifications looks to be the same information

11   that was provided in the original report, correct?

12         A.   It is.

13         Q.   Okay.  Your introduction of

14   supplemental opinions reflects that you still

15   endorse your initial report.  The information and

16   case material you reviewed.  The only thing that I

17   see in comparing the two reports that is identified

18   specifically in this supplement that wasn't

19   provided or identified in the original report is

20   the record of duty status, the driver's logs.  Was

21   that not provided to you originally?

22         A.   It was.  It was -- the reason I decided

23   to -- and I thought about this, you know, should I

24   do it; should I not?  But I thought, no, I'd better

25   do it.  It was part of the document production that

Page 166

1    I had, you know, what little production we did

2    have.

3           Since my -- this whole report involves

4    the hours-of-service issue, I just wanted to make

5    sure that somebody wouldn't hold me responsible for

6    relying on the driver logs but not stating that as

7    material that I've relied upon or reviewed.

8           Q.   Okay.

9           A.   So that's the reason I put it in there.

10   That's the only reason I put it in there.

11          Q.   Okay.  But I'm correct, you had the

12   driver's logs and you had the cell phone records

13   when you were first provided the materials to

14   review in this case?

15          A.   I did.  I wasn't quite finished with

16   the actual project, but yes, I did have that.  Now,

17   there is additional, you know, if you turn the page

18   up there on 10, the reconstruction of the logs with

19   the Verizon is something I am reliant upon, and

20   then also the hours-of-service visual aids, which

21   is incorporated in Appendix A.

22          Q.   Understood.  And that was all done

23   based on your analysis and assessment of the cell

24   phone records and the driver logs which were part

25   of the final materials that were originally

Page 167

1    produced to you?

2         A.   Yes, sir.

3         Q.   Okay.   What I'm trying to understand,

4    and maybe there's a simple explanation, is, why do

5    we have a supplemental report dated August 27th,

6    2019, two days ago, when 100 percent of the

7    materials that you've relied upon for your

8    supplemental report were available to you at the

9    time you generated your original report?   What

10   changed?

11        A.   Well, nothing changed except that I

12   have this additional opinion after reviewing the

13   material.

14        Q.   And you didn't have it when you

15   reviewed it initially?

16        A.   I did.   I just did not pick up on the

17   hours-of-service infraction at the first look of

18   this material.

19        Q.   So this supplemental report is

20   something that you picked up on independently based

21   on your continued review and assessment of the

22   materials?

23        A.   That's correct.

24        Q.   Nobody directed you to do an additional

25   analysis?

Page 168

1        A.   Absolutely not.

2        Q.   Okay.  And when is it that you had this

3   epiphany that there may be additional opinions

4   based on those cell phone records and the driver

5   logs?

6        A.   Well, I made this determination as I

7   was beginning to review for the deposition and so

8   forth, so I don't know specifically if it was about

9   the 26th or maybe the weekend before, but it was

10   just a couple of days before this 27th of

11   publication.

12        Q.   Okay.  I mean, and that explains the

13   timeline as to why I didn't get it two months ago

14   versus two days ago.

15        A.   Mr. Hayes hasn't been holding out on

16   you.  I haven't been holding out on you.  It took

17   me a little while to develop this, and I wanted to

18   try to do a good job with some visual aids.  I've

19   been criticized before that I want to come to trial

20   with a visual aid and didn't have it in the report.

21   So it just takes time to do those things.

22        Q.   All right.  And let me be just be clear

23   for the record.  I'm not suggesting or accusing

24   either you or Mr. Hayes of holding out on me.

25        A.   Sure.

Page 169

1          Q.   I just wanted an explanation.

2          A.   Thank you.

3          Q.   All right.  The industry reference

4     materials stayed the same, correct?

5          A.   Yes, sir.

6          Q.   All right.  Let's talk about opinion

7     number five.

8          A.   Okay.

9          Q.   Which we kind of already talked about,

10    didn't we, when we were looking at the logbook

11    exhibit, but let's make sure I fully explore it.

12    Again you use the term, conscious disregard.  Where

13    is that coming from, that terminology?

14         A.   Well, it's my terminology.  But --

15         Q.   Do you understand that it also has a

16    legal connotation?

17         A.   You mean that that is a definition of

18    some legal term?

19         Q.   The term, conscious disregard.

20         A.   I mean, it may.

21         Q.   Okay.

22         A.   I'm just simply defining what I believe

23    to be the attributes of his conduct.

24         Q.   You're not using that term in

25    conjunction with any legal claim that's being made

1    in this case?

2              A.    No.   No, whatsoever.

3              Q.    Okay.

4              A.    I know better than that.

5              Q.    All right.   Go ahead.

6              A.    Okay.   Was there another question about

7    that?

8              Q.    That's just your terminology?

9              A.    Yes, sir.

10             Q.    All right.   So you talk about comparing

11   the cell phone records to the log and the

12   discrepancies noted, and then you reach the

13   conclusion that's a falsification as you've

14   described falsification, correct?

15             A.    Yes, sir.   I mean, I'm criticized often

16   for different things, but we use the term,

17   falsification.   Some people will pick at that and

18   say that's not really a legal term and stuff like

19   that.   And I get that.   That's why I sort of now

20   sort of explain it.   The actual regulation talks

21   about a false report, but it's commonly referred to

22   as falsification.   I hear regulators refer to it.

23             Q.    Which is the regulation that makes

24   reference to false report?

25             A.    395.8(e).   So if we go to 395.8(e),

Page 171

1   here it states that no driver or motor carrier may

2   make a false report in connection with a duty

3   status.

4           Q.   395.8(e)?

5           A.   Yes, and 1 in parentheses.  So you go

6   to 395.8 -- you'll have to sort of work your way

7   down to --

8           Q.   What version of the CFR are you using?

9           A.   It ain't going to matter.  It's been in

10  there since I've been in the business.

11          Q.   Okay.

12          A.   So you start with (a)(1).  Okay?  You

13  got that?  395.8 -- you see (a)(1)?  So work your

14  way down until you find the first (e), in

15  parentheses.  Not the big E, but the little e.

16  Okay.  Here, you want to look at mine?  It's right

17  after where you see all that date, total miles

18  today, truck, tractor, name of carrier --

19          Q.   Yeah.  I've got a parentheses, small e,

20  closed parentheses.

21          A.   There you go.

22          Q.   Mine says, failure to complete the

23  record of duty activities of this section, or

24  Section 395.15, failure to preserve a record of

25  such duty activities, or making of false reports in

Page 172

1   connection with such duty activities shall make the

2   driver and/or the carrier liable to prosecution.

3           A.    You're reading the interpretations.

4   You're not reading the regulation, I think.  Are

5   you not?  May I see it?

6           Q.    Yeah.

7           A.    I believe yours is a little out of

8   date.

9           Q.    That's why I asked whether or not the

10  versions mattered.

11          A.    Yeah.  I mean, it's saying the -- I

12  like this one better.  I think we should go with

13  this one.  But --

14          Q.    So what year are you looking at?

15          A.    Well, this one just happens to be, that

16  I pulled off the shelf, is February 2019.

17          Q.    Okay.  Tell me what --

18          A.    But I've got them for all time periods,

19  and I'll double check and go back and read that.

20  But this one just says simply, (e)(1), no driver or

21  motor carrier may make a false report in connection

22  with a duty status.

23          Q.    Okay.

24          A.    So I'll go back and double check.  I'll

25  go back into the future here and get the right one.

Page 173

1          Q.   Because we've just established that my

2     version from 2014 is different from your version in

3     2019, and the accident took place in 2017.  There

4     may or may not be language that's different than

5     our respective --

6          A.   It could be different, but that's going

7     to be for you lawyers to work through, you know, as

8     far as what you're going to get as far as jury

9     charges.  I mean, it's not for me to deal -- I know

10    it's wrong.  Yours doesn't say it's right and mine

11    doesn't say it's right.  It says it's wrong.

12         Q.   Can there be a discrepancy that you

13    don't consider to be a falsification?

14         A.   You asked me that earlier, and I told

15    you sort of what my guideline is on that.

16         Q.   Okay.

17         A.   Do you want me to repeat that.

18         Q.   No, I don't.  I don't.

19         A.   Okay.  Yeah.

20         Q.   Let's go through your log analysis

21    observations that start on Page 5.

22         A.   Let me just make one second --

23              THE WITNESS:  I'm going get a version

24    of the 395.8 (e)(1), and I'll get to that to you,

25    Mr. Hayes.

1          A.    Okay.

2          Q.    And what I'd like you to do -- and we

3     don't have to spend ten hours on it, and we're not

4     going to spend ten hours on it, is just kind of

5     walk me through the analysis.  I've read it.  I

6     just want to appreciate what you did.

7          A.    Right.  Regarding time, I'm a little

8     concerned that had we're five hours into this thing

9     and -- or let me see.  We're four hours into it.

10         Q.    We're not five hours into it.  I'll be

11    done within five hours.

12         A.    Okay.  Good deal.  All right.  That's

13    all I wanted to make sure.

14               So you were asking me -- I'm sorry.

15         Q.    As I understand it, you've outlined in

16    Pages 5 carrying over into 6, essentially your

17    methodology for how you've analyzed and evaluated

18    and compared the cell phone records and the record

19    of duty status log.

20         A.    Correct.

21         Q.    Okay.  I just want you to walk me

22    through the two examples that you've outlined in

23    detail, just so I make sure I understand what it

24    is.

25         A.    Okay.

Page 175

1        Q.   Because you're the industry expert and

2   I'm just the lawyer asking questions.

3        A.   Okay.   Thank you.

4             So starting on Page 5, I have laid out

5   critical events in my analysis of the logs that I

6   think are important to the determination of not

7   only his falsification, but his failure to get his

8   ten-hour required rest break.   Okay.   First off, I

9   start by just sort of the laying some groundwork

10  here under a.   This is under 10/23/2017 under

11  little a.   On his log, he showed that had he was

12  off duty in Ringgold, Georgia at 8:30 p.m. Central

13  Time.

14       Q.   Okay.   Now, we've discussed the Central

15  Time versus Eastern Time.   You're assuming for

16  purposes of your analysis Central Time?

17       A.   Yes, sir.

18       Q.   Okay.

19       A.   His log is supposed to be in Central

20  Time.

21       Q.   Okay.

22       A.   However, under B here, this cell phone

23  record shows a call from Guild, Tennessee which is

24  right on I-24, you know, heading toward Chattanooga

25  and then heading down toward Ringgold, Georgia.

Page 176

1   I've driven this route I don't know how many times

2   in the past.  But his cell phone record shows that

3   he has just arrived or is in Guild, Tennessee at --

4   maybe passing through -- at 10:58 p.m. Central

5   Time.  So it's impossible for him to be in

6   Ringgold, Georgia at 8:30 p.m., which is further

7   south than his intended route, when we know he's in

8   Guild, Tennessee at 10:58 p.m., Okay?

9           Guild, Tennessee -- this is C -- Guild,

10  Tennessee is due north of Ringgold, Georgia.

11  Another way to state it is Ringgold is due south by

12  41 minutes according to Google Maps.  Now, I don't

13  know if you know anything about that territory up

14  there, but that's a mountainous terrain that sort

15  of dips in from Tennessee back down into Georgia

16  and then back up to Tennessee.  Whether or not he

17  could make it in 41 minutes or not in a

18  tractor-trailer rig is doubtable.

19      Q.   Do you know if there's a cell phone

20  tower that would ping such that on a cell phone

21  record it would actually show the town of Ringgold?

22      A.   I don't.

23      Q.   You agree with me that there's no call,

24  either incoming or outgoing, that has a destination

25  as Ringgold in the cell phone records?

1          A.    I agree.  I didn't find one.

2          Q.    Did you give any consideration to

3     perhaps the Guild, Tennessee reference being the

4     only reference that Ringgold calls would be

5     identified on a cell record?

6          A.    I did not.  And I think I can explain

7     why I don't think that makes a difference based on

8     my analysis.  But I mean, you can draw your own

9     conclusions once I get through explaining it here.

10         Q.    Okay.  I'm gathering when you show log

11    off duty under the regs --

12         A.    He shows log off duty.

13         Q.    Right.  Under the regs off duty means

14    you're not driving anywhere?

15         A.    Actually, I say off duty, and really he

16    shows in the sleeper.  So really what I'm -- he

17    shows in the sleeper berth, but I'm not picking at

18    that.  I don't care whether it's off duty or

19    sleeper berth.  Technically, if he's in the

20    sleeper, he's supposed to show asleep or not, and

21    I'm fully giving him that, that he's in the sleeper

22    at some point in time.  I'm none the wiser to that.

23    That's what I mean when I say off duty.

24         Q.    Okay.  And --

25         A.    He's not working.

1        Q.   He's not working, meaning he's not

2   driving?

3        A.   Not driving, not unloading trucks, not

4   working.  That's what he says.

5        Q.   And that triggers the ten-hour

6   uninterrupted time period?

7        A.   Well, that could, if he gets ten hours

8   consecutively.

9        Q.   Okay.

10        A.   Either in the sleeper or for eight

11   hours in off-duty or some combination there

12   consecutively.

13        Q.   All right.  You had gotten to

14   subsection C where you had talked about the

15   41 minutes per Google Maps.  Let me ask you about

16   that, because you included some demonstrative

17   exhibits in your appendix, right?

18        A.   Yes, sir.

19        Q.   At what time did you generate these

20   exhibits?

21        A.   You mean time of day or --

22        Q.   Yes, sir.

23        A.   That's a good question.  I never would

24   have anticipated that question.  You ask a lot of

25   good questions.

1       Q.   Have you ever used Google Maps -- you

2   obviously have -- to get from point A to point B?

3       A.   I have.  And let me answer one question

4   at a time, if you don't mind.

5            I have saved -- I was working with this

6   mapping on the 26th, in the afternoon of the 26th.

7   So I was probably putting this together from like,

8   you know, maybe 1:00 or 2:00 p.m. on the 26th,

9   working on up until after hours, because I've saved

10  one document here at 5:15 p.m.  So does that answer

11  your question?  It was on the 26th in the

12  afternoon.

13      Q.   Okay.  Do you agree, given your

14  experience using Google Maps, that the minutes that

15  it would take to get from one point to another can

16  be different depending on the time of day that you

17  enter that information into Google Maps?

18      A.   There may could be some.  I think the

19  only way to really test that would be to do the

20  same work at different times of day.  It's an

21  interesting exercise.  I may go ahead and do that.

22      Q.   Well, let me give you an example.

23  We're in Greenville, right?

24      A.   Yes.

25      Q.   Clemson is right down the street,

1   right?

2        A.   Yes.

3        Q.   If we were to punch in the time it

4   should take on Google Maps -- and we could even do

5   it right now.  At 3:00 in the afternoon, it would

6   give us X amount of time, right?

7        A.   And it will take longer than whatever

8   they tell you.  I can tell you that.

9        Q.   Okay.  That's not my point.  Clemson

10  plays Georgia Tech tonight in the first college

11  football game for them, right?

12       A.   Right.

13       Q.   Defending national champions, right?

14       A.   Right.

15       Q.   Full house in Clemson?

16       A.   Right.

17       Q.   If we try to get to Clemson from here

18  at game time, it's going to take us a heck of a lot

19  longer to get the same distance; would you agree

20  with that?

21       A.   Yes, sir.

22       Q.   Okay.  And Google Maps incorporates

23  traffic conditions when they give you their time

24  estimate, don't they, in your experience?

25       A.   I've actually used this -- I actually

Page 181

1    sort of continued getting my practice of big rigs

2    and riding them on the road.  I have a motorcoach

3    bus, and my experience has been that I can never

4    make the destination by the time that they say.  So

5    it typically takes longer.  You add a truck to it,

6    it even gets longer.

7                 If I'm looking at it elongated,

8    meaning, you know, 100, 150 miles, something like

9    that, I don't know that we can see the traffic

10   issues with how long it takes.  I've rarely ever

11   been going down the road and have it change until I

12   get close in proximity.  And I don't know what

13   their measurement of close proximity is.  So I

14   think it's something we just have to test out.

15        Q.   Okay.  And the other question I have

16   about your map and your use of Google Maps is, you

17   don't identify a specific address in these towns.

18        A.   No.  Good point.  I don't.  This is

19   general, and I'm willing to admit that to the jury.

20   I mean, this could be -- and I'm not quoting

21   mileages here or anything like that.  I'm just

22   quoting minutes.  So we could be off maybe five

23   minutes, ten minutes.  It ain't going to make a

24   difference.

25        Q.   But it's not entirely accurate, is it,

Page 182

1   because you don't have a specific location for Mr.

2   Sepesi?

3          A.   The falsification will become clear,

4   and I think you know it is clear.  The

5   falsification is clear because we're not talking

6   about a small margin like five, ten minutes.  We're

7   talking hours.

8          Q.   Okay.  Let's go through the analysis.

9          A.   Okay.  Yeah.

10         Q.   All right.  So you went through Google

11  Maps.  You found Guild is due north of Ringgold by

12  41 minutes.  Go to letter D.  Tell me what you mean

13  by that.

14         A.   So Ringgold -- the ETA from Guild,

15  Tennessee to Ringgold, Georgia -- the ETA could not

16  occur before 11:39 p.m..  And that's really just

17  doing the math of adding 10:58 in Guild and 41

18  minutes and 11:39 being the answer.  And that's

19  under just ideal conditions.  That assumes he

20  doesn't run into any slow traffic or anything like

21  that.  Doesn't have to -- you understand that

22  Google Maps is designed for automobiles.  My

23  understanding of this is automobiles at running the

24  posted speed limit, which you may or may not could

25  do with a commercial truck, under ideal conditions.

1           Q.    Okay.

2           A.    Okay.  So this is most favorable, I

3    believe, to the defendant.

4                 All right.  Number E.  Assuming the

5    break in Ringgold -- and I'm not assuming that, but

6    I'm just simply presenting this here.  It may be

7    that he did not take the break in Ringgold.  I

8    believe more likely he took his break in Calhoun,

9    Georgia.  There's truck stops all along that way.

10   And I know that, you know, by fact and looking at

11   Google.

12          Q.    Why do you think it was in Calhoun?

13          A.    It will become clear in just a minute.

14                Assuming the break in Ringgold, it

15   could not have occurred before 11:45 p.m.  And the

16   difference between 11:39 and the 11:45, just the

17   time that it takes to, you know, ingress, egress

18   into truck stops, finding a place that you can

19   park, hoping there is a place that you can park,

20   getting your rig backed in, getting it locked down.

21                And this -- I've provided no additional

22   time for all of the things that a truck driver does

23   as part of his duty, to log on duty, not driving,

24   like filling out his paperwork, inspecting his

25   truck, fueling, any of that.  He may have done all

Page 184

1   of that, but I'm not dinging him for that.  I'm

2   giving him the benefit of the doubt.

3          Q.   Let me see if I understand what you're

4   telling me, and we'll cut to the chase.  Are you

5   interpreting all this to mean that because the cell

6   phone record shows he called from Guild,

7   Tennessee -- to Guild, Tennessee.  That doesn't

8   matter, does it, or does it?

9          A.   Let me see.  You got the cell phone

10  record up?

11         Q.   Mm-hmm (affirmatively)

12         A.   Let me get to it.

13              Okay.  If you go up to the column at

14  the top of that page there, it has origination.

15         Q.   So that's where you're putting him

16  physically in Guild, Tennessee, because that's

17  where the record suggests the call originated from?

18         A.   Yes, sir.

19         Q.   Okay.  He can't be in two places at one

20  time?

21         A.   You know, I haven't tried that.

22  Haven't tested it either.  I don't think so.

23         Q.   The log as you -- as it's been

24  presented by Mr. Sepesi suggests that he's in

25  Ringgold and off duty at 8:30 p.m.  The cell phone

Page 185

1   records suggest that he's placing the call while

2   physically present in Guild, Tennessee at

3   10:58 p.m.?

4          A.   Correct.  That's classic falsification

5   or false report right there.

6          Q.   Okay.  Let's go to the second example,

7   which I assume is similar to what we just went

8   through?

9          A.   Yeah.  These aren't examples.  These

10  are really just statement of what I believe the

11  facts are.  I mean, I'm not giving -- I'm just

12  trying to state facts.  I mean, if I've stated it

13  wrong, we'll clear it up right here.  So we go to

14  10/24/17.  Now, we're still back on the log still

15  shows him off duty.  Actually, he's in the sleeper

16  according to his log until 6:30 a.m.  So he's

17  saying he's there from 8:30 p.m. to 6:30 a.m.  He

18  could do the math.  He knows that's ten hours.

19         Q.   So again, if you assume that what he's

20  put down is accurate -- and I know you don't agree

21  with that -- once he stops the previous night at

22  8:30 until he starts up again at 6:30, he's

23  consistently and entirely within Ringgold, Georgia?

24         A.   That's what he says.

25         Q.   Okay.

1        A.   Yeah.   So I'm restating again here

2   this -- well, no, I don't guess I have stated yet

3   that under B here cell phone record shows a call

4   from Calhoun, Georgia at 1:34 that extends

5   approximately to 1:36.

6        Q.   Okay.

7        A.   Okay.

8        Q.   That's an incoming call from Calhoun?

9        A.   No.   Well, let's see.   Yes, it's an

10  incoming call, but he's at Calhoun.

11       Q.   How do you know that?

12       A.   Let me get to the record here.

13            I'm operating under that assumption,

14  that everything in that left column that's showing

15  origination -- it's the only thing that makes

16  sense.   Because I mean, if you look at all his

17  calls on the other end, they're all in Illinois and

18  stuff like that.   He can't be in Illinois and

19  Georgia at the same time, to use your analogy.   So

20  I'm operating under that assumption, that this call

21  is from somewhere in the Calhoun, Georgia area.

22  Should we continue?

23            MR. HAYES:   Let me object to the

24  responsiveness.   I think you got it reversed in

25  that last statement.

1              MR. HURAY:  You're going to object to

2      the responsiveness of a question you didn't ask

3      from your own expert witness?

4              MR. HAYES:  Yes.  You've got my

5      objection.

6              THE WITNESS:  I must have missed

7      something here.  Ask the question again, and I

8      guess...

9              MR. HAYES:  Repeat the last answer.

10     BY MR. HURAY:

11         Q.  Let me see if I can restate it.  I

12     don't want you to say things that you didn't mean.

13         A.  Sure.  I don't either.

14         Q.  Is it -- your interpretation of the

15     cell phone record is that in the column which says

16     origination, whether or not it's an incoming or

17     outgoing call, that's reflective of where you

18     believe Mr. Sepesi was at the time the call was

19     either placed or taken?

20         A.  Correct.

21             MR. HURAY:  Does that clear it up?

22             MR. HAYES:  Yep.  That clears it up.

23     Thank you, sir.

24             THE WITNESS:  It's getting a little

25     late in the day.  And that's the reason I sort of

1  draw a five-hour limit, because this is --

2          MR. HURAY:  Okay.

3          THE WITNESS:  -- tedious work.  Okay.

4  Should I continue?

5  BY MR. HURAY:

6      Q.   Please.

7      A.   Okay.  So C, Calhoun, Georgia is

8  37 minutes south of Ringgold, according to Google

9  Maps.  I mean, it's straight down I-75.  It makes

10 no trucking sense for him to overshoot Ringgold to

11 go down to Calhoun and come back to Ringgold and

12 spend the night.  Rather, what I think makes sense

13 is that, under D, Calhoun, Georgia is more likely

14 the rest stop that was used by Sepesi.

15          There is another possibility that I

16 feel like -- and I thought about this, in fact,

17 last night -- there is a possibility that he didn't

18 take a break at all until he got somewhere near

19 Smyrna.  That would even be more dangerous.

20     Q.   Just drove straight through?

21     A.   Yes, sir.  It doesn't make a difference

22 on the amount of rest break.  It's really just

23 sliding the scale.  That's hard to imagine, that he

24 would do that, but I think more likely there's

25 truck stops in the Calhoun, Georgia area there

1   right off the interstate that, since he made the

2   phone call, that's more likely a better place to

3   say that he stopped.  I don't think it was

4   Ringgold.  That's not to say he didn't stop in

5   Ringgold.  It just doesn't make sense why he would

6   overshoot the runway by 37 minutes and then

7   backtrack, not being that these trucks are getting

8   six, seven miles to the gallon and how much fuel

9   is, I just don't see him spending that kind of fuel

10   to go backwards.

11        Q.   Okay.

12        A.   Okay.  So if -- the log shows arrival

13   at Smyrna, Georgia at 8:15 a.m. Central Time.  So

14   when I look at the possibilities here, and this is

15   really broken out a little bit better on the

16   graphics that I've got, if we can go to -- I think

17   really we just go to Page Number 10.  I sort of cut

18   to the chase right here.

19             A critical point in this analysis is

20   sort of -- pivotal point, I should say -- is the

21   Calhoun, Georgia issue.  So I believe more likely

22   than not, the rest break occurred in Calhoun,

23   Georgia, again, unless he drove all the way

24   through, which would be just really, really unsafe.

25   And that I'm adding no fueling, inspection, or

1   paperwork time to any of this.  So this is in a

2   most favorable light to the defendant.

3            I think, alternative one, he starts his

4   break in Calhoun at 1:30.  He departs Calhoun at

5   6:45 a.m.  His rest break would then be five and a

6   quarter hours, max, just doing the math.  And the

7   reason it would only be five and a quarter hours,

8   max, is just the amount of time it's going to take

9   him to get to where he says he's at 8:15.  Inbound

10  Atlanta, morning, et cetera.

11           Alternative two would be that he starts

12  his break in Calhoun at 12:45, which would be the

13  earliest possible time he could arrive.  In other

14  words, alternative two takes into consideration

15  again trying to give the defendant driver the

16  benefit of more doubt.  It could be that he's

17  already arrived in Calhoun and doesn't place the

18  call until later.  So he might have gotten to

19  Calhoun, maybe went inside and got him something to

20  eat, showered, I don't know, and then places a call

21  before he goes to nighty night.

22           Q.   Okay.

23           A.   Okay.  That's alternative two.  Okay.

24  Now, under alternative two, he could potentially

25  have a rest break of six hours.  That's about as

Page 191

1  good as I could do if you'd hired me to work this
2  from the defense perspective.
3          Q.   Did you make a note of when you ran the
4  Google Maps exhibits?
5          A.   No, sir, but you can see from this
6  analysis, if I'm 30 minutes off on the front end
7  and 30 minutes off on the back end, he still has
8  violated the ten-hour rest break rule.
9              Now, the one thing that is important,
10  and it's part of this, is the amount of time in
11  each of these narratives, each of these
12  alternatives, that he has -- the time that he has
13  ability to have restorative, uninterrupted,
14  continuous, in other words sleep, the potential to
15  restore his body.  And that's what the rest break
16  is for, is to get sleep.
17          Q.   Do the regs require sleep or just rest?
18          A.   No, they don't require sleep.  They
19  don't require a lot of stuff that's sensical.  But
20  they don't require sleep.  They do require a rest
21  break.  But in the rule-making, they specifically
22  stated the reason they went from an eight-hour rest
23  break to a ten-hour rest break was for the goal in
24  mind and encouragement that drivers would get seven
25  to eight hours of sleep to restore their body,

Page 192

1    drive safe.

2             So the amount of opportunity of sleep

3    doesn't change from narrative -- or alternative one

4    to alternative two, and that's predicated because

5    we know he's on the phone in Calhoun, Georgia at

6    1:34.

7             Q.   Okay.

8             A.   Now, what follows there under 24 --

9    10/24; excuse me -- at the bottom of Page 5, is I'm

10   just laying out the different regulatory rules that

11   were violated.  And if you turn to Page 6, you see

12   there under, at the top of the page, C, the 14-hour

13   tour limit, part of the new regulations that

14   started in 2004 was to limit the amount of time

15   from start to finish that a driver could be doing

16   anything associated with a truck and driving.

17            Now, he can work himself to death on

18   the platform and dock, but he just can't drive

19   after having been on duty 14 consecutive hours.

20   His 14-hour stretch ran out at 9:45 p.m.  If we

21   think of nothing else from the time he shows on his

22   log of when he started, which was -- where was it

23   he says he started?

24            On 10/23 he said he started his tour in

25   Bridgeview, Illinois at 7:45 a.m.  14 hours

Page 193

1   forward, 9:45 p.m., he is out of business driving a

2   truck.  Well, he states he's there in Ringgold,

3   Georgia.  He understands how these rules work.

4   He's putting himself in the sleeper, or essentially

5   off-duty for the next ten hours.

6        Q.   Can you get to Bridgeview -- can you

7   get from Bridgeview, Illinois to Ringgold, Georgia

8   within the time that he's accounted for in his log,

9   or did you look at that?

10       A.   I think I did look at that.  I may have

11  looked at that.  It's -- he's saying it's

12  675 miles.  Bear with me one second here.

13            No, I don't think he can do it in that

14  10.5 hours that he states there, and I'll tell you

15  the reason why.  When I take 675 miles and divide

16  it by 10 hours and 50 minutes, this is the answer,

17  is 64 minutes -- I mean 64 miles an hour, plus.

18  The regulators have already said that any runs,

19  routes, log representations that show an average

20  speed, particularly over this amount of space, in

21  excess of 55 miles an hour is impossible.

22            In my experience -- and this is from

23  looking at so many DDEC reports where we actually

24  see average speeds and stuff for the day -- I've

25  never seen a truck that can average even 60 miles

Page 194

1    an hour.

2           Q.   Okay.

3           A.   But I didn't note that as another

4    falsification.  I appreciate you bringing it up,

5    because I think that is another good example of

6    another falsification.

7           Q.   All right.  Let's go to opinion seven,

8    unless you have anything to add to what we've

9    discussed with opinion six -- with opinion five.

10          A.   We can talk about it.  I mean, I think

11   it speaks for itself, but you let me know if

12   there's any questions you've got.  I sort of walk

13   through this a little bit more -- this is a little

14   bit more about the sleep aspect than -- you know,

15   the rest, restorative rest, but I recapitulate a

16   little bit of this.

17          Q.   Okay.  There is no opinion six, right?

18          A.   Oh, did I skip one?  My apologies.  I

19   did.  So I skipped from five to seven.  My

20   apologies.

21          Q.   Let's talk about opinion seven.

22          A.   Okay.

23          Q.   And your analysis is in many respects a

24   lot of what we've just discussed, correct?

25          A.   Yes, sir, it is.

1        Q.   When you say a CMV driver is presumed

2   fatigued when they violate the rules, what is the

3   authority for that presumption?

4        A.   There's -- I'm not aware of any

5   regulation that states that, but regulators, when

6   they -- when they cite drivers for an

7   hours-of-service infraction -- let's say they've

8   run 30 minutes over their 11 hours of driving, or

9   30 minutes over their 14 hours.  It goes into a

10  category that in the past used to be referred to as

11  the fatigue category.  It may in fact now read

12  hours of service.

13            But the original rulemaking was -- and

14  if you -- I think I reference it.  I do, on Page 7

15  under footnote one.  If you go to that

16  particular -- the Federal Registry, you see the

17  regulators determination, and they'll explain a

18  little bit of that about the seven, eight hours of

19  sleep and about fatigue driving and exceeding the

20  rules, leading to fatigue-related crashes, and

21  based on that and based on also my conversations

22  with CDSA and also DOT representatives, they

23  determined that when a driver has violated the

24  rule, they assume that he's fatigued.

25            And that's the reason they place them

1    out of service.  They don't want to endanger the

2    public.  And if Mr. Sepesi, or Sepesi or -- if he

3    were caught with this log telling the truth, he

4    would have immediately been placed out of service

5    for ten hours.

6         Q.   The fatigue that you reference, the

7    evidence is your analysis that we've just

8    discussed, right?

9         A.   Yes, sir.

10        Q.   Okay.  Did you see any corroborating

11   evidence of Mr. Sepesi's fatigue beyond that?  Let

12   me give you an example.

13        A.   Okay.

14        Q.   Is there any evidence that anybody

15   witnessed him swerving or weaving at any point in

16   time leading up to the accident which might suggest

17   that he was falling asleep or inattentive?

18        A.   No.

19        Q.   Okay.  Is there anything in the

20   investigating officer's report which memorialized

21   in any way, shape, or form any concerns that that

22   officer had that Mr. Sepesi was impaired in any

23   capacity, including fatigue?

24        A.   No.

25        Q.   Okay.  Did anybody witness him yawning

Page 197

1    or flat out asleep or falling asleep at the

2    accident scene after the accident?

3            A.    No.

4            Q.    Okay.  So it's -- the entirety of your

5    conclusion is the comparison between the cell phone

6    records, the driver's logs, and your application of

7    the regulations?

8            A.    Well, we know he's over his hours of

9    service, lack of sleep.  We also know that there is

10   a cell phone distraction issue.  I believe those

11   things contributed to resulting in a crash.  His --

12   some level of impairment associated to him leading

13   to a crash.

14           Q.    Can some people function appropriately

15   on less sleep than others?

16           A.    I can't answer that scientifically.

17           Q.    You cannot?

18           A.    No.

19           Q.    Okay.

20           A.    I can speak from a layman's standpoint,

21   but I'm not in a professional.

22           Q.    I don't need to hear your layperson

23   opinion if you're not offering an expert opinion on

24   that and can't speak to it in an expert capacity.

25           A.    Correct.

1          Let me, since you asked that question

2     and followed up, and I've thought about this.  I'll

3     rehabilitate this just a little bit.  We do have --

4     the Federal Motor Carrier Safety Administration has

5     conducted studies that evaluate the frequency of

6     crash associated with the driver's lack of sleep.

7     So there are some bodies of studies out there that

8     addresses that.  I didn't come prepared today to

9     tell you what the difference is.

10         A lot of the studies that led to the

11    14-hour rulemaking in 2004 dealt with time-on-task,

12    or time on-duty, and they saw a direct correlation

13    and a fall-off in the frequency of crashes, in the

14    driver's performance after having been on task, on

15    duty 12 hours.  Now, why in the world they went to

16    14 hours for the length of tour, I don't know.  But

17    that was their study.

18         Q.   All right.  That kind of dovetails, I

19    think, with my next question on Page 7 of your

20    report at the end of opinion two.  You say, FMCSA

21    has determined based on various studies that

22    drivers who do not get enough restorative sleep

23    become fatigued and cause more crashes.

24         A.   Yes, sir.

25         Q.   Okay.  And then you cite, in a

Page 199

1   footnote, one example in the Federal Registry?

2           A.   Yes, sir.

3           Q.   All right.  Do you have any other

4   specific examples that would fall in the category

5   of the various studies that you reference in your

6   report?

7           A.   I can produce this study that I'm

8   talking about that was used in the additional

9   rulemaking that analyzed -- it was a very big

10  study, so it's worthy of noting.  Would you like me

11  to present that as well as my other to-do list?

12          Q.   Only if you have it readily available

13  and are not going to charge me for it.

14          A.   I won't charge you anything.

15          Q.   Okay.

16          A.   Yeah, I didn't charge you for my list

17  or anything like that.  That was an interesting

18  email.  Let's see.

19               (This page contains information to be

20  supplied by counsel and/or the deponent.)

21          Q.   All right.  Let's talk about opinion

22  eight.

23          A.   Okay.

24          Q.   You indicate false reports or the

25  falsifications were misleading to law enforcement,

Page 200

1    and in your discussion you indicated that -- okay.

2    We talked about this earlier.  You're generally

3    speaking of an intent to deceive, but you can't

4    speak to Mr. Sepesi's intent or mindset, correct?

5          A.   I can only judge his conduct, and his

6    conduct indicates that he made a false report.  And

7    I, based on my review, I don't see how he could not

8    have known that he didn't do it.

9               Now, he can say whatever he wants and

10   we'll just let the jury hear it, but based on, you

11   know, sort of if it walks like a duck and quacks

12   like one, this is a typical classic example that

13   I've seen thousands of times of drivers

14   misrepresenting their duty.

15         Q.   Okay.  And I don't think -- I'm not

16   asking you about what you've seen thousands of

17   times.  I'm asking you about your analysis of this

18   case.

19              You've never met Mr. Sepesi.  You've

20   never talked with him about this.  You've never

21   discussed your conclusions.  You can't speak to his

22   intent.  You can only speak to what conclusions you

23   draw based upon your review of the information you

24   were provided.  His mindset.

25         A.   Where have I mentioned in here about

Page 201

1   mindset or intent?  I'm just a little lost

2   because --

3        Q.   Opinion eight.  His logs were

4   misleading.  The falsification is an obvious intent

5   to deceive.  That's what I'm referring to.

6        A.   What's wrong about that?  His logs were

7   misleading.

8        Q.   Intent to deceive?

9        A.   I didn't say intent to deceive.  I said

10  his log were misleading.  Now, I do say down here

11  it's an obvious intent to deceive.  That is my

12  opinion down in the narrative here under the

13  discussion.  But his logs were misleading.  If an

14  officer -- if you go up and tell a lie to an

15  officer, you know, hey, where were you last night?

16  Well, I wasn't there.  And if they don't go and

17  check it out, it's deceptive.

18             This log report -- and that's the

19  reason there is a significant violation for this.

20  This log report is many times the officer's only

21  opportunity to get a window into this guy's rest

22  and what he's done in the last 10, 12, 24 hours,

23  and it was not accurate.  And I don't think it was

24  an accident, based on my analysis.

25             MR. HURAY:  Thank you, sir.

Page 202

1              MR. HAYES:  No questions.

2              THE WITNESS:  All right.

3              VIDEOGRAPHER:  We're off the record at

4    1518, and this concludes today's testimony given by

5    David L. Dorrity.  The total number of media units

6    used was three, and will be retained by Veritext

7    Legal Solutions.

8              (Off-the-record conference.)

9              COURT REPORTER:  Mr. Huray, you said

10   you wanted the original and an E-tran, correct?

11             MR. HURAY:  I did not.  I said I wanted

12   the copy, but I think you have to send me the

13   original, so yeah, I'll take that.

14             COURT REPORTER:  And I thought you said

15   you wanted sync.  Do you want sync?

16             MR. HURAY:  Yes.

17             COURT REPORTER:  Mr. Hayes, did you say

18   you want E-tran?

19             MR. HAYES:  E-tran, yes, please.

20             COURT REPORTER:  Did you decide if you

21   want the video?

22             MR. HAYES:  We'll let you know if we

23   need it.

24

25

Page 203

1              (The witness, after having been advised

2    of his right to read and sign this transcript, does

3    not waive that right.)

4              (The deposition was concluded at 3:20

5    p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER                    Page 204

1

2

3          I, Eric S. Glazier, Court Reporter and

4    Notary Public for the State of South Carolina at

5    Large, do hereby certify that the foregoing

6    transcript is a true, accurate, and complete

7    record.

8          I further certify that I am neither related

9    to nor counsel for any party to the cause pending

10   or interested in the events thereof.

11         Witness my hand, I have hereunto affixed my

12   official seal this _____ day of _____, 20__, at

13   Easley, Pickens County, South Carolina.

14

15

16

17

18

19

20

21

22

23   _____
     Eric S. Glazier,
24   Court Reporter
     My Commission expires
25   April 11, 2026

```
                                                          Page 205
1                        Veritext Legal Solutions
                      290 W. Mt. Pleasant Ave. - Suite 3200
2                         Livingston, New Jersey 07039
                       Toll Free: 800-227-8440  Fax: 973-629-1287
3
4    September 17, 2019
5    To: Jonathan P. Hayes, Esq.
6    Case Name: Frushtick, Nathaniel D. v. Fero Express Inc., Et Al.
7    Veritext Reference Number: 3502722
8    Witness:  David L. Dorrity , Mhrb, Cds, Cdt        Deposition Date:
     8/29/2019
9
10   Dear Sir/Madam:
11   Enclosed please find a deposition transcript.  Please have the witness
     review the transcript and note any changes or corrections on the
12   included errata sheet, indicating the page, line number, change, and
     the reason for the change.  Have the witness' signature at the bottom
13   of the sheet notarized except in California where they are signing
     under penalty of perjury and forward the errata sheet back to us at
14   the address shown above.
15
16   If the jurat is not returned within thirty days of your receipt of
17   this letter, the reading and signing will be deemed waived.
18
19
20   Sincerely,
21
22   Production Department
23
24   Encl.
25   Cc: Scott D. Huray, Esq.
```

```
1                    ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS
2                    800-567-8658
     ASSIGNMENT NO. CS3502722
3    CASE NAME: Frushtick, Nathaniel D. v. Fero Express Inc., Et Al.
     DATE OF DEPOSITION: 8/29/2019
4    WITNESS' NAME: David L. Dorrity , Mhrb, Cds, Cdt
5
     PAGE/LINE(S)/    CHANGE              REASON
6    ____/_____/_____/_____
     ____/_____/_____/_____
7    ____/_____/_____/_____
     ____/_____/_____/_____
8    ____/_____/_____/_____
     ____/_____/_____/_____
9    ____/_____/_____/_____
     ____/_____/_____/_____
10   ____/_____/_____/_____
     ____/_____/_____/_____
11   ____/_____/_____/_____
     ____/_____/_____/_____
12   ____/_____/_____/_____
     ____/_____/_____/_____
13   ____/_____/_____/_____
     ____/_____/_____/_____
14   ____/_____/_____/_____
     ____/_____/_____/_____
15   ____/_____/_____/_____
     ____/_____/_____/_____
16   ____/_____/_____/_____
     ____/_____/_____/_____
17   ____/_____/_____/_____
     ____/_____/_____/_____
18   ____/_____/_____/_____
     ____/_____/_____/_____
19   ____/_____/_____/_____
20          _____
                David L. Dorrity , Mhrb, Cds, Cdt
21   (Notary not required in California)
     SUBSCRIBED AND SWORN TO
22   BEFORE ME THIS_____DAY
     OF_____, 2019.
23
     _____
24       NOTARY PUBLIC
25   MY COMMISSION EXPIRES_____
```

South Carolina Rules of Civil Procedure

Part V. Depositions and Discovery

Court Rule 30

(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed the
deposition shall be submitted to the witness for
examination and shall be read to or by him unless
such examination and reading are waived by the
witness and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within 30 days of its
submission to him, the officer shall sign it and
state on the record the fact of the waiver or of
the illness or absence of the witness or the fact
of the refusal to sign together with the reason, if
any, given therefor; and the deposition may then be
used as fully as though signed unless on a motion
to suppress under Rule 32(d)(4) the court holds

that the reasons given for the refusal to sign
require rejection of the deposition in whole or in
part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

---

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
<u>DLDorrity@aol.com</u> – **(864) 288-7193**

---

# <u>SAFETY REPORT</u>

### Prepared By:

## DAVID L. DORRITY, MHRD, CDS, CDT

### June 24, 2019

### Prepared For:

### JONATHAN P. HAYES, Esquire

-----------------------------------------------------

### Relating To The Following Matters:

### NATHANIEL DAVID FRUSHTICK,

### Plaintiff,

### Vs.

### FEROEXPRESS, INC. and

### FRANTISEK SEPESI,

### Defendants.

-------------------------------------------------------------

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

### Case No. 1:18-cv-02891-MLB



1

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

## I.  SUMMARY OF PREPARER'S QUALIFICATIONS:

I have worked in the transportation industry since 1969 in various capacities.  I have owned, driven, loaded and inspected several types of commercial motor vehicles and I have held a variety of positions with trucking companies ranging from clerk (at the outset of my career) to President of a 150-employee trucking company.  Along that career path I have had oversight responsibility for various aspects of company operations including Safety, Operations and more. Therefore, I have a wide range of knowledge and experience in the transportation industry.  I have additionally driven various transportation delivery vehicles myself, including large CMVs, as well as hired, trained and supervised hundreds of transportation drivers, and that includes actual in-cab training of drivers.

I have current certifications from the North American Transportation Management Institute (NATMI) as both a certified Director of Safety and a certified Director of Driver Training.  I also received training and certification to teach the National Safety Council's Defensive Driving Course for Professional Truck Drivers.

I have a Master's Degree from Clemson University in Human Resource Development, I have taught numerous safety and management courses for the North American Transportation Management Institute (NATMI) and was employed as an adjunct professor/instructor at Clemson University between 2005 and 2008 where I taught an undergraduate course in occupational and commercial motor vehicle safety training.

In 1989, I began using my management and safety experience to start a consulting firm working for numerous and diverse types of non-DOT fleets, DOT commercial motor vehicle operations, and those using material handling equipment.  I have provided consulting assistance in policy, procedures, audits and safety training development to over a hundred transportation fleets during my career. In 1993, I began aiding in investigating fleet accidents for our consulting clients and attorneys and have now reviewed over 800 fleet crash cases.  I have been qualified to testify in numerous state and federal courts regarding a variety of safety topics associated with the transportation and logistics industry.

My curriculum vitae is attached (**Exhibit A**).  My case list is attached (**Exhibit B**).

2

> **David L. Dorrity, MHRD, CDS, CDT**
> **Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
> DLDorrity@aol.com – (864) 288-7193

I am charging $250 per hour for my general consulting services, $400 per hour for trial and deposition appearances (5-hour minimum).

## II.    MY INVOLVEMENT

The following report is in response to your request for me to evaluate the defendant CMV driver's safety training and performance as it relates to CMV regulations or respected industry standards.

My initial task was to evaluate the defendant's document and interrogatory responses. There are significant amounts of documents that were requested, and generally expected to be retained, that have not yet been produced.  It is my understanding that the requested documents likely will not be produced.

My evaluation generally involves a review of the shared discovery documents, depositions and deposition exhibits and then comparing that information with the minimum fleet industry standards and practices as I have learned them from my training, education and experience. The methods and basis for my opinions in this report and depositions are the same as those relied upon by any other expert in my field who have similar training and experience.

## III.    INFORMATION REVIEWED

**The following information was reviewed and relied upon in formulating the observations, opinions, and conclusions in this report.**

### CASE MATERIAL:

1. Georgia Motor Vehicle Accident Report (10/24/2017, 10:30),
2. Litigation Pleadings,
3. Defendants' Interrogatory Answers,
4. Defendant's Document Production,
5. Cobb County 911 Records,
6. Mr. Sepesi's Verizon Cellphone Records,
7. Vehicle Photos at Scene,

3

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

8. Deposition transcripts and exhibits of;
    a. Mr. Frushtick,
    b. Mr. Sepesi.

**INDUSTRY:**
1. Federal Motor Carrier Safety Regulations ("FMCSR") – (CFR 49),
2. CDL instruction and testing manuals published by Georgia and Illinois,
3. National Safety Council Training Regarding Distracted Driving,
4. Defensive Driving Course for Professional Truck Drivers by NSC,
5. Safe Practices for Motor Carrier Operations (ANSI/ASSE Z15.1-2017),
6. Following Distance Training by Smith System Driver Improvement Institute,
7. Other industry texts, training or research as may be noted within the report.

## IV.  OPINIONS, OBSERVATIONS and DISCUSSION

Throughout the report, unless otherwise noted, I'm referring to the relevant minimum industry standards in place on the date of the crash.  All my observations and opinions are based on industry standards that are used and relied upon by all experts in my field and my opinions should be consistent with any reasonable safety expert who has similar training and experience.  The standards, concepts, methods and techniques in evaluating and reaching my opinions in this case are the same that I have used over the last 25 years for my non-litigation trucking industry clients.

I am available for deposition to more fully explain any of my observations and opinions.  These observations and opinions are preliminary since discovery is ongoing and may be supplemented, if appropriate, should I be asked to review any additional information.

> **David L. Dorrity, MHRD, CDS, CDT**
> Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615
> DLDorrity@aol.com — (864) 288-7193

**OPINION 1**

Feroexpress, Inc. (Feroexpress) is a USDOT authorized motor carrier[1] that was operating the commercial motor vehicle (CMV) involved in the subject crash and Feroexpress is responsible for compliance with all Federal, State and additional industry recognized safety standards.

Discussion:

Evidence indicates that Feroexpress received a "Pass" as a result of a recent FMCSA safety audit. Additionally, Feroexpress had the primary responsibility to train and evaluate Mr. Sepesi's driving acumen and performance.

**OPINION 2**

Mr. Sepesi, the driver of the subject CMV, was the regulatory employee of Feroexpress who had the regulatory duty for hiring, training and supervising Mr. Sepesi while operating a CMV under Feroexpress's control and authority.

Discussion:

49 CFR § 390.5 defines any driver of a CMV, including owner-operators, as the employee of a motor carrier. Motor carriers have a duty for compliance with all rules and regulations and training of their employees regarding all rules and regulations – § 390.3(e).

**OPINION 3**

Mr. Sepesi failed to use the ordinary care expected of a prudent CDL driver by failing to maintain a proper lookout required for his CMV which included following at an appropriate distance, reducing speed according change in traffic conditions and hazard recognition.

Discussion:

The CDL manuals provide the CMV minimum driving performance rules of the road. These rules are different than for passenger vehicles for reasons discussed later.

---

[1] USDOT # 2955176, MC # MC00001443.

5

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

According to the state commercial driver's license manuals (CDL), Mr. Sepesi should have been scanning the roadway ahead by 12 to 15 seconds and appreciating what the traffic conditions were and how to adjust his speed and space.

The CDL manual also teaches that tractor-trailer CMVs can take 1 ½ to 2 times more distance to stop than do cars. There are several reasons why it takes longer to stop a large CMV which can be discussed at my deposition or trial. The professional CMV driver takes this increased stopping distance fact into account and therefore maintains a safe following distance and always adjusts speed to maintain that safe space cushion. Large CMVs can't stop as quickly as passenger vehicles if conditions change unexpectedly. The CDL manual teaches a rule that Mr. Sepesi should have been following at least 7 seconds behind the plaintiff's vehicle but that was not he did. The CDL manual describes CMV drivers who follow too close as "aggressive drivers".

A fully loaded CMV like Sepesi's can weigh up to 80,000 lbs. versus 4,000 lbs. for ordinary passenger cars – 20 times heavier. The weight of Sepesi's CMV is unknown currently. Even an empty CMV could reach 35,000 lbs. This weight difference, and the taller center of gravity, can have devastating results when high speed crashes occur. CMV trucks account for 12% of all fatal crashes but only 3% of registered vehicles – a 4 times greater fatality rate. Large CMV crash fatalities have increased 55% from 2009 to 2014.[2]

Mr. Sepesi testified that he was unsure what the industry standard required for following distance. It is my professional opinion that Mr. Sepesi was either untrained, willingly driving too fast for conditions, impaired or distracted in some way so as not to observe traffic slowing or stopped, willingly following too close, or a combination of the above. Willingly driving too fast or following too close in a CMV is aggressive driving and increases the risk of serious crashes.

The jury may benefit from understanding that large CMVs have commercial air brakes which has unique characteristics to ordinary passenger car hydraulic brakes. Unlike passenger car brakes, CMV air brakes do not engage immediately but have a feature known as "air brake lag" or "air brake application delay". This is a function of the time it takes for the brakes to

---

[1] " Large Truck and Bus Crash Facts 2014", USDOT, FMCSA Div., March 2016.

---

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

---

activate the brake drum, or disk, once a foot pedal switch sends the request (i.e., press the brake). This lag or delay can take ½ second which means the CMV is still moving without braking during that time period.

The jury may also benefit from the instruction found in the Appendix section to this report explaining the CDL manual instruction regarding the proper lookout and increased stopping distance attributes of a CMV when compared to a passenger vehicle. A large CMV can take 50% to 100% longer to stop based on industry training. Mr. Sepesi should have known and complied with this training in order to prevent this crash.

The proper lookout, speed and following distance instructional standards found in the Uniform CDL manual is produced and supported by the authority of FMCSR 49 CFR § 383.131.

Mr. Sepesi was cited for "Following Too Close".[3]


**OPINION 4**

**Mr. Sepesi deviated from the standard of care for prudent CMV/CDL operators by talking on his cellphone near the time of the crash while driving a large CMV.**

Discussion:

Mr. Sepesi testified that he was not on his cellphone at the time of the crash, however, his Verizon cellphone record reveals that he was involved in several phone calls within minutes of the assumed crash time that occurred before 10:29:01 – the time Cobb County 911 opened a case for this crash.

The Federal Motor Carrier Safety Regulations (FMCSR) allows CMV operators to talk on a cellphone if their "handsfree" requirements are obeyed.[4] However, "handsfree" cellphone use has been proven to be unsafe and the trucking industry was put on notice of this reckless problem long before the 2012 rulemaking. For this reason, most major motor carriers have policies banning any use of a cellphone while driving. Even the study that the FMCSA relied upon for this rulemaking has been called into question by scientists involved in that study.

---

[3] Defendant's Production # 000021.
[4] 49 CFR § 392.82.

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

Driver simulator scientific studies have concluded that cellphone conversations while driving produces cognitive impairment like a "drunk driver". Scientists have indicated that this impairment creates an "inattention blindness" that impacts cellphone conversing driver's ability to react to changing traffic conditions.[5] Additional epidemiological scientific studies concluded a 4-fold crash risk for drivers who admitted to being on a cellphone conversation within at least 10 minutes before the crash.[6]

Mr. Sepesi admitted he talked on his cellphone from time to time while using a headset device. Cellphone use while driving a CMV shows a conscious indifference to the scientific evidence and education published to the trucking industry by various safety organizations.[7] Most large commercial motor carriers have policies that ban all cellphone use while driving.

Mr. Sepesi told the police officer that the sun was obscuring his vision and he was not able to stop in time, however, he denied in his deposition that the sun was a factor that caused his failure. Since the sun wasn't a factor, it is reasonable to conclude cellphone distraction may be the best explanation for why Mr. Sepesi rear-ending Mr. Frushtick. Science has informed us that cellphone conversations distract the driver's brain so that he/she cannot mentally process accurately, nor timely, the speed or stopping of vehicles they are following resulting in significantly more hard braking events and rear-end crashes.[8]

---

[5] "Fatal Distraction? A Comparison of the Cellphone Driver and the Drunk Driver", Strayer, 2002.
[6] "Association Between Cellular-Telephone Calls and Motor Vehicle Collisions", The New England Journal of Medicine, Redelmeier, et al, February 13, 1997.
[7] For Example: National Safety Council, Smith System Driving Institute, ANSI, NHTSA, etc.
[8] Strayer, 2002.

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

## V.    CERTIFICATION:

The observations, discussions and conclusions/opinions in this report are based on my education, training and experience after reviewing the specified evidence.  I hold these professional opinions to a reasonable degree of certainty in the fields of motor carrier safety standards and regulatory compliance. These opinions are based solely on the facts, research, minimum trucking industry standards, trucking regulations and requirements as interpreted by the industry. I used the same analytical approach as used in my non-litigation work and work within the trucking industry. The process I used to reach my observations, opinions and conclusions is the same that any other reasonable expert in my field would use, given the same background, experience and facts.  I reserve the right to supplement these opinions as necessary should I be asked to review additional evidence.  I plan to use anything mentioned in this report, the references and/or the discovery in this case as a trial exhibit.

Signed:    *David L. Dorrity*

**David L. Dorrity, MHRD, CDS, CDT**

9

| David L. Dorrity, MHRD, CDS, CDT |
| :---: |
| Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615 |
| DLDorrity@aol.com – (864) 288-7193 |

# APPENDIX

The following are additional explanations, examples and citations of industry standards that I may rely upon to explain and support my opinions heretofore discussed.

### CDL-CMV Lookout Standard

The industry standard for truck drivers is to scan the road ahead by at least 12 to 15 seconds.[9] Scanning the road ahead lets the driver get the "big picture"[10] and time to react to any potential hazard and changing conditions. Scanning ahead also prevents, or mitigates, distracted driving because you are focused on the roadway ahead. Scanning ahead is defeated when drivers follow too close to other vehicles because they are looking down at vehicle's tail lights rather than the emerging traffic conditions 12 to 15 seconds ahead.



CITY DRIVING                    OPEN HIGHWAY
12-15 Seconds is About One Block   12-15 Seconds is About A Quarter-Mile [11]

---

[9] CDL Manual, Section 2.4 – Seeing.
[10] Smith System Defensive Driving concept.
[11] CDL Manual, Seeing, Figure 2.6.

10

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – **(864) 288-7193**

### CDL-CMV Speed and Space Management Standard

CMVs have unique following distance rules when compared to an automobile. The CDL standard for a CMV like the one the defendant was driving is supposed to follow at a distance no closer than a 6-second interval from the vehicle it is following and at least 7 seconds when traveling over 40 MPH.[12] The reasoning for this following distance incorporates the size, weight, combination and air-braking system of this large CMV and a safety cushion that can provide space and time for controlled braking.



**Figure 2.11** [13]

---

[12] CDL Manual, Section 2.7.1 – Space Ahead.
[13] CDL Manual, Section 2.6.1 – Stopping Distances (Figure 2.11).

11

---

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

---

The vehicle "following" distance is managed by constantly modulating the speed based on prevailing, or emerging, traffic and environmental conditions. Following distances should be increased when the roadway is wet, or traction may be compromised.  The following CDL figure explains how to calculate that distance.

## HEAVY VEHICLE FORMULA
### For timed interval following distance

- 1 second required for each 10 feet of vehicle length at speeds under 40 MPH
- Above 40 MPH use same formula, then add 1 second for the additional speed



40 foot truck (under 40 MPH) = 4 seconds



50 foot truck (above 40 MPH) = 6 seconds



60 foot truck (under 40 MPH) = 6 seconds

[14]

---

[14] CDL Manual, Section 2.7 – Managing Space (Figure 2.12).

12

---

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

---

## Additional CDL Manual Excerpts Supporting My Opinions

### 2.7 – MANAGING SPACE

*To be a safe driver, you need space all around your vehicle. When things go wrong, space gives you time to think and to take action. To have space available when something goes wrong, you need to manage space. While this is true for all drivers, it is very important for large vehicles. They take up more space and they require more space for stopping and turning.*

### 2.7.1 – Space Ahead

*of all the space around your vehicle, it is the area ahead of the vehicle--the space you are driving into --that is most important.*

### 2.8.4 – Always Have a Plan

*You should always be looking for hazards.  Continue to learn to see hazards on the road. However, don't forget why you are looking for the hazards--they may turn into emergencies. You look for the hazards in order to have time to plan a way out of any emergency. When you see a hazard, think about the emergencies that could develop and figure out what you would do. Always be prepared to take action based on your plans. In this way, you will be a prepared, defensive driver who will improve your own safety as well as the safety of all road users.*

### 2.10 – Aggressive Drivers/Road Rage
### 2.10.1 – What Is It?

*Aggressive driving and road rage is not a new problem. However, in today's world, where heavy and slow-moving traffic and tight schedules are the norm, more and more drivers are taking out their anger and frustration in their vehicles.  Crowded roads leave little room for error, leading to suspicion and hostility among drivers and encouraging them to take personally the mistakes of other drivers.  Aggressive driving is the act of operating a motor vehicle in a selfish, bold, or pushy manner, without regard for the rights or safety of others.*

13

> **David L. Dorrity, MHRD, CDS, CDT**
> **Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
> DLDorrity@aol.com – (864) 288-7193

# SAFETY REPORT

### Prepared By:

## DAVID L. DORRITY, MHRD, CDS, CDT

### June 24, 2019

### Prepared For:

### JONATHAN P. HAYES, Esquire

-----------------------------------------------

### Relating To The Following Matters:

### NATHANIEL DAVID FRUSHTICK,

### Plaintiff,

### Vs.

### FEROEXPRESS, INC. and

### FRANTISEK SEPESI,

### Defendants.

-------------------------------------------------------------

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

### Case No. 1:18-cv-02891-MLB

1

---

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

---

## I.   SUMMARY OF PREPARER'S QUALIFICATIONS:

I have worked in the transportation industry since 1969 in various capacities.  I have owned, driven, loaded and inspected several types of commercial motor vehicles and I have held a variety of positions with trucking companies ranging from clerk (at the outset of my career) to President of a 150-employee trucking company.  Along that career path I have had oversight responsibility for various aspects of company operations including Safety, Operations and more. Therefore, I have a wide range of knowledge and experience in the transportation industry.  I have additionally driven various transportation delivery vehicles myself, including large CMVs, as well as hired, trained and supervised hundreds of transportation drivers, and that includes actual in-cab training of drivers.

I have current certifications from the North American Transportation Management Institute (NATMI) as both a certified Director of Safety and a certified Director of Driver Training.  I also received training and certification to teach the National Safety Council's Defensive Driving Course for Professional Truck Drivers.

I have a Master's Degree from Clemson University in Human Resource Development, I have taught numerous safety and management courses for the North American Transportation Management Institute (NATMI) and was employed as an adjunct professor/instructor at Clemson University between 2005 and 2008 where I taught an undergraduate course in occupational and commercial motor vehicle safety training.

In 1989, I began using my management and safety experience to start a consulting firm working for numerous and diverse types of non-DOT fleets, DOT commercial motor vehicle operations, and those using material handling equipment.  I have provided consulting assistance in policy, procedures, audits and safety training development to over a hundred transportation fleets during my career. In 1993, I began aiding in investigating fleet accidents for our consulting clients and attorneys and have now reviewed over 800 fleet crash cases.  I have been qualified to testify in numerous state and federal courts regarding a variety of safety topics associated with the transportation and logistics industry.

My curriculum vitae is attached (**Exhibit A**).  My case list is attached (**Exhibit B**).

2

| David L. Dorrity, MHRD, CDS, CDT |
| :---: |
| Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615 |
| DLDorrity@aol.com – (864) 288-7193 |

I am charging $250 per hour for my general consulting services, $400 per hour for trial and deposition appearances (5-hour minimum).

## II.   MY INVOLVEMENT

The following report is in response to your request for me to evaluate the defendant CMV driver's safety training and performance as it relates to CMV regulations or respected industry standards.

My initial task was to evaluate the defendant's document and interrogatory responses. There are significant amounts of documents that were requested, and generally expected to be retained, that have not yet been produced.  It is my understanding that the requested documents likely will not be produced.

My evaluation generally involves a review of the shared discovery documents, depositions and deposition exhibits and then comparing that information with the minimum fleet industry standards and practices as I have learned them from my training, education and experience. The methods and basis for my opinions in this report and depositions are the same as those relied upon by any other expert in my field who have similar training and experience.

## III.   INFORMATION REVIEWED

**The following information was reviewed and relied upon in formulating the observations, opinions, and conclusions in this report.**

### CASE MATERIAL:
1. Georgia Motor Vehicle Accident Report (10/24/2017, 10:30),
2. Litigation Pleadings,
3. Defendants' Interrogatory Answers,
4. Defendant's Document Production,
5. Cobb County 911 Records,
6. Mr. Sepesi's Verizon Cellphone Records,
7. Vehicle Photos at Scene,

3

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – **(864) 288-7193**

8. Deposition transcripts and exhibits of;
   a. Mr. Frushtick,
   b. Mr. Sepesi.

**INDUSTRY:**

1. Federal Motor Carrier Safety Regulations ("FMCSR") – (CFR 49),
2. CDL instruction and testing manuals published by Georgia and Illinois,
3. National Safety Council Training Regarding Distracted Driving,
4. Defensive Driving Course for Professional Truck Drivers by NSC,
5. Safe Practices for Motor Carrier Operations (ANSI/ASSE Z15.1-2017),
6. Following Distance Training by Smith System Driver Improvement Institute,
7. Other industry texts, training or research as may be noted within the report.

## IV.  OPINIONS, OBSERVATIONS and DISCUSSION

Throughout the report, unless otherwise noted, I'm referring to the relevant minimum industry standards in place on the date of the crash. All my observations and opinions are based on industry standards that are used and relied upon by all experts in my field and my opinions should be consistent with any reasonable safety expert who has similar training and experience. The standards, concepts, methods and techniques in evaluating and reaching my opinions in this case are the same that I have used over the last 25 years for my non-litigation trucking industry clients.

I am available for deposition to more fully explain any of my observations and opinions. These observations and opinions are preliminary since discovery is ongoing and may be supplemented, if appropriate, should I be asked to review any additional information.

David L. Dorrity, MHRD, CDS, CDT
Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615
DLDorrity@aol.com – (864) 288-7193

**OPINION 1**

Feroexpress, Inc. (Feroexpress) is a USDOT authorized motor carrier[1] that was operating the commercial motor vehicle (CMV) involved in the subject crash and Feroexpress is responsible for compliance with all Federal, State and additional industry recognized safety standards.

Discussion:

Evidence indicates that Feroexpress received a "Pass" as a result of a recent FMCSA safety audit. Additionally, Feroexpress had the primary responsibility to train and evaluate Mr. Sepesi's driving acumen and performance.

**OPINION 2**

Mr. Sepesi, the driver of the subject CMV, was the regulatory employee of Feroexpress who had the regulatory duty for hiring, training and supervising Mr. Sepesi while operating a CMV under Feroexpress's control and authority.

Discussion:

49 CFR § 390.5 defines any driver of a CMV, including owner-operators, as the employee of a motor carrier. Motor carriers have a duty for compliance with all rules and regulations and training of their employees regarding all rules and regulations – § 390.3(e).

**OPINION 3**

Mr. Sepesi failed to use the ordinary care expected of a prudent CDL driver by failing to maintain a proper lookout required for his CMV which included following at an appropriate distance, reducing speed according change in traffic conditions and hazard recognition.

Discussion:

The CDL manuals provide the CMV minimum driving performance rules of the road. These rules are different than for passenger vehicles for reasons discussed later.

---

[1] USDOT # 2955176, MC # MC00001443.

David L. Dorrity, MHRD, CDS, CDT
Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615
DLDorrity@aol.com – (864) 288-7193

According to the state commercial driver's license manuals (CDL), Mr. Sepesi should have been scanning the roadway ahead by 12 to 15 seconds and appreciating what the traffic conditions were and how to adjust his speed and space.

The CDL manual also teaches that tractor-trailer CMVs can take 1 ½ to 2 times more distance to stop than do cars. There are several reasons why it takes longer to stop a large CMV which can be discussed at my deposition or trial. The professional CMV driver takes this increased stopping distance fact into account and therefore maintains a safe following distance and always adjusts speed to maintain that safe space cushion. Large CMVs can't stop as quickly as passenger vehicles if conditions change unexpectedly. The CDL manual teaches a rule that Mr. Sepesi should have been following at least 7 seconds behind the plaintiff's vehicle but that was not he did. The CDL manual describes CMV drivers who follow too close as "aggressive drivers".

A fully loaded CMV like Sepesi's can weigh up to 80,000 lbs. versus 4,000 lbs. for ordinary passenger cars – 20 times heavier. The weight of Sepesi's CMV is unknown currently. Even an empty CMV could reach 35,000 lbs. This weight difference, and the taller center of gravity, can have devastating results when high speed crashes occur. CMV trucks account for 12% of all fatal crashes but only 3% of registered vehicles – a 4 times greater fatality rate. Large CMV crash fatalities have increased 55% from 2009 to 2014.[2]

Mr. Sepesi testified that he was unsure what the industry standard required for following distance. It is my professional opinion that Mr. Sepesi was either untrained, willingly driving too fast for conditions, impaired or distracted in some way so as not to observe traffic slowing or stopped, willingly following too close, or a combination of the above. Willingly driving too fast or following too close in a CMV is aggressive driving and increases the risk of serious crashes.

The jury may benefit from understanding that large CMVs have commercial air brakes which has unique characteristics to ordinary passenger car hydraulic brakes. Unlike passenger car brakes, CMV air brakes do not engage immediately but have a feature known as "air brake lag" or "air brake application delay". This is a function of the time it takes for the brakes to

---

[1] " Large Truck and Bus Crash Facts 2014", USDOT, FMCSA Div., March 2016.

6

activate the brake drum, or disk, once a foot pedal switch sends the request (i.e., press the brake).  This lag or delay can take ½ second which means the CMV is still moving without braking during that time period.

The jury may also benefit from the instruction found in the Appendix section to this report explaining the CDL manual instruction regarding the proper lookout and increased stopping distance attributes of a CMV when compared to a passenger vehicle.  A large CMV can take 50% to 100% longer to stop based on industry training.  Mr. Sepesi should have known and complied with this training in order to prevent this crash.

The proper lookout, speed and following distance instructional standards found in the Uniform CDL manual is produced and supported by the authority of FMCSR 49 CFR § 383.131.

Mr. Sepesi was cited for "Following Too Close".[3]

**OPINION 4**

**Mr. Sepesi deviated from the standard of care for prudent CMV/CDL operators by talking on his cellphone near the time of the crash while driving a large CMV.**

Discussion:

Mr. Sepesi testified that he was not on his cellphone at the time of the crash, however, his Verizon cellphone record reveals that he was involved in several phone calls within minutes of the assumed crash time that occurred before 10:29:01 – the time Cobb County 911 opened a case for this crash.

The Federal Motor Carrier Safety Regulations (FMCSR) allows CMV operators to talk on a cellphone if their "handsfree" requirements are obeyed.[4]  However, "handsfree" cellphone use has been proven to be unsafe and the trucking industry was put on notice of this reckless problem long before the 2012 rulemaking.  For this reason, most major motor carriers have policies banning any use of a cellphone while driving.  Even the study that the FMCSA relied upon for this rulemaking has been called into question by scientists involved in that study.

---

[3] Defendant's Production # 000021.
[4] 49 CFR § 392.82.

7

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

Driver simulator scientific studies have concluded that cellphone conversations while driving produces cognitive impairment like a "drunk driver". Scientists have indicated that this impairment creates an "inattention blindness" that impacts cellphone conversing driver's ability to react to changing traffic conditions.[5] Additional epidemiological scientific studies concluded a 4-fold crash risk for drivers who admitted to being on a cellphone conversation within at least 10 minutes before the crash.[6]

Mr. Sepesi admitted he talked on his cellphone from time to time while using a headset device. Cellphone use while driving a CMV shows a conscious indifference to the scientific evidence and education published to the trucking industry by various safety organizations.[7] Most large commercial motor carriers have policies that ban all cellphone use while driving.

Mr. Sepesi told the police officer that the sun was obscuring his vision and he was not able to stop in time, however, he denied in his deposition that the sun was a factor that caused his failure. Since the sun wasn't a factor, it is reasonable to conclude cellphone distraction may be the best explanation for why Mr. Sepesi rear-ending Mr. Frushtick. Science has informed us that cellphone conversations distract the driver's brain so that he/she cannot mentally process accurately, nor timely, the speed or stopping of vehicles they are following resulting in significantly more hard braking events and rear-end crashes.[8]

---

[5] "Fatal Distraction? A Comparison of the Cellphone Driver and the Drunk Driver", Strayer, 2002.
[6] "Association Between Cellular-Telephone Calls and Motor Vehicle Collisions", The New England Journal of Medicine, Redelmeier, et al, February 13, 1997.
[7] For Example: National Safety Council, Smith System Driving Institute, ANSI, NHTSA, etc.
[8] Strayer, 2002.

8

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com -- **(864) 288-7193**

## V.   CERTIFICATION:

The observations, discussions and conclusions/opinions in this report are based on my education, training and experience after reviewing the specified evidence.  I hold these professional opinions to a reasonable degree of certainty in the fields of motor carrier safety standards and regulatory compliance. These opinions are based solely on the facts, research, minimum trucking industry standards, trucking regulations and requirements as interpreted by the industry. I used the same analytical approach as used in my non-litigation work and work within the trucking industry. The process I used to reach my observations, opinions and conclusions is the same that any other reasonable expert in my field would use, given the same background, experience and facts.  I reserve the right to supplement these opinions as necessary should I be asked to review additional evidence.  I plan to use anything mentioned in this report, the references and/or the discovery in this case as a trial exhibit.

Signed:   *David L. Dorrity*

**David L. Dorrity, MHRD, CDS, CDT**

9

**David L. Dorrity**, MHRD, CDS, CDT
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

## APPENDIX

The following are additional explanations, examples and citations of industry standards that I may rely upon to explain and support my opinions heretofore discussed.

### CDL-CMV Lookout Standard

The industry standard for truck drivers is to scan the road ahead by at least 12 to 15 seconds.[9] Scanning the road ahead lets the driver get the "big picture"[10] and time to react to any potential hazard and changing conditions. Scanning ahead also prevents, or mitigates, distracted driving because you are focused on the roadway ahead. Scanning ahead is defeated when drivers follow too close to other vehicles because they are looking down at vehicle's tail lights rather than the emerging traffic conditions 12 to 15 seconds ahead.



CITY DRIVING     OPEN HIGHWAY
12-15 Seconds is About One Block  12-15 Seconds is About A Quarter-Mile [11]

### CDL-CMV Speed and Space Management Standard

---

[9] CDL Manual, Section 2.4 – Seeing.
[10] Smith System Defensive Driving concept.
[11] CDL Manual, Seeing, Figure 2.6.

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

CMVs have unique following distance rules when compared to an automobile.  The CDL standard for a CMV like the one the defendant was driving is supposed to follow at a distance no closer than a 6-second interval from the vehicle it is following and at least 7 seconds when traveling over 40 MPH.[12]  The reasoning for this following distance incorporates the size, weight, combination and air-braking system of this large CMV and a safety cushion that can provide space and time for controlled braking.



**Figure 2.11** [13]

The vehicle "following" distance is managed by constantly modulating the speed based on prevailing, or emerging, traffic and environmental conditions. Following distances should be

---

[12] CDL Manual, Section 2.7.1 – Space Ahead.
[13] CDL Manual, Section 2.6.1 – Stopping Distances (Figure 2.11).

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

increased when the roadway is wet, or traction may be compromised. The following CDL figure explains how to calculate that distance.

## HEAVY VEHICLE FORMULA
### For timed interval following distance

- 1 second required for each 10 feet of vehicle length at speeds under 40 MPH
- Above 40 MPH use same formula, then add 1 second for the additional speed



40 foot truck (under 40 MPH) = 4 seconds



50 foot truck (above 40 MPH) = 6 seconds



60 foot truck (under 40 MPH) = 6 seconds

[14]

## <u>Additional CDL Manual Excerpts Supporting My Opinions</u>

## *2.7 – MANAGING SPACE*

---

[14] CDL Manual, Section 2.7 – Managing Space (Figure 2.12).

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

*To be a safe driver, you need space all around your vehicle. When things go wrong, space gives you time to think and to take action. To have space available when something goes wrong, you need to manage space. While this is true for all drivers, it is very important for large vehicles. They take up more space and they require more space for stopping and turning.*

### 2.7.1 – Space Ahead
*of all the space around your vehicle, it is the area ahead of the vehicle--the space you are driving into --that is most important.*

### 2.8.4 – Always Have a Plan
*You should always be looking for hazards.  Continue to learn to see hazards on the road. However, don't forget why you are looking for the hazards--they may turn into emergencies. You look for the hazards in order to have time to plan a way out of any emergency. When you see a hazard, think about the emergencies that could develop and figure out what you would do. Always be prepared to take action based on your plans. In this way, you will be a prepared, defensive driver who will improve your own safety as well as the safety of all road users.*

## 2.10 – Aggressive Drivers/Road Rage
### 2.10.1 – What Is It?
*Aggressive driving and road rage is not a new problem. However, in today's world, where heavy and slow-moving traffic and tight schedules are the norm, more and more drivers are taking out their anger and frustration in their vehicles.  Crowded roads leave little room for error, leading to suspicion and hostility among drivers and encouraging them to take personally the mistakes of other drivers.  Aggressive driving is the act of operating a motor vehicle in a selfish, bold, or pushy manner, without regard for the rights or safety of others.*

13

○ USDOT Number   ○ MC/MX Number   ○ Name

Enter Value: 2955176

[Search]

**Company Snapshot**
FEROEXPRESS INC
USDOT Number: 2955176

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

**Other Information for this Carrier**
▼ SMS Results
▼ Licensing & Insurance

**Carriers:** If you would like to update the following ID/Operations information, please complete and submit form MCS-150 which can be obtained online or from your State FMCSA office. If you would like to challenge the accuracy of your company's safety data, you can do so using FMCSA's DataQs system.

**Carrier and other users:** FMCSA provides the Company Safety Profile (CSP) to motor carriers and the general public interested in obtaining greater detail on a particular motor carrier's safety performance then what is captured in the Company Snapshot. To obtain a CSP please visit the CSP order page or call (800)832-5660 or (703)280-4001 (Fee Required).

For help on the explanation of individual data fields, click on any field name or for help of a general nature go to SAFER General Help.

**The information below reflects the content of the FMCSA management information systems as of 06/11/2019. Carrier VMT Outdated.**

**To find out if this entity has a pending insurance cancellation, please click here.**

| | | | |
|---|---|---|---|
| **Entity Type:** | CARRIER | | |
| **Operating Status:** | NOT AUTHORIZED | **Out of Service Date:** | None |
| **Legal Name:** | FEROEXPRESS INC | | |
| **DBA Name:** | | | |
| **Physical Address:** | 8728 MILL CT E APT B2 PALOS PARK, IL  60464 | | |
| **Phone:** | (708) 600-7437 | | |
| **Mailing Address:** | 8728 MILL CT E APT B2 PALOS PARK, IL  60464-2678 | | |
| **USDOT Number:** | 2955176 | **State Carrier ID Number:** | |
| **MC/MX/FF Number(s):** | MC-1443 | **DUNS Number:** | -- |
| **Power Units:** | 1 | **Drivers:** | 1 |
| **MCS-150 Form Date:** | 09/15/2017 | **MCS-150 Mileage (Year):** | 1 (2015) |

**Operation Classification:**

| | | |
|---|---|---|
| X Auth. For Hire | Priv. Pass.(Non-business) | State Gov't |
| Exempt For Hire | Migrant | Local Gov't |
| Private(Property) | U.S. Mail | Indian Nation |
| Priv. Pass. (Business) | Fed. Gov't | |

**Carrier Operation:**

| | | |
|---|---|---|
| X Interstate | Intrastate Only (HM) | Intrastate Only (Non-HM) |

**Cargo Carried:**

| | | |
|---|---|---|
| X General Freight | Liquids/Gases | Chemicals |
| Household Goods | Intermodal Cont. | Commodities Dry Bulk |
| Metal: sheets, coils, rolls | Passengers | Refrigerated Food |
| Motor Vehicles | Oilfield Equipment | Beverages |
| Drive/Tow away | Livestock | Paper Products |
| Logs, Poles, Beams, Lumber | Grain, Feed, Hay | Utilities |
| Building Materials | Coal/Coke | Agricultural/Farm Supplies |
| Mobile Homes | Meat | Construction |
| Machinery, Large Objects | Garbage/Refuse | Water Well |
| Fresh Produce | US Mail | |

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

**US Inspection results for 24 months prior to: 06/11/2019**

Total Inspections: 2
Total IEP Inspections: 0

**Note:** Total Inspections may be less than the sum of vehicle, driver, and hazmat Inspections. Go to Inspections Help for further Information.

| Inspection Type | Inspections: | | | |
| --- | --- | --- | --- | --- |
| | Vehicle | Driver | Hazmat | IEP |
| Inspections | 0 | 2 | 0 | 0 |
| Out of Service | 0 | 0 | 0 | 0 |
| Out of Service % | % | 0% | % | 0% |
| Nat'l Average % (2009-2010) | 20.72% | 5.51% | 4.50% | N/A |

### Crashes reported to FMCSA by states for 24 months prior to: 06/11/2019

**Note:** Crashes listed represent a motor carrier's Involvement in reportable crashes, without any determination as to responsibility.

| | Crashes: | | | |
| --- | --- | --- | --- | --- |
| Type | Fatal | Injury | Tow | Total |
| Crashes | 0 | 1 | 0 | 1 |

---

## ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating

### Canadian Inspection results for 24 months prior to: 06/11/2019

**Total Inspections: 0**

**Note:** Total Inspections may be less than the sum of vehicle and driver inspections. Go to Inspections Help for further Information.

| Inspection Type | Inspections: | |
| --- | --- | --- |
| | Vehicle | Driver |
| Inspections | 0 | 0 |
| Out of Service | 0 | 0 |
| Out of Service % | 0% | 0% |

### Crashes results for 24 months prior to: 06/11/2019

**Note:** Crashes listed represent a motor carrier's Involvement in reportable crashes, without any determination as to responsibility.

| | Crashes: | | | |
| --- | --- | --- | --- | --- |
| Type | Fatal | Injury | Tow | Total |
| Crashes | 0 | 0 | 0 | 0 |

---

## ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating

*The Federal safety rating does not necessarily reflect the safety of the carrier when operating in intrastate commerce.*

**Carrier Safety Rating:**

### The rating below is current as of: 06/11/2019

#### Review Information:

| Rating Date: | None | Review Date: | None |
| --- | --- | --- | --- |
| Rating: | None | Type: | None |

---

SAFER Home | Feedback | Privacy Policy | USA.gov | Freedom of Information Act (FOIA) | Accessibility | OIG Hotline | Web Policies and Important Links | Plug-Ins

Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE, Washington, DC 20590 • 1-800-832-5660 • TTY: 1-800-877-8339 • Field Office Contacts

**SMS** Safety Measurement System

U.S. DOT# 2955176 has no current for-hire operating authority with FMCSA.

## FEROEXPRESS INC
U.S. DOT#: 2955176
Address: 9728 MILL CT E APT B2
PALOS PARK, IL 60464
Number of Vehicles: 1
Number of Drivers: 1
Number of Inspections: 2

## Safety Rating & OOS Rates
(As of 06/11/2019 updated daily from SAFER )

**Not Rated**

### Out of Service Rates

| Type | OOS % | National Avg % |
|------|-------|----------------|
| Vehicle | | 20.7 |
| Driver | 0.0 | 5.5 |
| Hazmat | | 4.5 |

## Licensing and Insurance
(As of 06/11/2019 updated hourly from L&I )

### Active For-Hire Authority

| Type | Yes/No MC#/MX# |
|------|----------------|
| Property | No |
| Passenger | No |
| Household Goods | No |
| Broker | No |

## BASIC Status (Public Property Carrier View)  ?

Behavior Analysis & Safety Improvement Categories (BASICs)          Based on a 24-month record ending May 31, 2019


Unsafe Driving


Not Public
Crash Indicator


Hours-of-Service Compliance


Vehicle Maintenance


Controlled Substances and Alcohol


Not Public
Hazardous Materials Compliance


Driver Fitness

## On-Road Performance

| 0 Measure | NOT PUBLIC | 0 Measure | 0 Measure | 0 Measure | NOT PUBLIC | 0 Measure |
|-----------|------------|-----------|-----------|-----------|------------|-----------|

### On-Road Performance Detail

| Driver Inspections with Unsafe Driving Violations: 0 | NOT PUBLIC | Driver Inspections: 2 with HOS Compliance Violations: 0 | Vehicle Inspections: 0 with Vehicle Maint. Violations: 0 | Driver Inspections: 2 with Drugs/Alcohol Violations: 0 | NOT PUBLIC | Driver Inspections: 2 with Driver Fitness Violations: 0 |
|---|---|---|---|---|---|---|

| Safety Event Group: No Safety Event Grouping | Safety Event Group: No Safety Event Grouping | Safety Event Group: No Safety Event Grouping | Safety Event Group: No Safety Event Grouping | | Safety Event Group: No Safety Event Grouping |

**Avg. PU × UF: 1**

**Segment:**
Combination
Carrier

## Investigation Results

| No Acute/Critical Violations Discovered | N/A | No Acute/Critical Violations Discovered | No Acute/Critical Violations Discovered | No Acute/Critical Violations Discovered | NOT PUBLIC | No Acute/Critical Violations Discovered |

Select a BASIC icon above to get details, or view your Complete SMS Profile.

**VIOLATION SUMMARY**                                                     Violations: 0

This carrier has no violations to display.

**INSPECTION HISTORY**                                         Total Inspections: 2

| Report | | | Vehicle | | | Measure | |
|---|---|---|---|---|---|---|---|
| Inspection Date | Number | State | Plate Number | Plate State | Type | Severity Weight (SW) | Time Weight (TiW) |
| 2/28/2018 | IA000P13RD56 | IA | P 935287 | IL | TRUCK TRACTOR | | 1 |
| 7/31/2017 | IL3831810069 | IL | P935287 | IL | TRUCK TRACTOR | | 1 |

**CRASH ACTIVITY DETAIL (VEHICLES INVOLVED IN CRASHES)**        Number of Crashes: 1

| Report | | | Vehicle | | Crash | | | | Measure = | Sum of the Total Weight (TotW) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Number | State | Plate Number | Plate State | Fatal | Inj. | Tow. | HM | | Severity Weight (SW) | Time Weight (TiW) | Total Weight (TotW) |
| 10/24/2017 | GA0006447663 | GA | P935287 | IL | 0 | 1 | Yes | No | | 2 | 1 | 2 |

**INVESTIGATION RESULTS**                                 Acute/Critical Violations: 0

This carrier has no Acute/Critical violations to display.

**Summary of Activities**

The summary includes
information on the 5 most recent

**Carrier Registration**

**Flags**

**Enforcement Cases**

(Six years as of 06/11/2019
updated monthly from FMCSA)

investigations and 24 months of inspections and crash history.

Subject to General Threshold

No penalties found

Most Recent Investigation:
Total Inspections: 2

>    Total Inspections without Violations used in SMS: 2
>    Total Inspections with Violations used in SMS: 0

Total Crashes* : 1

*Crashes listed represent a motor carrier's involvement in reportable crashes, regardless of the carrier's or driver's role in the crash. Continue for details.

## USE OF SMS DATA/INFORMATION

### FAST Act of 2015:

Readers should not draw conclusions about a carrier's overall safety condition simply based on the data displayed in this system. Unless a motor carrier has received an UNSATISFACTORY safety rating under part 385 of title 49, Code of Federal Regulations, or has otherwise been ordered to discontinue operations by the Federal Motor Carrier Safety Administration, it is authorized to operate on the Nation's roadways.

### Safety Measurement System:

The data in the Safety Measurement System (SMS) is performance data used by the Agency and Enforcement Community. A ⚠ symbol, based on that data, indicates that FMCSA may prioritize a motor carrier for further monitoring.

The ⚠ symbol is not intended to imply any federal safety rating of the carrier pursuant to 49 USC 31144. Readers should not draw conclusions about a carrier's overall safety condition simply based on the data displayed in this system. Unless a motor carrier in the SMS has received an UNSATISFACTORY safety rating pursuant to 49 CFR Part 385, or has otherwise been ordered to discontinue operations by the FMCSA, it is authorized to operate on the nation's roadways.

Motor carrier safety ratings are available at http://safer.fmcsa.dot.gov and motor carrier licensing and insurance status are available at http://li-public.fmcsa.dot.gov/.

HAYES RE: (Trushtick) v. Feroexpress

| | |
|---|---|
| | 140 pages |
| | By Mr. Bennett for the defense |
| 47 | Had his personal cell phone as well as his work cell phone on him at the time of the wreck |
| 48 | Was heading to a cell phone repair store to get his wife's admin's cell phone repaired |
| 52 | Traffic was heavy at the time of the accident. Conditions were sunny and dry |
| 54 | Was familiar with the intersection where the accident occurred because has been going to work in that area for 3 years |
| 55 | Was in far left turn lane at the time of the wreck. |
| 55 | Came out of Wright Dr., turned right onto South Cobb and worked his way over into the far left lane. Came up to the intersection, saw the red light and stopped normally |
| 57 | Doesn't remember the light being any other color other than red |
| 58 | Believes the traffic was backed up from the other traffic light across the bridge |
| 59 | Doesn't recall if there were cars directly in the intersection but knows they were backed up |
| 59 | Didn't even know the tractor trailer was behind him |
| 64 | Doesn't recall whether or not he was using his phone in any fashion at the time of the crash |
| 65 | Didn't have Bluetooth in his vehicle |
| 70 | Believes the traffic light was red and that he was stopped behind the white line |
| 129 | As far as he can recall, his car was fully stopped at the time he was hit |
| 129 | Also recalls the traffic light being red for the traffic in his lane |
| 130 | Never heard any horn blowing |
| 130 | Didn't see the truck coming in his rearview mirror. Says if you take your eyes off the road on S. Cobb, you'd be in trouble. Had no reason to look in his rearview mirror |
| | |

# GOLDSTEIN & HAYES, P.C.

ATTORNEYS AT LAW
ONE BUCKHEAD PLAZA
3060 PEACHTREE ROAD, N.W.
SUITE 1000
ATLANTA, GEORGIA 30305
(404) 869-8600

JAMES A. GOLDSTEIN
JONATHAN P. HAYES
JARED M. LINA

FACSIMILE
(404) 869-8044

April 17, 2019

David L. Dorrity, MHRD, CDS, CDT
Dorrity Safety Consulting, LLC
Two Meeting Place
Greenville, South Carolina 29615
(864) 288-7193

*VIA UPS AND EMAIL*
*DLDorrity@aol.com*

RE:   **Nathaniel David Frushtick v. Feroexpress Inc. and Frantisek Sepesi**
United States District Court
Northern District of Georgia, Atlanta Division
Civil Action File No. 1:18-cv-02891-MLB

Dear Mr. Dorrity:

Enclosed please find the executed *Fee Schedule Contract* and payment in the amount of Four Thousand Dollars ($4,000.00) as your retainer for the above-referenced case.

Thank you and please do not hesitate to contact Mr. Hayes or myself at (404) 869-8600 with any questions.

Very truly yours,

Jessica Breese
Paralegal to
Jonathan P. Hayes

Enclosures as stated



**DAVID L. DORRITY, MHRD, CDS, CDT**

*DORRITY SAFETY CONSULTING, LLC*

# FEE SCHEDULE CONTRACT

## January 2019

### INITIAL RETAINER PAYMENT - $4,000

<u>All of this advance retainer payment is non-refundable.</u> The retainer represents your agreement to retain my services for consultation and expert services in your case. In the event that I should decide not to participate in your case, this retainer less any expenses and billable time will be refunded. You may not use my name in connection as your consultant or expert on any correspondence or legal disclosures without first paying this retainer. The retainer will be applied to the final bill and is non-refundable.
<u>Expedited rates apply if opinions, or a report, are required within 21 days of engagement.</u>
    RETAINER BREAKDOWN: Expert witness fee and office expenses – $1,500 ($2,000 – If Expedited),
        Balance is applied to future time and travel expenses.

### BILLABLE HOURLY RATES:

<u>Office, Site, Travel and Consultation Time</u> – $250 per hour (*Standard Rate*)-$2,000/day minimum for travel.
           $350 per hour (*Expedited Rate*)-Same travel minimum.

<u>Trial and Deposition Time</u> - $400 per hour - $2,000 per day minimum.
- Includes travel and waiting time before and during actual time of testimony and collection of files.
- Your firm must assume payment for depositions unless paid for in advance by someone else.

### EXPENSES by Category:

| | |
|---|---|
| Auto travel | $.75 per mile |
| Airline | First Class Actual Cost ÷ 20% (unless prepaid by client) |
| All others | Actual Cost |

### FUTURE PAYMENT TERMS:

All fees and expenses are payable to David L. Dorrity c/o Dorrity Safety Consulting, LLC within 10 days from the date of our invoice. A 2% per month service charge is charged for past due bills. Your agreement as confirmed by the signature(s) below commits the person(s) below as well as his/her firm for payment of all invoices for authorized work on your case, regardless of the opinions offered or the outcome of this case.
<u>OUR FEIN: 47-5025833</u>

### CONFLICTS OF INTEREST:

It is expressly understood and agreed that this expert is being retained for his knowledge, skill, training and experience as a consultant in the transportation industry, and that it is understood and agreed to between the parties that this expert will not be provided with any trade secrets or other proprietary information that would create a conflict or preclude him from professional relationships with anyone else.

### DOCUMENT DISTRIBUTION:

All files and documentation provided should be via <u>electronic media</u> (e.g., Email, Dropbox, USB drive, etc.).

### CONTRACT ACCEPTED AND SIGNED BY:

Authorized Representative - X _____ Date 4.17.19

Your Name Jonathan Hayes Firm Name Goldstein + Hayes, P.C.

Case Caption Frushtick vs Fero express, et al.

<u>It is your responsibility to notify me when a case resolves to ensure all billing is current.</u>

---

**Dorrity Safety Consulting, LLC – Two Meeting Place – Greenville, SC 29615**
**(864) 288-7193 – DLDorrity@aol.com**

**GOLDSTEIN & HAYES PC**
**OPERATING ACCOUNT**
3060 PEACHTREE RD NW STE 1000
ATLANTA, GA 30305

11-15

7889

84-7041/2652

DATE 4.17.19

PAY TO THE ORDER OF _David L. Dorrity c/o Dorrity Safety Consulting LLC_      $ 4000.00

_Four Thousand and_ ————————————————— DOLLARS

**iBERIABANK**

FOR _Frushtick v. FernExpress, et al._

⑈007889⑈ ⑆265270413⑆ 2000127781 2⑈

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

Give Form to the
requester. Do not
send to the IRS.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**DORRITY SAFETY CONSULTING, LLC**

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification; check only one of the following seven boxes:

☑ Individual/sole proprietor or ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate
single-member LLC

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ __P__

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

5 Address (number, street, and apt. or suite no.)
**2 MEETING PLACE**

6 City, state, and ZIP code
**GREENVILLE, SC 29615**

Requester's name and address (optional)

7 List account number(s) here (optional)

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number
**4 7 – 5 0 2 5 8 3 3**

### Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

Sign
Here

Signature of
U.S. person ▶

Date ▶

### General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at www.irs.gov/fw9.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See What is FATCA reporting? on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

DEPOSITION OF FRANTISEK SEPESI
NOTES RE: (Hushnick) v. PeroExpress

| | 45 pages |
|---|---|
| 10 | First obtained a CDL in 2016. Opened up a trucking company in 2016 |
| 11 | Other than this wreck, has never been in a wreck with a commercial motor vehicle |
| 13 | Did go to truck driving school that lasted for 6 weeks. When he first got his CDL, he drove for DSV Corp. for 7 months before opening his own company |
| 14 | Left DSV because they owed him $8,000, so opened up his own company |
| 15 | Does have a dispatcher that gives him jobs. His name is Daniel Belcak. Daniel will go to the auction and bid on jobs and loads, then gives them to him |
| 15 | It is his decision whether to accept or deny the load |
| 15 | Was leasing the truck and trailer at the time of the collision. Is still leasing truck. Has finished paying off trailer |
| 16 | He is responsible for all maintenance on the tractor and trailer |
| 17 | When he has maintenance issues, has a mechanic in Chicago that he uses |
| 17 | There wasn't anything wrong with the brakes on the truck. It was practically brand new |
| 17 | Checks the brakes every time before he starts a road trip. Writes it in his logbook |
| 18 | In the logbook, there is a part where a pre-trip inspection is. |
| 18 | Doesn't do a post-inspection at the end of the day. Says that's because he does it at the beginning of the day |
| 19 | No onboard communication devices on the truck |
| 20 | Has never received a DOT violation for hours of service violation |
| 20 | Never received violation for log falsification |
| 20 | Never had his CDL suspended |
| 21 | Never had any medical issues that would disqualify him from driving a commercial motor vehicle |
| 22 | When he first went to work for DSV, he was given a road test by driving with a guy for a week. |
| 23 | Denies using his cell phone at the time of the wreck |
| 24 | Was empty and on his way to pick up a load at the time of the wreck. Didn't get to pick it up. Load was cancelled |
| 26 | Had a headset to go with his phone |
| 26 | Always completes his logs at the time of the event |
| 27 | Had never been to the area before where the accident occurred |
| 28 | Was relying on his GPS to get him to the destination to pick up his load |
| 28 | At the time of the accident, there was a straight road, he was in the left lane and going to turn left. The light was green. All of a sudden, the car in front of him stopped suddenly at a green light. He couldn't stop in time |
| 29 | Took 2 pictures at the scene. One of the pictures that shows where his truck came to rest was after he had moved the truck back a little after the cops asked him to |
| 30 | Doesn't know how long he had been following the vehicle that was in front of him. |
| 32 | Was driving and watching the traffic lights. Doesn't remember how far away he was when he started watching the lights but says he was watching them the whole while |
| 32 | As he was approaching the intersection, the lights were steady green |
| 33 | Never saw the light change. It was always green |
| 33 | Doesn't remember if he decreased his speed as he was approaching the intersection or not |
| 34 | Doesn't remember if he was ever trained that as he was approaching an intersection, that he should be prepared to stop. Says he wasn't taught that in school |

DEPOSITION OF FRANTISEK SEPESI

| 34 | Doesn't count seconds between objects for his following distance but visually tries to keep a safe distance |
|----|---|
| 36 | It's hard for him to explain how he keeps a proper lookout, but says he just tries to keep a long distance between himself and the vehicle in front of him |
| 39 | Following the scene, didn't go take a drug and alcohol test. Is aware of the FMCSR regarding drug testing after a wreck but nobody ever asked him to |
| 41 | Says there was no traffic that day and there were no cars in front of the plaintiff vehicle |
| 42 | There were no cars blocking the intersection |
| 43 | Never saw the light change from green to yellow because when he was approaching the intersection, it was always green |
| 45 | Since this accident, hasn't had any additional training on operating his truck |
|  |  |



**Cobb County**
**911 Communications** _____ **Destiny Davidson, Director**
140 North Marietta Pkwy,
Marietta, GA. 30060
Phone: (770) 499-4106
Fax: (770) 590-5718

# REQUEST FOR PAYMENT

To:  Jessica Breese
     Goldstein & Hayes, PC

Date:  12/04/17   Ref: case 17-102029

| Qty | | Price | Totals | |
|---|---|---|---|---|
| 1 | CD | $ 5.00 | $ | 5.00 |
| 5 | Pages of CAD Printout | $ 0.10 | $ | 0.50 |
| 1 | Each 15 minutes Research/Download Time ( 1st 15 Mins Free per GA Law) | $ 5.50 | $ | 5.50 |
| | **Total Due** | | **$** | **11.00** |

Received By:_____   Date:_____
                    *Signature*

Please make Checks Payable /mail to:

**Cobb County 911 Communications**
Attn: Michelle Ottosen
140 N. Marietta Pkwy
Marietta, GA 30060

## CERTIFICATE OF AUTHENTICATION OF RECORDS
## PURSUANT TO O.C.G.A. §§ 24-8-803 and 24-9-902

STATE OF Georgia

COUNTY OF Cobb

    Personally appeared before me, the undersigned officer, duly authorized to administer oaths, Michelle Ottosen an authorized representative of COBB COUNTY E911 COMMUNICATIONS BUREAU, who, upon being duly sworn, states:

    This Certificate of Authentication of Records is given pursuant to O.C.G.A. §§ 24-8-803, 24-9-902 and/or Federal Rule of Evidence 902(11) in lieu of the personal appearance of the person certifying hereto, and in connection with a lawsuit involving NATHANIEL DAVID FRUSHTICK.

    The undersigned certifies that same is a records custodian and/or a person responsible for the keeping of records for COBB COUNTY E911 COMMUNICATIONS BUREAU, and that the within and attached records are true and accurate reproductions and copies of the records of this facility concerning 911 RECORDS PERTAINING TO A COLLISION INVOLVING NATHANIEL DAVID FRUSHTICK OCCURRING ON 10/24/2017, which were kept in the aforesaid facility, and that said records were kept as reasonably necessary.

    The undersigned certifies that any and all copies of records and documents attached hereto are true and correct copies of business records kept in the ordinary course of business and that the facts represented in the written records were entered upon the records shortly after the incidents which they purport to reflect as part of the normal course of business.

    The undersigned certifies that the records:

    (a) Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
    (b) Were kept in the course of the regularly conducted activity; and
    (c) Were made by the regularly conducted activity as a regular practice.

    The undersigned further certifies that said records with this attached Certificate were delivered pursuant to O.C.G.A. § 9-11-34(c) to GOLDSTEIN & HAYES, P.C., Attorneys of Record for the Plaintiff, who is the counsel who sought production.

Sworn to and subscribed
before me this 4th day
of December, 201__

Sabrina Woodall
NOTARY PUBLIC

Michelle Ottosen
Print Name: Michelle Ottosen
Records Custodian for:
COBB COUNTY E911
COMMUNICATIONS BUREAU

**Incident Detailed Report**

Incident #:

| | | | |
|---|---|---|---|
| Incident #: | CO-2017-10-24-00297421 | | |

Certified Copy
Cobb County Communications
Date: __ - 4 - 17
By: __

**Summary**

| | | | |
|---|---|---|---|
| Location: | S COBB DR-I285 | | |
| Loc Name: | S COBB DR-I285 | | |
| City | CC' | | |
| Loc Descr: | | Subdiv. | |
| Building | | Apt/Unit: | |
| Floor | | | |
| Status; | Closed | Created: | 10:29:01 10/24/2017 |
| Inc Type: | 414 | Agency Type | POLICE |
| Mod Circ: | | Priority. | 2 |
| Agency ID: | CO | Area: | 3 |
| Sector | | Beat | 315A |
| Report #: | CO-2017-0102029 | | |
| Disposition: | 16 | | |

**Dispatch**

Unit(s):   CO/3215 (Officers: CO/LINDSEY T DANIEL) (Primary), CO/3215 (Officers:
CO/LINDSEY T DANIEL), CO/3217 (Officers: CO/GRZONKA ROBERT), CO/3216
(Officers: CO/BARTLETT J ALEXANDER)

**Comments**

| | | |
|---|---|---|
| 10:51.17 10/24/2017 | EC2001 | EC34 |

BARROWS CLR ON S85 HEAVY WRECKER REQUEST

| | | |
|---|---|---|
| 10:50.45 10/24/2017 | EC2001 | EC34 |

NORMAL 53FOOT BOX TRUCK TRAILER

| | | |
|---|---|---|
| 10:48 05 10/24/2017 | EC2001 | EC34 |

HEAVY WRECKER C8 EMPTY BOX TRUCK TRAILER (CO/3216)

| | | |
|---|---|---|
| 10:39:28 10/24/2017 | EC2001 | EC34 |

S85 FOR ONE, BARROWS IS CLR

| | | |
|---|---|---|
| 10:29:37 10/24/2017 | EC2944 | EC10 |

ON THE BRIDGE OVER I285

| | | |
|---|---|---|
| 10:29:01 10/24/2017 | EC2944 | EC10 |

78S WHITE TOYOTA SUV VS BROWN TT
TOYOTA DRIVER INJ
LEFT HAND SHOULDER

**Persons**

| | | | |
|---|---|---|---|
| Name' | HAMMOND, JUSTIN | Role: | INITIAL CALLER |
| Address: | 2560 PLANT ATKINSON RD SE | | |
| | | Apt/Unit: | |
| City: | | | |
| Phone: | (770) 841-8081 | Contact?: | Yes |
| Gender: | | DOB' | |
| Race: | | Age: | |
| Height | | Bldg: | |
| Hair: | | Weight: | |
| Eyes: | | License # | |
| Misc.: | | | |

CO-2017-10-24-00297421     12/4/2017 03:30:28     EC9734     Page 2 of 5

Vehicles ————————————————————————————
Premise Hazard ————————————————————————
Previous Incidents ——————————————————————————

Note: The number of previous incidents printed was limited to 0. There were additional previous incidents not printed. Incomplete Printout (IncNum:0/51 )

Associated Incidents ————————————————————

| Incident # | Type | Agency ID | Status | Location |
|---|---|---|---|---|
| CF-2017-10-24-00056721 | 414F | CF | Closed | S COBB DR-I285, CC |
| CO-2017-10-24-00297421 | 414 | CO | Closed | S COBB DR-I285, CC |

Attachments ————————————————————————————
History ————————————————————————————

| Time/Date | Trans Type | User ID | Console ID |
|---|---|---|---|
| 12:19:39 10/24/2017 | INC STAT | EC2373 | EC23 |
| Incident Status | | Status: Closed (Pending) | |
| 12:19:39 10/24/2017 | INC UPDT | EC2373 | EC23 |
| Disposition | | Dispo: 16 | |
| 12:19:34 10/24/2017 | REC | EC9455 | EC06 |
| Preferred | | Rec: [P] 3210 (1:34) | |
| Add'l: [P] 3312 (2:10), 3215 (4:11), 3217 (4:15) | | | |
| 12:19:34 10/24/2017 | REC | EC9455 | EC06 |
| Fixed | | Rec: [P] 3215 | |
| Add'l: [P] 3210, 3217, 3312 | | | |
| 12:19:32 10/24/2017 | REC | EC2373 | EC23 |
| Preferred | | Rec: [P] 3210 (1:34) | |
| Add'l: [P] 3312 (2:10), 3215 (4:11), 3217 (4:15) | | | |
| 12:19:31 10/24/2017 | REC | EC2373 | EC23 |
| Fixed | | Rec: [P] 3215 | |
| Add'l: [P] 3210, 3217, 3312 | | | |
| 12:18:28 10/24/2017 | TIMEOUT | EC2373 | EC23 |
| Incident Timeout Reset | | Timeout Value: 2 | |
| 12:18:28 10/24/2017 | UNIT MGMT | EC2373 | EC23 |
| Unit Location | | Unit ID: CO/3215 | |
| Location: NULL (S COBB DR-I285) | | Loc Name: NULL (S COBB DR-I285) | |
| City: NULL (CC) | | | |
| 12:18:28 10/24/2017 | FREE UNIT | EC2373 | EC23 |
| Unit Freed | | Unit ID: CO/3215 | |
| 12:18:28 10/24/2017 | UNIT STAT | EC2373 | EC23 |
| Unit Status | | Unit ID: CO/3215 | |
| Status: C (E) | | | |
| 12:18:28 10/24/2017 | INC STAT | EC2373 | EC23 |
| Incident Status | | Status: Pending (Active) | |
| 12:17:34 10/24/2017 | UNIT MGMT | EC2373 | EC23 |
| Unit Location | | Unit ID: CO/3215 | |
| Location: S COBB DR-I285 | | Loc Name: S COBB DR-I285 | |
| City: CC | | | |
| 12:17:34 10/24/2017 | UNIT STAT | EC2373 | EC23 |
| Unit Status | | Unit ID: CO/3215 | |
| Status: E (C) | | | |
| 12:17:34 10/24/2017 | INC STAT | EC2373 | EC23 |
| Incident Status | | Status: Active (Pending) | |
| 12:17:34 10/24/2017 | PRIM UNIT | EC2373 | EC23 |

| Time/Date | Trans Type | User ID | Console ID |
|-----------|-----------|---------|-----------|
| Primary Unit | | Primary: CO/3215 (CO/3216) | |
| 12:17:34 10/24/2017 | DPTCH | EC2373 | EC23 |
| Dispatch | | Assigned Unit: CO/3215 (Officers: CO/LINDSEY T | |
| DANIEL) | | | |
| 12:17:26 10/24/2017 | REC | EC2373 | EC23 |
| Preferred | | Rec: [P] 3210 (1:34) | |
| Add'l: [P] 3312 (2:10), 3217 (4:15), 2215 (4:41) | | | |
| 12:17:25 10/24/2017 | REC | EC2373 | EC23 |
| Fixed | | Rec: [P] 3215 | |
| Add'l: [P] 3210, 3217, 3312 | | | |
| 12:17:11 10/24/2017 | TIMEOUT | EC2373 | EC23 |
| Incident Timeout Reset | | Timeout Value: 2 | |
| 12:17:11 10/24/2017 | FREE UNIT | EC2373 | EC23 |
| Unit Freed (Preempted) | | Unit ID: CO/3216 | |
| 12:17:11 10/24/2017 | UNIT STAT | EC2373 | EC23 |
| Unit Status | | Unit ID: CO/3216 | |
| Status: C (OK) | | | |
| 12:17:11 10/24/2017 | INC STAT | EC2373 | EC23 |
| Incident Status | | Status: Pending (Active) | |
| 11:30:42 10/24/2017 | UNIT MGMT | EC9455 | EC06 |
| Unit Location | | Unit ID: CO/3217 | |
| Location: NULL (S COBB DR-I285) | | Loc Name: NULL (S COBB DR-I285) | |
| City: NULL (CC) | | | |
| 11:30:42 10/24/2017 | FREE UNIT | EC9455 | EC06 |
| Unit Freed | | Unit ID: CO/3217 | |
| 11:30:42 10/24/2017 | UNIT STAT | EC9455 | EC06 |
| Unit Status | | Unit ID: CO/3217 | |
| Status: C (OK) | | | |
| 10:51:17 10/24/2017 | CMNTS | EC2001 | EC34 |
| Comments | | | |
| BARROWS CLR ON S85 HEAVY WRECKER REQUEST | | | |
| 10:50:45 10/24/2017 | CMNTS | EC2001 | EC34 |
| Comments | | | |
| NORMAL 53FOOT BOX TRUCK TRAILER | | | |
| 10:48:05 10/24/2017 | CMNTS | EC2001 | EC34 |
| Comments (Unit) | | Unit ID: CO/3216 | |
| HEAVY WRECKER C6 EMPTY BOX TRUCK TRAILER | | | |
| 10:46:21 10/24/2017 | RPT NUM | EC2001 | EC34 |
| Report Number Assigned | | Rprt Num: CO-2017-0102029 | |
| 10:44:11 10/24/2017 | UNIT STAT | EC2001 | EC34 |
| Unit Status | | Unit ID: CO/3216 | |
| Status: OK (AR) | | | |
| 10:42:58 10/24/2017 | UNIT MGMT | EC2001 | EC34 |
| Unit Location | | Unit ID: CO/3217 | |
| Location: S COBB DR-I285 | | Loc Name: S COBB DR-I285 | |
| City: CC | | | |
| 10:42:58 10/24/2017 | UNIT STAT | EC2001 | EC34 |
| Unit Status | | Unit ID: CO/3217 | |
| Status: OK (C) | | | |
| 10:42:58 10/24/2017 | DPTCH | EC2001 | EC34 |
| Dispatch | | Assigned Unit: CO/3217 (Officers: CO/GRZONKA | |
| ROBERT) | | | |
| 10:42:58 10/24/2017 | REC | EC2001 | EC34 |

| Time/Date | Trans Type | User ID | Console ID |
|---|---|---|---|
| Not Requested | | Recommendations  not requested | |
| 10:42:10 10/24/2017 | TIMEOUT | System | System |
| Unit Timeout | | Unit ID: CO/3216 | |
| 10:39:28 10/24/2017 | CMNTS | EC2001 | EC34 |
| Comments | | | |
| S85 FOR ONE, BARROWS IS CLR | | | |
| 10:38:10 10/24/2017 | UNIT STAT | EC2001 | EC34 |
| Unit Status | | Unit ID: CO/3216 | |
| Status: AR (E) | | | |
| 10:30:35 10/24/2017 | UNIT MGMT | EC2001 | EC34 |
| Unit Location | | Unit ID: CO/3216 | |
| Location: S COBB DR-I285 | | Loc Name: S COBB DR-I285 | |
| City: CC | | | |
| 10:30:35 10/24/2017 | UNIT STAT | EC2001 | EC34 |
| Unit Status | | Unit ID: CO/3216 | |
| Status: E (C) | | | |
| 10:30:35 10/24/2017 | INC STAT | EC2001 | EC34 |
| Incident Status | | Status: Active (Pending) | |
| 10:30:35 10/24/2017 | PRIM UNIT | EC2001 | EC34 |
| Primary Unit | | Primary: CO/3216 (CO/3215) | |
| 10:30:35 10/24/2017 | DPTCH | EC2001 | EC34 |
| Dispatch | | Assigned Unit: CO/3216 (Officers: CO/BARTLETT J ALEXANDER) | |
| 10:30:22 10/24/2017 | REC | EC2001 | EC34 |
| Preferred | | Rec: [P] 3215 (3:01) | |
| Add'l: [P] 3210 (3:07), 2215 (4:41), 3219 (6:23) | | | |
| 10:30:21 10/24/2017 | REC | EC2001 | EC34 |
| Fixed | | Rec: [P] 3215 | |
| Add'l: [P] 3216, 3210, 3219 | | | |
| 10:30:12 10/24/2017 | TIMEOUT | EC2001 | EC34 |
| Incident Timeout Reset | | Timeout Value: 2 | |
| 10:30:12 10/24/2017 | UNIT MGMT | EC2001 | EC34 |
| Unit Location | | Unit ID: CO/3215 | |
| Location: NULL (S COBB DR-I285) | | Loc Name: NULL (S COBB DR-I285) | |
| City: NULL (CC) | | | |
| 10:30:12 10/24/2017 | FREE UNIT | EC2001 | EC34 |
| Unit Freed | | Unit ID: CO/3215 | |
| 10:30:12 10/24/2017 | UNIT STAT | EC2001 | EC34 |
| Unit Status | | Unit ID: CO/3215 | |
| Status: C (E) | | | |
| 10:30:12 10/24/2017 | INC STAT | EC2001 | EC34 |
| Incident Status | | Status: Pending (Active) | |
| 10:30:00 10/24/2017 | UNIT MGMT | EC2001 | EC34 |
| Unit Location | | Unit ID: CO/3215 | |
| Location: S COBB DR-I285 | | Loc Name: S COBB DR-I285 | |
| City: CC | | | |
| 10:30:00 10/24/2017 | UNIT STAT | EC2001 | EC34 |
| Unit Status | | Unit ID: CO/3215 | |
| Status: E (C) | | | |
| 10:30:00 10/24/2017 | INC STAT | EC2001 | EC34 |
| Incident Status | | Status: Active (Pending) | |
| 10:30:00 10/24/2017 | PRIM UNIT | EC2001 | EC34 |
| Primary Unit | | Primary: CO/3215 | |

CO-2017-10-24-00297421        12/4/2017 03:30:31        EC9734        Page 5 of 5

| Time/Date | Trans Type | User ID | Console ID |
|---|---|---|---|
| 10:30:00 10/24/2017 | DPTCH | EC2001 | EC34 |
| Dispatch | | | Assigned Unit: CO/3215 (Officers: CO/LINDSEY T |
| DANIEL) | | | |
| 10:29:46 10/24/2017 | REC | EC2001 | EC34 |
| Preferred | | | Rec: [P] 3215 (3:01) |
| Add'l: [P] 3210 (3:07), 2215 (4:41), 3219 (5:23) | | | |
| 10:29:45 10/24/2017 | REC | EC2001 | EC34 |
| Fixed | | | Rec: [P] 3215 |
| Add'l: [P] 3210, 3219, 3213 | | | |
| 10:29:37 10/24/2017 | CMNTS | EC2944 | EC10 |
| Comments | | | |
| ON THE BRIDGE OVER I285 | | | |
| 10:29:03 10/24/2017 | INC ASSOC | EC2944 | EC10 |
| Incident Associated | | | Incid #: CF-2017-10-24-00056721 |
| 10:29:01 10/24/2017 | CMNTS | EC2944 | EC10 |
| Comments | | | |
| 78S WHITE TOYOTA SUV VS BROWN TT | | | |
| TOYOTA DRIVER INJ | | | |
| LEFT HAND SHOULDER | | | |
| 10:29:01 10/24/2017 | PER INFO | EC2944 | EC10 |
| Person 1 Added | | | Role: INITIAL CALLER |
| First: JUSTIN | | | Last: HAMMOND |
| Phone: (770) 841-8081 | | | Address: 2560 PLANT ATKINSON RD SE |
| Contact: Yes | | | Is Property Seized: No |
| 10:29:01 10/24/2017 | INC CREATE | EC2944 | EC10 |
| Jurisdiction | | | Area: 3 |
| Beat: 315A | | | |
| 10:29:01 10/24/2017 | INC CREATE | EC2944 | EC10 |
| Incident Created | | | Started: 10:26:04 10/24/2017 |
| Details to Follow: None | | | Location: S COBB DR-I285 |
| Loc Name: S COBB DR-I285 | | | Latitude: 33.825022 |
| Longitude: -84.489422 | | | City: CC |
| Source: 911 | | | Incid Type: 414 |
| Priority: 2 | | | Validation Level: Premise Lvl |
| 10:26:30 10/24/2017 | ANI/ALI | EC2944 | EC10 |
| 911 Call | | | Ani/Ali Populate Time: 10:26:30 10/24/2017 |
| E911 Phone Call Status: Offered | | | Incoming: Yes |
| Emergency Number: 223 | | | Mobile: No |
| Time Offered: 10:26:04 10/24/2017 | | | Time Received at Switch: 10:26:00 10/24/2017 |
| Total Time on Hold: 0 | | | Total Time in Conference: 0 |

**VERIZON CONFIDENTIAL**





January 16, 2019

Goldstein & Hayes, P.C
ATTN: Jonathan Hayes, Esq
3060 Peachtree Road NW
Suite 1000
Atlanta, GA 30305

Verizon Wireless Case #: 190012064
Docket / File # 1:18-CV-02891-MLB
Target:  708-600-7434

Dear Jonathan Hayes,

Please note, the attached request is being returned for the following reason(s):

**(X) Some of the records that you requested no longer exist because they are beyond Verizon's period of retention.**

- **Non-content text messages data (SMS) is maintained for one rolling calendar year (includes originating/terminating telephone numbers and the date/time).**

Respectfully,

Patricia P.
VERIZON SECURITY SUBPOENA COMPLIANCE



**verizon√**

VERIZON SECURITY SUBPOENA COMPLIANCE
180 WASHINGTON VALLEY ROAD
BEDMINSTER NJ 07921
Phone 800-451-5242 Fax 325-949-6918

January 30, 2019

GOLDSTEIN & HAYES, P.C
3060 PEACHTREE ROAD NW SUITE 1000
ATLANTA GA 30305

**Verizon Case #: 190012064**
**Docket / File #: 1:18-CV-02891-MLB**

State of Texas
ss:

County of Tom Green
I, PATRICIA PHONGSAVANHTHONG, being duly sworn, depose and say:

I am the custodian of records for Verizon, and in that capacity, I certify that the attached 32 pages of records are true and accurate copies of the records created from the information maintained by Verizon in the actual course of business. It is Verizon's ordinary practice to maintain such records, and that said records were made contemporaneously with the transaction and events stated therein, or within a reasonable time thereafter.

PATRICIA PHONGSAVANHTHONG,

Sworn to before me this 30 day of January, 2019

Notary Public

**verizon√**

VERIZON SECURITY SUBPOENA COMPLIANCE
2701 S. JOHNSON ST.
SAN ANGELO, TX, 76904
TAX ID: 23-2259884 / Cage # 3L7L6
PHN: 888-483-2600
FAX: 325-949-6916

| Date | Invoice # |
|------|-----------|
| 01/30/2019 | 2019246332 |

**Case Invoice**

Account #          NJ130113
Payment Due Date:   03/01/2019

RECEIVED
FEB 01 2019

Goldstein & Hayes, P.C
3060 Peachtree Road NW
Suite 1000
Atlanta, GA, 30305

| VZ Case# | File/Docket # | Description | Date Rec | Request Atty/Agent | Rate | Amount |
|----------|---------------|-------------|----------|--------------------|------|--------|
| 190012064 181050210 | 1:18-CV-02891-MLB | # Hours 1 / $75.00 Shipping: $6.00 | 01/30/2019 | Johnathan Hayes | | $81.00 |

| | |
|---|---|
| Total | $81.00 |
| Payments/Credits | $0.00 |
| Balance Due | $81.00 |

Please return a copy of this summary with your payment. Please reference invoice number on your remittance check.

| Account # | Total Amount Due | Payment Due Date | Amount Enclosed |
|-----------|------------------|------------------|-----------------|
| NJ130113 | 81.00 | 03/01/2019 | |

Goldstein & Hayes, P.C
3060 Peachtree Road NW
Suite 1000
Atlanta, GA, 30305
Attn: Johnathan Hayes

Make check payable to:
VERIZON SECURITY SUBPOENA COMPLIANCE
2701 S. JOHNSON ST.
SAN ANGELO, TX, 76904

P001859

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of Georgia

| | | |
|---|---|---|
| NATHANIEL DAVID FRUSHTICK | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:18-CV-02891-MLB |
| FEROEXPRESS INC. and FRANTISEK SEPESI | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   Verizon Wireless (VAW) LLC, Attn: Subpoena Compliance/Custodian of Records, c/o registered agent C T
       Corporation System, 289 S. Culver Street, Lawrenceville, Georgia 30046, fax: (888) 667-0028

*(Name of person to whom this subpoena is directed)*

    ☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following
documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the
material:Please see the attached Exhibit "A" for the documents to produce.  IN LIEU OF APPEARANCE, PLEASE
PRODUCE CERTIFIED COPIES OF THE REQUESTED DOCUMENTS via U.S. Mail to: JONATHAN P.
HAYES, ESQ. at Goldstein & Hayes, P.C., 3060 Peachtree Road NW, Suite 1000, Atlanta, Georgia 30305.

| Place: Goldstein & Hayes, P.C., 3060 Peachtree Road NW, Suite 1000, Atlanta, Georgia 30305 | Date and Time: 02/01/2019 12:00 pm |
|---|---|

    ☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or
other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party
may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

    The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance;
Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to
respond to this subpoena and the potential consequences of not doing so.

Date:   01/14/2019

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Nathaniel David Frushtick                                      , who issues or requests this subpoena, are:

Jonathan Hayes, 3060 Peachtree Rd. NW, Ste 1000, Atlanta, GA 30305, (404) 869-8600, jph@goldsteinhayes.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the
inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before
it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT "A"**

**YOU ARE REQUESTED TO PRODUCE <u>CERTIFIED</u> <u>COPIES</u> OF THE FOLLOWING:**

1. The complete records for mobile phone number (708) 600-7437 from October 1, 2017 through October 31, 2017, including but not limited to the following:

   a. Subscriber information;

   b. Service features;

   c. Originating/outgoing call logs;

   d. Terminating/incoming call logs;

   e. Records and logs related to all voice features, including but not limited to the following:

      1) Connect date;

      2) Connect time;

      3) Seizure time;

      4) Originating number;

      5) Terminating number;

      6) Elapsed time/call duration;

      7) Number dialed;

      8) IMEI/International Mobile Equipment Identification number;

      9) IMSI/International Mobile Subscriber identity number;

      10) Description of how the call was handled, including carrier and routing information;

      11) Carrier identification code;

      12) Call code; and

      13) Cell location information;

f.  Records and logs related to all data usage, including but not limited to the following:

    1)  Bytes up;

    2)  Bytes down;

    3)  Network interface access point;

    4)  Cell location information; and

    5)  Description of the type of data services that were accessed;

g.  Records and logs related to SMS usage, including but not limited to the following:

    1)  Originating number;

    2)  Terminating number;

    3)  Description of the direction of the message and all information known about the type of message; and

    4)  Cell location information; and

h.  Any and all other records; and

2.  Billing statements indicating billing address and account holder for phone number (708) 600-7437 from October 1, 2017 through October 31, 2017.

- 2 -

| Searched-Value | Device Id | Device Type | MTN Status Cod | MTN Effective D | IMEI | 4G Indicator |
|---|---|---|---|---|---|---|
| 7086007437 | | ICC | A | 8/27/2016 | "353821083315 | Y |

| Searched-Value | Feature Name |
| --- | --- |
| 7086007437 | TXT MSG W PER MSG CHARGES |
| 7086007437 | STREAMLINE BILLING |
| 7086007437 | CALLER ID |
| 7086007437 | BUSY TRANSFER |
| 7086007437 | 3-WAY CALLING |
| 7086007437 | CALL DELIVERY |
| 7086007437 | CALL WAITING |
| 7086007437 | NO ANSWER TRANSFER |
| 7086007437 | CALL FORWARDING |
| 7086007437 | 4G SMS |
| 7086007437 | DYNAMIC PRIVATE IP |
| 7086007437 | APN VZWINTERNET |
| 7086007437 | 4G APN VZWAPP |
| 7086007437 | ALP MMS PROVISIONING |
| 7086007437 | USAGE BS 4G MOB HOTSPT |
| 7086007437 | USAGE BASED MHS TRIGGER |
| 7086007437 | 4G PROVISIONING |
| 7086007437 | CONSUMER PDA |
| 7086007437 | EMAIL TRIGGER ALP |
| 7086007437 | DATA PROVISION TRIGGER |
| 7086007437 | INTEGRATED MESSAGING |
| 7086007437 | VISUAL VOICE MAIL -SPEC |
| 7086007437 | INTL MSG IT TRACKER |
| 7086007437 | ADVN CALL EAB |
| 7086007437 | ADV CALL VM TRIGGER |
| 7086007437 | ADV CALL VIDEO CALLING |
| 7086007437 | WPP ASURION SINGLE TIER |
| 7086007437 | PREMIUM CALL FILTER II |
| 7086007437 | INTL SERVICE ENABLED LITE |
| 7086007437 | HSS ALI PROVISIONING |
| 7086007437 | ALP LINE MSHAR TLK & TXT |
| 7086007437 | GSM VOICE ROAM |
| 7086007437 | RTR/UC TRIGGER UNLIMITED |
| 7086007437 | RTR FOR UNLIMITED |

| Searched-Value | Account Number | Last Name | First Name | Middle Name | Business Name |
|---|---|---|---|---|---|
| 7086007437 | 688834368-1 | SEPESI | FRANTISEK | | |

| Addr Line1 | Addr Line2 | Addr Line3 | City | State | Zip Code |
|---|---|---|---|---|---|
| 9728 MILL CT E | | | PALOS PARK | IL | 604642625 |

P001866



P.O. BOX 4002
ACWORTH, GA 30101

| | |
|---|---|
| Billing period | Sep 27, 2017 - Oct 26, 2017 |
| Account number | 688834368-00001 |
| Invoice number | 3642232123 |

KEYLINE
|.||.||...|.|.||.|...|.|.|.||.|...|.||.|.|..|.|

See last page for payment options and how to split your bill.
Questions? Visit vzw.com/contactus

# Hi          , here's your bill for this month.

 **verizon**✓ Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

708.600.7437 | iPhone 7 Plus

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Sep 30 | | | | | | | | |
| Oct 2 | 8:13 AM | 708.691.3320 | Orland Par, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 2 | 8:14 AM | 708.691.3320 | Orland Par, IL | Incoming, CL | 14 | -- | -- | -- |
| Oct 2 | 8:42 AM | 773.418.1371 | Bridgeview, IL | Chicago, IL | 2 | -- | -- | -- |
| Oct 2 | 8:44 AM | 201.741.9351 | Bridgeview, IL | Hackensack, NJ | 5 | -- | -- | -- |
| Oct 2 | 8:49 AM | 631.418.5855 | Chicago Ri, IL | Huntington, NY | 38 | -- | -- | -- |
| Oct 2 | 9:26 AM | 708.504.3309 | Lake Stall, IN | Incoming, CL | 8 | -- | -- | -- |
| Oct 2 | 9:34 AM | 631.418.5855 | Portage, IN | Huntington, NY | 43 | -- | -- | -- |
| Oct 2 | 10:16 AM | 708.504.3309 | Hamlet, IN | Incoming, CL | 8 | -- | -- | -- |
| Oct 2 | 10:24 AM | 773.319.7611 | Knox, IN | Chicago, IL | 1 | -- | -- | -- |
| Oct 2 | 11:25 AM | 708.853.9682 | Plymouth, IN | Riverside, IL | 1 | -- | -- | -- |
| Oct 2 | 11:27 AM | 631.418.5855 | Plymouth, IN | Huntington, NY | 4 | -- | -- | -- |
| Oct 2 | 11:30 AM | 708.853.9682 | Plymouth, IN | Incoming, CL | 5 | -- | -- | -- |
| Oct 2 | 11:35 AM | 631.418.5855 | Plymouth, IN | Huntington, NY | 20 | -- | -- | -- |
| Oct 2 | 11:55 AM | 708.504.3309 | Warsaw, IN | Incoming, CL | 2 | -- | -- | -- |
| Oct 2 | 11:57 AM | 631.418.5855 | Warsaw, IN | Huntington, NY | 5 | -- | -- | -- |
| Oct 2 | 12:02 PM | 708.691.3320 | Warsaw, IN | Orland, IL | 4 | -- | -- | -- |
| Oct 2 | 12:17 PM | 708.691.3320 | Warsaw, IN | Incoming, CL | 8 | -- | -- | -- |
| Oct 2 | 12:32 PM | 708.853.9682 | Warsaw, IN | Riverside, IL | 4 | -- | -- | -- |
| Oct 2 | 12:38 PM | 708.691.3320 | Warsaw, IN | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 2 | 12:47 PM | 708.691.3320 | Warsaw, IN | Incoming, CL | 1 | -- | -- | -- |
| Oct 2 | 1:11 PM | 631.418.5813 | Warsaw, IN | Huntington, NY | 7 | -- | -- | -- |
| Oct 2 | 1:20 PM | 708.504.3309 | Warsaw, IN | LA Grange, IL | 1 | -- | -- | -- |
| Oct 2 | 1:21 PM | 708.504.3309 | Warsaw, IN | Incoming, CL | 2 | -- | -- | -- |
| Oct 2 | 1:29 PM | 708.853.9682 | Warsaw, IN | Incoming, CL | 3 | -- | -- | -- |
| Oct 2 | 1:37 PM | 708.853.9682 | Warsaw, IN | Incoming, CL | 2 | -- | -- | -- |
| Oct 2 | 1:49 PM | 631.745.8893 | Grovertown, IN | Incoming, CL | 18 | -- | -- | -- |
| Oct 2 | 2:08 PM | 708.853.9682 | Hanna, IN | Riverside, IL | 1 | -- | -- | -- |
| Oct 2 | 2:09 PM | 631.745.8893 | Warsaw, IN | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 2 | 2:12 PM | 708.691.3320 | Warsaw, IN | Orland, IL | 12 | -- | -- | -- |
| Oct 2 | 2:23 PM | 708.853.9682 | Bourbon, IN | Incoming, CL | 7 | -- | -- | -- |
| Oct 2 | 2:37 PM | 708.853.9682 | Chesterton, IN | Riverside, IL | 4 | -- | -- | -- |
| Oct 2 | 2:41 PM | 631.745.8893 | Portage, IN | Riverhead, NY | 1 | -- | -- | -- |
| Oct 2 | 2:48 PM | 773.909.1224 | Lake Stall, IN | Chicago, IL | 1 | -- | -- | -- |
| Oct 2 | 2:52 PM | 773.909.1224 | Gary, IN | Chicago, IL | 2 | -- | -- | -- |
| Oct 2 | 3:15 PM | 201.741.9351 | Hazel Cres, IL | Incoming, CL | 14 | -- | -- | -- |
| Oct 2 | 3:52 PM | 708.853.9682 | Bridgeview, IL | Riverside, IL | 13 | -- | -- | -- |
| Oct 2 | 4:08 PM | 773.905.3592 | Burbank, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 2 | 4:15 PM | 773.909.1224 | Bridgeview, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 2 | 4:18 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 2 | 4:27 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 2 | 4:29 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 2 | 4:36 PM | 708.504.3309 | Chicago, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 2 | 4:44 PM | 708.504.3309 | Chicago, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 2 | 4:50 PM | 773.909.1224 | Chicago, IL | Chicago, IL | 5 | -- | -- | -- |

9

 **verizon**  Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|----------------------|-------|
| Oct 2 | 4:55 PM | 708.504.3309 | Chicago, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 2 | 4:56 PM | 773.909.1224 | Chicago, IL | Chicago, IL | 5 | -- | -- | -- |
| Oct 2 | 8:26 PM | 773.558.7751 | Orland Par, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 2 | 8:27 PM | 773.558.7751 | Palos Park, IL | Chicagozn03, IL | 1 | -- | -- | -- |
| Oct 2 | 8:27 PM | 773.558.7751 | Palos Park, IL | Chicagozn03, IL | 2 | -- | -- | -- |
| Oct 2 | 8:29 PM | 773.558.7751 | Orland Par, IL | Incoming, CL | 14 | -- | -- | -- |
| Oct 3 | 10:26 AM | 773.905.3592 | Palos Heig, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 3 | 10:42 AM | 773.319.7611 | Oak Lawn, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 3 | 10:43 AM | 708.691.3320 | Oak Lawn, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 3 | 10:44 AM | 708.853.9682 | Oak Lawn, IL | Incoming, CL | 7 | -- | -- | -- |
| Oct 3 | 10:51 AM | 708.691.3320 | Chicago Fit, IL | Orland, IL | 10 | -- | -- | -- |
| Oct 3 | 11:03 AM | 708.307.8507 | Bridgeview, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 3 | 11:04 AM | 708.504.3309 | Burbank, IL | LA Grange, IL | 4 | -- | -- | -- |
| Oct 3 | 11:08 AM | 708.307.8507 | Bridgeview, IL | Incoming, CL | 5 | -- | -- | -- |
| Oct 3 | 11:35 AM | 708.504.3309 | Palos Hill, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 3 | 11:36 AM | 631.745.8893 | Palos Hill, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 3 | 11:38 AM | 708.307.8507 | Palos Hill, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 3 | 11:40 AM | 773.558.7751 | Palos Park, IL | Chicagozn03, IL | 20 | -- | -- | -- |
| Oct 3 | 12:01 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 6 | -- | -- | -- |
| Oct 3 | 12:29 PM | 708.307.8507 | Orland Par, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 3 | 12:36 PM | 631.418.5855 | Orland Par, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 3 | 12:37 PM | 631.418.5813 | Orland Par, IL | Huntington, NY | 3 | -- | -- | -- |
| Oct 3 | 12:39 PM | 631.418.5855 | Palos Hill, IL | Huntington, NY | 3 | -- | -- | -- |
| Oct 3 | 12:41 PM | 708.307.8507 | Palos Park, IL | Incoming, CL | 27 | -- | -- | -- |
| Oct 3 | 1:48 PM | 773.344.1159 | Oakbrook T, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 3 | 1:50 PM | 708.307.8507 | Oak Brook, IL | Tinleypark, IL | 7 | -- | -- | -- |
| Oct 3 | 2:10 PM | 631.745.8893 | LA Grange, IL | Riverhead, NY | 1 | -- | -- | -- |
| Oct 3 | 2:22 PM | 914.403.6561 | Orland Par, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 3 | 2:25 PM | 201.741.9351 | Orland Par, IL | Hackensack, NJ | 8 | -- | -- | -- |
| Oct 3 | 2:33 PM | 708.307.8507 | Orland Par, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 3 | 2:58 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 3 | 3:19 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 3 | -- | -- | -- |
| Oct 3 | 3:29 PM | 631.418.5855 | Orland Par, IL | Incoming, CL | 9 | -- | -- | -- |
| Oct 3 | 3:52 PM | 631.418.5855 | Orland Par, IL | Huntington, NY | 52 | -- | -- | -- |
| Oct 3 | 5:08 PM | 708.504.3309 | Chicago, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 3 | 5:24 PM | 708.307.8507 | Chicago, IL | Tinleypark, IL | 41 | -- | -- | -- |
| Oct 3 | 5:53 PM | 773.344.1159 | Hickory Hil, IL | Incoming, CL | 10 | -- | -- | -- |
| Oct 4 | 8:01 AM | 631.418.5813 | Orland Par, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 4 | 9:24 AM | 708.853.9682 | Orland Par, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 4 | 10:07 AM | 708.504.3309 | Hickory Hil, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 4 | 10:10 AM | 708.504.3309 | Hickory Hil, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 4 | 10:11 AM | 773.909.1224 | Hickory Hil, IL | Chicago, IL | 31 | -- | -- | -- |
| Oct 4 | 10:42 AM | 773.909.1224 | Chicago, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 4 | 10:42 AM | 773.909.1224 | Chicago, IL | Incoming, CL | 16 | -- | -- | -- |
| Oct 4 | 11:09 AM | 708.853.9682 | Des Plaine, IL | Riverside, IL | 1 | -- | -- | -- |

P001869

 **verizon**✓ Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 4 | 11:12 AM | 708.853.9682 | Des Plaine, IL | Riverside, IL | 11 | -- | -- | -- |
| Oct 4 | 11:25 AM | 421-918144774 | Des Plaine, IL Mobile | Slovakia, | 3 | -- | 3.98 | 3.98 |
| Oct 4 | 11:47 AM | 708.504.3309 | Des Plaine, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 4 | 12:03 PM | 708.691.3320 | Des Plaine, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 4 | 12:11 PM | 708.307.8507 | Des Plaine, IL | Tinleypark, IL | 9 | -- | -- | -- |
| Oct 4 | 12:32 PM | 631.745.8893 | Des Plaine, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 4 | 12:33 PM | 2017419351 | Des Plaine, IL | Hackensack, NJ | 14 | -- | -- | -- |
| Oct 4 | 1:25 PM | 708.691.3320 | Monee, IL | Incoming, CL | 7 | -- | -- | -- |
| Oct 4 | 1:31 PM | 708.691.3320 | Monee, IL | Orland, IL | 4 | -- | -- | -- |
| Oct 4 | 1:45 PM | 708.691.3320 | Bradley, IL | Incoming, CL | 8 | -- | -- | -- |
| Oct 4 | 1:53 PM | 708.691.3320 | Kankakee, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 4 | 1:55 PM | 708.691.3320 | Chebanse, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 4 | 1:57 PM | 708.307.8507 | Chebanse, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 4 | 1:59 PM | 708.691.3320 | Clifton, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 4 | 2:01 PM | 708.691.3320 | Clifton, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 4 | 2:03 PM | 708.691.3320 | Clifton, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 4 | 2:11 PM | 708.307.8507 | Gilman, IL | Incoming, CL | 14 | -- | -- | -- |
| Oct 4 | 2:24 PM | 708.504.3309 | Buckley, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 4 | 2:30 PM | 708.307.8507 | Paxton, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 4 | 2:30 PM | 708.691.3320 | Paxton, IL | Orland, IL | 21 | -- | -- | -- |
| Oct 4 | 2:51 PM | 708.691.3320 | Champaign, IL | Incoming, CL | 32 | -- | -- | -- |
| Oct 4 | 3:26 PM | 631.418.5855 | Arcola, IL | Incoming, CL | 26 | -- | -- | -- |
| Oct 4 | 4:03 PM | 708.691.3320 | Mattoon, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 4 | 4:35 PM | 630.544.8133 | Mattoon, IL | Naperville, IL | 30 | -- | -- | -- |
| Oct 4 | 5:04 PM | 708.307.8507 | Effingham, IL | Tinleypark, IL | 8 | -- | -- | -- |
| Oct 4 | 5:12 PM | 631.418.5855 | Mason, IL | Huntington, NY | 3 | -- | -- | -- |
| Oct 4 | 5:22 PM | 708.307.8507 | Kinmundy, IL | Incoming, CL | 46 | -- | -- | -- |
| Oct 4 | 5:52 PM | 708.691.3320 | Dix, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 4 | 5:53 PM | 708.691.3320 | Dix, IL | Incoming, CL | 14 | -- | -- | -- |
| Oct 4 | 5:55 PM | 773.344.1159 | Dix, IL | Incoming, CL | 15 | -- | -- | -- |
| Oct 4 | 6:09 PM | 708.691.3320 | Bonnie, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 4 | 6:09 PM | 708.504.3309 | Bonnie, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 4 | 6:11 PM | 773.344.1159 | Bonnie, IL | Incoming, CL | 34 | -- | -- | -- |
| Oct 4 | 6:11 PM | 708.691.3320 | Bonnie, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 4 | 6:12 PM | 708.307.8507 | Bonnie, IL | Tinleypark, IL | 14 | -- | -- | -- |
| Oct 4 | 6:23 PM | 708.691.3320 | Benton, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 4 | 6:24 PM | 708.691.3320 | Benton, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 4 | 6:26 PM | 708.691.3320 | West Frank, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 4 | 6:27 PM | 708.691.3320 | West Frank, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 4 | 6:27 PM | 708.691.3320 | West Frank, IL | Incoming, CL | 17 | -- | -- | -- |
| Oct 4 | 6:29 PM | 708.307.8507 | West Frank, IL | Incoming, CL | 18 | -- | -- | -- |
| Oct 4 | 6:44 PM | 708.691.3320 | Marion, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 4 | 6:45 PM | 708.691.3320 | Marion, IL | Orland, IL | 2 | -- | -- | -- |
| Oct 4 | 6:46 PM | 773.344.1159 | Marion, IL | VM Deposit, CL | 2 | -- | -- | -- |

11



Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|------|------|------|
| Oct 4 | 6:47 PM | 708.691.3320 | Marion, IL | Orland, IL | 14 | -- | -- | -- |
| Oct 4 | 6:48 PM | 708.307.8507 | Goreville, IL | Incoming, CL | 12 | -- | -- | -- |
| Oct 4 | 6:49 PM | 773.344.1159 | Goreville, IL | Incoming, CL | 5 | -- | -- | -- |
| Oct 4 | 6:54 PM | 773.344.1159 | Buncombe, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 4 | 7:00 PM | 708.504.3309 | Dongola, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 4 | 7:01 PM | 708.504.3309 | Dongola, IL | LA Grange, IL | 7 | -- | -- | -- |
| Oct 4 | 7:08 PM | 773.909.1224 | Villa Ridg, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 4 | 8:40 PM | 773.909.1224 | Hayti, MO | Chicago, IL | 1 | -- | -- | -- |
| Oct 4 | 9:08 PM | 708.307.8507 | Dyersburg, TN | Tinleypark, IL | 70 | -- | -- | -- |
| Oct 4 | 9:41 PM | 708.307.8507 | Denmark, TN | Incoming, CL | 34 | -- | -- | -- |
| Oct 4 | 9:49 PM | 708.504.3309 | Jackson, TN | Incoming, CL | 9 | -- | -- | -- |
| Oct 4 | 9:51 PM | 708.307.8507 | Jackson, TN | Tinleypark, IL | 2 | -- | -- | -- |
| Oct 4 | 9:51 PM | 773.909.1224 | Jackson, TN | Chicago, IL | 35 | -- | -- | -- |
| Oct 5 | 8:52 AM | 708.691.3320 | Corinth, MS | Incoming, CL | 16 | -- | -- | -- |
| Oct 5 | 9:26 AM | 708.504.3309 | Corinth, MS | Incoming, CL | 8 | -- | -- | -- |
| Oct 5 | 9:33 AM | 708.853.9682 | Corinth, MS | Riverside, IL | 7 | -- | -- | -- |
| Oct 5 | 9:35 AM | 708.853.9682 | Corinth, MS | Incoming, CL | 1 | -- | -- | -- |
| Oct 5 | 9:40 AM | 708.504.3309 | Corinth, MS | Incoming, CL | 5 | -- | -- | -- |
| Oct 5 | 10:29 AM | 631.745.8893 | Walnut, MS | Incoming, CL | 1 | -- | -- | -- |
| Oct 5 | 11:05 AM | 708.691.3320 | Lamar, MS | Orland, IL | 69 | -- | -- | -- |
| Oct 5 | 11:05 AM | 708.691.3320 | Lamar, MS | Orland, IL | 1 | -- | -- | -- |
| Oct 5 | 11:46 AM | 708.691.3320 | Memphis, TN | Incoming, CL | 1 | -- | -- | -- |
| Oct 5 | 12:26 PM | 708.853.9682 | Memphis, TN | Riverside, IL | 17 | -- | -- | -- |
| Oct 5 | 12:28 PM | 708.504.3309 | Memphis, TN | LA Grange, IL | 1 | -- | -- | -- |
| Oct 5 | 12:44 PM | 708.853.9682 | Memphis, TN | Incoming, CL | 6 | -- | -- | -- |
| Oct 5 | 12:47 PM | 708.504.3309 | Memphis, TN | LA Grange, IL | 2 | -- | -- | -- |
| Oct 5 | 3:30 PM | 708.691.3320 | Portagevil, MO | Incoming, CL | 7 | -- | -- | -- |
| Oct 5 | 3:42 PM | 708.691.3320 | Portagevil, MO | Orland, IL | 3 | -- | -- | -- |
| Oct 5 | 4:10 PM | 708.691.3320 | Sikeston, MO | Incoming, CL | 28 | -- | -- | -- |
| Oct 5 | 4:27 PM | 708.691.3320 | Chaffee, MO | Incoming, CL | 11 | -- | -- | -- |
| Oct 5 | 4:47 PM | 201.741.9351 | Perryville, MO | Hackensack, NJ | 22 | -- | -- | -- |
| Oct 5 | 4:48 PM | 201.741.9351 | Perryville, MO | Hackensack, NJ | 1 | -- | -- | -- |
| Oct 5 | 4:49 PM | 708.691.3320 | Perryville, MO | Incoming, CL | 6 | -- | -- | -- |
| Oct 5 | 4:54 PM | 708.504.3309 | Perryville, MO | Incoming, CL | 5 | -- | -- | -- |
| Oct 5 | 5:31 PM | 631.418.5813 | Festus, MO | Incoming, CL | 13 | -- | -- | -- |
| Oct 5 | 5:38 PM | 847.980.6962 | Pevely, MO | VM Deposit, CL | 5 | -- | -- | -- |
| Oct 5 | 6:16 PM | 631.418.5813 | Pevely, MO | Huntington, NY | 1 | -- | -- | -- |
| Oct 5 | 6:38 PM | 631.418.5813 | Sunset Hil, MO | Incoming, CL | 10 | -- | -- | -- |
| Oct 5 | 6:53 PM | 631.418.5813 | Chesterfie, MO | Huntington, NY | 7 | -- | -- | -- |
| Oct 5 | 6:57 PM | 631.418.5813 | Weldon Spr, MO | VM Deposit, CL | 4 | -- | -- | -- |
| Oct 5 | 6:57 PM | 631.418.5813 | Chesterfie, MO | Incoming, CL | 1 | -- | -- | -- |
| Oct 5 | 7:00 PM | 708.307.8507 | Saint Char, MO | Incoming, CL | 3 | -- | -- | -- |
| Oct 5 | 7:14 PM | 631.418.5813 | Wentzville, MO | Incoming, CL | 13 | -- | -- | -- |
| Oct 5 | 7:22 PM | 708.691.3320 | Troy, MO | Orland, IL | 6 | -- | -- | -- |
| Oct 5 | 7:28 PM | 708.691.3320 | Troy, MO | Incoming, CL | 7 | -- | -- | -- |
| Oct 5 | | | | | 1 | -- | -- | -- |

P001871



Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 5 | 7:31 PM | 708.691.3320 | Troy, MO | Incoming, CL | 45 | -- | -- | -- |
| Oct 5 | 7:44 PM | 201.741.9351 | Eolia, MO | Hackensack, NJ | 32 | -- | -- | -- |
| Oct 5 | 8:05 PM | 631.418.5856 | New London, MO | Huntington, NY | 17 | -- | -- | -- |
| Oct 5 | 9:55 PM | 708.504.3309 | Montrose, IA | LA Grange, IL | 5 | -- | -- | -- |
| Oct 5 | 10:00 PM | 708.504.3309 | Salem, IA | LA Grange, IL | 1 | -- | -- | -- |
| Oct 5 | 10:00 PM | 708.504.3309 | Montrose, IA | Incoming, CL | 14 | -- | -- | -- |
| Oct 5 | 10:15 PM | 708.691.3320 | Salem, IA | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 5 | 10:16 PM | 708.691.3320 | Salem, IA | Incoming, CL | 47 | -- | -- | -- |
| Oct 5 | 11:02 PM | 708.691.3320 | Riverside, IA | Incoming, CL | 25 | -- | -- | -- |
| Oct 5 | 11:54 PM | 708.504.3309 | Iowa City, IA | LA Grange, IL | 2 | -- | -- | -- |
| Oct 6 | 8:35 AM | 708.853.9682 | Iowa City, IA | Incoming, CL | 3 | -- | -- | -- |
| Oct 6 | 9:10 AM | 708.853.9682 | Iowa City, IA | Riverside, IL | 25 | -- | -- | -- |
| Oct 6 | 9:35 AM | 708.504.3309 | Riverside, IA | LA Grange, IL | 1 | -- | -- | -- |
| Oct 6 | 9:45 AM | 708.691.3320 | Crawfordsv, IA | Incoming, CL | 7 | -- | -- | -- |
| Oct 6 | 9:53 AM | 708.504.3309 | Winfield, IA | LA Grange, IL | 1 | -- | -- | -- |
| Oct 6 | 9:55 AM | 708.504.3309 | MT Pleasan, IA | Incoming, CL | 4 | -- | -- | -- |
| Oct 6 | 10:07 AM | 773.895.5272 | MT Pleasan, IA | Incoming, CL | 2 | -- | -- | -- |
| Oct 6 | 11:14 AM | 708.691.3320 | MT Pleasan, IA | Orland, IL | 3 | -- | -- | -- |
| Oct 6 | 11:17 AM | 201.741.9351 | MT Pleasan, IA | Hackensack, NJ | 6 | -- | -- | -- |
| Oct 6 | 11:27 AM | 631.418.5813 | Crawfordsv, IA | Huntington, NY | 7 | -- | -- | -- |
| Oct 6 | 12:03 PM | 631.875.1002 | Columbus J, IA | Incoming, CL | 14 | -- | -- | -- |
| Oct 6 | 12:17 PM | 708.853.9682 | Muscatine, IA | Incoming, CL | 3 | -- | -- | -- |
| Oct 6 | 12:20 PM | 708.691.3320 | Muscatine, IA | Orland, IL | 3 | -- | -- | -- |
| Oct 6 | 12:23 PM | 708.307.8507 | Muscatine, IA | Tinleypark, IL | 13 | -- | -- | -- |
| Oct 6 | 12:37 PM | 631.875.1002 | Muscatine, IA | Riverhead, NY | 59 | -- | -- | -- |
| Oct 6 | 12:58 PM | 708.691.3320 | Rock Islen, IL | Incoming, CL | 7 | -- | -- | -- |
| Oct 6 | 1:55 PM | 708.906.3437 | Princeton, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 6 | 2:04 PM | 708.853.9682 | Peru, IL | Riverside, IL | 3 | -- | -- | -- |
| Oct 6 | 2:12 PM | 631.418.5813 | Utica, IL | Huntington, NY | 2 | -- | -- | -- |
| Oct 6 | 2:13 PM | 631.418.5813 | Utica, IL | Huntington, NY | 1 | -- | -- | -- |
| Oct 6 | 2:14 PM | 631.418.5813 | Utica, IL | Incoming, CL | 21 | -- | -- | -- |
| Oct 6 | 3:17 PM | 708.853.9682 | Willowbroo, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 6 | 3:23 PM | 708.853.9682 | Willowbroo, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 6 | 3:24 PM | 773.295.5971 | Willowbroo, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 6 | 3:25 PM | 773.295.5971 | Willowbroo, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 6 | 3:30 PM | 773.295.5971 | Bridgeview, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 6 | 3:31 PM | 312.730.5707 | LA Grange, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 6 | 3:32 PM | 773.295.5971 | Hodgkins, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 6 | 3:32 PM | 708.853.9682 | Hodgkins, IL | Riverside, IL | 7 | -- | -- | -- |
| Oct 6 | 4:42 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 6 | 4:42 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 6 | 4:44 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 6 | 4:46 PM | 708.504.3309 | Bridgeview, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 6 | 5:20 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 6 | 5:27 PM | 708.504.3309 | Bridgeview, IL | Incoming, CL | 1 | -- | -- | -- |

13



Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|-----------------------|-------|
| Oct 6 | 5:45 PM | 708.307.8507 | Bridgeview, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 6 | 6:48 PM | 708.691.3320 | Orland Par, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 6 | 8:20 PM | 631.418.5813 | Orland Par, IL | Huntington, NY | 3 | -- | -- | -- |
| Oct 6 | 8:43 PM | 631.418.5813 | Orland Par, IL | Huntington, NY | 3 | -- | -- | -- |
| Oct 7 | 8:50 AM | 708.691.3320 | Orland Par, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 7 | 9:44 AM | 708.691.3320 | Palos Park, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 7 | 10:00 AM | 708.691.3320 | Orland Par, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 7 | 10:21 AM | 708.691.3320 | Orland Par, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 7 | 10:33 AM | 631.418.5813 | Orland Par, IL | Incoming, CL | 7 | -- | -- | -- |
| Oct 7 | 11:24 AM | 708.691.3320 | Hammond, IN | Incoming, CL | 1 | -- | -- | -- |
| Oct 7 | 11:35 AM | 708.691.3320 | Hammond, IN | Incoming, CL | 1 | -- | -- | -- |
| Oct 7 | 12:09 PM | 708.307.8507 | Bridgeview, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 7 | 12:17 PM | 708.307.8507 | Bridgeview, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 7 | 12:19 PM | 708.504.3309 | Hickory Hil, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 7 | 1:31 PM | 708.504.3309 | Burbank, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 7 | 1:31 PM | 708.504.3309 | Burbank, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 7 | 3:33 PM | 631.418.5855 | Orland Par, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 7 | 3:54 PM | 631.418.5855 | Palos Park, IL | Huntington, NY | 4 | -- | -- | -- |
| Oct 7 | 4:00 PM | 631.418.5855 | Orland Par, IL | Incoming, CL | 12 | -- | -- | -- |
| Oct 8 | 1:07 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 8 | 2:18 PM | 708.504.3309 | Palos Park, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 8 | 2:49 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 8 | 3:10 PM | 631.418.5855 | Lemont, IL | Huntington, NY | 12 | -- | -- | -- |
| Oct 8 | 5:13 PM | 708.691.3320 | Bridgeview, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 8 | 5:30 PM | 708.504.3309 | Hickory Hil, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 8 | 7:43 PM | 708.691.3320 | Orland Par, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 9 | 7:43 AM | 708.853.9682 | Orland Par, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 9 | 7:47 AM | 317.218.7777 | Orland Par, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 9 | 7:49 AM | 708.853.9682 | Orland Par, IL | Riverside, IL | 8 | -- | -- | -- |
| Oct 9 | 7:57 AM | 708.853.9682 | Palos Park, IL | Incoming, CL | 4 | -- | -- | -- |
| Oct 9 | 9:06 AM | 708.691.3320 | Orland Par, IL | Orland, IL | 5 | -- | -- | -- |
| Oct 9 | 9:59 AM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 9 | 10:08 AM | 708.504.3309 | Palos Park, IL | Incoming, CL | 13 | -- | -- | -- |
| Oct 9 | 10:26 AM | 708.906.3437 | Orland Par, IL | LA Grange, IL | 24 | -- | -- | -- |
| Oct 9 | 10:50 AM | 708.691.3320 | Peotone, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 9 | 10:51 AM | 708.307.8507 | Peotone, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 9 | 10:53 AM | 631.745.8893 | Peotone, IL | Riverhead, NY | 26 | -- | -- | -- |
| Oct 9 | 11:30 AM | 708.853.9682 | Bradley, IL | Riverside, IL | 2 | -- | -- | -- |
| Oct 9 | 11:34 AM | 708.853.9682 | Bradley, IL | Riverside, IL | 1 | -- | -- | -- |
| Oct 9 | 11:37 AM | 631.745.8893 | Bradley, IL | Riverhead, NY | 11 | -- | -- | -- |
| Oct 9 | 12:06 PM | 631.745.8893 | Bradley, IL | Riverhead, NY | 2 | -- | -- | -- |
| Oct 9 | 12:11 PM | 708.691.3320 | Bradley, IL | Incoming, CL | 20 | -- | -- | -- |
| Oct 9 | 12:12 PM | 708.307.8507 | Bradley, IL | Tinleypark, IL | 6 | -- | -- | -- |
| Oct 9 | 12:39 PM | 708.853.9682 | Bradley, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 9 | 12:41 PM | 800.326.9977 | Bradley, IL | Toll-Free, CL | 17 | -- | -- | -- |

14

 **verizon**✓    Billing period Sep 27, 2017 to Oct 26, 2017  |  Account # 688834368-00001  |  Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|----------------------|-------|
| Oct 9 | 12:58 PM | 708.853.9682 | Bradley, IL | Riverside, IL | 3 | -- | -- | -- |
| Oct 9 | 1:30 PM | 708.853.9682 | Bradley, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 9 | 1:38 PM | 708.307.8507 | Bradley, IL | Incoming, CL | 59 | -- | -- | -- |
| Oct 9 | 2:36 PM | 631.418.5855 | Bradley, IL | Incoming, CL | 7 | -- | -- | -- |
| Oct 9 | 2:42 PM | 708.853.9682 | Bradley, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 9 | 2:49 PM | 708.307.8507 | Bradley, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 9 | 2:56 PM | 708.853.9682 | Bradley, IL | Incoming, CL | 22 | -- | -- | -- |
| Oct 9 | 3:25 PM | 708.853.9682 | Bradley, IL | Riverside, IL | 12 | -- | -- | -- |
| Oct 9 | 3:39 PM | 773.558.7751 | Bradley, IL | Chicagozn03, IL | 2 | -- | -- | -- |
| Oct 9 | 3:40 PM | 708.853.9682 | Bradley, IL | Incoming, CL | 5 | -- | -- | -- |
| Oct 9 | 3:49 PM | 708.504.3309 | Bradley, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 9 | 3:50 PM | 631.418.5855 | Bradley, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 9 | 4:03 PM | 708.504.3309 | Bradley, IL | Incoming, CL | 19 | -- | -- | -- |
| Oct 9 | 4:23 PM | 631.418.5855 | Bradley, IL | Huntington, NY | 8 | -- | -- | -- |
| Oct 9 | 4:31 PM | 631.418.5855 | Bradley, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 9 | 4:31 PM | 631.418.5855 | Bradley, IL | Incoming, CL | 11 | -- | -- | -- |
| Oct 9 | 4:47 PM | 708.504.3309 | Bradley, IL | Incoming, CL | 21 | -- | -- | -- |
| Oct 9 | 5:47 PM | 708.307.8507 | Bradley, IL | Tinleypark, IL | 13 | -- | -- | -- |
| Oct 9 | 6:00 PM | 773.909.1224 | Bradley, IL | Chicago, IL | 47 | -- | -- | -- |
| Oct 9 | 6:47 PM | 708.504.3309 | Paolone, IL | LA Grange, IL | 3 | -- | -- | -- |
| Oct 9 | 6:50 PM | 773.909.1224 | Paolone, IL | Chicago, IL | 36 | -- | -- | -- |
| Oct 9 | 7:26 PM | 708.307.8507 | Orland Par, IL | Tinleypark, IL | 13 | -- | -- | -- |
| Oct 10 | 6:58 AM | 708.691.3320 | Wolcott, IN | Incoming, CL | 59 | -- | -- | -- |
| Oct 10 | 8:53 AM | 630.802.8924 | Indianapol, IN | Sugargrove, IL | 24 | -- | -- | -- |
| Oct 10 | 9:17 AM | 708.307.8507 | Greenfield, IN | Tinleypark, IL | 18 | -- | -- | -- |
| Oct 10 | 9:37 AM | 708.691.3320 | Straughn, IN | Incoming, CL | 2 | -- | -- | -- |
| Oct 10 | 9:42 AM | 708.691.3320 | Cambridge, IN | Incoming, CL | 21 | -- | -- | -- |
| Oct 10 | 10:21 AM | 708.504.3309 | Clayton, OH | Incoming, CL | 22 | -- | -- | -- |
| Oct 10 | 10:46 AM | 631.745.8893 | Springfiel, OH | Riverhead, NY | 1 | -- | -- | -- |
| Oct 10 | 10:57 AM | 773.909.1224 | London, OH | Incoming, CL | 31 | -- | -- | -- |
| Oct 10 | 12:18 PM | 708.853.9682 | Grove City, OH | Incoming, CL | 24 | -- | -- | -- |
| Oct 10 | 1:12 PM | 708.691.3320 | Grove City, OH | Incoming, CL | 6 | -- | -- | -- |
| Oct 10 | 1:17 PM | 217.229.1838 | Grove City, OH | Incoming, CL | 4 | -- | -- | -- |
| Oct 10 | 2:33 PM | 708.853.9682 | Prospect, OH | Incoming, CL | 2 | -- | -- | -- |
| Oct 10 | 2:55 PM | 708.504.3309 | Marion, OH | Incoming, CL | 1 | -- | -- | -- |
| Oct 10 | 3:01 PM | 708.691.3320 | Marion, OH | Orland, IL | 2 | -- | -- | -- |
| Oct 10 | 3:02 PM | 708.504.3309 | Marion, OH | LA Grange, IL | 12 | -- | -- | -- |
| Oct 10 | 3:22 PM | 708.853.9682 | Marion, OH | Riverside, IL | 1 | -- | -- | -- |
| Oct 10 | 4:26 PM | 2017.419351 | Bucyrus, OH | Hackensack, NJ | 27 | -- | -- | -- |
| Oct 10 | 5:02 PM | 708.504.3309 | Bluffton, OH | LA Grange, IL | 1 | -- | -- | -- |
| Oct 10 | 5:03 PM | 631.745.8893 | Bluffton, OH | Incoming, CL | 10 | -- | -- | -- |
| Oct 10 | 5:13 PM | 2017.419351 | Lima, OH | Hackensack, NJ | 9 | -- | -- | -- |
| Oct 10 | 5:32 PM | 708.691.3320 | Middle Poi, OH | Incoming, CL | 15 | -- | -- | -- |
| Oct 10 | 5:46 PM | 708.504.3309 | Convoy, OH | Incoming, CL | 15 | -- | -- | -- |
| Oct 10 | 6:02 PM | 708.307.8507 | Fort Wayne, IN | Tinleypark, IL | 76 | -- | -- | -- |

15



Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

708.600.7437 | iPhone 7 Plus

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 10 | 6:17 PM | 708.691.3320 | Fort Wayne, IN | Orland, IL | 1 | -- | -- | -- |
| Oct 10 | 6:17 PM | 708.691.3320 | Fort Wayne, IN | Incoming, CL | 20 | -- | -- | -- |
| Oct 10 | 6:57 PM | 708.691.3320 | Hanna, IN | Incoming, CL | 11 | -- | -- | -- |
| Oct 10 | 6:59 PM | 708.691.3320 | Pierceton, IN | Orland, IL | 21 | -- | -- | -- |
| Oct 10 | 7:18 PM | 708.307.8507 | Bourbon, IN | Incoming, CL | 82 | -- | -- | -- |
| Oct 10 | 7:20 PM | 708.691.3320 | Bourbon, IN | Incoming, CL | 37 | -- | -- | -- |
| Oct 10 | 7:40 PM | 708.307.8507 | Lake Statl, IN | Incoming, CL | 168 | -- | -- | -- |
| Oct 10 | 9:13 PM | 201.741.9351 | Hoffman Es, IL | Incoming, CL | 93 | -- | -- | -- |
| Oct 10 | 10:58 PM | 708.504.3309 | Madison, WI | LA Grange, IL | 1 | -- | -- | -- |
| Oct 10 | 11:05 PM | 708.504.3309 | Madison, WI | Incoming, CL | 8 | -- | -- | -- |
| Oct 10 | 11:40 PM | 708.691.3320 | Portage, WI | Orland, IL | 3 | -- | -- | -- |
| Oct 10 | 11:51 PM | 708.504.3309 | Portage, WI | LA Grange, IL | 2 | -- | -- | -- |
| Oct 10 | 11:52 PM | 708.691.3320 | Portage, WI | Orland, IL | 8 | -- | -- | -- |
| Oct 11 | 12:06 AM | 708.691.3320 | Portage, WI | Orland, IL | 6 | -- | -- | -- |
| Oct 11 | 12:15 AM | 708.691.3320 | Portage, WI | Incoming, CL | 7 | -- | -- | -- |
| Oct 11 | 12:47 AM | 708.504.3309 | Portage, WI | LA Grange, IL | 3 | -- | -- | -- |
| Oct 11 | 8:15 AM | 708.853.9682 | Portage, WI | Riverside, IL | 7 | -- | -- | -- |
| Oct 11 | 8:21 AM | 708.691.3320 | Portage, WI | Orland, IL | 9 | -- | -- | -- |
| Oct 11 | 8:29 AM | 708.853.9682 | Portage, WI | Riverside, IL | 10 | -- | -- | -- |
| Oct 11 | 8:47 AM | 708.691.3320 | Portage, WI | Orland, IL | 1 | -- | -- | -- |
| Oct 11 | 8:47 AM | 708.691.3320 | Portage, WI | Incoming, CL | 3 | -- | -- | -- |
| Oct 11 | 9:19 AM | 708.691.3320 | Portage, WI | Incoming, CL | 4 | -- | -- | -- |
| Oct 11 | 9:23 AM | 773.418.1571 | Portage, WI | Chicago, IL | 5 | -- | -- | -- |
| Oct 11 | 9:38 AM | 708.504.3309 | Portage, WI | LA Grange, IL | 11 | -- | -- | -- |
| Oct 11 | 9:58 AM | 773.418.1571 | Portage, WI | Incoming, CL | 10 | -- | -- | -- |
| Oct 11 | 10:09 AM | 608.742.4228 | Portage, WI | Portage, WI | 2 | -- | -- | -- |
| Oct 11 | 10:11 AM | 773.418.1571 | Portage, WI | Chicago, IL | 2 | -- | -- | -- |
| Oct 11 | 10:27 AM | 708.691.3320 | Portage, WI | Incoming, CL | 12 | -- | -- | -- |
| Oct 11 | 10:41 AM | 201.741.9351 | Portage, WI | Hackensack, NJ | 1 | -- | -- | -- |
| Oct 11 | 10:41 AM | 708.307.8507 | Portage, WI | Tinleypark, IL | 4 | -- | -- | -- |
| Oct 11 | 10:56 AM | 708.853.9682 | Portage, WI | Riverside, IL | 36 | -- | -- | -- |
| Oct 11 | 11:31 AM | 708.504.3309 | Portage, WI | LA Grange, IL | 3 | -- | -- | -- |
| Oct 11 | 1:40 PM | 708.691.3320 | Portage, WI | Orland, IL | 4 | -- | -- | -- |
| Oct 11 | 2:05 PM | 708.853.9682 | Portage, WI | Incoming, CL | 2 | -- | -- | -- |
| Oct 11 | 2:16 PM | 708.853.9682 | Baraboo, WI | Riverside, IL | 20 | -- | -- | -- |
| Oct 11 | 4:05 PM | 201.741.9351 | Mauston, WI | Hackensack, NJ | 15 | -- | -- | -- |
| Oct 11 | 4:19 PM | 708.504.3309 | Camp Dougl, WI | Incoming, CL | 5 | -- | -- | -- |
| Oct 11 | 4:25 PM | 201.741.9351 | Camp Dougl, WI | Hackensack, NJ | 13 | -- | -- | -- |
| Oct 11 | 4:37 PM | 708.504.3309 | Tomah, WI | Incoming, CL | 14 | -- | -- | -- |
| Oct 11 | 4:50 PM | 708.691.3320 | Sparta, WI | Orland, IL | 9 | -- | -- | -- |
| Oct 11 | 4:58 PM | 708.691.3320 | Bangor, WI | Incoming, CL | 23 | -- | -- | -- |
| Oct 11 | 4:59 PM | 708.307.8507 | Bangor, WI | Tinleypark, IL | 35 | -- | -- | -- |
| Oct 11 | 5:21 PM | 708.691.3320 | Holmen, WI | Incoming, CL | 85 | -- | -- | -- |
| Oct 11 | 5:33 PM | 708.307.8507 | Winona, MN | Incoming, CL | 22 | -- | -- | -- |
| Oct 11 | 6:45 PM | 708.691.3320 | Dexter, MN | Orland, IL | 10 | -- | -- | -- |

16



Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|----------------------|-------|
| Oct 11 | 7:00 PM | 631.418.5855 | Austin, MN | Huntington, NY | 11 | -- | -- | -- |
| Oct 11 | 7:16 PM | 708.504.3309 | Austin, MN | LA Grange, IL | 1 | -- | -- | -- |
| Oct 11 | 7:24 PM | 708.504.3309 | Austin, MN | Incoming, CL | 2 | -- | -- | -- |
| Oct 11 | 7:50 PM | 773.909.1224 | Austin, MN | Incoming, CL | 14 | -- | -- | -- |
| Oct 11 | 9:53 PM | 708.504.3309 | Austin, MN | Incoming, CL | 3 | -- | -- | -- |
| Oct 12 | 8:21 AM | 708.853.9682 | Austin, MN | Incoming, CL | 2 | -- | -- | -- |
| Oct 12 | 8:44 AM | 708.691.3320 | Austin, MN | Orland, IL | 11 | -- | -- | -- |
| Oct 12 | 8:55 AM | 708.853.9682 | Austin, MN | Riverside, IL | 2 | -- | -- | -- |
| Oct 12 | 9:01 AM | 708.853.9682 | Austin, MN | Incoming, CL | 2 | -- | -- | -- |
| Oct 12 | 9:03 AM | 631.745.8893 | Austin, MN | Riverhead, NY | 1 | -- | -- | -- |
| Oct 12 | 9:05 AM | 708.691.3320 | Austin, MN | Orland, IL | 2 | -- | -- | -- |
| Oct 12 | 9:06 AM | 708.504.3309 | Austin, MN | Incoming, CL | 5 | -- | -- | -- |
| Oct 12 | 9:15 AM | 708.853.9682 | Austin, MN | Incoming, CL | 5 | -- | -- | -- |
| Oct 12 | 9:19 AM | 630.544.8133 | Austin, MN | Naperville, IL | 7 | -- | -- | -- |
| Oct 12 | 9:31 AM | 773.558.7751 | Austin, MN | Chicago n03, IL | 15 | -- | -- | -- |
| Oct 12 | 9:45 AM | 708.504.3309 | Hayward, MN | Incoming, CL | 4 | -- | -- | -- |
| Oct 12 | 9:53 AM | 708.535.3000 | Hayward, MN | Blueisland, IL | 3 | -- | -- | -- |
| Oct 12 | 9:57 AM | 773.558.7751 | Albert Lea, MN | Chicago n03, IL | 12 | -- | -- | -- |
| Oct 12 | 10:09 AM | 773.558.7751 | New Richla, MN | Incoming, CL | 18 | -- | -- | -- |
| Oct 12 | 10:26 AM | 312.890.8515 | Owatonna, MN | Incoming, CL | 3 | -- | -- | -- |
| Oct 12 | 10:31 AM | 773.558.7751 | Medford, MN | Chicago n03, IL | 14 | -- | -- | -- |
| Oct 12 | 10:45 AM | 708.691.3320 | Faribault, MN | Incoming, CL | 1 | -- | -- | -- |
| Oct 12 | 11:12 AM | 631.418.5855 | Faribault, MN | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 12 | 11:34 AM | 708.853.9682 | Faribault, MN | Riverside, IL | 2 | -- | -- | -- |
| Oct 12 | 11:37 AM | 708.853.9682 | Faribault, MN | Incoming, CL | 1 | -- | -- | -- |
| Oct 12 | 11:41 AM | 708.691.3320 | Faribault, MN | Incoming, CL | 17 | -- | -- | -- |
| Oct 12 | 11:57 AM | 631.418.5855 | Owatonna, MN | Incoming, CL | 2 | -- | -- | -- |
| Oct 12 | 12:14 PM | 708.853.9682 | Owatonna, MN | Incoming, CL | 1 | -- | -- | -- |
| Oct 12 | 12:29 PM | 708.307.8507 | Dodge Cent, MN | Incoming, CL | 6 | -- | -- | -- |
| Oct 12 | 12:35 PM | 708.307.8507 | Kasson, MN | Tinleypark, IL | 30 | -- | -- | -- |
| Oct 12 | 1:04 PM | 631.745.8893 | Chatfield, MN | Incoming, CL | 18 | -- | -- | -- |
| Oct 12 | 1:21 PM | 708.691.3320 | Utica, MN | Incoming, CL | 12 | -- | -- | -- |
| Oct 12 | 1:32 PM | 708.691.3320 | Winona, MN | Orland, IL | 2 | -- | -- | -- |
| Oct 12 | 2:11 PM | 201.741.9351 | Onalaska, WI | Incoming, CL | 1 | -- | -- | -- |
| Oct 12 | 2:13 PM | 201.741.9351 | La Crosse, WI | Hackensack, NJ | 14 | -- | -- | -- |
| Oct 12 | 2:26 PM | 708.691.3320 | Sparta, WI | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 12 | 2:27 PM | 708.691.3320 | Sparta, WI | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 12 | 2:30 PM | 201.741.9351 | Sparta, WI | Hackensack, NJ | 16 | -- | -- | -- |
| Oct 12 | 3:08 PM | 201.741.9351 | Mauston, WI | Hackensack, NJ | 1 | -- | -- | -- |
| Oct 12 | 3:16 PM | 631.418.5855 | Lyndon STA, WI | Incoming, CL | 33 | -- | -- | -- |
| Oct 12 | 3:51 PM | 201.741.9351 | Lodi, WI | Hackensack, NJ | 34 | -- | -- | -- |
| Oct 12 | 4:24 PM | 201.741.9351 | Stoughton, WI | Incoming, CL | 8 | -- | -- | -- |
| Oct 12 | 4:32 PM | 201.741.9351 | Edgerton, WI | Incoming, CL | 26 | -- | -- | -- |
| Oct 12 | 4:58 PM | 708.504.3309 | Roscoe, IL | LA Grange, IL | 16 | -- | -- | -- |
| Oct 12 | 5:14 PM | 773.319.7611 | Belvidere, IL | Chicago, IL | 24 | -- | -- | -- |

17

 **verizon**✓   Billing period Sep 27, 2017 to Oct 26, 2017  |  Account # 688834368-00001  |  Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437  |  iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 12 | 5:37 PM | 773.319.7611 | Huntley, IL | Incoming, CL | 87 | -- | -- | -- |
| Oct 13 | 7:08 PM | 708.691.3320 | Palos Park, IL | Orland, IL | 3 | -- | -- | -- |
| Oct 13 | 9:33 AM | 773.558.7751 | Palos Park, IL | Chicago zn03, IL | 23 | -- | -- | -- |
| Oct 13 | 10:03 AM | 630.802.8924 | Palos Heig, IL | Incoming, CL | 8 | -- | -- | -- |
| Oct 13 | 10:12 AM | 708.653.9682 | Palos Heig, IL | Riverside, IL | 2 | -- | -- | -- |
| Oct 13 | 10:14 AM | 708.504.3309 | Palos Heig, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 10:16 AM | 708.504.3309 | Palos Heig, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 10:20 AM | 773.418.1571 | Palos Heig, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 13 | 10:21 AM | 708.504.3309 | Palos Heig, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 10:27 AM | 773.418.1571 | Palos Heig, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 13 | 10:28 AM | 708.504.3309 | Palos Heig, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 10:28 AM | 708.504.3309 | Palos Heig, IL | LA Grange, IL | 4 | -- | -- | -- |
| Oct 13 | 10:49 AM | 631.745.8893 | Alsip, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 13 | 10:53 AM | 773.558.7751 | Crestwood, IL | Chicago zn03, IL | 5 | -- | -- | -- |
| Oct 13 | 10:59 AM | 773.418.1571 | Bridgeview, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 13 | 11:16 AM | 631.745.8893 | Bridgeview, IL | Riverhead, NY | 1 | -- | -- | -- |
| Oct 13 | 11:49 AM | 631.745.8893 | Bridgeview, IL | Riverhead, NY | 31 | -- | -- | -- |
| Oct 13 | 12:23 PM | 773.418.1571 | Blue Islan, IL | Chicago, IL | 2 | -- | -- | -- |
| Oct 13 | 12:27 PM | 708.691.3320 | Blue Islan, IL | Incoming, CL | 4 | -- | -- | -- |
| Oct 13 | 12:31 PM | 708.724.2554 | Blue Islan, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 13 | 12:43 PM | 708.724.2554 | Blue Islan, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 12:57 PM | 773.447.5357 | Alsip, IL | Incoming, CL | 5 | -- | -- | -- |
| Oct 13 | 1:02 PM | 708.724.2554 | Blue Islan, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 1:05 PM | 708.504.3309 | Blue Islan, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 1:06 PM | 708.504.3309 | Blue Islan, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 1:08 PM | 708.504.3309 | Blue Islan, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 1:10 PM | 708.504.3309 | Blue Islan, IL | Incoming, CL | 5 | -- | -- | -- |
| Oct 13 | 1:26 PM | 773.558.7751 | Blue Islan, IL | Incoming, CL | 4 | -- | -- | -- |
| Oct 13 | 1:44 PM | 708.504.3309 | Blue Islan, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 1:44 PM | 708.504.3309 | Blue Islan, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 1:47 PM | 773.558.7751 | Robbins, IL | Chicago zn03, IL | 16 | -- | -- | -- |
| Oct 13 | 2:05 PM | 708.504.3309 | Oak Lawn, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 2:09 PM | 631.418.5813 | Oak Lawn, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 13 | 2:09 PM | 631.418.5813 | Oak Lawn, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 13 | 2:12 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 1 | -- | -- | -- |
| Oct 13 | 2:15 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 2 | -- | -- | -- |
| Oct 13 | 2:16 PM | 708.504.3309 | Oak Lawn, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 13 | 2:17 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 25 | -- | -- | -- |
| Oct 13 | 2:42 PM | 708.504.3309 | Oak Lawn, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 2:42 PM | 708.504.3309 | Oak Lawn, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 2:43 PM | 708.504.3309 | Oak Lawn, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 13 | 2:44 PM | 630.544.8133 | Oak Lawn, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 13 | 2:48 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 4 | -- | -- | -- |
| Oct 13 | 3:04 PM | 708.691.3320 | Oak Lawn, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 13 | 3:04 PM | 708.504.3309 | Oak Lawn, IL | Incoming, CL | 1 | -- | -- | -- |

18



verizon√   Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|----------------------|-------|
| Oct 13 | 3:26 PM | 708.691.3320 | Oak Lawn, IL | Orland, IL | 3 | -- | -- | -- |
| Oct 13 | 4:00 PM | 708.504.3309 | Oak Lawn, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 13 | 4:03 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 2 | -- | -- | -- |
| Oct 13 | 4:05 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 1 | -- | -- | -- |
| Oct 13 | 4:08 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 1 | -- | -- | -- |
| Oct 13 | 4:10 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 1 | -- | -- | -- |
| Oct 13 | 4:15 PM | 631.418.5855 | Oak Lawn, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 13 | 4:30 PM | 773.558.7751 | Oak Lawn, IL | Chicagozn03, IL | 5 | -- | -- | -- |
| Oct 13 | 4:46 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 10 | -- | -- | -- |
| Oct 13 | 5:15 PM | 631.418.5813 | Oak Lawn, IL | Huntington, NY | 2 | -- | -- | -- |
| Oct 13 | 5:39 PM | 631.418.5813 | Chicago, IL | Huntington, NY | 5 | -- | -- | -- |
| Oct 13 | 5:47 PM | 708.691.3320 | Oak Lawn, IL | Orland, IL | 30 | -- | -- | -- |
| Oct 13 | 6:22 PM | 630.544.8133 | Hickory Hil, IL | Napervile, IL | 16 | -- | -- | -- |
| Oct 13 | 6:38 PM | 631.418.5855 | Orland Par, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 13 | 6:40 PM | 708.691.3320 | Orland Par, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 13 | 6:41 PM | 708.691.3320 | Orland Par, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 13 | 6:41 PM | 708.691.3320 | Orland Par, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 13 | 6:42 PM | 708.691.3320 | Orland Par, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 13 | 6:52 PM | 631.418.5855 | Palos Park, IL | Huntington, NY | 9 | -- | -- | -- |
| Oct 13 | 7:01 PM | 708.691.3320 | Worth, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 13 | 7:02 PM | 631.418.5855 | Palos Heig, IL | Huntington, NY | 16 | -- | -- | -- |
| Oct 13 | 7:58 PM | 631.418.5813 | Chicago, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 13 | 7:58 PM | 631.418.5855 | Chicago, IL | Huntington, NY | 10 | -- | -- | -- |
| Oct 13 | 8:08 PM | 708.691.3320 | Chicago, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 13 | 8:09 PM | 708.691.3320 | Oak Lawn, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 13 | 8:14 PM | 708.691.3320 | Oak Lawn, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 13 | 8:15 PM | 708.691.3320 | Oak Lawn, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 13 | 8:18 PM | 631.418.5855 | Oak Lawn, IL | Huntington, NY | 14 | -- | -- | -- |
| Oct 13 | 9:47 PM | 708.691.3320 | Palos Park, IL | Incoming, CL | 4 | -- | -- | -- |
| Oct 14 | 7:46 AM | 631.418.5855 | Lemont, IL | Huntington, NY | 8 | -- | -- | -- |
| Oct 14 | 7:54 AM | 630.544.8133 | Lemont, IL | Napervilee, IL | 2 | -- | -- | -- |
| Oct 14 | 10:24 AM | 631.418.5813 | Whitewater, WI | Incoming, CL | 5 | -- | -- | -- |
| Oct 14 | 1:52 PM | 708.504.3309 | Eagle, WI | LA Grange, IL | 2 | -- | -- | -- |
| Oct 14 | 2:06 PM | 773.447.5357 | Eagle, WI | Incoming, CL | 2 | -- | -- | -- |
| Oct 14 | 6:06 PM | 631.418.5813 | Bolingbroo, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 14 | 6:08 PM | 708.504.3309 | Bolingbroo, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 14 | 6:08 PM | 708.504.3309 | Romeovile, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 14 | 6:09 PM | 708.504.3309 | Bolingbroo, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 14 | 6:10 PM | 708.504.3309 | Bolingbroo, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 14 | 6:15 PM | 708.504.3309 | Bolingbroo, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 15 | 10:51 AM | 773.447.5357 | Orland Par, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 15 | 11:25 AM | 631.418.5855 | Palos Park, IL | Incoming, CL | 11 | -- | -- | -- |
| Oct 15 | 11:46 AM | 773.447.5357 | Orland Par, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 15 | 12:30 PM | 421-918144774 | Orland Par, IL Mobile | Slovakia, | 2 | -- | 1.90 | 1.90 |

19



verizon√   Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|----------------------|-------|
| Oct 15 | 2:11 PM | 708.691.3320 | Orland Par, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 15 | 2:11 PM | 631.418.5855 | Orland Par, IL | Huntington, NY | 5 | -- | -- | -- |
| Oct 15 | 2:54 PM | 708.691.3320 | Orland Par, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 15 | 3:06 PM | 773.447.5357 | Orland Par, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 15 | 3:06 PM | 773.319.7611 | Palos Heig, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 15 | 5:19 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 15 | 5:20 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 15 | 5:26 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 15 | 5:52 PM | 773.319.7611 | Orland Par, IL | Chicago, IL | 10 | -- | -- | -- |
| Oct 15 | 6:01 PM | 708.691.3320 | Orland Par, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 15 | 6:23 PM | 708.307.8507 | Orland Par, IL | Tinleypark, IL | 26 | -- | -- | -- |
| Oct 15 | 6:51 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 15 | 6:57 PM | 631.418.5855 | Hickory Hil, IL | Huntington, NY | 9 | -- | -- | -- |
| Oct 15 | 7:12 PM | 631.418.5855 | Orland Par, IL | Huntington, NY | 12 | -- | -- | -- |
| Oct 16 | 9:44 AM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 16 | 9:45 AM | 773.319.7611 | Hickory Hil, IL | Chicago, IL | 5 | -- | -- | -- |
| Oct 16 | 10:22 AM | 773.319.7611 | Alsip, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 16 | 10:24 AM | 708.504.3309 | Alsip, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 16 | 10:28 AM | 708.504.3309 | Robbins, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 16 | 10:51 AM | 708.504.3309 | Blue Islan, IL | LA Grange, IL | 10 | -- | -- | -- |
| Oct 16 | 11:01 AM | 708.691.3320 | Alsip, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 16 | 11:01 AM | 708.691.3320 | Alsip, IL | Incoming, CL | 13 | -- | -- | -- |
| Oct 16 | 12:33 PM | 708.853.9682 | Richton PA, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 16 | 1:01 PM | 773.319.7611 | Bradley, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 16 | 2:06 PM | 708.504.3309 | Bradley, IL | Incoming, CL | 5 | -- | -- | -- |
| Oct 16 | 3:51 PM | 815.401.7811 | Bradley, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 16 | 4:12 PM | 773.558.7751 | Bradley, IL | Chicago03, IL | 1 | -- | -- | -- |
| Oct 16 | 4:43 PM | 708.504.3309 | Bradley, IL | Incoming, CL | 7 | -- | -- | -- |
| Oct 16 | 4:50 PM | 773.558.7751 | Bradley, IL | Chicago03, IL | 18 | -- | -- | -- |
| Oct 16 | 5:29 PM | 631.418.5613 | Kankakee, IL | Huntington, NY | 3 | -- | -- | -- |
| Oct 16 | 5:32 PM | 773.319.7611 | Kankakee, IL | Chicago, IL | 3 | -- | -- | -- |
| Oct 16 | 5:35 PM | 631.418.5613 | Bourbonnai, IL | Huntington, NY | 10 | -- | -- | -- |
| Oct 16 | 5:45 PM | 708.691.3320 | Momence, IL | Orland, IL | 3 | -- | -- | -- |
| Oct 16 | 5:49 PM | 708.504.3309 | Schneider, IN | LA Grange, IL | 1 | -- | -- | -- |
| Oct 16 | 7:08 PM | 708.504.3309 | Beecher, IL | Incoming, CL | 5 | -- | -- | -- |
| Oct 16 | 7:32 PM | 708.307.8507 | Momence, IL | Tinleypark, IL | 198 | -- | -- | -- |
| Oct 16 | 8:08 PM | 708.691.3320 | Fair Oaks, IN | Incoming, CL | 1 | -- | -- | -- |
| Oct 16 | 8:09 PM | 708.691.3320 | Fair Oaks, IN | Incoming, CL | 1 | -- | -- | -- |
| Oct 16 | 8:09 PM | 708.691.3320 | Fair Oaks, IN | Orland, IL | 1 | -- | -- | -- |
| Oct 16 | 8:12 PM | 708.691.3320 | Rensselaer, IN | Incoming, CL | 1 | -- | -- | -- |
| Oct 16 | 9:41 PM | 773.344.1159 | Brookston, IN | Chicago, IL | 53 | -- | -- | -- |
| Oct 17 | 12:41 AM | 708.504.3309 | New Carlis, OH | Incoming, CL | 8 | -- | -- | -- |
| Oct 17 | 6:14 AM | 888.823.6020 | Grove City, OH | Incoming, CL | 3 | -- | -- | -- |
| Oct 17 | 7:35 AM | 443.297.1578 | Grove City, OH | Incoming, CL | 3 | -- | -- | -- |
| Oct 17 | 8:03 AM | 773.319.7611 | Grove City, OH | Chicago, IL | 3 | -- | -- | -- |

20

 Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|----------------------|-------|
| Oct 17 | 8:38 AM | 708.853.9682 | Grove City, OH | Incoming, CL | 3 | — | — | — |
| Oct 17 | 8:40 AM | 631.875.1002 | Grove City, OH | Incoming, CL | 36 | — | — | — |
| Oct 17 | 9:16 AM | 631.875.1002 | Grove City, OH | VM Deposit, CL | 1 | — | — | — |
| Oct 17 | 9:16 AM | 631.875.1002 | Grove City, OH | Riverhead, NY | 9 | — | — | — |
| Oct 17 | 9:25 AM | 708.853.9682 | Grove City, OH | Incoming, CL | 1 | — | — | — |
| Oct 17 | 9:25 AM | 631.875.1002 | Grove City, OH | VM Deposit, CL | 1 | — | — | — |
| Oct 17 | 9:25 AM | 631.875.1002 | Grove City, OH | VM Deposit, CL | 1 | — | — | — |
| Oct 17 | 9:26 AM | 631.875.1002 | Grove City, OH | VM Deposit, CL | 1 | — | — | — |
| Oct 17 | 9:26 AM | 631.875.1002 | Grove City, OH | VM Deposit, CL | 1 | — | — | — |
| Oct 17 | 9:26 AM | 631.875.1002 | Grove City, OH | Riverhead, NY | 28 | — | — | — |
| Oct 17 | 10:26 AM | 708.504.3309 | Grove City, OH | Incoming, CL | 21 | — | — | — |
| Oct 17 | 10:54 AM | 708.504.3309 | Grove City, OH | LA Grange, IL | 2 | — | — | — |
| Oct 17 | 11:11 AM | 708.853.9682 | Grove City, OH | Riverside, IL | 3 | — | — | — |
| Oct 17 | 11:18 AM | 201.741.9351 | Grove City, OH | Incoming, CL | 9 | — | — | — |
| Oct 17 | 12:14 PM | 708.691.3320 | Columbus, OH | VM Deposit, CL | 1 | — | — | — |
| Oct 17 | 12:14 PM | 708.307.8507 | Columbus, OH | Tinleypark, IL | 10 | — | — | — |
| Oct 17 | 12:24 PM | 630.802.8924 | Columbus, OH | Incoming, CL | 1 | — | — | — |
| Oct 17 | 12:24 PM | 773.319.7611 | Columbus, OH | Incoming, CL | 2 | — | — | — |
| Oct 17 | 12:27 PM | 708.691.3320 | Columbus, OH | VM Deposit, CL | 1 | — | — | — |
| Oct 17 | 12:31 PM | 630.802.8924 | Columbus, OH | Sugargrove, IL | 8 | — | — | — |
| Oct 17 | 12:36 PM | 708.691.3320 | Columbus, OH | Incoming, CL | 26 | — | — | — |
| Oct 17 | 1:04 PM | 708.853.9682 | Columbus, OH | Incoming, CL | 3 | — | — | — |
| Oct 17 | 1:16 PM | 708.853.9682 | Union Town, OH | Incoming, CL | 3 | — | — | — |
| Oct 17 | 1:48 PM | 708.504.3309 | Columbus, OH | Incoming, CL | 9 | — | — | — |
| Oct 17 | 2:26 PM | 708.307.8507 | Columbus, OH | Tinleypark, IL | 6 | — | — | — |
| Oct 17 | 2:31 PM | 708.853.9682 | Columbus, OH | Incoming, CL | 4 | — | — | — |
| Oct 17 | 2:35 PM | 773.255.5971 | Columbus, OH | Chicago, IL | 6 | — | — | — |
| Oct 17 | 2:47 PM | 708.853.9682 | Columbus, OH | Riverside, IL | 6 | — | — | — |
| Oct 17 | 3:12 PM | 708.853.9682 | Columbus, OH | Incoming, CL | 2 | — | — | — |
| Oct 17 | 4:44 PM | 302.253.0452 | Lancaster, OH | Incoming, CL | 3 | — | — | — |
| Oct 17 | 4:54 PM | 708.853.9682 | Lancaster, OH | Incoming, CL | 5 | — | — | — |
| Oct 17 | 5:22 PM | 708.504.3309 | Lancaster, OH | LA Grange, IL | 1 | — | — | — |
| Oct 17 | 6:33 PM | 708.504.3309 | Lancaster, OH | LA Grange, IL | 1 | — | — | — |
| Oct 17 | 6:50 PM | 708.307.8507 | Carroll, OH | Incoming, CL | 130 | — | — | — |
| Oct 17 | 9:01 PM | 708.307.8507 | Hagerstown, IN | Incoming, CL | 95 | — | — | — |
| Oct 17 | 10:59 PM | 708.504.3309 | Stilesvill, IN | LA Grange, IL | 1 | — | — | — |
| Oct 17 | 11:00 PM | 708.504.3309 | Marshall, IL | Incoming, CL | 5 | — | — | — |
| Oct 17 | 11:25 PM | 708.504.3309 | Brazil, IN | Incoming, CL | 6 | — | — | — |
| Oct 17 | 11:35 PM | 773.344.1159 | Terre Haut, IN | Chicago, IL | 25 | — | — | — |
| Oct 18 | 12:28 AM | 708.504.3309 | Vandalia, IL | LA Grange, IL | 1 | — | — | — |
| Oct 18 | 7:19 AM | 302.253.0452 | Earth City, MO | Incoming, CL | 1 | — | — | — |
| Oct 18 | 7:21 AM | 800.319.6968 | Maryland H, MO | Toll-Free, CL | 1 | — | — | — |
| Oct 18 | 7:25 AM | 708.853.9682 | Earth City, MO | Incoming, CL | 1 | — | — | — |
| Oct 18 | 8:03 AM | 708.853.9682 | Hazelwood, MO | Incoming, CL | 2 | — | — | — |
| Oct 18 | 8:19 AM | 708.853.9682 | Hazelwood, MO | Incoming, CL | 2 | — | — | — |

21

 **verizon√**  Billing period Sep 27, 2017 to Oct 26, 2017  |  Account # 688834368-00001  |  Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 18 | 9:31 AM | 708.504.3309 | Earth City, MO | Incoming, CL | 1 | -- | -- | -- |
| Oct 18 | 9:46 AM | 708.504.3309 | Earth City, MO | LA Grange, IL | 6 | -- | -- | -- |
| Oct 18 | 10:01 AM | 708.853.9682 | Creve Coeu, MO | Riverside, IL | 3 | -- | -- | -- |
| Oct 18 | 10:04 AM | 773.295.5971 | Saint Loui, MO | Chicago, IL | 1 | -- | -- | -- |
| Oct 18 | 10:06 AM | 312.730.5707 | Kirkwood, MO | Chicagozn01, IL | 2 | -- | -- | -- |
| Oct 18 | 10:11 AM | 201.741.9351 | Saint Loui, MO | Hackensack, NJ | 3 | -- | -- | -- |
| Oct 18 | 10:13 AM | 708.691.3320 | Saint Loui, MO | Orland, IL | 2 | -- | -- | -- |
| Oct 18 | 10:15 AM | 773.900.1224 | Arnold, MO | Chicago, IL | 30 | -- | -- | -- |
| Oct 18 | 10:49 AM | 708.307.8507 | Sainte Gen, MO | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 18 | 10:57 AM | 708.691.3320 | Sainte Gen, MO | Incoming, CL | 3 | -- | -- | -- |
| Oct 18 | 11:23 AM | 201.741.9351 | Sainte Gen, MO | Incoming, CL | 4 | -- | -- | -- |
| Oct 18 | 12:18 PM | 708.307.8507 | Sainte Gen, MO | Incoming, CL | 1 | -- | -- | -- |
| Oct 18 | 12:32 PM | 708.853.9682 | Sainte Gen, MO | Incoming, CL | 3 | -- | -- | -- |
| Oct 18 | 12:49 PM | 708.504.3309 | Sainte Gen, MO | Incoming, CL | 1 | -- | -- | -- |
| Oct 18 | 1:02 PM | 573.883.4106 | Sainte Gen, MO | Incoming, CL | 1 | -- | -- | -- |
| Oct 18 | 2:20 PM | 708.691.3320 | Sainte Gen, MO | Incoming, CL | 13 | -- | -- | -- |
| Oct 18 | 2:33 PM | 312.730.5707 | Sainte Gen, MO | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 18 | 2:33 PM | 773.295.5971 | Sainte Gen, MO | Chicago, IL | 2 | -- | -- | -- |
| Oct 18 | 2:34 PM | 630.802.8924 | Sainte Gen, MO | Incoming, CL | 7 | -- | -- | -- |
| Oct 18 | 2:44 PM | 630.802.8924 | Perryville, MO | Incoming, CL | 13 | -- | -- | -- |
| Oct 18 | 2:57 PM | 708.504.3309 | Perryville, MO | LA Grange, IL | 1 | -- | -- | -- |
| Oct 18 | 2:58 PM | 773.558.5032 | Perryville, MO | Chicagozn03, IL | 24 | -- | -- | -- |
| Oct 18 | 3:00 PM | 815.405.8576 | Oak Ridge, MO | Joliet, IL | 22 | -- | -- | -- |
| Oct 18 | 3:22 PM | 708.504.3309 | Cape Girar, MO | Incoming, CL | 14 | -- | -- | -- |
| Oct 18 | 3:38 PM | 773.558.5032 | Mc Clure, IL | Chicagozn03, IL | 1 | -- | -- | -- |
| Oct 18 | 3:40 PM | 708.691.3320 | Mc Clure, IL | Orland, IL | 11 | -- | -- | -- |
| Oct 18 | 3:42 PM | 773.558.5032 | Mc Clure, IL | Incoming, CL | 9 | -- | -- | -- |
| Oct 18 | 3:51 PM | 708.853.9682 | Jonesboro, IL | Riverside, IL | 12 | -- | -- | -- |
| Oct 18 | 4:04 PM | 773.558.5032 | Anna, IL | Chicagozn03, IL | 96 | -- | -- | -- |
| Oct 18 | 4:04 PM | 708.307.8507 | Anna, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 18 | 4:11 PM | 708.307.8507 | Dongola, IL | Incoming, CL | 78 | -- | -- | -- |
| Oct 18 | 4:13 PM | 708.691.3320 | Vienna, IL | Orland, IL | 2 | -- | -- | -- |
| Oct 18 | 4:14 PM | 708.691.3320 | Buncombe, IL | Incoming, CL | 17 | -- | -- | -- |
| Oct 18 | 4:15 PM | 773.344.1159 | Buncombe, IL | Incoming, CL | 87 | -- | -- | -- |
| Oct 18 | 4:30 PM | 708.691.3320 | Grantsburg, IL | Incoming, CL | 72 | -- | -- | -- |
| Oct 18 | 4:32 PM | 708.504.3309 | Grantsburg, IL | Incoming, CL | 7 | -- | -- | -- |
| Oct 18 | 5:30 PM | 773.909.1224 | Eddyville, KY | Incoming, CL | 15 | -- | -- | -- |
| Oct 18 | 6:03 PM | 773.558.7751 | Oak Grove, KY | Incoming, CL | 6 | -- | -- | -- |
| Oct 18 | 7:36 PM | 708.307.8507 | Oak Grove, KY | Tinleypark, IL | 9 | -- | -- | -- |
| Oct 18 | 7:44 PM | 312.730.5707 | Clarksvil, TN | Incoming, CL | 6 | -- | -- | -- |
| Oct 18 | 7:49 PM | 708.307.8507 | Clarksvil, TN | Tinleypark, IL | 22 | -- | -- | -- |
| Oct 18 | 7:54 PM | 773.558.5032 | Clarksvil, TN | Chicagozn03, IL | 18 | -- | -- | -- |
| Oct 18 | 8:20 PM | 708.307.8507 | Whites Cre, TN | Tinleypark, IL | 40 | -- | -- | -- |
| Oct 18 | 9:00 PM | 708.307.8507 | Lebanon, TN | Incoming, CL | 36 | -- | -- | -- |
| Oct 18 | 9:06 PM | 773.558.5032 | Gordonsvil, TN | Incoming, CL | 16 | -- | -- | -- |

P001881

 **verizon**√  Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 18 | 9:35 PM | 708.307.8507 | Cookeville, TN | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 18 | 9:35 PM | 708.307.8507 | Cookeville, TN | Incoming, CL | 49 | -- | -- | -- |
| Oct 18 | 10:41 PM | 708.307.8507 | Crossville, TN | Incoming, CL | 28 | -- | -- | -- |
| Oct 19 | 12:08 AM | 708.504.3309 | Harriman, TN | Incoming, CL | 27 | -- | -- | -- |
| Oct 19 | 9:51 AM | 708.691.3320 | Ellenboro, NC | Incoming, CL | 8 | -- | -- | -- |
| Oct 19 | 10:19 AM | 708.504.3309 | Kings Moun, NC | Incoming, CL | 20 | -- | -- | -- |
| Oct 19 | 11:27 AM | 630.544.8133 | Charlotte, NC | Incoming, CL | 6 | -- | -- | -- |
| Oct 19 | 12:41 PM | 708.853.9682 | Charlotte, NC | Riverside, IL | 3 | -- | -- | -- |
| Oct 19 | 1:20 PM | 708.853.9682 | Charlotte, NC | Riverside, IL | 1 | -- | -- | -- |
| Oct 19 | 1:21 PM | 708.853.9682 | Charlotte, NC | Incoming, CL | 2 | -- | -- | -- |
| Oct 19 | 1:29 PM | 708.853.9682 | Charlotte, NC | Incoming, CL | 26 | -- | -- | -- |
| Oct 19 | 1:54 PM | 708.504.3309 | Charlotte, NC | La Grange, IL | 1 | -- | -- | -- |
| Oct 19 | 1:54 PM | 708.691.3320 | Charlotte, NC | Orland, IL | 18 | -- | -- | -- |
| Oct 10 | 2:12 PM | 708.307.8507 | Cornelius, NC | Incoming, CL | 36 | -- | -- | -- |
| Oct 19 | 2:12 PM | 708.691.3320 | Cornelius, NC | Incoming, CL | 48 | -- | -- | -- |
| Oct 19 | 2:47 PM | 708.307.8507 | Statesvil, NC | Tinleypark, IL | 18 | -- | -- | -- |
| Oct 19 | 3:06 PM | 773.895.5272 | Hamptonvil, NC | Chicagozn01, IL | 1 | -- | -- | -- |
| Oct 19 | 3:07 PM | 708.307.8507 | Hamptonvil, NC | Tinleypark, IL | 33 | -- | -- | -- |
| Oct 19 | 3:37 PM | 708.691.3320 | Lambsburg, VA | Incoming, CL | 3 | -- | -- | -- |
| Oct 19 | 3:39 PM | 773.558.7751 | Fancy Gap, VA | Incoming, CL | 30 | -- | -- | -- |
| Oct 19 | 4:09 PM | 708.853.9682 | Max Meadow, VA | Riverside, IL | 1 | -- | -- | -- |
| Oct 19 | 4:30 PM | 708.853.9682 | Wytheville, VA | Incoming, CL | 2 | -- | -- | -- |
| Oct 19 | 4:25 PM | 773.319.7611 | Bland, VA | Incoming, CL | 56 | -- | -- | -- |
| Oct 19 | 5:21 PM | 773.558.7751 | Beckley, WV | Chicagozn03, IL | 6 | -- | -- | -- |
| Oct 19 | 5:26 PM | 708.504.3309 | Mount Hope, WV | La Grange, IL | 5 | -- | -- | -- |
| Oct 19 | 6:14 PM | 708.504.3309 | Eskdale, WV | La Grange, IL | 1 | -- | -- | -- |
| Oct 19 | 6:14 PM | 708.504.3309 | Eskdale, WV | La Grange, IL | 1 | -- | -- | -- |
| Oct 19 | 6:52 PM | 708.691.3320 | Kenna, WV | Orland, IL | 1 | -- | -- | -- |
| Oct 19 | 6:53 PM | 773.319.7611 | Kenna, WV | Incoming, CL | 65 | -- | -- | -- |
| Oct 19 | 7:57 PM | 708.504.3309 | Marietta, OH | La Grange, IL | 1 | -- | -- | -- |
| Oct 19 | 7:59 PM | 708.504.3309 | Lowell, OH | La Grange, IL | 29 | -- | -- | -- |
| Oct 19 | 8:27 PM | 708.691.3320 | Senecavil, OH | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 19 | 8:27 PM | 708.307.8507 | Senecavil, OH | Tinleypark, IL | 37 | -- | -- | -- |
| Oct 19 | 8:34 PM | 708.691.3320 | Cambridge, OH | Orland, IL | 2 | -- | -- | -- |
| Oct 19 | 8:46 PM | 708.691.3320 | Newcomerst, OH | Incoming, CL | 12 | -- | -- | -- |
| Oct 19 | 9:04 PM | 708.691.3320 | New Philad, OH | Incoming, CL | 1 | -- | -- | -- |
| Oct 19 | 9:59 PM | 708.691.3320 | Strasburg, OH | Orland, IL | 75 | -- | -- | -- |
| Oct 19 | 10:18 PM | 708.307.8507 | Canton, OH | Incoming, CL | 56 | -- | -- | -- |
| Oct 19 | 10:51 PM | 773.344.1159 | Richfield, OH | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 19 | 10:52 PM | 773.344.1159 | Richfield, OH | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 19 | 11:26 PM | 708.691.3320 | North Olms, OH | Orland, IL | 1 | -- | -- | -- |
| Oct 19 | 11:34 PM | 708.504.3309 | Eaton Twp, OH | La Grange, IL | 1 | -- | -- | -- |
| Oct 20 | 8:09 AM | 631.418.5855 | Elyria, OH | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 20 | 8:35 AM | 708.853.9682 | Elyria, OH | Incoming, CL | 3 | -- | -- | -- |
| Oct 20 | 8:51 AM | 708.691.3320 | Elyria, OH | Incoming, CL | 2 | -- | -- | -- |

23

 **verizon**√   Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 20 | 9:05 AM | 708.691.3320 | Elyria, OH | Orland, IL | 50 | -- | -- | -- |
| Oct 20 | 9:05 AM | 708.307.8507 | Elyria, OH | Tinleypark, IL | 50 | -- | -- | -- |
| Oct 20 | 9:59 AM | 708.691.3320 | Macedonia, OH | Incoming, CL | 1 | -- | -- | -- |
| Oct 20 | 10:01 AM | 708.853.9682 | Macedonia, OH | Riverside, IL | 2 | -- | -- | -- |
| Oct 20 | 10:03 AM | 708.691.3320 | Macedonia, OH | Orland, IL | 2 | -- | -- | -- |
| Oct 20 | 10:04 AM | 708.691.3320 | Macedonia, OH | Incoming, CL | 1 | -- | -- | -- |
| Oct 20 | 10:11 AM | 708.853.9682 | Macedonia, OH | Riverside, IL | 2 | -- | -- | -- |
| Oct 20 | 10:20 AM | 708.504.3309 | Macedonia, OH | Incoming, CL | 1 | -- | -- | -- |
| Oct 20 | 10:57 AM | 708.504.3309 | Macedonia, OH | LA Grange, IL | 1 | -- | -- | -- |
| Oct 20 | 10:59 AM | 708.853.9682 | Macedonia, OH | Riverside, IL | 4 | -- | -- | -- |
| Oct 20 | 11:03 AM | 708.504.3309 | Macedonia, OH | LA Grange, IL | 1 | -- | -- | -- |
| Oct 20 | 11:04 AM | 708.691.3320 | Macedonia, OH | Orland, IL | 2 | -- | -- | -- |
| Oct 20 | 11:06 AM | 708.853.9682 | Bedford, OH | Riverside, IL | 15 | -- | -- | -- |
| Oct 20 | 11:21 AM | 708.504.3309 | Mayfield, OH | LA Grange, IL | 1 | -- | -- | -- |
| Oct 20 | 11:21 AM | 708.307.8507 | Mayfield, OH | Tinleypark, IL | 3 | -- | -- | -- |
| Oct 20 | 11:24 AM | 708.853.9682 | Willoughby, OH | Incoming, CL | 7 | -- | -- | -- |
| Oct 20 | 11:30 AM | 631.418.5813 | Kirtland, OH | Incoming, CL | 4 | -- | -- | -- |
| Oct 20 | 11:33 AM | 631.418.5813 | Concord, OH | Huntington, NY | 12 | -- | -- | -- |
| Oct 20 | 11:45 AM | 708.504.3309 | Chardon, OH | Incoming, CL | 5 | -- | -- | -- |
| Oct 20 | 12:06 PM | 708.691.3320 | Chardon, OH | Incoming, CL | 2 | -- | -- | -- |
| Oct 20 | 12:12 PM | 708.853.9682 | Chardon, OH | Riverside, IL | 1 | -- | -- | -- |
| Oct 20 | 12:34 PM | 708.691.3320 | Painesvll, OH | Incoming, CL | 15 | -- | -- | -- |
| Oct 20 | 1:14 PM | 773.558.7751 | Concord, OH | Chicagon03, IL | 31 | -- | -- | -- |
| Oct 20 | 1:45 PM | 708.853.9682 | Cleveland, OH | Riverside, IL | 4 | -- | -- | -- |
| Oct 20 | 1:49 PM | 773.995.5272 | Lakewood, OH | Chicagon01, IL | 2 | -- | -- | -- |
| Oct 20 | 1:53 PM | 773.558.7751 | Westlake, OH | Chicagon03, IL | 51 | -- | -- | -- |
| Oct 20 | 2:45 PM | 773.742.7687 | Sandusky, OH | Chicagon03, IL | 1 | -- | -- | -- |
| Oct 20 | 3:01 PM | 708.691.3320 | Oak Harbor, OH | Incoming, CL | 2 | -- | -- | -- |
| Oct 20 | 3:04 PM | 708.691.3320 | Fremont, OH | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 20 | 3:07 PM | 708.691.3320 | Lindsey, OH | Incoming, CL | 12 | -- | -- | -- |
| Oct 20 | 3:27 PM | 708.853.9682 | Woodville, OH | Incoming, CL | 4 | -- | -- | -- |
| Oct 20 | 3:33 PM | 773.742.7687 | Luckey, OH | Incoming, CL | 3 | -- | -- | -- |
| Oct 20 | 3:36 PM | 708.504.3309 | Luckey, OH | LA Grange, IL | 7 | -- | -- | -- |
| Oct 20 | 3:45 PM | 708.691.3320 | Perrysburg, OH | Orland, IL | 3 | -- | -- | -- |
| Oct 20 | 3:48 PM | 708.307.8507 | Perrysburg, OH | Incoming, CL | 15 | -- | -- | -- |
| Oct 20 | 4:04 PM | 708.691.3320 | Grand Rapl, OH | Incoming, CL | 6 | -- | -- | -- |
| Oct 20 | 4:06 PM | 708.504.3309 | Grand Rapl, OH | Incoming, CL | 3 | -- | -- | -- |
| Oct 20 | 4:10 PM | 708.227.0191 | Grand Rapl, OH | LA Grange, IL | 2 | -- | -- | -- |
| Oct 20 | 4:15 PM | 708.227.0191 | Liberty Ce, OH | Incoming, CL | 3 | -- | -- | -- |
| Oct 20 | 4:19 PM | 708.504.3309 | Napoleon, OH | LA Grange, IL | 1 | -- | -- | -- |
| Oct 20 | 4:21 PM | 773.906.1224 | Napoleon, OH | Chicago, IL | 1 | -- | -- | -- |
| Oct 20 | 4:25 PM | 631.745.8893 | Napoleon, OH | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 20 | 4:26 PM | 201.741.9351 | Napoleon, OH | Hackensack, NJ | 4 | -- | -- | -- |
| Oct 20 | 4:29 PM | 708.504.3309 | Defiance, OH | Incoming, CL | 2 | -- | -- | -- |
| Oct 20 | 4:31 PM | 708.691.3320 | Napoleon, OH | Incoming, CL | 1 | -- | -- | -- |

P001883



**verizon**√   Billing period Sep 27, 2017 to Oct 26, 2017  |  Account # 688834368-00001  |  Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 20 | 4:31 PM | 2017.419351 | Defiance, OH | Hackensack, NJ | 1 | -- | -- | -- |
| Oct 20 | 4:32 PM | 708.691.3320 | Defiance, OH | Incoming, CL | 29 | -- | -- | -- |
| Oct 20 | 4:33 PM | 2017.419351 | Defiance, OH | Hackensack, NJ | 29 | -- | -- | -- |
| Oct 20 | 4:43 PM | 773.909.1224 | Ney, OH | Incoming, CL | 47 | -- | -- | -- |
| Oct 20 | 5:29 PM | 708.691.3320 | Fort Wayne, IN | Orland, IL | 12 | -- | -- | -- |
| Oct 20 | 5:37 PM | 708.504.3309 | Columbia C, IN | Incoming, CL | 13 | -- | -- | -- |
| Oct 20 | 5:49 PM | 708.691.3320 | Columbia C, IN | Orland, IL | 20 | -- | -- | -- |
| Oct 20 | 6:08 PM | 708.307.8507 | Warsaw, IN | Incoming, CL | 27 | -- | -- | -- |
| Oct 20 | 6:09 PM | 708.691.3320 | Warsaw, IN | Orland, IL | 1 | -- | -- | -- |
| Oct 20 | 6:11 PM | 708.691.3320 | Warsaw, IN | Incoming, CL | 20 | -- | -- | -- |
| Oct 20 | 6:21 PM | 773.344.1759 | Warsaw, IN | Incoming, CL | 14 | -- | -- | -- |
| Oct 20 | 6:31 PM | 708.691.3320 | Bourbon, IN | Incoming, CL | 4 | -- | -- | -- |
| Oct 20 | 6:34 PM | 631.418.5855 | Plymouth, IN | Incoming, CL | 84 | -- | -- | -- |
| Oct 20 | 6:58 PM | 708.691.3320 | Gary, IN | Orland, IL | 5 | -- | -- | -- |
| Oct 20 | 7:03 PM | 708.691.3320 | Gary, IN | Incoming, CL | 10 | -- | -- | -- |
| Oct 20 | 7:13 PM | 708.691.3320 | Lansing, IL | Incoming, CL | 33 | -- | -- | -- |
| Oct 20 | 7:13 PM | 708.307.8507 | Lansing, IL | Tinleypark, IL | 28 | -- | -- | -- |
| Oct 20 | 7:47 PM | 708.691.3320 | Bridgeview, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 20 | 8:04 PM | 708.691.3320 | Bridgeview, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 20 | 8:40 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 21 | 7:26 PM | 708.691.3320 | Orland Par, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 21 | 7:27 PM | 708.691.3320 | Orland Par, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 21 | 8:14 AM | 708.691.3320 | Orland Par, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 21 | 10:06 AM | 630.914.1500 | Bridgeview, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 21 | 3:08 PM | 708.504.3309 | Orland Par, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 21 | 3:53 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 21 | 3:55 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 21 | 3:56 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 21 | 4:00 PM | 630.544.8133 | Orland Par, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 22 | 2:44 PM | 773.344.1759 | Orland Par, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 23 | 8:47 AM | 708.691.3320 | Elk Grove, IL | Orland, IL | 6 | -- | -- | -- |
| Oct 23 | 8:52 AM | 708.853.9682 | Elk Grove, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 23 | 8:58 AM | 708.691.3320 | Wood Dale, IL | Orland, IL | 10 | -- | -- | -- |
| Oct 23 | 9:11 AM | 708.853.9682 | Northlake, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 23 | 9:41 AM | 708.504.3309 | Western SP, IL | LA Grange, IL | 10 | -- | -- | -- |
| Oct 23 | 10:02 AM | 708.691.3320 | Bolingbroo, IL | Incoming, CL | 4 | -- | -- | -- |
| Oct 23 | 10:33 AM | 708.691.3320 | Shorewood, IL | Incoming, CL | 11 | -- | -- | -- |
| Oct 23 | 11:13 AM | 708.853.9682 | Joliet, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 23 | 11:38 AM | 708.504.3309 | Joliet, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 23 | 11:46 AM | 708.504.3309 | Joliet, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 23 | 11:57 AM | 708.853.9682 | Joliet, IL | Riverside, IL | 1 | -- | -- | -- |
| Oct 23 | 12:01 PM | 708.504.3309 | Joliet, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 23 | 12:03 PM | 708.853.9682 | Joliet, IL | Riverside, IL | 3 | -- | -- | -- |
| Oct 23 | 12:08 PM | 708.853.9682 | Joliet, IL | Incoming, CL | 4 | -- | -- | -- |
| Oct 23 | 12:12 PM | 708.504.3309 | New Lenox, IL | LA Grange, IL | 2 | -- | -- | -- |

25

 **verizon√**  Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

708.600.7437 | iPhone 7 Plus

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 23 | 12:13 PM | 708.691.3320 | New Lenox, IL | Orland, IL | 9 | -- | -- | -- |
| Oct 23 | 12:23 PM | 773.558.5932 | Matteson, IL | Chicgozn03, IL | 22 | -- | -- | -- |
| Oct 23 | 12:45 PM | 708.504.3309 | Peotone, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 23 | 12:52 PM | 708.504.3309 | Manteno, IL | Incoming, CL | 13 | -- | -- | -- |
| Oct 23 | 1:06 PM | 773.558.5932 | Kankakee, IL | Chicgozn03, IL | 1 | -- | -- | -- |
| Oct 23 | 1:07 PM | 708.691.3320 | Chebanse, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 23 | 1:07 PM | 773.558.5932 | Chebanse, IL | Incoming, CL | 9 | -- | -- | -- |
| Oct 23 | 1:16 PM | 708.691.3320 | Clifton, IL | Orland, IL | 7 | -- | -- | -- |
| Oct 23 | 1:24 PM | 708.691.3320 | Gilman, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 23 | 2:28 PM | 773.909.1224 | Gilman, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 23 | 2:54 PM | 631.745.8893 | Rantoul, IL | Riverhead, NY | 1 | -- | -- | -- |
| Oct 23 | 2:59 PM | 773.909.1224 | Champaign, IL | Incoming, CL | 48 | -- | -- | -- |
| Oct 23 | 3:48 PM | 773.909.1224 | Mattoon, IL | Incoming, CL | 52 | -- | -- | -- |
| Oct 23 | 4:40 PM | 708.504.3309 | Kinmundy, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 23 | 4:48 PM | 708.504.3309 | Salem, IL | LA Grange, IL | 17 | -- | -- | -- |
| Oct 23 | 5:05 PM | 708.691.3320 | Mount Vern, IL | Orland, IL | 56 | -- | -- | -- |
| Oct 23 | 6:01 PM | 773.344.1159 | Vienna, IL | Chicago, IL | 34 | -- | -- | -- |
| Oct 23 | 6:19 PM | 708.691.3320 | Metropolis, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 23 | 6:20 PM | 708.691.3320 | Metropolis, IL | Incoming, CL | 24 | -- | -- | -- |
| Oct 23 | 10:58 PM | 708.504.3309 | Guild, TN | LA Grange, IL | 2 | -- | -- | -- |
| Oct 24 | 1:34 AM | 708.504.3309 | Calhoun, GA | Incoming, CL | 2 | -- | -- | -- |
| Oct 24 | 8:42 AM | 708.504.3309 | Smyrna, GA | Incoming, CL | 7 | -- | -- | -- |
| Oct 24 | 9:03 AM | 708.504.3309 | Smyrna, GA | Incoming, CL | 3 | -- | -- | -- |
| Oct 24 | 9:19 AM | 708.504.3309 | Smyrna, GA | LA Grange, IL | 3 | -- | -- | -- |
| Oct 24 | 9:27 AM | 708.853.9682 | Smyrna, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 9:46 AM | 631.418.5855 | Smyrna, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 10:17 AM | 708.853.9682 | Smyrna, GA | Riverside, IL | 2 | -- | -- | -- |
| Oct 24 | 10:19 AM | 708.853.9682 | Smyrna, GA | Incoming, CL | 3 | -- | -- | -- |
| Oct 24 | 10:26 AM | 708.853.9682 | Smyrna, GA | Riverside, IL | 1 | -- | -- | -- |
| Oct 24 | 10:27 AM | 708.853.9682 | Smyrna, GA | Riverside, IL | 2 | -- | -- | -- |
| Oct 24 | 10:36 AM | 708.691.3320 | Smyrna, GA | Orland, IL | 2 | -- | -- | -- |
| Oct 24 | 10:39 AM | 708.853.9682 | Smyrna, GA | Riverside, IL | 4 | -- | -- | -- |
| Oct 24 | 10:53 AM | 708.691.3320 | Smyrna, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 11:00 AM | 708.853.9682 | Smyrna, GA | Riverside, IL | 3 | -- | -- | -- |
| Oct 24 | 11:27 AM | 708.691.3320 | Smyrna, GA | Orland, IL | 9 | -- | -- | -- |
| Oct 24 | 11:51 AM | 708.853.9682 | Smyrna, GA | Incoming, CL | 11 | -- | -- | -- |
| Oct 24 | 12:09 PM | 631.418.5855 | Smyrna, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 12:15 PM | 708.691.3320 | Smyrna, GA | Incoming, CL | 3 | -- | -- | -- |
| Oct 24 | 12:21 PM | 708.853.9682 | Smyrna, GA | Riverside, IL | 5 | -- | -- | -- |
| Oct 24 | 12:25 PM | 312.730.5707 | Smyrna, GA | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 24 | 12:26 PM | 773.295.5971 | Smyrna, GA | Chicago, IL | 1 | -- | -- | -- |
| Oct 24 | 12:28 PM | 773.295.5971 | Smyrna, GA | Chicago, IL | 1 | -- | -- | -- |
| Oct 24 | 12:28 PM | 312.730.5707 | Smyrna, GA | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 24 | 12:30 PM | 773.295.5971 | Smyrna, GA | Chicago, IL | 1 | -- | -- | -- |
| Oct 24 | 12:31 PM | 312.730.5707 | Smyrna, GA | Chicgozn01, IL | 2 | -- | -- | -- |

26

 **verizon**√  Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|-----------------------|-------|
| Oct 24 | 12:41 PM | 631.418.5813 | Smyrna, GA | Incoming, CL | 4 | -- | -- | -- |
| Oct 24 | 12:45 PM | 708.691.3320 | Smyrna, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 12:48 PM | 708.691.3320 | Smyrna, GA | Orland, IL | 4 | -- | -- | -- |
| Oct 24 | 12:51 PM | 888.816.2227 | Smyrna, GA | Toll-Free, CL | 3 | -- | -- | -- |
| Oct 24 | 12:54 PM | 312.730.5707 | Smyrna, GA | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 24 | 12:55 PM | 773.295.5971 | Smyrna, GA | Chicago, IL | 6 | -- | -- | -- |
| Oct 24 | 1:00 PM | 773.742.7687 | Smyrna, GA | Incoming, CL | 33 | -- | -- | -- |
| Oct 24 | 1:30 PM | 773.558.7751 | Smyrna, GA | Incoming, CL | 12 | -- | -- | -- |
| Oct 24 | 1:31 PM | 773.558.7751 | Smyrna, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 1:33 PM | 773.558.7751 | Smyrna, GA | Incoming, CL | 2 | -- | -- | -- |
| Oct 24 | 1:34 PM | 708.691.3320 | Smyrna, GA | Orland, IL | 5 | -- | -- | -- |
| Oct 24 | 1:38 PM | 773.558.7751 | Smyrna, GA | Chicogozn03, IL | 1 | -- | -- | -- |
| Oct 24 | 1:39 PM | 868.649.1761 | Smyrna, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 1:40 PM | 708.691.3320 | Smyrna, GA | Incoming, CL | 3 | -- | -- | -- |
| Oct 24 | 1:44 PM | 708.691.3320 | Smyrna, GA | Incoming, CL | 2 | -- | -- | -- |
| Oct 24 | 1:46 PM | 773.558.7751 | Smyrna, GA | Chicogozn03, IL | 7 | -- | -- | -- |
| Oct 24 | 1:53 PM | 773.418.1571 | Smyrna, GA | Chicago, IL | 7 | -- | -- | -- |
| Oct 24 | 2:05 PM | 773.295.5971 | Smyrna, GA | Chicago, IL | 1 | -- | -- | -- |
| Oct 24 | 2:09 PM | 773.558.7751 | Smyrna, GA | Incoming, CL | 5 | -- | -- | -- |
| Oct 24 | 2:13 PM | 773.418.1571 | Smyrna, GA | Incoming, CL | 9 | -- | -- | -- |
| Oct 24 | 2:24 PM | 770.433.0024 | Smyrna, GA | Atlanta NW, GA | 1 | -- | -- | -- |
| Oct 24 | 2:25 PM | 678.983.2375 | Smyrna, GA | Atlanta NE, GA | 2 | -- | -- | -- |
| Oct 24 | 2:44 PM | 678.983.2375 | Smyrna, GA | Incoming, CL | 3 | -- | -- | -- |
| Oct 24 | 2:55 PM | 678.783.9000 | Smyrna, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 2:59 PM | 678.707.2230 | Smyrna, GA | Gainesvl, GA | 1 | -- | -- | -- |
| Oct 24 | 3:00 PM | 678.707.2230 | Smyrna, GA | Gainesvl, GA | 1 | -- | -- | -- |
| Oct 24 | 3:03 PM | 678.707.2230 | Smyrna, GA | Incoming, CL | 2 | -- | -- | -- |
| Oct 24 | 3:07 PM | 773.558.7751 | Smyrna, GA | Chicogozn03, IL | 1 | -- | -- | -- |
| Oct 24 | 3:08 PM | 678.707.2230 | Smyrna, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 3:09 PM | 678.707.2230 | Smyrna, GA | Gainesvl, GA | 2 | -- | -- | -- |
| Oct 24 | 3:10 PM | 773.558.7751 | Smyrna, GA | Chicogozn03, IL | 7 | -- | -- | -- |
| Oct 24 | 3:18 PM | 770.432.3341 | Smyrna, GA | Atlanta NW, GA | 20 | -- | -- | -- |
| Oct 24 | 3:46 PM | 773.295.5971 | Smyrna, GA | Chicago, IL | 2 | -- | -- | -- |
| Oct 24 | 3:48 PM | 773.742.7687 | Smyrna, GA | Incoming, CL | 11 | -- | -- | -- |
| Oct 24 | 3:58 PM | 773.558.7751 | Smyrna, GA | Chicogozn03, IL | 6 | -- | -- | -- |
| Oct 24 | 4:04 PM | 773.905.3592 | Smyrna, GA | Chicago, IL | 5 | -- | -- | -- |
| Oct 24 | 4:33 PM | 773.905.3592 | Smyrna, GA | Incoming, CL | 4 | -- | -- | -- |
| Oct 24 | 4:17 PM | 708.691.3320 | Smyrna, GA | Incoming, CL | 10 | -- | -- | -- |
| Oct 24 | 4:26 PM | 773.732.8243 | Smyrna, GA | Chicogozn03, IL | 4 | -- | -- | -- |
| Oct 24 | 4:44 PM | 770.436.7308 | Smyrna, GA | Atlanta NW, GA | 1 | -- | -- | -- |
| Oct 24 | 4:46 PM | 708.853.9682 | Smyrna, GA | Riverside, IL | 1 | -- | -- | -- |
| Oct 24 | 4:48 PM | 708.853.9682 | Smyrna, GA | Incoming, CL | 13 | -- | -- | -- |
| Oct 24 | 5:01 PM | 708.691.3320 | Smyrna, GA | Orland, IL | 3 | -- | -- | -- |
| Oct 24 | 5:03 PM | 708.504.3309 | Smyrna, GA | LA Grange, IL | 8 | -- | -- | -- |
| Oct 24 | 5:11 PM | 773.237.7271 | Smyrna, GA | Incoming, CL | 12 | -- | -- | -- |

27

 **verizon**√  Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 24 | 5:24 PM | 708.504.3309 | Smyrna, GA | LA Grange, IL | 1 | -- | -- | -- |
| Oct 24 | 5:24 PM | 773.237.7271 | Smyrna, GA | Incoming, CL | 2 | -- | -- | -- |
| Oct 24 | 5:26 PM | 773.742.7687 | Smyrna, GA | Chicago n03, IL | 24 | -- | -- | -- |
| Oct 24 | 5:50 PM | 773.732.8243 | Smyrna, GA | Chicago n03, IL | 1 | -- | -- | -- |
| Oct 24 | 5:54 PM | 770.226.0002 | Smyrna, GA | Atlanta NW, GA | 1 | -- | -- | -- |
| Oct 24 | 5:56 PM | 770.984.8067 | Smyrna, GA | Atlanta NW, GA | 3 | -- | -- | -- |
| Oct 24 | 5:59 PM | 770.226.0002 | Smyrna, GA | Atlanta NW, GA | 1 | -- | -- | -- |
| Oct 24 | 6:03 PM | 773.742.7687 | Smyrna, GA | Chicago n03, IL | 12 | -- | -- | -- |
| Oct 24 | 6:26 PM | 770.226.0002 | Marietta, GA | Atlanta NW, GA | 2 | -- | -- | -- |
| Oct 24 | 6:28 PM | 404.242.4179 | Marietta, GA | Atlanta, GA | 2 | -- | -- | -- |
| Oct 24 | 6:31 PM | 770.423.0000 | Marietta, GA | Atlanta NW, GA | 2 | -- | -- | -- |
| Oct 24 | 6:33 PM | 773.742.7687 | Marietta, GA | Chicago n03, IL | 2 | -- | -- | -- |
| Oct 24 | 6:35 PM | 224.238.3155 | Marietta, GA | Elgin, IL | 1 | -- | -- | -- |
| Oct 24 | 6:36 PM | 224.238.3040 | Marietta, GA | Elgin, IL | 1 | -- | -- | -- |
| Oct 24 | 6:41 PM | 708.601.3320 | Marietta, GA | Incoming, CL | 8 | -- | -- | -- |
| Oct 24 | 6:48 PM | 312.553.0550 | Marietta, GA | Chicago, IL | 1 | -- | -- | -- |
| Oct 24 | 6:49 PM | 773.742.7687 | Marietta, GA | Chicago n03, IL | 3 | -- | -- | -- |
| Oct 24 | 6:53 PM | 404.242.4179 | Marietta, GA | Incoming, CL | 2 | -- | -- | -- |
| Oct 24 | 7:03 PM | 773.310.7611 | Marietta, GA | Chicago, IL | 11 | -- | -- | -- |
| Oct 24 | 7:16 PM | 770.432.3341 | Smyrna, GA | Atlanta NW, GA | 1 | -- | -- | -- |
| Oct 24 | 7:18 PM | 404.763.5220 | Smyrna, GA | Atlanta, GA | 2 | -- | -- | -- |
| Oct 24 | 7:21 PM | 773.742.7687 | Smyrna, GA | Chicago n03, IL | 2 | -- | -- | -- |
| Oct 24 | 8:11 PM | 708.504.3309 | Smyrna, GA | LA Grange, IL | 1 | -- | -- | -- |
| Oct 24 | 8:12 PM | 708.691.3320 | Atlanta, GA | Orland, IL | 18 | -- | -- | -- |
| Oct 24 | 8:42 PM | 773.558.7751 | Atlanta, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 9:15 PM | 631.418.5855 | Atlanta, GA | Huntington, NY | 13 | -- | -- | -- |
| Oct 24 | 9:27 PM | 708.504.3309 | Marietta, GA | Incoming, CL | 1 | -- | -- | -- |
| Oct 24 | 9:29 PM | 708.504.3309 | Marietta, GA | Incoming, CL | 12 | -- | -- | -- |
| Oct 24 | 9:40 PM | 773.558.7751 | Cartersvil, GA | Chicago n03, IL | 03 | -- | -- | -- |
| Oct 24 | 10:59 PM | 708.504.3309 | South Pitt, TN | Incoming, CL | 3 | -- | -- | -- |
| Oct 25 | 8:11 AM | 631.745.8893 | Beechgrove, TN | Riverhead, NY | 79 | -- | -- | -- |
| Oct 25 | 9:30 AM | 708.504.3309 | Goodletsv, TN | LA Grange, IL | 1 | -- | -- | -- |
| Oct 25 | 9:32 AM | 708.504.3309 | Greenbrier, TN | Incoming, CL | 19 | -- | -- | -- |
| Oct 25 | 9:50 AM | 773.909.1224 | Franklin, KY | Incoming, CL | 31 | -- | -- | -- |
| Oct 25 | 10:20 AM | 708.504.3309 | Park City, KY | Incoming, CL | 13 | -- | -- | -- |
| Oct 25 | 10:35 AM | 773.909.1224 | Bonnievil, KY | Chicago, IL | 13 | -- | -- | -- |
| Oct 25 | 11:48 AM | 773.909.1224 | Upton, KY | Chicago, IL | 24 | -- | -- | -- |
| Oct 25 | 12:11 PM | 708.691.3320 | Lebanon Ju, KY | Incoming, CL | 9 | -- | -- | -- |
| Oct 25 | 12:25 PM | 773.344.1159 | Shepherdsv, KY | Incoming, CL | 30 | -- | -- | -- |
| Oct 25 | 12:56 PM | 708.691.3320 | Memphis, IN | Incoming, CL | 30 | -- | -- | -- |
| Oct 25 | 1:26 PM | 708.504.3309 | Columbus, IN | LA Grange, IL | 1 | -- | -- | -- |
| Oct 25 | 1:26 PM | 708.504.3309 | Columbus, IN | Incoming, CL | 5 | -- | -- | -- |
| Oct 25 | 1:31 PM | 773.310.7611 | Columbus, IN | Chicago, IL | 14 | -- | -- | -- |
| Oct 25 | 1:46 PM | 708.691.3320 | Edinburgh, IN | Orland, IL | 33 | -- | -- | -- |
| Oct 25 | 2:18 PM | 312.553.0550 | Indianapol, IN | Chicago, IL | 3 | -- | -- | -- |

28



Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 588834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 25 | 2:20 PM | 708.691.3320 | Indianapol, IN | Orland, IL | 3 | -- | -- | -- |
| Oct 25 | 2:23 PM | 847.707.7537 | Indianapol, IN | Northbrook, IL | 2 | -- | -- | -- |
| Oct 25 | 2:25 PM | 708.691.3320 | Indianapol, IN | Orland, IL | 1 | -- | -- | -- |
| Oct 25 | 2:25 PM | 708.691.3320 | Indianapol, IN | Orland, IL | 1 | -- | -- | -- |
| Oct 25 | 2:25 PM | 708.691.3320 | Indianapol, IN | Orland, IL | 1 | -- | -- | -- |
| Oct 25 | 2:25 PM | 708.691.3320 | Indianapol, IN | Orland, IL | 1 | -- | -- | -- |
| Oct 25 | 2:30 PM | 773.344.1159 | Rensselaer, IN | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 25 | 2:30 PM | 773.344.1159 | Rensselaer, IN | Chicago, IL | 2 | -- | -- | -- |
| Oct 25 | 2:31 PM | 708.691.3320 | Lebanon, IN | Orland, IL | 54 | -- | -- | -- |
| Oct 25 | 2:35 PM | 773.344.1159 | Rensselaer, IN | Incoming, CL | 1 | -- | -- | -- |
| Oct 25 | 2:36 PM | 773.344.1159 | Rensselaer, IN | Chicago, IL | 1 | -- | -- | -- |
| Oct 25 | 2:37 PM | 773.319.7611 | Fair Oaks, IN | Chicago, IL | 1 | -- | -- | -- |
| Oct 25 | 2:37 PM | 773.319.7611 | Rensselaer, IN | Incoming, CL | 12 | -- | -- | -- |
| Oct 25 | 2:49 PM | 708.504.3309 | Demotte, IN | LA Grange, IL | 4 | -- | -- | -- |
| Oct 25 | 3:01 PM | 2017.419.351 | Crown Poin, IN | Incoming, CL | 16 | -- | -- | -- |
| Oct 25 | 3:21 PM | 773.558.7751 | Gary, IN | Chicgozn03, IL | 1 | -- | -- | -- |
| Oct 25 | 3:25 PM | 708.504.3309 | Rensselaer, IN | LA Grange, IL | 4 | -- | -- | -- |
| Oct 25 | 3:25 PM | 773.558.7751 | Hammond, IN | Incoming, CL | 10 | -- | -- | -- |
| Oct 25 | 3:36 PM | 773.344.1159 | Markham, IL | Chicago, IL | 11 | -- | -- | -- |
| Oct 25 | 3:47 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 25 | 3:55 PM | 708.504.3309 | Chicago Ri, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 25 | 4:02 PM | 323.318.3657 | Chicago Ri, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 25 | 4:02 PM | 708.504.3309 | Chicago Ri, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 25 | 4:54 PM | 773.344.1159 | Orland Par, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 26 | 10:04 AM | 708.853.9682 | Bridgeview, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 26 | 10:13 AM | 631.418.5813 | Bridgeview, IL | Huntington, NY | 4 | -- | -- | -- |
| Oct 26 | 10:58 AM | 847.707.7537 | Chicago, IL | Northbrook, IL | 5 | -- | -- | -- |
| Oct 26 | 11:02 AM | 773.558.7751 | Chicago, IL | Chicgozn03, IL | 1 | -- | -- | -- |
| Oct 26 | 11:04 AM | 708.691.3320 | Chicago, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 26 | 11:05 AM | 708.504.3309 | Chicago, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 26 | 11:14 AM | 708.504.3309 | Bedford PA, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 26 | 11:16 AM | 708.691.3320 | Bedford PA, IL | Orland, IL | 15 | -- | -- | -- |
| Oct 26 | 11:40 AM | 773.558.7751 | Bedford PA, IL | Chicgozn03, IL | 4 | -- | -- | -- |
| Oct 26 | 11:44 AM | 773.418.1571 | Chicago, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 26 | 11:48 AM | 773.418.1571 | Chicago, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 26 | 11:52 AM | 773.418.1571 | Chicago, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 26 | 12:02 PM | 708.504.3309 | Chicago, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 26 | 12:04 PM | 708.369.3984 | Chicago, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 26 | 12:06 PM | 773.558.7751 | Bridgeview, IL | Chicgozn03, IL | 17 | -- | -- | -- |
| Oct 26 | 12:23 PM | 847.507.1039. | Chicago Ri, IL | Roselle, IL | 2 | -- | -- | -- |
| Oct 26 | 12:24 PM | 773.558.7751 | Chicago Ri, IL | Chicgozn03, IL | 12 | -- | -- | -- |
| Oct 26 | 12:37 PM | 708.504.3309 | Chicago Ri, IL | LA Grange, IL | 3 | -- | -- | -- |
| Oct 26 | 1:34 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 8 | -- | -- | -- |
| Oct 26 | 2:18 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 26 | 2:39 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |

29

 **verizon**✓   Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# Frantisek Sepesi

**708.600.7437 | iPhone 7 Plus**

### Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 26 | 2:41 PM | 708.504.3309 | Chicago Ri, IL | Incoming, CL | 15 | -- | -- | -- |
| Oct 26 | 3:01 PM | 630.544.8133 | Chicago Ri, IL | Naperville, IL | 14 | -- | -- | -- |
| Oct 26 | 3:24 PM | 773.295.5971 | Bridgeview, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 26 | 3:26 PM | 773.295.5971 | Palos Helg, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 26 | 3:38 PM | 708.504.3309 | Palos Hill, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 26 | 3:39 PM | 309.532.5442 | Chicago Ri, IL | Bloomingtn, IL | 3 | -- | -- | -- |
| Oct 26 | 5:05 PM | 773.295.5971 | Chicago Ri, IL | Chicago, IL | 3 | -- | -- | -- |
| Oct 26 | 5:09 PM | 708.504.3309 | Palos Helg, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 26 | 5:33 PM | 631.418.5855 | Orland Par, IL | Huntington, NY | 3 | -- | -- | -- |

P001889


Billing period Sep 27, 2017 to Oct 26, 2017 | Account # 688834368-00001 | Invoice # 3642232123

# You've got options.
**We have all sorts of ways to pay so that you can pick the one that's right for you.**

---



| | |
|---|---|
| **Bill date** | October 26, 2017 |
| **Account number** | 688834368-00001 |
| **Invoice number** | 3642232123 |

P.O. BOX 25505
LEHIGH VALLEY, PA 18002-5505

36422321230106883436800001000000185650000000358684

NOTICE: Bank account and routing numbers will be retained to enable future payments by phone or online. To opt out, call 1.800.544.0401.

P001890



P.O. BOX 4002
ACWORTH, GA 30101

**Billing period**         Oct 27, 2017 - Nov 26, 2017
**Account number**              688834368-00001
**Invoice number**                 3655439433

KEYLINE

**See last page for payment options and how to
split your bill.**
Questions? Visit vzw.com/contactus

# Hi          , here's your bill for this
# month.



Billing period Oct 27, 2017 to Nov 26, 2017 | Account # 688834368-00001 | Invoice # 3655439433

**708.600.7437 | iPhone 7 Plus**

## Talk activity

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|----------------------|-------|
| Oct 27 | 8:37 AM | 630.544.8133 | Orland Par, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 27 | 8:45 AM | 773.558.7751 | Orland Par, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 27 | 8:48 AM | 708.369.3984 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 27 | 8:49 AM | 773.558.7751 | Orland Par, IL | Chicago0n03, IL | 4 | -- | -- | -- |
| Oct 27 | 9:32 AM | 631.418.5855 | Palos Park, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 27 | 9:34 AM | 631.418.5855 | Palos Park, IL | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 27 | 10:01 AM | 773.558.7751 | Orland Par, IL | Chicago0n03, IL | 2 | -- | -- | -- |
| Oct 27 | 10:02 AM | 631.418.5855 | Orland Par, IL | Incoming, CL | 12 | -- | -- | -- |
| Oct 27 | 10:14 AM | 847.507.1039 | Orland Par, IL | Roselle, IL | 2 | -- | -- | -- |
| Oct 27 | 10:17 AM | 773.558.7751 | Palos Hill, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 27 | 10:22 AM | 708.691.3320 | Bridgeview, IL | Orland, IL | 9 | -- | -- | -- |
| Oct 27 | 12:03 PM | 708.504.3309 | Burbank, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 27 | 12:06 PM | 708.691.3320 | Burbank, IL | Incoming, CL | 10 | -- | -- | -- |
| Oct 27 | 12:23 PM | 708.504.3309 | Oak Lawn, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 27 | 1:35 PM | 708.504.3309 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 27 | 2:39 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 27 | 2:43 PM | 708.504.3309 | Orland Par, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 27 | 4:30 PM | 708.504.3309 | Orland Par, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 27 | 4:45 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 27 | 5:17 PM | 773.558.7751 | Palos Park, IL | Chicago0n03, IL | 1 | -- | -- | -- |
| Oct 27 | 5:19 PM | 631.745.8893 | Palos Park, IL | Riverhead, NY | 29 | -- | -- | -- |
| Oct 27 | 6:16 PM | 773.742.7687 | Orland Par, IL | Chicago0n03, IL | 10 | -- | -- | -- |
| Oct 27 | 6:29 PM | 631.745.8893 | Orland Par, IL | Riverhead, NY | 13 | -- | -- | -- |
| Oct 28 | 2:57 AM | 773.558.7751 | Orland Par, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 28 | 5:48 AM | 708.691.3320 | Rantoul, IL | Orland, IL | 21 | -- | -- | -- |
| Oct 28 | 11:52 AM | 708.504.3309 | Clarksvill, TN | LA Grange, IL | 2 | -- | -- | -- |
| Oct 28 | 11:54 AM | 847.507.1039 | Clarksvill, TN | VM Deposit, CL | 1 | -- | -- | -- |
| Oct 28 | 9:21 PM | 708.504.3309 | Smyrna, GA | LA Grange, IL | 3 | -- | -- | -- |
| Oct 29 | 12:11 AM | 708.504.3309 | Jasper, TN | LA Grange, IL | 2 | -- | -- | -- |
| Oct 29 | 10:00 AM | 631.418.5855 | Sango, TN | Huntington, NY | 11 | -- | -- | -- |
| Oct 29 | 10:36 AM | 631.418.5813 | Cadiz, KY | Huntington, NY | 5 | -- | -- | -- |
| Oct 29 | 11:11 AM | 708.504.3309 | Grand Rive, KY | LA Grange, IL | 1 | -- | -- | -- |
| Oct 29 | 12:32 PM | 708.307.8507 | Marion, IL | Tinleypark, IL | 9 | -- | -- | -- |
| Oct 29 | 4:18 PM | 631.745.8893 | Champaign, IL | Riverhead, NY | 7 | -- | -- | -- |
| Oct 29 | 5:48 PM | 708.504.3309 | Paxton, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 29 | 6:24 PM | 631.418.5813 | Kankakee, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 29 | 7:17 PM | 708.369.3984 | Bridgeview, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 30 | 7:46 AM | 773.905.3592 | Orland Par, IL | Chicago, IL | 2 | -- | -- | -- |
| Oct 30 | 8:42 AM | 773.905.3592 | Palos Park, IL | Chicago, IL | 1 | -- | -- | -- |
| Oct 30 | 9:39 AM | 847.507.1039 | Palos Hill, IL | Roselle, IL | 1 | -- | -- | -- |
| Oct 30 | 9:57 AM | 773.905.3592 | Bridgeview, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 30 | 9:58 AM | 773.558.7751 | Bridgeview, IL | Chicago0n03, IL | 7 | -- | -- | -- |
| Oct 30 | 10:05 AM | 773.558.7751 | Bridgeview, IL | Chicago0n03, IL | 5 | -- | -- | -- |
| Oct 30 | 10:10 AM | 773.905.3592 | Chicago, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 30 | 10:18 AM | 708.504.3309 | Chicago, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 30 | 10:30 AM | 708.504.3309 | Chicago, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 30 | 10:38 AM | 847.316.9933 | Chicago, IL | Incoming, CL | 8 | -- | -- | -- |

6

 **verizon**√  Billing period Oct 27, 2017 to Nov 26, 2017 | Account # 688834368-00001 | Invoice # 3655439433

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|
| Oct 30 | 10:46 AM | 708.504.3309 | Chicago, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 30 | 10:53 AM | 708.369.3984 | Chicago, IL | LA Grange, IL | 2 | -- | -- | -- |
| Oct 30 | 11:47 AM | 708.228.7348 | Chicago, IL | Chicagohts, IL | 2 | -- | -- | -- |
| Oct 30 | 11:48 AM | 815.405.8576 | Summit Arg, IL | Joliet, IL | 24 | -- | -- | -- |
| Oct 30 | 12:20 PM | 630.435.0244 | Hickory Hil, IL | Downersgrv, IL | 6 | -- | -- | -- |
| Oct 30 | 12:31 PM | 773.558.7751 | Hickory Hil, IL | Chicagozn03, IL | 1 | -- | -- | -- |
| Oct 30 | 12:33 PM | 773.558.7751 | Chicago Ril, IL | Incoming, CL | 2 | -- | -- | -- |
| Oct 30 | 12:47 PM | 630.468.2410 | Palos Hill, IL | Hinsdale, IL | 19 | -- | -- | -- |
| Oct 30 | 1:10 PM | 708.228.7348 | Palos Hill, IL | Chicagohts, IL | 3 | -- | -- | -- |
| Oct 30 | 1:14 PM | 708.504.3309 | Palos Hill, IL | Incoming, CL | 5 | -- | -- | -- |
| Oct 30 | 1:27 PM | 708.504.3309 | Bridgeview, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 30 | 1:46 PM | 708.853.9682 | Palos Hill, IL | Riverside, IL | 6 | -- | -- | -- |
| Oct 30 | 1:57 PM | 773.558.7751 | Palos Hill, IL | Incoming, CL | 5 | -- | -- | -- |
| Oct 30 | 2:07 PM | 708.228.7348 | Lemont, IL | Chicagohts, IL | 1 | -- | -- | -- |
| Oct 30 | 2:13 PM | 708.228.7348 | Lemont, IL | Chicagohts, IL | 1 | -- | -- | -- |
| Oct 30 | 2:35 PM | 262.886.3757 | Lemont, IL | Racine, WI | 1 | -- | -- | -- |
| Oct 30 | 2:37 PM | 773.558.7751 | Lemont, IL | Chicagozn03, IL | 1 | -- | -- | -- |
| Oct 30 | 2:38 PM | 708.691.3320 | Lemont, IL | Orland, IL | 1 | -- | -- | -- |
| Oct 30 | 2:57 PM | 773.757.4760 | Orland Par, IL | Chicagozn08, IL | 1 | -- | -- | -- |
| Oct 30 | 3:04 PM | 773.822.6160 | Orland Par, IL | Chicagozn06, IL | 1 | -- | -- | -- |
| Oct 30 | 3:16 PM | 630.788.6625 | Orland Par, IL | Aurora, IL | 1 | -- | -- | -- |
| Oct 30 | 3:23 PM | 630.788.6625 | Orland Par, IL | Incoming, CL | 3 | -- | -- | -- |
| Oct 30 | 3:29 PM | 631.745.8893 | Orland Par, IL | Riverhead, NY | 1 | -- | -- | -- |
| Oct 30 | 3:38 PM | 773.558.7751 | Orland Par, IL | Incoming, CL | 1 | -- | -- | -- |
| Oct 30 | 3:42 PM | 773.558.7751 | Orland Par, IL | Chicagozn03, IL | 5 | -- | -- | -- |
| Oct 30 | 3:47 PM | 773.558.7751 | Orland Par, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 30 | 4:03 PM | 631.745.8893 | Orland Par, IL | Riverhead, NY | 1 | -- | -- | -- |
| Oct 30 | 4:04 PM | 631.745.8893 | Orland Par, IL | Riverhead, NY | 1 | -- | -- | -- |
| Oct 30 | 4:10 PM | 631.745.8893 | Orland Par, IL | Incoming, CL | 17 | -- | -- | -- |
| Oct 30 | 4:27 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 1 | -- | -- | -- |
| Oct 30 | 4:27 PM | 631.745.8893 | Orland Par, IL | Incoming, CL | 22 | -- | -- | -- |
| Oct 30 | 4:49 PM | 708.504.3309 | Orland Par, IL | LA Grange, IL | 3 | -- | -- | -- |
| Oct 30 | 4:52 PM | 708.691.3320 | Orland Par, IL | Orland, IL | 9 | -- | -- | -- |
| Oct 31 | 9:47 AM | 773.558.7751 | Orland Par, IL | Chicagozn03, IL | 20 | -- | -- | -- |
| Oct 31 | 10:06 AM | 708.504.3309 | Hodgkins, IL | Incoming, CL | 10 | -- | -- | -- |
| Oct 31 | 10:22 AM | 631.418.5855 | Bridgeview, IL | Incoming, CL | 14 | -- | -- | -- |
| Oct 31 | 10:41 AM | 773.900.1224 | Bridgeview, IL | Chicago, IL | 16 | -- | -- | -- |
| Oct 31 | 12:10 PM | 708.671.8960 | Chicago, IL | Palos Park, IL | 2 | -- | -- | -- |
| Oct 31 | 12:25 PM | 201.741.9351 | Chicago, IL | Hackensack, NJ | 11 | -- | -- | -- |
| Oct 31 | 12:41 PM | 201.741.9351 | Chicago, IL | Incoming, CL | 6 | -- | -- | -- |
| Oct 31 | 12:59 PM | 201.741.9351 | Chicago, IL | Hackensack, NJ | 4 | -- | -- | -- |
| Oct 31 | 1:16 PM | 201.741.9351 | Chicago, IL | Hackensack, NJ | 3 | -- | -- | -- |
| Oct 31 | 1:20 PM | 201.741.9351 | Chicago, IL | Hackensack, NJ | 6 | -- | -- | -- |
| Oct 31 | 1:31 PM | 309.532.5442 | Chicago, IL | Bloomington, IL | 1 | -- | -- | -- |
| Oct 31 | 1:33 PM | 708.504.3309 | Chicago, IL | LA Grange, IL | 8 | -- | -- | -- |

P001893

 **verizon**√   Billing period Oct 27, 2017 to Nov 26, 2017 | Account # 688834368-00001 | Invoice # 3655439433

**708.600.7437 | iPhone 7 Plus**

## Talk activity - continued

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|-------------|-------------|------|-----------------|----------------------|-------|
| Oct 31 | 1:53 PM | 708.691.3320 | Summit Arg, IL | Orland, IL | 13 | -- | -- | -- |
| Oct 31 | 2:09 PM | 708.307.8507 | Palos Hill, IL | Tinleypark, IL | 1 | -- | -- | -- |
| Oct 31 | 2:36 PM | 708.307.8507 | Orland Par, IL | Incoming, CL | 21 | -- | -- | -- |
| Oct 31 | 3:12 PM | 708.504.3309 | Orland Par, IL | Incoming, CL | 7 | -- | -- | -- |
| Oct 31 | 3:55 PM | 773.558.7751 | Orland Par, IL | Chicgozn03, IL | 9 | -- | -- | -- |
| Oct 31 | 5:56 PM | 708.228.3101 | Orland Par, IL | Chicagohts, IL | 1 | -- | -- | -- |
| Nov 1 | | | | | | | | |

P001894

David L. Dorrity, MHRD, CDS, CDT
Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615
DLDorrity@aol.com – (864) 288-7193

# SUPLEMENTAL SAFETY REPORT

**Prepared By:**

## DAVID L. DORRITY, MHRD, CDS, CDT

**August 27, 2019**

**Prepared For:**

### JONATHAN P. HAYES, Esquire

-----------------------------------------------------

**Relating To The Following Matters:**

### NATHANIEL DAVID FRUSHTICK,

**Plaintiff,**

**Vs.**

### FEROEXPRESS, INC. and
### FRANTISEK SEPESI,

**Defendants.**

-----------------------------------------------------------

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**Case No. 1:18-cv-02891-MLB**

1



DEFENDANT'S
EXHIBIT
2
Dorrity

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – **(864) 288-7193**

## I.    SUMMARY OF PREPARER'S QUALIFICATIONS:

I have worked in the transportation industry since 1969 in various capacities. I have owned, driven, loaded and inspected several types of commercial motor vehicles and I have held a variety of positions with trucking companies ranging from clerk (at the outset of my career) to President of a 150-employee trucking company. Along that career path I have had oversight responsibility for various aspects of company operations including Safety, Operations and more. Therefore, I have a wide range of knowledge and experience in the transportation industry. I have additionally driven various transportation delivery vehicles myself, including large CMVs, as well as hired, trained and supervised hundreds of transportation drivers, and that includes actual in-cab training of drivers.

I have current certifications from the North American Transportation Management Institute (NATMI) as both a certified Director of Safety and a certified Director of Driver Training. I also received training and certification to teach the National Safety Council's Defensive Driving Course for Professional Truck Drivers.

I have a Master's Degree from Clemson University in Human Resource Development, I have taught numerous safety and management courses for the North American Transportation Management Institute (NATMI) and was employed as an adjunct professor/instructor at Clemson University between 2005 and 2008 where I taught an undergraduate course in occupational and commercial motor vehicle safety training.

In 1989, I began using my management and safety experience to start a consulting firm working for numerous and diverse types of non-DOT fleets, DOT commercial motor vehicle operations, and those using material handling equipment. I have provided consulting assistance in policy, procedures, audits and safety training development to over a hundred transportation fleets during my career. In 1993, I began aiding in investigating fleet accidents for our consulting clients and attorneys and have now reviewed over 800 fleet crash cases. I have been qualified to testify in numerous state and federal courts regarding a variety of safety topics associated with the transportation and logistics industry.

My curriculum vitae is attached (**Exhibit A**). My case list is attached (**Exhibit B**).

2

---

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – **(864) 288-7193**

---

I am charging $250 per hour for my general consulting services, $400 per hour for trial and deposition appearances (5-hour minimum).

## II.    INTRODUCTION TO SUPPLEMENTED OPINIONS

The following will supplement the observations, opinions and conclusion contained in my initial report dated June 24, 2019.  I still endorse my initial report unless specifically stated otherwise in this report.

My evaluation generally involves a review of the shared discovery documents, depositions and deposition exhibits and then comparing that information with the minimum fleet industry standards and practices as I have learned them from my training, education and experience. The methods and basis for my opinions in this report and depositions are the same as those relied upon by any other expert in my field who have similar training and experience.

## III.    INFORMATION REVIEWED

**The following information was reviewed and relied upon in formulating the observations, opinions, and conclusions in this report.**

**CASE MATERIAL:**

1. Georgia Motor Vehicle Accident Report (10/24/2017, 10:30),
2. Litigation Pleadings,
3. Defendants' Interrogatory Answers,
4. Defendant's Document Production,
5. Cobb County 911 Records,
6. Mr. Sepesi's Verizon Cellphone Records,
7. Vehicle Photos at Scene,
8. Deposition transcripts and exhibits of;
    a.  Mr. Frushtick,
    b.  Mr. Sepesi,
9. Mr. Sepesi's Driver Record of Duty Status (RODS) – a/k/a Driver Logs,

3

---

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

---

10. Reconstruction of Mr. Sepesi's RODS with Verizon Cellphone Record,

11. HOS Visual Aids (see Appendix).

**INDUSTRY:**

1. Federal Motor Carrier Safety Regulations ("FMCSR") – (CFR 49),

2. CDL instruction and testing manuals published by Georgia and Illinois,

3. National Safety Council Training Regarding Distracted Driving,

4. Defensive Driving Course for Professional Truck Drivers by NSC,

5. Safe Practices for Motor Carrier Operations (ANSI/ASSE Z15.1-2017),

6. Following Distance Training by Smith System Driver Improvement Institute,

7. Other industry texts, training or research as may be noted within the report.

## IV.    OPINIONS, OBSERVATIONS and DISCUSSION

Throughout the report, unless otherwise noted, I'm referring to the relevant minimum industry standards in place on the date of the crash. All my observations and opinions are based on industry standards that are used and relied upon by all experts in my field and my opinions should be consistent with any reasonable safety expert who has similar training and experience. The standards, concepts, methods and techniques in evaluating and reaching my opinions in this case are the same that I have used over the last 25 years for my non-litigation trucking industry clients.

I am available for deposition to more fully explain any of my observations and opinions.

## OPINION 5

**Mr. Sepesi acted with a conscious disregard for foreseeable risk of harm to Mr. Frushtick by driving his large CMV in direct violation of the FMCSR hours of service rule limitations at the time of this crash.**

Discussion:

4

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

A comparison of Mr. Sepesi's Verizon cellphone record and his USDOT record of duty status log (f/k/a "log") was conducted. There were several discrepancies discovered that are outlined below. The discrepancies represent Mr. Sepesi's false reports (f/k/a "falsifications) on 2 of the 3 logs produced. The falsifications involved locations and times which if recorded accurately would have revealed numerous hours of service rule violations and limitations to reach the delivery destination on time.

Log Analysis Observations:

10/23/2017

    a.  Log shows off duty in Ringgold, GA at 8:30pm (CT),

    b.  Cellphone record shows call from Guild, TN at 10:58pm (CT),

    c.  Guild, TN is due north of Ringgold, GA by 41 mins. (per Google Maps),

    d.  Ringgold ETA could not occur before 11:39pm (CT),

    e.  Assuming break in Ringgold, it could not have occurred before 11:45pm (CT),

    f.  Rule Violated: FMCSR 49CFR § 395.8(e) – Making a false report.

10/24/2017

    a.  Log shows off duty in Ringgold, GA until 6:30am (CT),

    b.  Cellphone record shows call from Calhoun, GA at 1:34-1:36am (CT),

    c.  Calhoun, GA is 37 mins south of Ringgold, GA (per Google Maps),

    d.  Calhoun, GA is more likely the rest break stop used by Sepesi,

    e.  Calhoun, GA to Smyrna, GA is 63 mins. (per Google Maps),

    f.  Log shows arrival at Smyrna, GA at 8:15am (CT),

    g.  Rules Violated:

        1.  FMCSR 49CFR § 395.8(e) – Making a false report,

        2.  FMCSR 49CFR § 395.3(a)(2) – Driving after being on-duty 14 hours since last 10-hour off-duty rest break,

            a.  Last known qualified 10-hour rest break ended on 10/23/2017 at 7:45am in Bridgeview, IL (per Log),

---

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

---

      b.  14-hour tour began at above time,

      c.  14-hour tour limit was reached ON 10/23/2017 at 9:45pm (CT),

    3.  FMCSR 49CFR § 395.3(a)(3) – Driving more than 11 hours since last 10-hour off-duty rest break.

---

**NOTE:  Please refer to the Appendix for additional Log and HOS Analysis**

---

**OPINION 7**

    The FMCSR 49CFR § 392.3 prohibited Mr. Sepesi from driving when his ability or alertness was impaired by fatigue and likely to cause a crash.

    **A.  A CMV driver is presumed fatigued when they violate the rules in § 395.3.**

    **B.  Mr. Sepesi's fatigue from lack of required rest break is a contributing factor to the cause of this crash.**

Discussion/Observations:

    In addition to the above referenced FMCSR hours of service violations, Mr. Sepesi had insufficient restorative rest in the 26 ½ hours before this crash. Mr. Sepesi could not have obtained more than 5 hours of uninterrupted sleep between 1:38am (Calhoun, GA) and 8:15am (Smyrna, GA) on 10/24/2017.  Assuming Mr. Sepesi went to sleep around 1:45am, very soon after his phone call, he had to depart Calhoun, GA no later than 6:45am to reach Smyrna, GA by 8:15am (Log).  It is more probable that he left Calhoun before 6:45am in anticipation of morning traffic in the Atlanta area.  Assuming he did leave sooner than 6:45am he would have received less than 5 hours opportunity for a continuous sleep break.  His sleep break was a significant deviation from the recommendations of the FMCSA and other industry sources.

    My evaluations in this report have not included any additional time considerations for the routine tasks and time it takes for a CMV driver to perform their job properly.  It takes a considerable amount of time to enter and leave truck stops, fuel, arrive at shipper/receiver

6

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

facilities, etc. It is reasonable to conclude that Mr. Sepesi may not have had the opportunity to sleep uninterrupted in Calhoun, GA for 4 to 4 ½ hours. This conclusion is based on my personal experience and professional expert evaluation of the time consumed in inspecting equipment, fueling, ingress/egress of truck stops and the time required for staging equipment at shipper/receiver facilities. My analysis however has reconstructed Mr. Sepesi's hours of service reality in the most favorable light to the defendant.

The goal of the FMCSA and industry experts is for drivers to obtain 7 to 8 hours of uninterrupted sleep each 24-hour period. The 10-hour rest break was promulgated in 2004 to allow, and encourage, drivers to obtain between 7 and 8 hours of uninterrupted restorative sleep. FMCSA has determined based on various studies that drivers who do not get enough restorative sleep become fatigued and cause more crashes. "Fatigued drivers have slowed reaction times and a reduced ability to assess situations quickly."[1]


**OPINION 8**

**Mr. Sepesi's driver log false reports (f/k/a "falsifications") was misleading to law enforcement by portraying that he was compliant, properly rested, and safe to drive his CMV.**

Discussion/Observations:

I have audited close to a half million driver logs during my 30-year consulting career. I have co-taught course with the U.S.D.O.T regarding regulatory compliance with the hours of service rules in Part 395. I have also attended numerous FMCSA audits of my client's logs and understand the principles they use to determine the difference between a log "mistake" and a "false" entry.

A falsification is generally decided when an entry has an obvious intent to deceive and force the appearance of compliance – usually regarding the rest break period. Mr. Sepesi's log

---

[1] Federal Register / Volume 76, No. 248 / Tuesday, December 27, 2011 / Rules and Regulations.

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

inaccuracies were falsifications, not mistakes, because they were the only way he could have continued to drive and reach the destination at the time of this crash.

## V.    CERTIFICATION:

The observations, discussions and conclusions/opinions in this report are based on my education, training, knowledge and experience after reviewing the specified evidence.  I hold these professional opinions to a reasonable degree of certainty in the fields of motor carrier safety standards and regulatory compliance. These opinions are based solely on the facts, research, minimum trucking industry standards, trucking regulations and requirements as interpreted by the industry. I used the same analytical approach as used in my non-litigation work and work within the trucking industry. The process I used to reach my observations, opinions and conclusions is the same that any other reasonable expert in my field would use, given the same background, experience and facts.  I reserve the right to supplement these opinions as necessary should I be asked to review additional evidence.  I plan to use anything mentioned in this report, the references and/or the discovery in this case as a trial exhibit.

Signed:        *David L. Dorrity*

David L. Dorrity, MHRD, CDS, CDT

8

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
DLDorrity@aol.com – (864) 288-7193

# APPENDIX

Sepesi
Log Analysis
10/23-10/24



Sepesi
Log Analysis
10/24



9

**David L. Dorrity, MHRD, CDS, CDT**
**Dorrity Safety Consulting, LLC, 2 Meeting Place, Greenville, SC 29615**
<u>DLDorrity@aol.com</u> – **(864) 288-7193**

## APPENDIX (Continued)

# Sepesi
# HOS Reconstruction
# 10/23-10/24



- Rest Break Occurred in Calhoun, GA
- Following Add No Additional Work
  - E.g., Fueling, Inspections, Paperwork
- <u>Alternative 1</u>
  - Start Break in Calhoun @ 1:30am
  - Depart Calhoun @ 6:45am
  - Rest Break = 5 ¼ Hours Max
  - Continuous Sleep Opportunity = 5 Hours
- <u>Alternative 2</u>
  - Start Break in Calhoun @ 12:45am
    - Guild, TN (10:58am) to Calhoun =
    - 69 Miles & 1 ½ Hr. by CMV (Min.)
  - Depart Calhoun @ 6:45am
  - Rest Break = 6 Hours Max
  - Continuous Sleep Opportunity = 5 Hours

Dorrity (Freestick)

. 10

**Exhibit A**

July 2019      # DAVID L. DORRITY      Page 1

**MHRD, CDS, CDT**

*TRANSPORTATION SAFETY EXPERT*

## SUMMARY OF PROFESSIONAL EXPERIENCE:

- ❑ Motor Carrier Manager and Owner – Twenty Years
- ❑ Transportation Safety and Compliance Consultant – Thirty Years
- ❑ Clemson University – Former adjunct professor & lecturer of safety training
- ❑ Certified Fleet Driver Safety Instructor
- ❑ Fleet Vehicle Accident Investigator – hundreds of company fleet crashes reviewed
- ❑ Materials Handling Accident Investigator – loading, securement and dock accidents reviewed
- ❑ Court Expert Witness testimony over 300 times on various fleet topics such as:
  - ➤ Federal Motor Carrier Safety Regulations and Commercial Driver's License
  - ➤ Fleet driver hiring, training and supervision principles and practices
  - ➤ Hours of service management & fatigue mitigation, log auditing & reconstruction
  - ➤ Defensive driving performance failures and training standards
  - ➤ Vehicle inspection and maintenance procedures
  - ➤ Cell-phone distracted driving analysis, policy and supervision methods

## EMPLOYMENT HISTORY:

| | | | |
|---|---|---|---|
| ❑ | 2016- | Dorrity Safety Consulting, LLC | President |
| ❑ | 1992-16 | Transportation Resources, Inc. | President |
| ❑ | 2005-08 | Clemson University, Clemson, SC | Adjunct Professor |
| ❑ | 1989-92 | Carolina Trucking Consultants, Inc. | President/Founder |
| ❑ | 1988-89 | Stevens Transport, Inc., Dallas, TX | Reg. Vice President |
| ❑ | 1987-88 | PST Vans, Inc., Salt Lake City, UT | Reg. Vice President |
| ❑ | 1985-87 | Harrier, Inc., Lavonia, GA | President |
| ❑ | 1980-85 | Piedmont Transportation Services, Inc. | President/Founder |
| ❑ | 1975-80 | Spartan Express, Inc., Greer, SC | Regional Manager |
| ❑ | 1973-75 | G&P Trucking Co., Inc., Greenville, SC | Traffic and Sales |
| ❑ | 1969-73 | Watkins Motor Lines, Inc., Greenville, SC | Traffic/Operations |

## FORMAL EDUCATION:

**M.H.R.D. Degree, Clemson University**, Clemson, SC, 2005
     Master's Degree in Human Resource Development – Safety Sciences Concentration
**B.S. Degree, University of South Carolina**, Spartanburg, SC, 2003
     Bachelor of Science in Interdisciplinary Studies – Business and Psychology

     Bob Jones University, Greenville, SC 1978-80 (Religion, Speech).
     North Greenville College, Tigerville, SC 1977-78 (General Education).
     Greenville Technical College, Greenville, SC 1975-77 (Transportation Mgt.)

---

**David L. Dorrity – Two Meeting Place – Greenville, SC 29615**

**Dorrity Safety Consulting, LLC – 33 Market Point – Greenville, SC 29607**

**(864) 288-7193 – DLDorrity@aol.com**

**Exhibit A**

July 2019        **DAVID L. DORRITY**        Page 2
MHRD, CDS, CDT
*TRANSPORTATION SAFETY CONSULTANT*

## PROFESSIONAL CERTIFICATIONS:

**Certified Director of Safety (CDS)**      November 10, 1999
     Registration No. 1077 - NATMI and Indiana University of Pennsylvania *
**Certified Driver Trainer (CDT)**      November 10, 1999
     Registration No. 3012 - NATMI and Indiana University of Pennsylvania *
     * CDS & CDT re-certifications through Central Florida University
**Certification as NATMI Instructor**      December 16, 1997
     By Indiana University of Pennsylvania, Indiana, PA instructor Dr. Allen Robinson
**Certified Driver Instructor (DDC-PTD)**      June 4, 1998
     Registration No. 0519737 - National Safety Council, Itasca, IL

## PROFESSIONAL AFFILIATIONS:

- American Society of Safety Professionals (ASSP) (p/k/a ASSP)
- National Safety Council (NSC), South Carolina Chapter
- Society for Human Resource Management (SHRM)
- North American Transportation Management Institute (NATMI)
  - Past Member of Advisory Board
  - Curriculum Technical Advisor
  - Certification Exhibit Reviewer and Test Proctor

## PUBLIC COURSES TAUGHT:

**North American Transportation Management Institute (NATMI)**
     <u>2-3 Day Professional Development Course Topics:</u>
- Managing Motor Fleet Safety
- Motor Fleet Safety Basics
- Advanced Motor Fleet Safety
- Commercial Motor Vehicle Accident Investigation
- Commercial Driver Training (Train-the-Trainer)
- Federal Motor Carrier Safety Regulations (Co-taught with U.S.D.O.T.)

**Clemson University, Clemson, SC (2005-2008)**
- Course Title: Safety Training (CTE 360)

## PUBLICATIONS:

"Motor Fleet Safety Basics" Seminar Course (Curriculum Advisor)
     Published by NATMI in 1998.
"Managing Motor Fleet Safety" Seminar Course (Curriculum Advisor)
     Published by NATMI in 1998.

---

**David L. Dorrity – Two Meeting Place – Greenville, SC 29615**
**Dorrity Safety Consulting, LLC – 33 Market Point – Greenville, SC 29607**
**(864) 288-7193 – DLDorrity@aol.com**

**Exhibit A**

July 2019         **DAVID L. DORRITY**         Page 3
MHRD, CDS, CDT
*TRANSPORTATION SAFETY CONSULTANT*

| RELEVANT CONTINUING EDUCATION: |
|---|

| Course Topic: | (Provider): | Location: | Dates: |
|---|---|---|---|
| Intermodal Transportation | (U.Tenn.) | Knoxville, TN | 1974 |
| Foreign Trade & Transportation (40) | (Gvl. Tech.) | Greenville, SC | 1975 |
| Traffic Management (40) | (Gvl. Tech.) | Greenville, SC | 1975 |
| Transport Law I (40) | (Gvl. Tech.) | Greenville, SC | 1975 |
| Transport Law II (40) | (Gvl. Tech.) | Greenville, SC | 1975 |
| Dispatcher-Driver Communications | (BellSouth) | Greenville, SC | 1977 |
| FMCSR | (USDOT) | Columbia, SC | 1990 |
| CDL Driver Trainer | (SCDMV) | Greenville, SC | 1990 |
| Drug Testing Procedures | (Structured) | Greenville, SC | 1991 |
| Hazardous Materials Handling | (USDOT) | Columbia, SC | 1991 |
| Motor Fleet Safety | (ATA) | Phoenix, AZ | March 1-3, 1996 |
| Advance Motor Fleet Safety | (ATA) | Atlanta, GA | Oct. 22-24, 1996 |
| Train the Trainer Certification | (IUP) | Alexandria, VA | Dec. 14-16, 1997 |
| Vehicle Inspection Procedures | (CVSA) | Atlanta, GA | March 18, 1998 |
| Motor Fleet Trainer | (NATMI) | Charleston, SC | Sep. 9-11, 1998 |
| PTD-Defensive Driving | (NSC) | Atlanta, GA | June 3, 1998 |
| PTD-DDC Trainer Certification | (NSC) | Atlanta, GA | June 4-5, 1998 |
| Truck Accident Litigation | (Nissenberg) | Greenville, SC | Mar. 29, 1999 |
| Cost of Speed | (SCTA) | Myrtle Beach, SC | Nov. 6, 1999 |
| National Safety Mgt. Conference | (ATA) | St. Louis, MO | Oct. 2-4, 2000 |
| Accident Reconstruction Course | (SCTA-Dr. Barret) | Myrtle Beach, SC | Nov. 10-11, 2000 |
| Elements of Safety & Security | (NPTC-Idealease) | Charlotte, NC | June 17, 2002 |
| International Truck Safety Symposium, | U. Tenn. | Knoxville, TN | May 3-5, 2002 |
| Business Statistics (40 hrs.) | (Gvl. Tech) | Greenville, SC | May 2002 |
| FMCSR Compliance Workshop | (SCTA, DOT) | Columbia, SC | Dec. 11, 2002 |
| Legal Environment of Business | (USCS) | Spartanburg, SC | May 2002 (40 hrs) |
| Director of Safety Recertification | (NATMI, UCF) | Orlando, FL | 2002 |
| Driver Trainer Recertification | (NATMI, UCF) | Orlando, FL | 2002 |

**David L. Dorrity – Two Meeting Place – Greenville, SC 29615**
**Dorrity Safety Consulting, LLC – 33 Market Point – Greenville, SC 29607**
**(864) 288-7193 – DLDorrity@aol.com**

**Exhibit A**

July 2019          **DAVID L. DORRITY**          Page 4
MHRD, CDS, CDT
*TRANSPORTATION SAFETY CONSULTANT*

---

## RELEVANT CONTINUING EDUCATION:

| Course Topic: | (Provider): | Location: | Dates: |
|---|---|---|---|
| Organizational Psychology | (USCS) | Spartanburg, SC | June 2003 (40 hrs) |
| Organizational Management | (USCS) | Spartanburg, SC | August 2003 (40 hrs) |
| Training Needs Assessment | (Clemson Univ.), | Clemson, SC | Fall 2004 (40 hrs) |
| Human Resource Development | (Clemson Univ.), | Clemson, SC | Fall 2004 (40 hrs) |
| Occupational Health Psychology | (Clemson Univ.), | Clemson, SC | Spring 2005 (40 hrs) |
| Instructional System Design | (Clemson Univ.), | Clemson, SC | Spring 2005 (40 hrs) |
| Research Methods - Industry/ED | (Clemson Univ.), | Clemson, SC | Spring 2005 (40 hrs) |
| Industrial Safety & Health | (Clemson Univ.), | Clemson, SC | Summer 2005 (40 hrs) |
| Industry Consulting Practices | (Clemson Univ.), | Clemson, SC | Summer 2005 (40 hrs) |
| Human Performance Improvement | (Clemson Univ.), | Clemson, SC | Fall 2005 (40 hrs) |
| Evaluation of HRD | (Clemson Univ.), | Clemson, SC | Fall 2005 (40 hrs) |
| Developing Web-Based Training | (Clemson Univ.), | Clemson, SC | Fall 2005 (40 hrs) |
| ASSE Professional Development | (ASSE) | Greer, SC | March 16, 2006 |
| Director of Safety Recertification | (NATMI, Embry-Riddle), Florida | | April 2008 |
| Driver Trainer Recertification | (NATMI, Embry-Riddle), Florida | | April 2008 |
| ASSE Professional Development | (ASSE) | Greenville, SC | March 27, 2008 |
| TCA Annual Safety Conference | (TCA) | Charlotte, NC | May 18-20, 2008 |
| FMCSR Compliance Workshop | (SCTA, USDOT) | Greenville, SC | Fall 2008 |
| Commercial Air Brake School | (Bendix Corp.) | Orlando, FL | April 7-10, 2009 |
| A&I (SafeStat & CSA 2010) | (FMCSA) | Webinar | July 14, 2010 |
| Best Practices in Transp. Safety | (ASSE) | Webinar | July20-22, 2010 |
| Hours of Service Feedback | (FMCSA) | Podcasts | August 2010 |
| VRM Airbrakes | (CVSA-Zurich) | Online Course | September 2010 |
| Pre-employment Screening (PSP) | (FMCSA) | Webinar (6/10) | October 2010 |
| Sleep Apnea and CMV drivers | (NPTC) | Webinar (7/11) | July 13, 2011 |

---

David L. Dorrity – Two Meeting Place – Greenville, SC 29615
Dorrity Safety Consulting, LLC – 33 Market Point – Greenville, SC 29607
(864) 288–7193 – DLDorrity@aol.com

**Exhibit A**

July 2019       **DAVID L. DORRITY**       Page 5

MHRD, CDS, CDT

*TRANSPORTATION SAFETY CONSULTANT*

---

### RELEVANT CONTINUING EDUCATION:

| Course Topic: | (Provider): | Location: | Dates: |
|---|---|---|---|
| Preparing for CSA Interventions | (NPTC) | Webinar (3/12) | April 2012 |
| Corporate Liability-Cell Phone Policy | (NSC) | Webinar (4/12) | April 25, 2012 |
| FMCSR & Driver Safety Seminar | (NPTC-Idealease) | Charlotte, NC | May 2, 2012 |
| NSC Truck Driver Defensive Driving | (NSC) | Online Course | May 3-7, 2012 |
| CVSA Roadside Inspections & CSA | (NPTC) | Webinar | May 9, 2012 |
| FMCSA Compliance Workshop | (SCTA, DOT) | Greenville, SC | Dec. 11, 2013 |
| Legal Impact of CVSA Ratings | (SCRA) | Webinar | Feb. 12, 2014 |
| Trucking Litigation Trends | (SCRA) | Webinar | April 16, 2014 |
| CVSA Workshop | (NATMI-TTA) | Nashville, TN | May 20, 2014 |
| Cell Phone Liability – Driving | (NSC) | Webinar | June 11, 2014 |
| NSC Truck Driver Defensive Driving | (NSC) | Online Course | June 4-8, 2016 |
| Sleep Apnea in Trucking Industry | (Kales, MD) | Orlando, FL | Sept. 28, 2016 |
| 7 Stages of Distraction Denial | (HDT) | Online Seminar | July 25, 2017 |
| FMCSA ELD Presentation | (FMCSA) | Online Seminar | Oct. 11, 2017 |
| Federal Workplace Drug Testing | (NSC) | Online Seminar | Dec. 5, 2017 |
| Lytx DriveCam Crash Mitigation | (ATA) | Online Webinar | Jan. 22, 2018 |
| Fatigue in Workplace | (NSC) | Online Webinar | Sept. 25, 2018 |
| ELD Real World Experiences | (ATA) | Online Webinar | Oct. 11, 2018 |
| Managing Risk – CSA Scores | (ATA) | Online Webinar | Oct. 17, 2018 |
| Defensive Driving Course-PTD (6 Hr.) | (NSC) | Online Course | Jan. 18, 2019 |
| DDC Distracted Driving (90 min.) | (NSC) | Online Course | Jan. 19, 2019 |
| Driving Distracted | (Smith System) | Online Course | May 30, 2019 |
| Following Distance-Resolving Debate | (Smith System) | Online Course | May 30, 2019 |
| Hang up on Distractions | (Atchley, PhD) | Automotive Fleet | July 11, 2019 |
| Motor Fleet Safety Basics | (NATMI) | Louisville, KY | July 22-23, 2019 |
| Managing Motor Fleet Safety Programs | (NATMI) | Louisville, KY | July 24-25, 2019 |

---

**David L. Dorrity – Two Meeting Place – Greenville, SC 29615**
**Dorrity Safety Consulting, LLC – 33 Market Point – Greenville, SC 29607**
**(864) 288-7193 – DLDorrity@aol.com**

**Exhibit B**

## CASE LISTING
### Where Deposition and/or Trial Testimony
### Was Provided By
### DAVID L. DORRITY

| No. Cases | Case Name (Party Represented) | Attorney Name | Crash Location | State Fed. | Date | Deposed Trial |
|---|---|---|---|---|---|---|
| | **2015** | | | | | |
| 208. | (Ray) vs. Service Transport, Inc. | Geoff Glick | Powdersville, SC | (S) | 03/24/15 | D |
| | (Case No.: 2014-CP-04-00115) – Common Pleas, Anderson County, SC | | | | | |
| 209. | (Anderson) vs. Carolina Freightways | Forrest Abbott | Jacksonville, FL | (S) | 04/14/15 | D |
| | (Case No.: 2012-CA-013792) – Fourth Judicial Circuit, Duval County, FL | | | | | |
| 210. | (Riddle) vs. U.S. Foods, Inc. | Alex Murdaugh | Allendale, SC | (S) | 04/15/15 | D |
| | (Case No.: 13-CP-03-15) – Common Pleas, Allendale County, FL | | | | 07/22/15 | T |
| 211. | (Baker) vs. PBV (Pepsi) Myrtle-Beach | Derk Derrick | Conway, SC | (S) | 05/13/15 | D |
| | (Case No.: 2014-CP- 26-654) – Common Pleas, Horry County, SC | | | | | |
| 212. | (Hairston) vs. Ed Nelson Transport | Fraz Ahmed | Jacksonville, FL | (F) | 05/14/15 | D |
| | (Case No.: 3:13-CV-01457-J-32JBT) – U.S. Middle District, Jacksonville, FL Division | | | | | |
| 213. | (Gilliam) vs. Valmont-Columbia (see # 195) | John Koon | Lexington, SC | (F) | 05/20/15 | D |
| | (Case No.: 4:13-CV-1575-MGL) – U.S. District Court, Florence, SC Division | | | | | |
| 214. | (Terry) vs. Directional Signs, LLC | Mark Tanenbaum | Goose Creek, SC | (S) | 06/16/15 | D |
| | (Case No.: 12-CP-08-3465) – Common Pleas, Berkeley County, SC | | | | | |
| 215. | (Thomas) vs. Kenyon Concrete | Karl Twenge | Beaufort, SC | (S) | 08/06/15 | D |
| | (Case No.: 2014-CP-07-1109) – Common Pleas, Beaufort County, SC | | | | | |
| 216. | (Skocy) vs. Black Bear Transport | Rick Holtsclaw | Vernon County, MO | (F) | 08/18/15 | D |
| | (Case No.: 2013-CV-01159) – U.S. District Court, Western Missouri | | | | | |
| 217. | (Copeland) vs. Palmentere Bros. Cartage | Curry Pajcic | Jacksonville, FL | (S) | 09/01/15 | D |
| | (Case No.: 2011-CA-006645) – 4TH Judicial Circuit, Duval County, FL | | | | 09/03/15 | D |
| 218. | (Mears) vs. Lawton Transit Mix | Marcus Mears | Lawton, OK | (S) | 09/02/15 | D |
| | (Case No.: CJ-2012-812) – District Court, Comanche County, OK | | | | | |
| 219. | (Johnson) vs. Bardon, Inc. | Kenneth Berger | Summit, SC | (S) | 09/09/15 | D |
| | (Case No.: 2014-CP-40-00943) – Common Pleas, Richland County, SC | | | | 12/30/15 | D |
| 220. | (Dugan) vs. Ards Trucking Co. Inc. | Lloyd Hoffspiegel | Statesville, NC | (S) | 09/29/15 | D |
| | (Case No.: 2014-CP-16-0310) – Common Pleas, Darlington County, SC | | | | | |
| 221. | Lawdermilt vs. (Carnes Trucking Co.Inc.) | Diane Laughlin | Louisville, KY | (S) | 10/29/15 | D |
| | (Case No.: 12-CI-002370) – Jefferson Circuit Court, KY | | | | | |
| 222. | (Gillard) vs. Southeastern Freight Lines | George Jebaily | Marion, SC | (S) | 11/11/15 | D |
| | (Case No.: 2012-CP-33-835) – Common Pleas, Marion County, SC | | | | 05/24/15 | T |
| 223. | (Robinson) vs. J.K. Moving & Storage | Kevin Smith | Charleston, SC | (F) | 11/18/15 | D |
| | (Case No.: 2:14-CV-01860-RMG) – U.S. District Court, Charleston, SC | | | | | |
| | **2016** | | | | | |
| 224. | (Clark) vs. Swift Transportation | Tom Slater | Jacksonville, FL | (S) | 01/19/16 | D |
| | (Case No.: 16-2015-CA-001058) – 4TH Judicial Circuit, Duval County, FL | | | | | |
| 225. | (Martin) vs. R.S. Senter Trucking | Allan Sloan | Duluth, GA | (S) | 01/26/16 | D |
| | (Case No.: 15EV000131) – State Court of Fulton County, GA | | | | | |
| 226. | (Baca) vs. Swift Transportation | Rahmeyer/Cady | Harrisonville, MO | (S) | 02/24/16 | D |
| | (Case No.: 14CA-CC00166) – Circuit Court, Cass County, MO | | | | | |
| 227. | (Gast) vs. Clark Transportation | Don Moore | Columbia, OH | (S) | 02/26/16 | D |
| | (Case No.: 1407482) – Common Pleas, Hamilton County, OH | | | | | |
| 228. | (Frechette) vs. Mason Dixon Intermodal | Thad Myers | Lexington, SC | (S) | 03/23/16 | D |
| | (Case No.: 2013-CP-32-2881) – Common Pleas, Lexington County, SC | | | | | |

**Exhibit B**

| No. Cases | Case Name (Party Represented) | Attorney Name | Crash Location | State Fed. | Date | Deposed Trial |
|---|---|---|---|---|---|---|
| | **2016 (cont.)** | | | | | |
| 229. | (O'Tuel) vs. Unifi Mfg. (Case No.: 4:15-CV-02200-RBH) – US District Court, Florence SC Division | Douglas Jennings | Bennettsville, SC (F) | | 03/30/16 11/14/16 | D T |
| 230. | (Williams) vs. Lumber Transport (Case No.: 13-CV-315) – Superior Court, Greene County, GA | Matt Cook | Irwinville, GA | (S) | 04/01/16 | D |
| 231. | (Letang) vs. Universal Am-Can (Case No.: 2013-CP-27-0487) – Common Pleas 14th Judicial Circuit, SC | William Barnes | Hardeeville, SC | (S) | 04/21/16 | D |
| 232. | (Young) vs. Martin Specialty (Case No.: 5:14-cv-03356) – U.S. District, Western District Louisiana, Shreveport | Chad Trammel | Shreveport, LA | (F) | 05/11/16 08/31/16 | D T |
| 233. | (Nelson) vs. Link America (Case No.: 14-CA-66) – 8TH Circuit Court, Alachua County, FL | David Guiley | Lake City, FL | (S) | 06/30/16 | D |
| 234. | (Rivera) vs. Newton's Farm, J&J Logging (Case No.: 2005-CP-26-1131) – Common Pleas, Georgetown County, SC | Sid Connor | Georgetown, SC | (S) | 08/09/16 | D |
| 235. | (Do) vs. UPS (Case No.: 14EV00148) – State Court, Fulton County, GA | Mike Moran | Atlanta, GA. | (S) | 08/12/16 | D |
| 236. | (Holcombe) vs. Helena Chemical Co. (Case No.: 2:15-CV-2852-PMD) – U.S. District of SC, Charleston Div. | Kevin Smith | N. Charleston, SC (F) | | 09/20/16 | D |
| 237. | (Johnson) vs. Petroleum Transport (Case No.: 1:16-cv-00487-MHC) – U.S. Northern Dist. Of GA, Atlanta Div. | Jay Sadd | Screven Cty, GA (F) | | 10/05/16 | D |
| 238. | (Norman) vs. Farelon Logging (Case No.: 2015-CA-000407) – 8TH Circuit, Bradford County, FL | Stefano Portigliatti | Bradford Cty., FL (S) | | 10/24/16 | D |
| 239. | (Reddick) vs. The Merchants Co. (Case No.: CV-15-900260) – Circuit Court, Dallas County, AL | Derrick Mills | Selma, AL | (S) | 10/27/16 | D |
| 240. | (Clarke) vs. Howard Sheppard, Inc. (Case No.: 2014-CP-14-0432) – Common Pleas, Clarendon County, SC | Ronnie Crosby | Summerton, SC | (S) | 12/14/16 | D |
| | **2017** | | | | | |
| 241. | (Beecham) vs. Unified Oilfield (Case No.: CJ-2015-923) – District Court, Oklahoma County, OK | Greg Smart | Elk City, OK | (S) | 01/06/17 | D |
| 242. | (Thomas) vs. Swift Transportation (Case No.: 4:15-CV-02002-RBH) – U.S. District of SC, Florence Div. | Ronnie Crosby | Scranton, SC | (F) | 01/10/17 | D |
| 243. | (Cooper) vs. Juan Deanda Trucking (Case No.: 2015-CI-02177) – 166TH District Court, Bexar County, TX | Richard Hunnicutt | Stockdale, TX | (S) | 02/20/17 | D |
| 244. | (Stacy) vs. Trout Trucking (Case No.: 2015-CCV-60928-3) – County Court No. 3, Nueces County, TX | Peter Zavaletta | Jourdanton, TX | (S) | 02/21/17 | D |
| 245. | (Rice) vs. Ahern Rentals (Case No.: 2014-CP-43-02294) – Common Pleas, Sumter County, SC | Wayne Ridgeway | Sumter, SC | (S) | 05/09/17 | D |
| 246. | (Colvin) vs. Lyndon Steel (Case No.: 15-CVS-5887) – Superior Court, Forsyth County, NC | Matt Cook | Greensboro, NC | (S) | 08/09/17 04/26/19 | D T |
| 247. | (Ward) vs. Schick Mfg. (Case No.: 0:16-CV-03365-MBS) – US District Court, Rock Hill, SC Div. | Chance Farr | Rock Hill, SC | (F) | 08/15/17 | D |
| 248. | (Skoruppa) vs. EADS Distribution (Case No.: 2015CCV-60997-2) – County Court, Nueces County, TX | Peter Zavaletta | Corpus Christi, TX (S) | | 08/21/17 | D |
| 249. | (Laquay) vs. Spirit Delivery Service (Case No.: 16-2015-CA-001266) – Fourth Judicial Circuit, Duval County, FL | Michael Pajcic | Jacksonville, FL | (S) | 09/07/17 | D |
| 250. | (Walker) vs. T&W Tire (Case No.: 2015CCV-61358-1) – County Court, Nueces County, TX | Robert Wilson | San Antonio, TX (S) | | 10/04/17 | D |
| 251. | (Bunting) vs. URRA Nursery (Case No.: 50-2016-CA-012629) – 15TH Circuit Court, Palm Beach, FL | Scott Smith | Glade City, FL | (S) | 10/09/17 | D |

# Exhibit B

| No. Cases | Case Name (Party Represented) | Attorney Name | Crash Location | State Fed. | Date | Deposed Trial |
|---|---|---|---|---|---|---|
| | **2017 (cont.)** | | | | | |
| 252. | (Khudhair) vs. Dabakh Freight Services (Case No.: 15A3161-6) – State Court, Cobb County, GA | Edward Sampson | Seneca, SC | (S) | 10/10/17 | D |
| 253. | (Scheifele) vs. Wilson Trucking (Case No.: 2016-CP-25-045) – 14TH Circuit, Hampton County, SC | Karl Twenge | Yemassee, SC | (S) | 10/26/17 | D |
| 254. | (Montini) vs. New Prime, Inc. (Case No.: 2:15-cv-01591) – US District Court, Western District Pennsylvania | John Gismondi | Mercer, PA | (F) | 10/31/17 | D |
| 255. | (Tripp) vs. USA Truck, Inc. (Case No.: 2016CI 6748) – 150TH Judicial Court, Bexar County, TX | Richard Hunnicutt | San Antonio, TX | (S) | 12/04/17 | D |
| 256. | (Brown) vs. Postal Fleet Services (Case No.: 2015-CP-00503) – 6TH Judicial Court Common Pleas, Chester, SC | Allan P. Sloan, III | Great Falls, SC | (S) | 12/11/17 | D |
| 257. | (McKeena) vs. J&L Oilfield Services (Case No.: CJ-2015-1342) – Oklahoma County District Court, Oklahoma City, OK | Greg Smart | Oklahoma City, OK | (S) | 12/14/17 | D |
| 258. | (Heidt) vs. Baker Hughes, Inc. (Case No.: 2014-CCV-62139-3) – Court at Law 3, Nueces County, TX | Richard Hunnicutt | Corpus Christi, TX | (S) | 12/21/17 | D |
| | **2018** | | | | | |
| 259. | (Turner) vs. Swing Transport, Inc. (Case No.: 2016-CP-21-955) – Common Pleas Court, Florence County, SC | Wayne Ridgeway | Lexington, SC | (S) | 01/11/18 | D |
| 260. | (Hall) vs. Skyview Farms (Case No.: 16-cv-01101-HE) – United States Western District Oklahoma | Chris Brinkley | Weatherford, OK | (F) | 02/01/18 | D |
| 261. | (Wankmueller) vs. Con-Way Truckload (Case No.: 6:16-cv-389) – United States Western District Texas, Waco Div. | Jay Beatty | Temple, TX | (F) | 02/08/18 | D |
| 262. | (Stewart) vs. Uber Technologies (Case No.: 2016-CA-000652) – 7th Circuit, Flagler County, Florida | Tad Griffin | Daytona Bch., FL | (S) | 02/15/18 | D |
| 263. | (Grimmage) vs. JK Moving and Storage (Case No.: 4:16-cv-03685-RBH) – U.S. District of South Carolina, Florence Div. | Jacob Born | Surfside Bch., SC | (F) | 02/22/18 | D |
| 264. | (Kirkland) vs. Trifecta Oilfield Services (Case No.: 16-05-0330-CVW) – 218 Judicial District, Wilson County, Texas | Robert Wilson | Wilson Cty., TX | (S) | 02/28/18 | D |
| 265. | (Bridges) vs. Stafford Transport (Case No.: 2017-CP-05-00106) – Court of Common Pleas, Bamberg County, SC | Steven Goldberg | N. Charleston, SC | (S) | 03/27/18 | D |
| 266. | (Scott) vs. Grice Trucking (Case No.: 2017-CP-17-00232) – Court of Common Pleas, Dillon County, SC | George Jebaily | Latta, SC | (S) | 05/22/18 | D |
| 267. | (Davis) vs. CBRE, Inc. (Case No.: 2016-CP-12-00498) – 6th Judicial Circuit, Chester County, SC | Harold Staley | Chester, SC | (S) | 06/27/18 | D |
| 268. | (Dean) vs. Ards Trucking (Case No.: 2017-CP-21-0242) – Common Pleas Court, Florence County, SC | Ed Love | Florence, SC | (S) | 07/19/18 | D |
| 269. | (Adamiak) vs. Sealy (Case No.: CV-2017-900321) – Circuit Court, Baldwin County, AL | Eaton Barnard | Gulf Shores, AL | (S) | 08/02/18 | DT |
| 270. | (Stallcup) vs. Grand Star Trucking (Case No.: 17-0563-CV-A) – 25TH Judicial District, Guadalupe County, TX | Peter Zavaletta | Seguin, TX | (S) | 08/14/18 | D |
| 271. | (Basso) vs. Ryder Logistics (Case No.: 2016-033304-CA-01) – 11TH Judicial Circuit, Miami-Dade County, FL | Stephano Portigliatti | Miami, FL | (S) | 08/28/18 | D |
| 272. | (Honeycutt) vs. Landstar Ranger (Case No.: 2017-CP-38-00116) – Common Pleas Court, Orangeburg County, SC | Andrew Creech | Orangeburg, SC | (S) | 09/20/18 | D |
| 273. | (Garcia) vs. ISS Facility Ground Services (Case No.: 2017-CI-08252) – 37TH Judicial District, Bexar County, TX | Jeffrey Pratt | San Antonio, TX | (S) | 09/21/18 | D |
| 274. | (Lindor/Lacroix) vs. Titan/BOS (Case No.: 16-18415-CA-06) – 11TH Judicial Circuit, Miami-Dade County, FL | Alan Goldfarb | West Palm Bch., FL | (S) | 10/02/18 | D |
| 275. | (Villarreal) vs. Legacy Home Health (Case No.: 2017-CI-04545) – 131ST Judicial District, Bexar County, TX | Dale Hicks | San Antonio, TX | (S) | 10/26/18 | D |

# Exhibit B

| No. Cases | Case Name (Party Represented) | Attorney Name | Crash Location | State Fed. | Date | Deposed Trial |
|---|---|---|---|---|---|---|

**2018 (cont.)**

| No. Cases | Case Name (Party Represented) | Attorney Name | Crash Location | State Fed. | Date | Deposed/Trial |
|---|---|---|---|---|---|---|
| 276. | (Hale) vs. FedEx Ground | Douglas Jennings | Marion, SC | (S) | 10/30/18 | D |
| | (Case No.: 2016-CP-45-00368) – Common Pleas, Williamsburg County, SC | | | | | |
| 277. | (Regalado) vs. Prolog Transportation | Peter Zavaletta | Freer, TX | (S) | 11/06/18 | D |
| | (Case No.: DC-17-18) – 229TH Judicial District, Duval County, TX | | | | | |
| 278. | (Villasana) vs. JM Bozeman Enterprises | Robert Wilson | New Braunfels, TX | (F) | 11/15/18 | D |
| | (Case No.: SA-17-CA-436-HJB) – U.S. Western District, San Antonio, TX | | | | | |
| 279. | (Stemple) vs. T&T Enterprises | King Smith | Anderson, SC | (S) | 11/19/18 | D |
| | (Case No.: 2016-CP-04-00411, 00953) – Common Pleas, Anderson County, SC | | | | | |
| 280. | (Escalante) vs. Creekside Logistics | Lindsey Corbin | Andrews, TX | (F) | 11/20/18 | D |
| | (Case No.: 5:18-CV-00116) – U.S. Western District, San Antonio, TX Division | | | | | |
| 281. | (Zahirovic) vs. Rush Transportation | Carl Pierce | Columbia, SC | (S) | 12/14/18 | D |
| | (Case No.: 2017-CP-01789) – Common Pleas, Richland County, SC | | | | 12/19/18 | T |

**2019**

| No. Cases | Case Name (Party Represented) | Attorney Name | Crash Location | State Fed. | Date | Deposed/Trial |
|---|---|---|---|---|---|---|
| 282. | (Allen) vs. Nationlight, Inc. | Michael Pajcic | Jacksonville, FL | (S) | 01/07/19 | D |
| | (Case No.: 2016-CA-3949) – 4TH Judicial Circuit, Duval County, FL | | | | | |
| 283. | (Guerrero) vs. Tri-National, Inc. | Roger Turk | San Antonio, TX | (S) | 01/11/19 | D |
| | (Case No.: 17-06-34449-MCVAJA) – 365th District Court, Maverick County, TX | | | | | |
| 284. | (Jones) vs. Schnitzer Southeast | Brandon Peak | Russell, AL | (S) | 01/15/19 | D |
| | (Case No.: SC-17-CV-89) – State Court, Muscogee County, GA | | | | | |
| 285. | (Lindor) vs. Titan Concrete | Alan Goldfarb | N. Miami, FL | (S) | 01/24/19 | D |
| | (Case No.: 16-18415-CA-06) – 11TH Judicial Circuit, Miami-Dade County, FL | | | | | |
| 286. | (Delgado) vs. Cinch Energy | Travis Venable | Kenedy, TX | (S) | 01/29/19 | D |
| | (Case No.: 17-16-15416) – 135th Judicial District, Jackson County, TX | | | | | |
| 287. | (Maldonado) vs. JAP Trucking | Jeffery Pratt | San Antonio, TX | (S) | 02/08/19 | D |
| | (Case No.: 2017-CV-A001762-D2) – 111TH Judicial District, Webb County, TX | | | | | |
| 288. | (Wiggins) vs. Campbell Pavement | Amanda Stearns | Moncks Corner, SC | (S) | 02/19/19 | D |
| | (Case No.: 2017-CP-08-1400) – Court of Common Pleas, Berkeley County, SC | | | | | |
| 289. | (Hartsfield) vs. Southeastern Freight Lines | Dale Hicks | San Antonio, TX | (S) | 02/20/19 | D |
| | (Case No.: 2018-CI-01977) – 438th Judicial District, Bexar County, TX | | | | | |
| 290. | (Bryant) vs. Williams Brothers Trucking | Randolph Murdaugh, IV | Walterboro, SC | (S) | 02/26/19 | D |
| | (Case No.: 2017-CP-15-00023) – Common Pleas, Colleton County, SC | | | | | |
| 291. | (Rodriguez) vs. Edible Arrangements | Dale Hicks | San Antonio, TX | (S) | 02/27/19 | D |
| | (Case No.: 2017-CI-08021) – 285th Judicial Circuit, Bexar County, TX | | | | | |
| 292. | (VanderHeul) vs. New Prime, Inc. | Joan Lockwood | Springfield, MO | (S) | 03/15/19 | D |
| | (Case No.: 17WE-CC00020) – 30th Judicial Circuit, Webster County, MO | | | | | |
| 293. | (Glover) vs. Premier Transportation | Mark Tinsley | Bowman, SC | (S) | 03/21/19 | D |
| | (Case No.: 2016-CP-38-01151) – Common Pleas, Orangeburg County, SC | | | | 04/24/19 | T |
| 294. | (XTL Transport) vs. Misty Blue Transport | Joseph Golian | Highland Hgts., OH | (S) | 04/01/19 | D |
| | (Case No.: CV-17-886181) – Common Pleas, Cuyahoga County, OH | | | | | |
| 295. | (Pressley) vs. McNeill Lumber | Tatum Turner | Mobile, AL | (S) | 04/02/19 | D |
| | (Case No.: 65-CV-2017-900059) – Circuit Court, Washington County, AL | | | | | |
| 296. | (Edmondson) vs. Wilco Electric | Michael Neff | Conyers, GA | (S) | 04/16/19 | D |
| | (Case No.: 2018-SV-1872) – State Court, Rockdale County, GA | | | | 05/21/19 | TD |
| 297. | (McCollum) vs. Foundation Xpress | Gary Poliakoff | Williamston, SC | (F) | 04/18/19 | D |
| | (Case No.: 8:17-cv-01244-MGL) – U.S. District Court, Anderson, SC District | | | | | |
| 298. | (Johnson) vs. Style Crest Enterprises | Haynes Studstill | Nashville, GA | (F) | 05/13/19 | D |
| | (Case No.: 7:18-CV-00153-HL) – U.S. District Court, Middle District Georgia | | | | | |
| 299. | (Jones) vs. New Prime, Inc. | Jeff Rickard | Anniston, AL | (S) | 05/14/19 | D |
| | (Case No.: 2017-900006.80) – Circuit Court Calhoun County, AL | | | | | |
| 300. | (Schaeffer) vs. USA Truck, Inc. | Craig Cook | Van Buren, AR | (S) | 05/16/19 | D |
| | (Case No.: 17-CV-2017-505) – Circuit Court Crawford County, AR | | | | 07/08/19 | T |

**Exhibit B**

| No. Cases | Case Name (Party Represented) | Attorney Name | Crash Location | State Fed. | Date | Deposed Trial |
|---|---|---|---|---|---|---|
| 301. | (Johnson) vs. Five Start Transport | Elizabeth Grimes | Gastonia, NC | (S) | 05/21/19 | D |
| | (Case No.: 18-CVS-21043) – Superior Court, Mecklenburg County, NC | | | | | |
| 302. | (Cantu) vs. Fleming's Master Refinishers | Dale Hicks | San Antonio, TX | (S) | 06/13/19 | DT |
| | (Case No.: 2017-CI-17189) – 57TH Judicial Court, Bexar County, TX | | | | | |
| 303. | (Sloan) vs. Medina's Hauling | Matthew Whitehead | Greenville, SC | (S) | 06/17/19 | D |
| | (Case No.: 2016-CP-30-684) – Common Pleas, Laurens County, SC | | | | | |

Updated – 07/17/2019                    David L. Dorrity                                5

**Exhibit B**

## PERSONAL TRIAL APPEARANCES

| No. | Case Name (Party Represented) | Attorney Name | Crash Location | State Fed. | Date |
|-----|------|------|------|------|------|

29. (Riddle) vs. U.S. Foods Corp.   Alex Murdaugh  Allendale, SC (S) 07/22/15
 (Case No.: 12-CP-03-015) – Common Pleas, Allendale County, SC
 *Qualified as expert in Trucking Industry Standards regarding CMV driver performance, CDL training and driver supervision.*
 Honorable Judge Cordell Maddox – Allendale County Court, Allendale, SC

30. (Gillard) vs. Southeastern Freight Lines  George Jebaily  Marion, SC (S) 05/24/15
 (Case No.: 2012-CP-33-835) – Common Pleas, Marion County, SC
 *Qualified as expert in Trucking Industry Standards regarding CMV driver performance, CDL training and performance.*
 Honorable Judge Thomas Russo – Marion County Court, Marion, SC

31. (Copeland) vs. Palmentere Trucking  Curry Pajcic  Jacksonville, FL (S) 08/18/16
 (Case No.: 2011-CA-006645) – 4TH Judicial Circuit, Duval County, FL
 *Qualified as expert in Trucking Industry Standards for monitoring CMV driver hours of service, FMCSRs for HOS, driver trip HOS reconstruction, CMV driver fatigue management, defensive driving for CMV drivers and the CDL manual instructions regarding defensive driving, speed, lane change and fatigue.*
 Honorable Judge Thomas M. Beverly – Duval County Courthouse, Jacksonville, FL

32. (Young) vs. Martin Specialty Co.  Chad Trammell, John Odom Shreveport, LA (F) 08/31/16
 (Case No.: 5:14-cv-03356) – U.S. District, Western District Louisiana, Shreveport
 *Qualified as expert in logistics/material handling – OSHA and FMCSR regulations related to load securement and hazard recognition, proper methods for preventing pipe from falling onto driver while unstrapping load.*
 Honorable Judge Maury Hicks – U.S. District Courthouse, Shreveport, LA

33. (O'Tuel) vs. Unifi Mfg.  Douglas Jennings  Bennettsville, SC (F) 11/14/16
 (Case No.: 4:15-CV-02200-RBH) – US District Court, Florence SC Division
 *Qualified as expert in Trucking Industry Standards, Management, Hours of Service, CMV Defensive Driving Training and Performance. CMV Cell-phone use analysis, Standards and Inattention Blindness Studies.*
 Honorable Judge R. Bryan Harwell – U.S. District Courthouse, Florence, SC

34. (Charles) vs. ACW Logistics  Kevin Smith  Turbeville, SC (F) 10/10/18
 (Case No.: 3:16-cv-3803-JFA) – US District Court, Columbia, SC Division
 *Qualified as expert in CMV/CDL driver performance, FMCSR CMV driver qualifications, CMV vehicle inspection, Motor Carrier safety management and supervision, FMCSA Safety Measurement System scores.*
 Honorable Judge Joseph F. Anderson – U.S. District Courthouse, Columbia, SC

35. (Bunting) vs. Urra Nursery  Scott Smith  Belle Glade, FL (S) 11/02/18
 (Case No.: 50-2016-CA-012629) – 15TH Circuit Court, West Palm Beach, FL
 *Qualified as expert in CMV/CDL driver performance regarding extreme caution in wet weather, FMCSR.*
 Honorable Judge Peter Blanc – 15th Judicial Circuit, West Palm Beach, FL

36. (Zahirovic) vs. Rush Transportation  Carl Pierce  Columbia, SC (S) 12/19/18
 (Case No.: 2017-CP-40-01790) – 5TH Judicial Circuit, Richland County, SC
 *Qualified as expert in CMV/CDL driver performance, hiring, training, hours of service and falsification.*
 Honorable Judge Robert Hood – 5th Judicial Circuit, Richland County, SC

37. (Adamiak) vs. Tempur-Sealy, Inc.  Eaton Barnard  Gulf Shores, AL (S) 03/12/19
 (Case No.: 2017-900321) – Circuit Court, Baldwin County, AL
 *Qualified as expert in CMV/CDL driver performance, right turn procedure, training and safety policy.*
 Honorable Judge Joe Norton – Circuit Court, Baldwin County, AL

Case 1:18-cv-02891-MLB   Document 63-2   Filed 08/27/19   Page 22 of 22

# Exhibit B

| No. | Case Name (Party Represented) | Attorney Name | Crash Location | State Fed. | Date |
|-----|-------------------------------|---------------|----------------|-----------|------|
| 38. | (Glover) vs. JHOC, Inc. <u>(Case No.: 2016-CP-38-01151)</u> – Common Pleas, Orangeburg County, SC *Qualified as expert in CMV/CDL speed and following standards, DDEC report interpretation, hours of service reconstruction, CMV accident investigation.* Honorable Judge Edward Dixon – Circuit Court, Orangeburg County, SC | Mark Tinsley | Bowman, SC | (S) | 04/24/19 |
| 39. | (Colvin) vs. Lyndon Steel <u>(Case No.: 15-CVS-5887)</u> – Superior Court, Forsyth County, NC *Qualified as expert in CMV driver cargo securement standards and duty of shipper to package safely.* Honorable Judge Richard Gottlieb – Superior Court, Forsyth County, NC | Matt Cook | Greensboro, NC | (S) | 04/26/19 |
| 40. | (Schaeffer) vs. USA Truck <u>(Case No.: 17-CV-2017-505)</u> – Circuit Court Crawford County, AR *Qualified as expert in cell-phone distraction as published to the transportation industry, interpretation of driver cell phone records and fleet driver training.* Honorable Judge Mike Madlock – Circuit Court II, Van Buren, AR | Craig Cook | Van Buren, AR | (S) | 07/08/19 |
| 41. | (Sloan) vs. Medina Hauling <u>(Case No.: 2016-CP-30-684)</u> – Common Pleas, Laurens County, SC *Qualified as expert in CDL licensing requirements and FMCSA USDOT operating authority requirements and FMCSR compliance standards.* Honorable Judge Mark Hayes – Circuit Court, Spartanburg County, SC | Matt Whitehead | Spartanburg, SC | (S) | 07/16/19 |
| 42. | (Allen) vs. Nationlight, Inc. <u>(Case No.: 2016-CA-3949)</u> – 4th Judicial Circuit, Duval County, FL *Qualified as expert in CMV tractor-trailer safe driving procedure and CDL training.* Honorable Judge Robert Dees – 4th Judicial Circuit, Duval County, FL | Michael Pajcic | Jacksonville, FL | (S) | 07/17/19 |

## DRIVER'S DAILY LOG
(24 HOURS)

**10 / 21 / 2017**
[Month] [Day] [Year]

Total Miles Driving Today — Total Mileage Today

81 - 599

Truck/Tractor and Trailer Numbers or License Plate(s)/ State (show each unit)

FEDEXPRESS
Name of Carrier or Carriers
PALOS PARK IL
Main Office Address
BRIDGEVIEW IL
Home Terminal Address

I certify these entries are true and correct.
Signature

| | TOTAL HOURS |
|---|---|
| 1. OFF DUTY | 24 |
| 2. SLEEPER BERTH | |
| 3. DRIVING | |
| 4. ON DUTY (NOT DRIVING) | |
| REMARKS | 24 |

OFF DUTY TO 10/23/2017

SHIPPING DOCUMENTS:

---

## DRIVER'S DAILY LOG
(24 HOURS)

**10 / 23 / 2017**
[Month] [Day] [Year]

675

Total Miles Driving Today — Total Mileage Today

81 - 599

FEDEXPRESS
Name of Carrier or Carriers
PALOS PARK IL
Main Office Address
BRIDGEVIEW IL
Home Terminal Address

I certify these entries are true and correct.

| | TOTAL HOURS |
|---|---|
| 1. OFF DUTY | 9.25 |
| 2. SLEEPER BERTH | 3.50 |
| 3. DRIVING | 10.50 |
| 4. ON DUTY (NOT DRIVING) | 0.75 |
| REMARKS | 24 |

SHIPPING DOCUMENTS:
898 10

B/L or Manifest No.
or
Shipper & Commodity

From: BRIDGEVIEW IL   To: STYX2A GA

---

## DRIVER'S DAILY LOG
(24 HOURS)

**10 / 24 / 2017**
[Month] [Day] [Year]

108

Total Miles Driving Today — Total Mileage Today

81 - 599

FEDEXPRESS
Name of Carrier or Carriers
PALOS PARK IL
Main Office Address
BRIDGEVIEW IL
Home Terminal Address

I certify these entries are true and correct.

| | TOTAL HOURS |
|---|---|
| 1. OFF DUTY | 14.25 |
| 2. SLEEPER BERTH | 6.50 |
| 3. DRIVING | 1.75 |
| 4. ON DUTY (NOT DRIVING) | 1.50 |
| REMARKS | |

SHIPPING DOCUMENTS:
898 10
B/L or Manifest No.
or
Shipper & Commodity

DEFENDANT'S EXHIBIT 3